1  understanding?
2      A.   Yes, as outlined in the complaint.
3      Q.   Can you tell me as the plaintiffs' corporate
4  representative what your understanding is of how C.H.
5  Robinson breached this contract?
6      A.   Well, after having reviewed the documentation
7  provided by ABB's attorney, it's my conclusion that
8  there was a contract issued between the two parties, ABB
9  and C.H. Robinson.  It was what I refer to as a
10 lump-sum, turnkey contract.  I think representatives of
11 C.H. Robinson even referred to "turnkey services" that
12 they would provide.  And in my industry that's all
13 encompassing in terms of soup-to-nuts, A-to-Z.
14             Their agreement, what they sold -- their
15 service was to move a piece of equipment from point A to
16 point B and to take care of all requirements, services,
17 needs that may be necessary to get it from point A to
18 point B, its final destination at the job site.
19             There was scope of services that they
20 agreed to do for a certain price, and they had operator
21 management, agency control and had abilities to some
22 part commit ABB to obligations for services and monies
23 over and above the contract price through some informal
24 agreements, I suspect, since there's no change orders to
25 the contract or anything, but there's subsequent

1  billings from C.H. Robinson to ABB for services that
2  they referred to as contingency services and what-not.
3      Q.   Okay.  Let's back up a little bit here.  When
4  you say "turnkey contract," I want to make sure I
5  understand what you mean.  And I think your definition
6  of "turnkey contract" was wrapped up in the response
7  that you just gave me, but just to be clear for the
8  record:  Tell me what you mean when you say "turnkey
9  contract."
10     A.   What I mean by it is an agreement -- an
11 obligation to perform certain services for a certain
12 price, and it's all encompassing in nature.  In the EPC
13 industry that I'm in, a contractor may enter into an EPC
14 lump-sum, turnkey contract with an owner; and in
15 exchange for a certain amount of money, the EPC
16 contractor would perform the engineering design
17 services, the procurement services, the construction
18 services and assumes a lot of risk in connection with
19 those turnkey services, and he's paid handsomely for it.
20          I mean, the owners recognize that because
21 it's turnkey, they have to pay additional sums, because
22 there's scheduling implications, there's performance
23 complications, there's all these risks that you're
24 asking a turnkey contractor to assume.  I mean, it could
25 be labor issues and soil conditions and political risks

Todd Strever

Page 8
January 21, 2005

1  regard to the shipment from the manufacturer facilities in
2  Mannheim, Germany until the time they arrived in the port
3  of Brownsville, correct?
4      A.   That's correct.
5      Q.   And you had a specific objective to accomplish on
6  behalf of ABB that you entered into the contract for,
7  correct?
8      A.   Correct.
9      Q.   You were authorized by ABB to -- about the terms
10 of the contract to manage the shipment of the goods from
11 Monterrey to -- I mean from Brownsville to Monterrey,
12 correct?
13     A.   Yes.
14     Q.   And while you were authorized to manage that, you
15 were subject to ABB giving you directions with regard to
16 specifics that they might want to have done with regard to
17 the movement of this equipment?
18          MS. CIOTTI:  Object to form.
19     A.   Yes.
20     Q.   (By Mr. Williams) The -- in fact of the matter
21 is, that during the time that y'all were gathering
22 information and deciding how to accomplish the various
23 parts that were required to move the equipment from the
24 port in Brownsville to Monterrey, you got directions from
25 ABB on various things with regard to move, such as using

Todd Strever

Page 11
January 21, 2005

1  way, correct?
2          MS. CIOTTI:  Object to form.
3     A.   Can you -- I'm sorry.  Can you ask that again?
4     Q.   (By Mr. Williams) Sure.
5          For instance, you would agree with me that
6  using a rod versus a cable to tie down a generator on a
7  rail car, that's one of the details of the job that y'all
8  were helping to perform for ABB, correct?
9     A.   Yeah.  Tie down was one of pieces of the surface
10 we were provided.
11    Q.   And ABB had the right to tell you, we want to use
12 a rod versus a cable or a cable versus a rod, correct?
13    A.   They did, however, in the scheme or the scope of
14 the work.  There's also other regulations and stipulations
15 that we had to meet, including the railroad had to approve
16 what the tie down schematic looked like.  It had to meet
17 engineering approval before they would transport it, so
18 there were more pieces to the puzzle than just that.
19    Q.   Subject to it, you know, you weren't going to
20 violate any law and you had to make sure that the railroad
21 would accept the equipment for transportation or you
22 weren't going to be able to get it to Monterrey?
23    A.   Correct.
24    Q.   Subject to that, ABB had the right to tell you to
25 use rods versus cables or cables versus rods, correct?

Esquire Deposition Services          703 McKinney Avenue, Suite 320          Dallas, Texas 75202
Phone (214) 965-9200                         (800) 852-9737                 Fax (214) 965-9205

1    A.   Yes.

2    Q.   There were certain details that you required
3  authorization from ABB to accomplish during this project,
4  correct?

5         MS. CIOTTI:  Object to form.

6    A.   You'd have to be more specific.

7    Q.   (By Mr. Williams) Okay.  Let's look at -- who is
8  Tom Ferguson?  Do you know who he is?

9    A.   He was a counterpart of mine at C.H. Robinson.

10   Q.   I'm going to hand you a memo that says Tom
11 Ferguson on the top of it, and it says to Roland Schneider
12 and cc to Todd Strever, and it's dated in a European date,
13 99-02-22, which I assume that's February 22nd, 1999?

14   A.   I assume so, yes.

15   Q.   Okay.  If you look down to the third paragraph at
16 the body of that.  It says, Require authorization of one
17 inch -- also require authorization of one inch threaded
18 rods secured to loaded lugs for lashing and securing to
19 car.  Also need by AM on the next day, February 23rd,
20 '99.  It doesn't say the next day, but I put that in
21 there.

22        MS. CIOTTI:  Object to form.

23   Q.   (By Mr. Williams) Actually, it reads, Also need
24 by AM on 2-23-99; is that correct?

25   A.   Yes.

1  knowing at the time of your deposition -- if you had known
2  at the port of Brownsville that day that it would have
3  been prudent to obtain a forklift or a crane to secure the
4  jacking plate prior to the time that the bolts were taken
5  off of it that way it wouldn't have fallen on Mr. Zemora;
6  is that correct?
7          MS. CIOTTI:  Object to form, calls for
8  speculation.
9      A.  I guess I'm not sure what the question was.
10     Q.  (By Mr. Williams) Would you agree with me --
11 obviously, it's a number of years later and looking back
12 that it would have been prudent considering what happened
13 that day at the port to have obtained a crane or a
14 forklift to secure the jacking plate prior to the time the
15 bolts were removed from it?
16     A.  Yeah.  I mean with hindsight being 20/20 that
17 might have remedied the situation.
18     Q.  Obviously, if it was properly secured and the
19 crane or the forklift or whatever securing device was
20 sufficient to hold the jacking plate and you had -- the
21 parties had secured that prior to the time that the bolts
22 were removed, it would not have fallen on Mr. Zemora?
23     A.  Correct.
24     Q.  And if ABB had asked you to obtain a crane or a
25 forklift in order to secure that jacking plate, would you

```
 1   have done so?
 2       A.   Yes.
 3       Q.   There are -- there's at least one letter that
 4   talks about contingency costs, were you aware that C.H.
 5   Robinson had provisions so that they could bill ABB for
 6   contingency costs that were incurred on behalf of ABB and
 7   the management of this project?
 8       A.   Define contingency cost?
 9       Q.   Well, if you look at --
10            MR. WILLIAMS:  Let's go ahead and mark these
11   as No. 2.
12            (Exhibit No. 2 marked.)
13       Q.   (By Mr. Williams) If you look at Deposition
14   Exhibit No. 2, the first page of it.  It's a July 19th,
15   1999 letter from Jim Hamilton to Sandro Lepori.
16            MS. CIOTTI:  You're going to mark this whole
17   thing Exhibit 2?
18            MR. WILLIAMS:  Yeah.  And we'll staple
19   them -- staple it together.  I think that's --
20       Q.   (By Mr. Williams) Okay.  If you refer to the
21   second invoice there or the paragraph that talks about a
22   second invoice.  It talks about contingency cost does it
23   not?
24       A.   Yes, right here.  Is this what you're talking
25   about?
```

```
 1       Q.   Yes.
 2       A.   Yes, it does.
 3       Q.   Were you involved in incurring any of the
 4  contingency costs that are listed in Mr. Hamilton's
 5  letter?
 6       A.   Specific knowledge, it's difficult for me to
 7  remember but I would assume so.  Being there on the
 8  project, this scope of work would have been going on while
 9  I was there.
10       Q.   Okay.
11       A.   And that's typical of a job like that.
12       Q.   So you have -- essentially you had authority
13  under the contract to incur a certain amount of expenses
14  on behalf of ABB and then those would be charged to ABB
15  under the contract?
16       A.   Yes.  It's very typical that additional expenses
17  are incurred in this kind of work.
18       Q.   You -- the contract itself is -- you've -- you've
19  looked at it before, have you not?
20       A.   Very briefly.
21       Q.   And this is marked as Lepori No. 4 from a
22  deposition that occurred in May -- on May 1st, 2001.
23  We're going to mark this as No. 3 to your deposition.
24            (Exhibit No. 3 marked.)
25       Q.   (By Mr. Williams) The contract is a cover page,
```

1  movement of this type of heavy equipment?
2     A.   Is that specific contract common?
3     Q.   Yes.
4     A.   Portions of it are.
5     Q.   Okay. The contract obviously -- there are --
6  would you agree that there are a lot of different problems
7  that could arise that you may not foresee during movement
8  of equipment like this between Texas and the U.S. and
9  Mexico?
10    A.   Yes.
11    Q.   It would be impossible to for see every problem
12 that is going to occur or every cost that you're going to
13 incur as a result of those problems and write it all down
14 in some kind of document?
15    A.   Correct.
16    Q.   You have to be able to have authorization to do
17 things as they come up in order to get the project
18 accomplished, do you not?
19    A.   Yes.
20    Q.   And you had that authority on behalf of ABB to do
21 the things that were necessary to get this equipment from
22 the port of Brownsville to Monterrey?
23    A.   I believe so. That's what's addressed with
24 contingencies.
25    Q.   Okay. You were aware that Mr. Hamilton went to

1　deposition. It has another mark on here, Lepori Exhibit

2　No. 4; is that right?

3　　A.　Yes.

4　　Q.　In looking over this document in the scope of

5　work that it calls for and you may have to look not just

6　at the contract but in these attachments, it talks about

7　the movement of different equipment. What I'd like to

8　find out is if you know when C.H.R. completed its

9　performance of the contract?

10　　A.　If I know when it was completed?

11　　Q.　Yeah, if you can recall.

12　　A.　I don't. I don't specifically know.

13　　　　　MS. CIOTTI:　Pass the witness back to you.

14　　　　　　　　　　FURTHER EXAMINATION

15　BY MR. WILLIAMS:

16　　Q.　Mr. Strever, one of the things that the generator

17　came with when it came with the last barge was it came

18　with wood framing. Specifically, there was a softer part

19　of the underbelly of the generator that you, Robinson and

20　your contractors had to use on the rail car to protect the

21　generator, correct?

22　　A.　Yes.

23　　Q.　Now, that was part of the equipment that you used

24　in your job that was furnished by ABB, correct?

25　　A.　Yes. It came from the barge onto the rail car.

Esquire Deposition Services
Phone (214) 965-9200
703 McKinney Avenue, Suite 320
(800) 852-9737
Dallas, Texas 75202
Fax (214) 965-9205

Todd Strever

Page 36
January 21, 2005

```
 1      Q.   Also, do you recall whether or not ABB supplied
 2  you with spreader bars?  I know there was discussion that
 3  Amfels had no spreader bars and there was an e-mail passed
 4  back and forth about that.  Do you know whether the
 5  spreader bars were supplied by ABB?
 6      A.   I do not know specifically but I would that would
 7  be unlikely.
 8      Q.   If you look at Hamilton's -- in Exhibit 1,
 9  Hamilton's 2/21/99 memo down at item 10, he writes to
10  Sandro, Roland and Robert, Amfels has no spreader bar,
11  Versabar providing quote 2/22 estimated to be around
12  12,500.  What is cost of ABB spreaders?  Do you see that?
13      A.   I do.
14      Q.   That was something that was inquired about by
15  Mr. Hamilton?
16      A.   Yes.
17      Q.   And you do not know whether or not they ended up
18  using ABB spreaders?
19      A.   I remember the issue but I don't know what the
20  resolution was.
21      Q.   If you had to go ahead and pay 12,500 for
22  additional spreader bars that were outside of the
23  contract, you would have been able to bill that to ABB,
24  would you not?
25      A.   Yes, with their approval.
```