COPY

| AGREEMENT: | Project MONTERREY | | |
|---|---|---|---|
| | MEXICO | off shore | 1/13 |

| AGREEMENT NO. | : | 159 |
|---|---|---|
| DATE OF AGREEMENT SIGNATURE | : | February 16, 1999 |
| DATE OF AGREEMENT REVISIONS | : | |

# Original

## TRANSPORTATION OF
## HEAVY COMPONENTS

for

## MONTERREY, MEXICO

between

## ABB POWER GENERATION LTD
## BADEN, SWITZERLAND
### (THE COMPANY)

and

## C.H. ROBINSON
## KELLER, TEXAS – U.S.A.

### (THE OPERATOR)

Revision 4.0, 98-02-26

EX. 1

| AGREEMENT: | Project MONTERREY MEXICO | off shore | 2/13 |

| AGREEMENT NO. | : | 159 |
| DATE OF AGREEMENT SIGNATURE | : | February 16, 1999 |
| DATE OF AGREEMENT REVISIONS | : | |

## INDEX:

1. **Preamble**

2. **Basis of Order**

3. **Scope of Work**

4. **Time Schedule**

5. **Price**

6. **Terms of Payment**

7. **Liability**

8. **Correspondence**

9. **Signatures**

Revision 4.0, 98-02-26

| AGREEMENT: | Project MONTERREY MEXICO | off shore | 3/13 |
|---|---|---|---|

| AGREEMENT NO. | : | 159 |
|---|---|---|
| DATE OF AGREEMENT SIGNATURE | : | February 16, 1999 |
| DATE OF AGREEMENT REVISIONS | : | |

## 1.  PREAMBLE

The Operator and the Company enter into this Agreement for the execution of heavy components for the MONTERREY Power Plant, N.L, Mexico, as per attached drawings HDST 301865 / HDST 201552 / HDST 301865.

## 2.  BASIS OF ORDER

The following conditions and documents form an integral part of this Agreement:

- ◆ C.H. ROBINSON COMPANY quotation dated January 30, 1999 and February 5, 1999, the latter to cover the quotation for two (2) transformers 526x269x370 cm / 49'969 grosskos, each.

## 3.  SCOPE OF WORK

Transport from Brownsville, Texas via Matemoros / Apodaca to the MONTERREY Power Plant Project in full accordance with Mexican Law and Operator's quotations as defined in Par. 2.

## 4.  TIME SCHEDULE

Between February 27, 99 up to approx end of July, 99 as per Company's specific schedule to provide in due course.

## 5.  PRICE + 6. Termins of payments

1st payment: USD 258'902.00 after contract signature
2nd payment: USD 54'222.69 after delivery of 2nd Thermal Block

## 6.  TERMS OF PAYMENT

Payable net 10 days.

Revision 4.0, 98-02-26

| AGREEMENT: | Project MONTERREY MEXICO | off shore | 4/13 |
|---|---|---|---|

| AGREEMENT NO. | : | 159 |
|---|---|---|
| DATE OF AGREEMENT SIGNATURE | : | February 16, 1999 |
| DATE OF AGREEMENT REVISIONS | : | |

## 7.  LIABILITY

The Operator will provide the following proof of liability coverage:

- AMFELS, BROWNSVILLE
  (Crane Operator)
- SCHAEFER BROWNSVILLE
  (Stevedoring / Rigger)
- BRI,  Brownsville
         Rio Grande
         International
         (Railroad)


## 8.  CORRESPONDENCE

Unless otherwise agreed all correspondence to be addressed to:

ABB Power Generation Ltd
Dep. KWGP-L
CH-5401 Baden / Switzerland

att. Mr Sandro Lepori
General Manager / Transportlogistics
Gas Turbine and Combined-Cycle Power Plants

Tel.:    +41 56/ 205 58 02 or +41 56/ 205 30 86
Fax:     +41 56/ 205 61 82


## 8.  SIGNATURES

ABB Power Generation Ltd.
CH-5401 Baden

Executed for          )
and on behalf of      )
ABB Power Generation  )    Date: February 16, 99
Baden, Switzerland

Agreed and accepted for )
and on behalf of        )
C.H. ROBINSON           )    Date: February 16, 1999

Revision 4.0, 98-02-26

JAN 30 '99 18:36 FR CH ROBINSON    817 431 3425 TO 01141562056182    P.01/25

## C. H. ROBINSON COMPANY

10x5



January 30, 1999

Mr. Sandro Lepori
General Manager Transport Logistics
Gas Turbine and Combined-Cycle Power Plants
ABB Power Generation Ltd.
Dept. KWGP-L
CH-5401 Baden / Switzerland

129 Keller Hicks Road
Keller, TX
76248-4438
817.431.3146
fax 817.431.3425

Dear Sandro,

Please refer to your memo of January 19, 1999 concerning the movement of a generator, transformer and gas turbine from Brownsville, Texas to ABB plant site southeast of Huinala, Mexico. Below please find our price to A). Move pieces from Brownsville, Texas to the jobsite; and B). Set pieces on foundations:

*valid for 3 pieces*

A). *$355,860\* (Three Hundred Fifty Five Thousand Eight Hundred Sixty Dollars) U. S.*
*\* Plus Mexican E. V. A. tax of 15%*

Price Includes:
All transportation and logistics management plan
3 Heavy Duty Rail Cars (12 Axle)
Unloading 325 Ton Generator from lash barge to rail car
Tie down to rail cars for all 3 pieces
Transloading (Jack and Skid) from rail cars to OTR Transporters
Tie down to OTR Transporters
All permits, grading, and re-conditioning of rail spur and overpass to site

*valid for 4 pieces*

B). *$225,285\* (Two Hundred Twenty Five Thousand Two Hundred Eighty Five Dollars) U. S.*
*\* Plus Mexican E. V. A. tax of 15%*

Price Includes:
1). Supply of Gantry, Labor, and all temporary materials required to perform the rigging operations.
2). Price is based on having no interferences at job site so as to allow setting of gantry in the area required for the rigging operations.
3). Price is based on having transformers module along side of the foundation which calls for only one operation.

*Above quotation subject to attached qualification sheet*

In closing please find a plan overview. We look forward to discussing any questions you may have.

Best Regards,

Jim Hamilton
General Manager - Multimodal Heavy Transport

JAN 30 '99 18:37 FR CH ROBINSON     817 431 3425 TO 01141562056182     P.03/25

**C.H. ROBINSON COMPANY**



129 Keller Hicks Road
Keller, TX
76248-4438
817.431.3146
fax 817.431.3425

January 30, 1999

Sandro,

As we have discussed, our plan is to receive the turbine and transformer from the MV Jumbo Spirit in Brownsville February 2. We have secured 2 rail cars that will be spotted on track 2, Dock 11 at the port. Attached please find the port drawing, as well as a photo of the vessel Petrel Arrow which is docked at Dock 11. From the side of the vessel to the track center is 25 feet. We need to ensure the vessel gear has enough reach to set pieces on rail cars.

We have also secured a 700 ton barge crane to unload the generator from a lash barge at the same location. We are in need of a date to identify which rail car we will utilize for this movement.

We have met with the Brownsville & Rio Grande International Railroad, who will provide the service from the Port to the TFM in Matamoros. All pieces have been cleared from the Port to the siding at Apodoca, Mexico.

With our award of the project, we will immediately begin formal planning which will include detailed timeline, procedures, calculations, and drawings as required.

Please do not hesitate to call me at home on Sunday (817) 431-9401 to discuss any thoughts, questions or ideas you may have. I will be watching the Super Bowl, so have your team selected and ready to wager.

Warmest Regards,



JAN 30 '99 18:37 FR CH ROBINSON     817 431 3425 TO 01141562056192     P.22/25

## Transportation Bid Qualifications

Rates based upon weights and dimensions supplied by customer. Changes or omission of details from shipper's original information can affect pricing and ability to provide clearance.

Subject to further technical drawings and/or details, including projection orientations and center of gravity.

Rates are contingent upon clearance of participating carriers.

Cargo is to be loaded per AAR, Federal, State and Local Rules and Regulations.

Loading and unloading to be the responsibility of others, unless specifically defined in our quotation.

This proposal does not include tarps or covers to lading. If required, service may be provided at additional cost.

Charges relating to excess demurrage or detention is responsibility of shipper and /or consignee.

Shipping delays due to weather and acts of God are at risk and expense of shipper.

Price does not include any liability. Liability is the responsibility of shipper unless liability has been requested and specifically provided in quotation.

~~All quotations are subject to availability of equipment and personnel.~~

Unless stated otherwise, this quotation is effective for 45 days from date of issuance.

~~The coordination of equipment and clearances for this movement will require 30 days.~~

Payment terms are 35% down, net balance 10 days from job completion.

Activities related to this movement will begin upon receipt of a purchase order or written authorization to proceed from the shipper.

Qualifications_____

_____

_____

_____

Quotation Submitted By:                          Accepted & Acknowledged: ABB Power Generation Ltd.
                                                                Transport Logistics
Name _____            Name _____Dept. KWGP-L_____
                                                                CH-5401 Baden
C. H. Robinson, Company                          Company _____

Date    1/30/99                                      Date    2/1/99

FEB 05 '99 16:17 FR CH ROBINSON     817 431 3425 TO 01141562856182     P.01/01

## G. H. Robinson Company



129 Keller Hicks Road
Keller, TX
76248-4438
817.431.3146
fax 817.431.3425

February 5, 1999

Mr. Sandro Lepori
General Manager Transport Logistics
Gas Turbine and Combined-Cycle Power Plants
ABB Power Generation Ltd.
Dept. KWGP-L
CH-5401 Baden / Switzerland

Dear Sandro,

Please refer to your fax of February 3, 1999, concerning the transportation of 2 transformers, dims of 526 x 269 x 370 cm, weighing 49,969 kilos each, from ships hook, Brownsville, Texas to job site at Huinila.

We are pleased to provide OTR transport for $14,000 each, plus I. V. A. tax of 15%.  Price includes all securing to transporters, permits, etc.

Please provide notification if you wish us to handle.

Regards,

Jim Hamilton
General Manager - Multimodal Heavy Transport

1                        CAUSE NO. 99-04-1644-E

2
GRACIELA ZAMORA, ET AL          *    IN THE DISTRICT COURT
3                                    *
VS.                             *    357TH JUDICIAL DISTRICT
4                                    *
ABB KRAFTWERKE AKTIENGESELLSCHAFT, *
5    ET AL                       *    CAMERON COUNTY, TEXAS

6

7    _____

8                    VIDEOTAPED DEPOSITION OF
                         ROLAND SCHNEIDER
9                     TAKEN ON APRIL 7, 2000

10   _____

11

12

13

14       VIDEOTAPED DEPOSITION OF ROLAND SCHNEIDER, produced as a

15   witness at the instance of the Plaintiffs, and duly sworn, was

16   taken in the above-styled and numbered cause on the 7th day of

17   April, 2000, from 9:00 a.m. to 12:00 p.m., before Kimberly Del

18   Bosque, CSR, in and for the State of Texas, reported by machine

19   shorthand, at the Hotel Venice Bauer, Campo S. Moise 1459, San

20   Marco 30124, Venice, Italy, pursuant to the Texas Rules of

21   Civil Procedure.

22

23

24

25                                              **ORIGINAL**

EX. 2

ROLAND SCHNEIDER                                            10
APRIL 7, 2000

1  would have acted, of course, and would have done something

2  about it.

3       Q    Meaning you would have stopped anyone who tried to

4  take off both -- both the bottom bolts on the jacking plate?

5       A    As you can see from the documents in your possess --

6  in your possession, you can see that I actually protested when

7  the nuts were loosened and -- okay.  So I already said

8  something when they started loosening the nuts because I saw

9  that, but then I told them not to take out the bolts.

10                 MR. TINNING:  Objection; nonresponsive.

11                 (Schneider Exhibit Nos. 2 and 3 were marked.)

12       Q    You're saying that if you had seen someone taking

13  off the bottom bolts, you would have stopped them because you

14  know that would be very dangerous?

15       A    Of course, with Mr. Charles Cherrington we decided

16  about how to proceed, and we did not do that only on the same

17  day but we did it on the day of the accident.  But we did that

18  before when we were changing the generator cover.

19                 MR. TINNING:  Again, nonresponsive.

20       Q    Let me show you --

21                 THE INTERPRETER:  He was going on.  He wasn't

22  finished yet.

23       Q    I'm sorry.  Go ahead.  I wasn't trying to interrupt.

24       A    This is the day when those pictures were made.  As

25  far as I remember, it was the 17th of March.  Okay.  There had

1  been many -- several talks and meetings with Mr. Charles

2  Cherrington and with Todd Strever before about how to transfer

3  the generator from the barge to the car, to the rail car.  And

4  the day the cover was changed -- the day the cover was changed

5  I proposed to Charles Cherrington to remove the jacking lugs

6  because at that point it would have been very easy to remove

7  them.  Charles Cherrington did not want to do that.  He said he

8  wanted to remove the jacking lugs after the generator had been

9  placed on the rail car.

10          On that day I explained to Mr. Charles Cherrington

11  exactly how to proceed to remove the jacking lug.  And I told

12  him that it had to be secured first, then you'd have to take

13  the bottom bolts out, and then you would -- you would be able

14  to remove the jacking lug.  And he never asked me about the

15  upper bolts and we never talked about those upper bolts.

16      Q      So you never would have told Mr. Cherrington

17  anything about the upper bolts in these talks before the

18  accident?

19      A      Okay.  As I already told you, I exactly explained

20  the procedure to Mr. Charles Cherrington.  And if the upper

21  bolts had to be loosened or if they had been attached to the

22  generator, I would certainly have told him, but we never talked

23  about those upper bolts.  He had no questions about -- about

24  them, so I assumed that he had understood the function of those

25  upper bolts.

ROLAND SCHNEIDER                                   14
APRIL 7, 2000

1      A      Mr. Zamora was standing --

2             MR. WILLIAMS:  Don't.

3      A      Mr. Zamora was standing here, and I was standing

4 here at this corner.

5      Q      What were you doing on the other end of the

6 generator at that time, Mr. Schneider?

7      A      I was with a worker at the port and I was telling

8 him how to correctly place the wooden base of the generator in

9 the right position.  Okay.  I only checked if he was doing it

10 right.

11     Q      When would be the last time you were on the part of

12 the generator where the jacking lug that was by Mr. Zamora?

13     A      Okay.  When I realized that workers had loosened the

14 nuts of those bolts, I went to Mr. Charles Cherrington who was

15 standing about here with Mr. Zamora and I told them -- I told

16 them not to take off -- that they -- okay -- you have taken off

17 the nuts, but please do not take off the bolts.

18     Q      And the reason not -- you can put the picture down.

19 The reason not to take off the bolts was because the jacking

20 plate would then fall off?

21     A      That's correct.

22     Q      And you're saying you told Mr. Cherrington this?

23     A      Okay.  Yes, I told this to Mr. Cherrington.  And

24 I've read his deposition and even if there's some

25 contradictions in it, he at one point clearly states that I had

1  told him that.

2      Q     And this would be right before the accident

3  happened?

4      A     I do not remember the exact time, but it was at some

5  point in time before the accident happened.

6      Q     The same day of the accident?

7      A     Yes, of course.

8      Q     It was your plan to have the nuts taken off of the

9  bolts; is that right?

10     A     Okay.  As I told you, when I saw that somebody had

11  loosened -- had removed the nut, I went to Mr. Cherrington and

12  told him, okay, the nuts have been loosened, but please

13  don't -- do not take off the bolts.  So it's clear that it was

14  not me who had given the order to take off the nuts or to

15  loosen the nuts because at that point there was no need at all

16  to take off anything from the generator.  As you can see, the

17  wooden boards are still in the same position.  And I'll show it

18  to you in this picture.  I'm looking for the transport drawing

19  of the generator.

20     Q     Here it is.  You're looking for what's been marked

21  and used as Baumann Exhibit 2, this one on the bottom, aren't

22  you?

23     A     Okay.  You can see it here as well.  You can see

24  that the wooden boards in this area where the bolts are do not

25  have -- are not in contact with the -- with the jacking --

1  jacking lug.

2       Q     And that's what you wanted to show us?

3       A     Yes.

4       Q     Do you know if the jacking plates, though, were too

5  wide, that the problem, in other words, was not that it was too

6  deep, but that the jacking plates needed to come off because

7  they stuck out too wide for the rail car?

8       A     Okay.  They had to be removed because the width of

9  the rail car did not meet the clearance the Mexican had

10 given -- the Mexican railways had given us.  They were too

11 large for the clearance on the Mexican railways.  And we had

12 talked with Mr. Charles Cherrington and Todd Strever about that

13 and we had said to remove -- and I had said to remove the

14 generator after -- sorry -- remove the jacking lugs after the

15 generator was placed on the rail car.

16            So the procedure -- the exact procedure was to take

17 off the jacking lugs after the generator had been already

18 placed on the rail car.  And it was never said that they had to

19 be removed -- sorry -- not replaced, but removed after -- while

20 the generator was still suspended and hanging on the crane.  So

21 for me, it was not necessary to remove the jacking lug at that

22 time, and I had told this to Mr. Charles Cherrington.

23            THE INTERPRETER:  We need to change.

24       A    During one of my first talks with Todd Strever and

25 Charles Cherrington I was asked to produce this drawing, and I

1  did that while in Switzerland, indicating exactly where the

2  lugs had to go, what kind of work had to be done on the

3  generator to make sure -- to indicate what kind of screws would

4  have to be needed to fix the generator on the -- on the basis

5  and all that.  This drawing was produced by me because Todd

6  Strever asked me to do so.  And the reason why it was there was

7  essentially only so that I could explain things with regard to

8  this drawing to Charles Cherrington who had been in possession

9  of these documents beforehand.

10      Q    This will go a lot faster, Mr. Schneider, if you'll

11  just answer my questions.

12                  MR. WILLIAMS:  Short break.

13                  MR. TINNING:  I don't want to take a break.

14  If he needs to take -- do you need to take a break right now?

15                  THE WITNESS:  It's not necessary.

16                  MR. TINNING:  Okay.  Then I'd just as soon

17  keep going.

18      Q    (By Mr. Tinning)  Mr. Schneider, you're saying that

19  the document in front of you is one that would show that the

20  jacking lugs are only held on by two bolts?

21      A    No, I didn't say that.  What I did say is that

22  together with Todd Strever I have -- we sat down and we -- with

23  Charles Cherrington -- sorry -- we discussed exactly what the

24  process and the proceedings would be to handle the generator,

25  how to move it over, how it had to be fixed and secured on the

ROLAND SCHNEIDER                           18
APRIL 7, 2000

1   various bases. We defined that on the various basis of the

2   drawings that we did on-site in Brownsville.  We later drew up

3   this drawing on the basis of the discussions we had had

4   previously.  It was clearly agreed.

5       Q     We're going to mark your drawing as Exhibit 4.

6             (Schneider Exhibit No. 4 was marked.)

7       Q     So Exhibit 4 doesn't have any information that the

8   jacking lugs are held on by two bolts?

9       A     If you --

10            MR. TINNING:  Nonresponsive.  Go ahead.

11      A     If you specifically talk about the jacking lug, we

12  have to refer to the transport drawing which is the one that

13  was previously sent beforehand, before this generator was

14  shipped off, which was sent to C.H. Robinson and the same

15  documents that I had along as I went to Brownsville and all

16  these transport drawings with the indication of the jacking

17  lugs that we used both in our talks in the offices of

18  Schaefer-Setevedoring and on-site on pier.  I think it was Pier

19  No. 12 there.  It was the transport drawings.

20            MR. TINNING:  Nonresponsive.

21      Q     Tell me what my question was.

22      A     Yes.  I replied to your question.  I specified when

23  we're talking about the jacking lug and the screws, we need to

24  look at the transport drawing.

25      Q     No, sir that wasn't my question.  That document

1      Q      Show me where it says two bolts hold on the jacking

2   lug.

3      A      As I've pointed out before, this is the railway

4   clearance drawing, and the railway clearance drawing does not

5   indicate the jacking lugs because the jacking lugs would no

6   longer be on  -- attached to the generator at the point when

7   the generator was on the railway.

8      Q      Exactly.  It doesn't even show the jacking plates,

9   does it?

10     A      Not on this railway clearance, that is correct

11   they're not there on the railway clearance, not anymore.

12     Q      Show me on Exhibit No. 3 where there is a decal and

13   instruction on the generator or the jacking lug that shows that

14   it's only held on by two bolts.

15     A      This is a snapshot, so to speak, of how the -- of

16   the moment when the jacking lug is attached to the generator.

17   If you want to have a clear indication, we would have to look

18   at the transport drawing.

19     Q      There is no decal or instruction on the generator or

20   the jacking lug that tells anyone that it's only held on by two

21   bolts, correct?

22     A      This is correct.

23     Q      Part of your job there at the Port of Brownsville

24   was to see to it that the jacking lugs came off correctly?

25     A      I had a double function while I was there in

1   Brownsville; No. 1, because I wanted to see firsthand how C.H.

2   Robinson and Schaefer-Setevedoring and everybody in the

3   Brownsville port were doing their jobs for the future; and

4   secondly, obviously, for consulting and advising purposes in

5   case there had been any questions.  And my advising role

6   obviously also comprised any kind of support or answering of

7   questions that may come up, may be raised by our contacts in

8   Brownsville.  That was essentially the advising and consulting

9   role there.

10       Q      Part of your job was to consult on getting the

11   jacking plates off?

12       A      Yes.  In fact, as I said before, I think it was on

13   the 17th of March when we exchanged the cover of the generator

14   I specifically indicated to Charles Cherrington how to remove

15   the jacking lugs.

16       Q      Mr. Cherrington and his crew had never off-loaded a

17   generator with jacking lugs like this before, correct?

18       A      I can't really say because obviously it's outside my

19   personal experience whether they had had any experience or not.

20   On the basis of the depositions that I've read, however, it

21   would appear that they hadn't done so.  But after all, this was

22   one of the reasons why I was there, in case some questions were

23   raised, they had -- there were doubts or anything.  For

24   clarifications, that's why I was there.

25       Q      Exactly.  You knew Mr. Cherrington was looking to

1   originally agreed that the generator would be placed on the

2   railway car and only then the jacking lugs would come off.  If

3   I had realized that they were thinking of taking those jacking

4   lugs off while the thing was still suspended -- but it didn't

5   even cross my mind at that time because I thought they were

6   just trying to save time by loosening the screws.  If I had

7   known that, yes, most definitely I would -- I agree with you.

8   I would have stopped the whole thing and would have saved a

9   person's life by that.

10      Q    Mr. Schneider, when they were taking the nuts off,

11  did they have a wrench on the top of the bolt and also the nut

12  to get the nut off?

13      A    Under normal circumstances, yes, you would have to

14  use a wrench to keep the top part fixed and loosen the lower

15  part.  In this particular instance, it was possible to loosen

16  the nut by hand, even though originally these nuts were

17  tightened with tools, with wrenches, in Germany before

18  shipment.  I can only explain that by saying that most likely

19  it was the vibration during transport on -- aboard the ship

20  that they may have come loose -- looser.

21      Q    So the nuts were being taken off by hand when you

22  saw it?

23      A    Yes, that's true.

24      Q    And you did not stop the men from taking the nuts

25  off by hand?

ROLAND SCHNEIDER                                    27
APRIL 7, 2000

1      A     When I realized that these nuts had been loosened

2 and removed, most of them had already been removed all

3 together.  And at that point I said -- as I pointed out before,

4 I said, Okay, fine, you've taken them off, but stop right

5 there, don't take the bolts out.

6      Q     And that would be true for all four jacking plates?

7 All eight nuts came off?

8      A     I'm not a hundred percent sure, but of these eight

9 nuts, perhaps six or seven had already been removed.  And after

10 the accident happened and the first shock and speaking with the

11 others and all that, I went back -- you know, after your mind

12 gets a little bit clearer and you can start thinking again, I

13 went around and I made sure personally to screw all those nuts

14 back on, just in case somebody else come up with the idea of

15 taking those bolts out and something -- and something like that

16 might happen again.

17      Q     After this accident, how did you get the other three

18 jacking plates off?

19      A     I don't remember exactly.  Was it one or two days

20 later after the accident?  The remaining jacking lugs were

21 removed exactly the way we had originally decided upon with

22 Charles Cherrington.  I'm looking for a picture.

23             MR. WILLIAMS:  Pat has got them upstairs.

24      A     It's not among these documents.  Do you have any

25 others that --

ROLAND SCHNEIDER                                    43
APRIL 7, 2000

1       A     Yes.

2                   (Schneider Exhibit Nos 8 and 9 were marked.)

3       Q     For instance, you signed on behalf of ABB a contract

4  to hire Brownsville Barge & Crane?

5       A     Yes, that's also correct.

6       Q     And you had authority to do that for ABB?

7       A     Yes, I have.  I have to add to that that without my

8  signature it wouldn't have been possible to proceed with the --

9  with the unloading of the generator, so I signed a bit against

10 will, but I double-checked prior to that with Mr. Lepori.

11      Q     But that was within your authority to sign for ABB?

12      A     Yes.

13      Q     And that contract was in English?

14      A     Yes, it was in English.

15      Q     You read Mr. Cherrington's deposition in English?

16      A     Yes, obviously with the help of a dictionary.

17      Q     You gave your instructions the day of the accident

18 in English?

19      A     Yes, but I didn't really give instructions the day I

20 was there in Brownsville.  My role was that of a consultant.  I

21 was just simply there.  I didn't give any instructions.

22      Q     I understand that.  You never instructed someone not

23 to take the nuts off?  You didn't give that instruction?

24      A     Correct.

25      Q     But when you spoke with the other workers you spoke

1  be removed, correct, until the final destination?

2       A     Yes, that's correct.

3       Q     Have you given me complete truthful answers,

4  Mr. Schneider?

5       A     Yes, I have.

6             MR. TINNING:  I'll pass the witness.  Thank

7  you.

8                    E X A M I N A T I O N

9  BY MR. UHLES:

10      Q     Mr. Schneider, my name is Keith Uhles.  I'm an

11 attorney from Brownsville.  Along with Javier Gonzales, I

12 represent Brownsville Barge & Crane, and I just have a very few

13 questions to ask you today.

14      A     Okay.

15      Q     As I understand your testimony, when you were doing

16 consulting or giving advice when you were at the Port of

17 Brownsville you were talking to Mr. Cherrington; is that

18 correct?

19      A     I may -- it's true.  I may correct that.  My role

20 was that as an advisor for C.H. Robinson.  But since C.H.

21 Robinson didn't have a technical collaborator there on-site, I

22 ended up acting as a consultant double-checking with Todd

23 Strever at all times with the subcontractors.

24      Q     Would it be fair to say that the people that you

25 talked to when you were out there were Mr. Strever and Mr.

1                    CAUSE NO. 99-04-1644-E

2

GRACIELA ZAMORA, ET AL           *     IN THE DISTRICT COURT
3                                      *
VS.                              *     357TH JUDICIAL DISTRICT
4                                      *
ABB KRAFTWERKE AKTIENGESELLSCHAFT, *
5  ET AL                          *     CAMERON COUNTY, TEXAS

6

7    _____

8                  VIDEOTAPED DEPOSITION OF
                        SANDRO LEPORI
9                    TAKEN ON APRIL 7, 2000

10   _____

11

12

13

14        VIDEOTAPED DEPOSITION OF SANDRO LEPORI, produced as a

15   witness at the instance of the Plaintiffs, and duly sworn, was

16   taken in the above-styled and numbered cause on the 7th day of

17   April, 2000, from 12:24 p.m. to 1:20 p.m., before Kimberly Del

18   Bosque, CSR, in and for the State of Texas, reported by machine

19   shorthand, at the Hotel Venice Bauer, Campo S. Moise 1459, San

20   Marco 30124, Venice, Italy, pursuant to the Texas Rules of

21   Civil Procedure.

22

23

24

25                                              COPY

EX. 3

SANDRO LEPORI
APRIL 7, 2000

5

```
1      A      I have a degree in commercial sciences, commerce --

2  business -- business.

3      Q      And where is that from?

4      A      In Bern.

5      Q      Bern or Baden?

6      A      Bern, B-E-R-N, Switzerland.

7      Q      Bern, okay, I'm sorry.  Bern, Switzerland, correct?

8      A      Yeah.

9      Q      When did you get that degree, sir?

10      A      1965.

11      Q      And how old, are you?

12      A      52 and a half years.

13      Q      And how long have you worked for ABB Switzerland?

14      A      Okay.  If I consider BBC, ABB, and BBC Alstom, it's

15  25 years.

16      Q      What year did you first go to work for them?

17      A      After my degree in 1965.

18      Q      What's your current position with them?

19      A      I'm general manager of the transport logistics

20  department.

21      Q      Does that include the shipping of the generator

22  involved in Mr. Zamora's accident?

23      A      Yes.

24      Q      You're the immediate supervisor of Roland Schneider?

25      A      Yes.
```

1    Q    And Mr. Schneider was sent with the generator

2  involved in this accident to help in its shipment?

3    A    Okay.  He was sent to the USA before the generator

4  arrived in Brownsville.

5    Q    But Mr. Schneider was sent by ABB to assist in the

6  shipment of this generator involved in this accident?

7    A    Okay.  He was there not to supervise but to answer

8  questions.

9    Q    To assist in shipment of this generator?

10   A    Yes.

11   Q    And that was part of Mr. Schneider's job with ABB?

12   A    Yes.

13   Q    You're aware Mr. Schneider, while he was there,

14 signed some contracts on behalf of ABB?

15   A    Yes.  I became aware of that after he had signed the

16 contract.

17   Q    And that, too, was part of his job for ABB, to bind

18 or authorize ABB in regards to those contracts, for instance,

19 with Brownsville Barge & Crane?

20   A    Yes, as long as the safety of the transport was

21 safeguarded.

22   Q    It was part of Mr. Schneider's job, then, to sign as

23 he did on Schneider Exhibit 10 on behalf of ABB for the

24 contract of services with Brownsville Barge & Crane?

25   A    Okay.  This contract was analyzed together with C.H.

1  Robinson, our supplier.  And after this -- after that we

2  decided to sign the contract -- or it was decided to sign the

3  contract.

4      Q    And Mr. Schneider had the authority to sign the

5  contract shown on Exhibit 10 for ABB?

6      A    Yes.

7      Q    C.H. Robinson was a company hired by ABB to help

8  with the transport of the generator?

9      A    Yes.

10     Q    And ABB was the one that selected that the generator

11 go through the Port of Brownsville?

12     A    Yes.  ABB decided that after other alternatives were

13 considered, but those alternatives were not possible when --

14 were not feasible.

15     Q    Do you have any engineering experience, Mr. Lepori?

16     A    No.

17     Q    Do you have any -- any part in deciding -- any role

18 in deciding what instructions are to actually be placed on the

19 generator?

20     A    No.  Since I have no engineering knowledge I cannot

21 decide which technical indications to place on the generator.

22     Q    Who does that for ABB?

23     A    The technical department.

24     Q    Okay.  Is that with ABB Switzerland or ABB in

25 Germany?

**Page 1**

CAUSE NO. 99-04-1644-E

| | |
|---|---|
| GRACIELA ZAMORA, ET AL | IN THE DISTRICT COURT |
| VS. | 357TH JUDICIAL DISTRICT |
| ABB KRAFTWERKE AKTIENGESELLSCHAFT, ET AL | CAMERON COUNTY, TEXAS |

————————————————

VIDEOTAPED DEPOSITION OF
ANDREAS REBHOLZ
TAKEN ON APRIL 7, 2000

————————————————

VIDEOTAPED DEPOSITION OF ANDREAS REBHOLZ, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 7th day of April, 2000, from 1:40 p.m. to 2:20 p.m., before Kimberly Del Bosque, CSR, in and for the State of Texas, reported by machine shorthand, at the Hotel Venice Bauer, Campo S. Moise 1459, San Marco 30124, Venice, Italy, pursuant to the Texas Rules of Civil Procedure.

**Page 3**

COPY

INDEX
                                    Page

Appearances .................. 2
EXAMINATION OF ANDREAS REBHOLZ
  By Mr. Tinning ............. 4

Signature and Changes ............ 20
Reporter's Certificate ............ 22

**Page 1**

APPEARANCES

FOR THE PLAINTIFFS:

MR. WILLIAM J. TINNING
Law Office of William J. Tinning
1013 Bluff Drive
Portland, Texas 78374

FOR THE DEFENDANTS, ABB KRAFTWERKE AKTIENGESELLSCHAFT AND ABB ALSTOM POWER (SWITZERLAND) LTD, FORMERLY KNOWN AS ABB POWER GENERATION, LTD.:

MR. JUSTIN WILLIAMS
MR. PAT KASPERITIS
Williams, Kasperitis & Gowan
5959 S. Staples, Suite 204
Corpus Christi, Texas 78413

FOR THE DEFENDANT, BROWNSVILLE BARGE & CRANE, INC.:

MR. KEITH N. UHLES
Royston, Rayzor, Vickery & Williams, L.L.P.
55 Cove Circle
P.O. Box 3509
Brownsville, Texas 78523-3509

ALSO PRESENT:

Christine Weise and Gisela Isten, Interpreters
Daniel de Feydeau

**Page 4**

ANDREAS REBHOLZ,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. TINNING:

Q   Could you give us your full name, please, sir?

A   Andreas Rebholz.

Q   Mr. Rebholz, my name is Bill Tinning, and I represent the family of the late Oscar Zamora.  Do you understand you're giving testimony today just as if you were in Brownsville, Texas, in front of the judge and the jury under oath?

A   Yes.

Q   Have you ever testified before?

A   No.

Q   I will ask you questions that need to be translated, so it's important that you wait and give us out loud, verbal answers only after the translation has been made to you in German, okay?

A   Yes.

Q   I'm not going to ask you any trick questions.  If you don't understand any question, please tell me so I can rephrase it.

A   Okay.

Q   Where do you work?

A   I work with ABB Alstom Power.

EX. 4

Page 5

1  Q  And is that the Swiss ABB or the German ABB?
2  A  The Swiss company.
3  Q  And where in Switzerland do you work for ABB?
4  A  I work in Baden.
5  Q  And how long have you worked for ABB?
6  A  It will be ten years in summer.
7  Q  And what do you do for ABB?
8  A  The first eight years I was construction engineer
9  and the design engineer in the department for steam turbines,
10  and for two years I've been working with the transport
11  logistics department.
12  Q  What kind of engineer are you?
13  A  I'm a mechanical engineer.
14  Q  And do you have a degree in engineering?
15  A  Yes.
16  Q  From which university or college?
17  A  Okay.  I studied in Germany at the Technical School
18  at Waldshut.
19  Q  Waltzberg?
20     THE INTERPRETER:  Waldshut, that's
21  W-a-l-d-s-h-u-t.
22  Q  Would that be equivalent to a university degree?
23  A  It's a poly-technical degree.
24  Q  How many years do you go to school to get that
25  degree?

Page 6

1  A  Two years, four semesters.
2  Q  Did you ever help make decisions for ABB about the
3  placement of instructions on how to remove the jacking plates
4  on the jacking plate with the generator it's attached to?
5  A  I was present at discussions.
6  Q  Did any of those discussions occur before the
7  accident with Mr. Zamora?
8  A  No.
9  Q  They only occurred after the accident to Mr. Zamora?
10  A  Talks at which I was present or which I know of took
11  place after the accident.
12  Q  And you don't know of any that occurred before the
13  accident?
14  A  I don't know.
15  Q  After these discussions about the jacking plates,
16  was the decision not to place any instructions or decals on the
17  generator or the jacking plate about how to remove the jacking
18  plate?
19  A  Okay.  We discussed different things.  We discussed
20  what to do, how to do it, where to do it, and then we decided
21  we did not need to do that because the jacking lugs would be --
22  would be removed at the Rotterdam port by qualified personnel.
23  Q  Who was in charge of those discussions where this
24  was decided?
25  A  It would be my boss, Roland Schneider, my technical

Page 7

1  boss.
2  Q  And because of the change in procedure, that is, to
3  remove the jacking plates in Rotterdam, it was decided no decal
4  or instruction was needed on the generator or jacking plate
5  itself, correct?
6  A  So if nothing is there -- if there's nothing there
7  to be removed, I do not need any warning decals.
8  Q  Some of the generators, though, still are sent out
9  with jacking plates to certain locations, correct?
10  A  As far as I know, no.
11  Q  Okay.  Are the jacking plates sent separately with
12  the generator in case they're needed?
13  A  Yes.
14  Q  But even so, there's no instruction on the generator
15  or the jacking plate how to put it on or take it off the
16  generator, correct?
17  A  That's correct, but when -- when those jacking lugs
18  are removed they are removed by qualified personnel, and when
19  they are put on again they will be put on again by qualified
20  personnel on-site.
21  Q  Is it required that someone from ABB go with the
22  generator until it reaches its final destination?
23  A  Yes.
24  Q  And that person is supposed to be sure that only
25  qualified personnel, as you put it, put on or take off the

Page 8

1  jacking plates, correct?
2  A  Okay.  So it's not this person's task to make sure
3  that qualified personnel does this job.  This is regulated
4  before by procedures.
5  Q  ABB procedures?
6  A  Yes, that's true.
7  Q  And the person like Roland Schneider who goes with
8  the generator, the person from ABB who goes with the generator,
9  would know how to put the jacking plates on correctly and
10  safely or take them off correctly and safely?
11  A  Yes.
12  Q  And part of that ABB person going with the
13  generator's job, if they observe the jacking plates being taken
14  on or put off -- taken off incorrectly, is to advise that it's
15  being done unsafely or incorrectly?
16  A  If this person sees that, of course.
17  Q  And it is the person like Mr. Schneider or the ABB
18  representative -- part of their job to oversee the transport of
19  the generator and the jacking plates, correct?
20  A  Could you please rephrase the question?
21  Q  Part of the ABB representative, like Mr. Schneider
22  who's going with the generator to the final point of
23  destination's job is to oversee the transport of the generator
24  and the jacking plates and everything that goes with the
25  generator, correct?

**Page 1**

```
        NO. 99-04-1644-E

GRACIELA ZAMORA,          ) IN THE DISTRICT COURT
INDIVIDUALLY AND ON       )
BEHALF OF THE ESTATE      )
OF HER LATE HUSBAND       )
OSCAR ZAMORA, SR.         )
AND HIS ONLY CHILD        )
OSCAR ZAMORA, JR.         )
AND ON BEHALF OF          )
OLIVIA ZAMORA, THE        )
SURVIVING MOTHER AND      )
ONLY SURVIVING PARENT     )
OF OSCAR ZAMORA, SR.      )
AND ALL OTHERS ENTITLED   )
TO BRING A CAUSE OF       )
ACTION FOR HIS DEATH      )
                          )
AND                       )
                          )
ANGIE ZAMORA, INTERVENOR, )
                          )
VS.                       ) CAMERON COUNTY, TEXAS
                          )
ABB KRAFTWERKE            )
AKTIENGESELLSCHAFT,       )
ABB ALSTOM POWER          )
(SWITZERLAND) LTD,        )
FORMERLY KNOWN AS ABB     )
POWER GENERATION, LTD.    )
AND BROWNSVILLE BARGE     )
& CRANE, INC.             ) 357TH JUDICIAL DISTRICT

*******************************************

        ORAL AND VIDEOTAPED DEPOSITION OF
              CHARLES E. CHERRINGTON
                 January 7, 2000

*******************************************
```

**Page 2**

```
        ORAL AND VIDEOTAPED DEPOSITION OF CHARLES E.
CHERRINGTON, produced as a witness at the instance of
the Plaintiffs, and duly sworn, was taken in the
above-styled and numbered cause on the 7th of
January, 2000, from 9:09 a.m. to 12:01 p.m., before
Amy Hinds-Nanez, CSR in and for the State of Texas,
reported by stenograph, at the Offices of Willette,
Guerra & Trevino, L.L.P., International Plaza, Suite
460, 3505 Boca Chica Boulevard, Brownsville, Texas,
pursuant to the Texas Rules of Civil Procedure and
the provisions stated on the record or attached
hereto.

        A P P E A R A N C E S

FOR THE PLAINTIFFS:
    WILLIAM J. TINNING
    LAW OFFICE OF WILLIAM J. TINNING
    1013 Bluff Drive
    Portland, Texas  78374

FOR THE INTERVENOR:
    R. BRUCE THARPE
    LAW OFFICES OF R. BRUCE THARPE
    Professional Plaza
    715 East Frontage, Suite D
    Alamo, Texas  78516

FOR SCHAEFER STEVEDORING, INC.:
    MARK E. SOSSI
    WILLETTE, GUERRA & TREVINO, L.L.P.
    International Plaza, Suite 460
    3505 Boca Chica Boulevard
    Brownsville, Texas  78521

FOR THE DEFENDANTS ABB KRAFTWERKE AKTIENGESELLSCHAFT
AND ABB ALSTOM POWER (SWITZERLAND) LTD:
    RICHARD B. WATERHOUSE, JR.
    PIPITONE & SEGER, P.C.
    615 Upper North Broadway, Suite 1770
    Corpus Christi, Texas  78477

FOR THE DEFENDANT BROWNSVILLE BARGE & CRANE, INC.:
    JAVIER GONZALES
    ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.
    55 Cove Circle
    Brownsville, Texas  78523

THE VIDEOGRAPHER:
```

**Page 3**

```
                      INDEX
                                                  PAGE
Appearances . . . . . . . . . . . . . . . .        2
Stipulations (Attached hereto). . . . . . .       NA
CHARLES E. CHERRINGTON
    Examination by Mr. Tinning. . . . . . .        4
    Examination by Mr. Gonzales . . . . . .       79
    Examination by Mr. Gonzalez . . . . . .       90
    Examination by Mr. Waterhouse . . . . .       93
    Examination by Mr. Tinning . . . . . . .     127
    Examination by Mr. Gonzalez . . . . . .      154

Signature and Changes . . . . . . . . . . .      156
Reporter's Certificate  . . . . . . . . . .      158

                    EXHIBITS

NO.   DESCRIPTION                                PAGE

1-13    Photographs . . . . . . . . . . .          4

14      Sworn statement by Eddie Cisneros. . .     4

15-37   Photographs . . . . . . . . . . .         52

38      Lifting services agreement . . . . . .    79

39      Certificate of insurance . . . . . . .    92

40-46   Diagrams . . . . . . . . . . . . .        92
```

**Page 4**

1  (Exhibits 1-14 marked.)
2  CHARLES E. CHERRINGTON,
3  having been first duly sworn, testified as follows:
4  EXAMINATION
5  BY MR. TINNING:
6      Q.  Could you give us your full name, please,
7  sir?
8      A.  My name is Charles E. Cherrington.
9      Q.  Mr. Cherrington, my name's Bill Tinning.  I
10 represent, along with Mr. Tharpe here, the survivors
11 in the interest of the late Oscar Zamora, Sr. who I
12 know you knew and I know you know a lot about what
13 happened to him.  And the first thing I'd like to do
14 is tell you I appreciate your being here.  I know
15 that it's hard for you to be here with what you've
16 already given us by way of information in your
17 statement.  I know there may be times when it's hard
18 to talk about some of what happened, and if you need
19 to take a break at any time, by all means, let us
20 know.  Even though this is testimony that's being
21 taken just as if you're in the courtroom, it does
22 have one advantage and difference, which is that if
23 you do need to take a break, that's up to you and you
24 can let us know if you need to compose yourself or
25 take some time, and by all means, feel free to do

EX. 5

Page 13

1  generator, as you called it, that was being
2  off-loaded at the time or --
3       MR. SOSSI: Look through them.
4       Q. (BY MR. TINNING) -- the general time and day
5  of Mr. Zamora's accident?
6       A. Yes.
7       Q. And the date that the accident happened with
8  Mr. Zamora was March 23rd, 1999?
9       A. Yes, I believe it was.
10      Q. The same date that shows on the photographs?
11      A. (Moving head up and down.)
12      Q. That's correct?  You need to --
13      A. Yes.
14      Q. -- answer out loud.  There we go.
15      A. Yes.
16      Q. I want to go through some of these now that
17  you've identified them and hold them up for the jury
18  to see and follow along with us.  The very first
19  exhibit that we have, No. 1, what would you call the
20  yellow item? I'm going to give the videographer a
21  chance to focus in with us.
22      A. We refer to that as a jacking plate.
23      Q. Okay.  And it's attached to some type of
24  equipment.  What is the khaki colored or olive green
25  colored piece of --

Page 14

1       A. It's the actual generator.
2       Q. Okay.  That's the generator itself?
3       A. Yes.
4       Q. And I'd like to go back to one of the later
5  exhibits so that the jury will have an idea about
6  your description as to the size, and we go to No.
7  13-A, the one at the top.  Is that the generator
8  itself?
9       A. Yes, it is.
10      Q. That it -- that the jacking plate's attached
11  to and is shown to the side of it, the bottom
12  photograph.  I'm going to give the videographer a
13  minute to focus in and make sure we've got the glare
14  off the picture.  And the jacking plates were on --
15  if we look closely -- on either side of the generator
16  when it came in?
17      A. They were on -- near each corner.  There
18  were four jacking plates, two on each side.
19      Q. And the generator itself came out of the
20  barge that's shown adjacent to the dock just behind
21  it in Photograph 13-A?
22      A. Yes.
23      MR. WATERHOUSE: Objection, form.
24      Q. (BY MR. TINNING) And where did the -- where
25  did the generator come from?

Page 15

1       A. Europe someplace.  I'm not sure what the
2  original port of loading was.
3       Q. And the barge that it came out of, where did
4  that come from?
5       A. The --
6       Q. The immediate last destination.
7       A. Actually, I believe that this particular
8  last barge was discharged in New Orleans and it was
9  moved down to Port of Brownsville by tug through the
10  intercoastal waterway.
11      Q. Okay.  We see on 13-A that there's some
12  lifting straps, hoisting straps still to the
13  generator.  Who was it that was actually providing
14  the crane that actually made the lift?
15      A. Brownsville Barge & Crane.  They provided
16  the rigging, the lifting tackle you see, the cables
17  and so forth, and the crane.
18      Q. And can you identify -- I'll take the
19  picture down for a moment so you can turn and look at
20  it.  Can you identify any of the personnel that show
21  up in the photographs 13-A and 13-B?
22      A. Yes.
23      Q. Okay.  And can you turn it around and point
24  for us, if you can do that, as to who the people are
25  that you can identify?  Give our videographer a

Page 16

1  second to tell us that we've got a good picture.
2       THE VIDEOGRAPHER: Go ahead.
3       A. This would be me in the red shirt.
4       Q. (BY MR. TINNING) Right.
5       A. And these two gentlemen off to the side are
6  longshoremen.  They work for ILA Local 29.
7       Q. Are those coworkers to --
8       A. Zamora.
9       Q. Okay.  Do you know them by name?
10      A. Let's see.  This would be -- I know who they
11  are.  I just -- my mind went blank right now as far
12  as, you know, their first names.
13      Q. Would either of them be Eddie Cisneros?
14      A. No.
15      Q. Is Eddie on the other side or shown in the
16  top photograph?
17      A. No, he's not.
18      Q. Okay.  Was he on duty that day?
19      A. Yes.
20      Q. The jacking plate that's shown at the bottom
21  of 13-B on the ground, is that the jacking plate --
22  well, you can identify -- can you identify that
23  jacking plate in relation to the accident that
24  happened to Oscar Zamora, Sr.?
25      A. Yeah, it was a jacking plate that -- it

**Page 17**

1   appears to be the one that, you know, that fell off.
2   And I don't know. This was taken the 23rd. It was
3   that corner. Yes, that would be the particular
4   plate.
5     Q. And you can see in the top portion behind it
6   there's still one attached to the back.
7     A. Right, there's still one attached.
8     Q. How many were there altogether?
9     A. Four.
10     Q. Two on each side?
11     A. Two on each side.
12     Q. And I'd like for you to go through, as best
13   you can, from the time that the lift was in the
14   position that's shown on 13-A. Basically tell me
15   what happened up to the point where Mr. Zamora was
16   injured.
17     A. Sure. To -- from where it's hovering a foot
18   over or from when we first started taking it out of
19   the barge?
20     Q. Wherever you feel like you need to pick up.
21     A. Gosh, why don't we just start.
22      MR. WATERHOUSE: Let me object to the
23   form. I'm sorry. Go ahead.
24     Q. (BY MR. TINNING) Go ahead and tell me
25   basically from the time the barge gets there up to

**Page 18**

1   the point where Mr. Zamora gets injured. What
2   happened?
3     A. Okay.
4      MR. WATERHOUSE: Same objection.
5     Q. (BY MR. TINNING) You can go ahead and
6   answer.
7     A. The barge arrived earlier during the week.
8   And I believe it was on the 22nd that myself, Todd
9   with C. H. Robinson and the -- I believe the engineer
10   with ABB, his first name was Roland. We went over to
11   the barge before the lift -- or maybe a day or two
12   before the actual lift took place and we looked
13   inside the barge. And it was at that point that, you
14   know, we noticed that the jacking plates were
15   attached to the generator, and they immediately
16   determined that at some point those would need to be
17   removed to -- not so -- not to exceed the width
18   allowances by the TFM, the Mexican railroad, 'cause
19   this was going to Mexico by rail and they were
20   exceeding the allowances, you know, so --
21     Q. You're gesturing with the width?
22     A. The width.
23     Q. Okay.
24     A. The width. So the next day -- I believe the
25   next day or the day after was the 23rd. That morning

**Page 19**

1   myself, my gear man, Eddie Cisneros, the gang that
2   was -- the ILA Local 29 gang -- I believe it was a
3   six-man gang -- showed up at the site along with Todd
4   from C. H. Robinson, Roland from ABB to do the actual
5   lift. And so we met around the barge, we looked
6   inside the barge, and we had basically a safety
7   meeting to disclose what was going to take place
8   throughout the course of the lift.
9     Q. Who was at that safety meeting?
10     A. The -- myself, Todd with C. H. Robinson,
11   Roland with ABB, and Zamora. He was the walking
12   foreman or the foreman representing the ILA, and my
13   gear man was Eddie.
14     Q. Eddie Cisneros?
15     A. Eddie Cisneros.
16     Q. And what safety points were brought up at
17   that meeting, if any, about the jacking plates?
18     A. Nothing was -- nothing was disclosed at that
19   point. And at that point, we began -- we began --
20   went down to the barge and we began hooking up the --
21   Brownsville Barge & Crane had positioned their heavy
22   lift barge to the offshore side. In other words,
23   opposite side of the barge. And they positioned the
24   barge and reconnected the lifting tackle to the
25   generator and made sure, you know, the generator was

**Page 20**

1   clear for lift. And with that said and done, we
2   began to lift. It was very slow. It's a very slow
3   lift. The crane is very slow. So anyway, took the
4   barge -- the generator out of the barge, swung it
5   over towards the rail car, and it was decided before
6   the lift took place that we would hover the generator
7   over the rail car about a foot so we could align
8   holes that were in the actual generator with holes
9   that were in the beams that had been placed on the
10   deck of the rail car in order to secure the generator
11   once it was on the car.
12     Q. How was that going to be done?
13     A. Just by -- with ropes and, you know, have
14   two or three men on each corner just to kind of --
15     Q. And then once it was aligned, how was the
16   securing going to be done? With bolts or with what?
17     A. Bolts, heavy steel bolts.
18     Q. Were the same bolts that show up on -- like
19   on Exhibit 1 that show up on the jacking plate going
20   to be used?
21     A. No.
22     Q. Okay. Go ahead. I didn't mean to interrupt
23   you.
24     A. So we were hovering the generator about a
25   foot over the car, and it was at that point that we

Page 21

1  noticed that on the bolts that run through the jack
2  plate through the generator were going to impede with
3  the plywood that was needed to be placed on the car
4  deck to prevent having metal to metal, you know,
5  friction. So Roland and Todd and myself were there
6  and it was decided -- I believe it was Roland. He
7  was the engineer on site and said, you know, let's go
8  ahead and we'll take the -- we'll remove the bolts,
9  take the nuts off and we'll remove the bolts and, you
10  know, we'll set the piece down.
11      Q. And the bolts you're referring to are the
12  ones that show on Exhibit 1?
13      A. The ones on the bottom.
14      Q. Because they -- they --
15      A. Right.
16      Q. -- protrude through the bottom surface.
17      A. And myself and all of my -- and the -- and
18  the union, the ILA guys and -- you know, we were all
19  under the impression that the two bolts on top were
20  also securing this piece.
21      Q. Okay.
22          MR. WATERHOUSE: Objection,
23  nonresponsive.
24      Q. (BY MR. TINNING) You can go ahead.
25      A. And --

Page 22

1      Q. Well, let me clear something up. When
2  Roland said to take out the bolts, he was referring
3  to these two bolts on the bottom?
4      A. Uh-huh.
5          MR. WATERHOUSE: Objection, form.
6      Q. (BY MR. TINNING) Which bolts were you
7  referring to again --
8      A. Yeah.
9      Q. -- if you could point them out for us?
10      A. The ones on the bottom.
11      Q. Okay.
12      A. So I went up to the corner -- or actually, I
13  guess it was -- in fact, it was the actual plate,
14  jacking plate that had fallen.
15      Q. Yeah, give her a chance to pick that up.
16  The one that shows on 13-B on the ground?
17      A. And there was, of course, two bolts as, you
18  know, you can see here. It's actually two bolts
19  holding it in place.
20      Q. Which two bolts?
21      A. The two on the bottom.
22      Q. When did you find that out?
23      A. Well, of course after it happened, but we
24  were going to remove the two on the bottom.
25      Q. And leave the two on the top?

Page 23

1      A. I'm sorry. Right.
2      Q. And why were you going to leave the two on
3  the top in?
4      A. We were going to -- well, there was no need
5  to take them out at that point because we were not
6  going to remove the jacking lugs. We were not going
7  to take them off. And again, as I stated, we were
8  under the impression, myself and the ILA -- my ILA --
9  the union crew, you know, that it had four bolts
10  holding the jacking plate to the side of the
11  generator.
12      Q. When Mr. --
13          MR. WATERHOUSE: Objection,
14  nonresponsive. I'm sorry.
15      Q. (BY MR. TINNING) When Mr. Snyder, Roland
16  Snyder, said to take out the bolts, the two bottom
17  bolts, what, if anything, did he say about the two
18  upper bolts as to whether or not they would still
19  hold the jacking plate?
20      A. Nothing.
21      Q. What, if anything, did he say about the
22  weight of these jacking plates themselves and how
23  much they weighed?
24      A. Nothing. We had no idea.
25      Q. What, if anything, did he say about whether

Page 24

1  or not they would stay in place or whether or not
2  they would come off if the two bottom bolts would be
3  removed?
4      A. Nothing.
5      Q. What, if anything, did he say about how they
6  were being removed in terms of any danger that would
7  be presented to the person removing the bolts?
8          MR. WATERHOUSE: Objection, form.
9      Q. (BY MR. TINNING) What, if anything, did he
10  say about that?
11      A. Nothing.
12      Q. Okay. Where was Mr. Snyder when the first
13  bolt was actually taken out of the jacking plate, the
14  first jacking plate?
15      A. If my memory serves me correct, he was down
16  towards the other corner here.
17      Q. But on the same --
18      A. On the same side --
19      Q. Okay.
20      A. -- but the opposite corner.
21      Q. And is that within eyesight? Line of sight?
22      A. Oh, definitely.
23      Q. And who took out the first bolt?
24      A. I took out the first bolt and placed it on
25  the car deck. I removed the nut and Zamora was

Charles E. Cherrington                 CondenseIt™                        January 7, 200(

Page 25

1  standing right next to me where the other bolt was.
2      Q. Let me get a close-up on one of the other
3  exhibits so the jury can also have an idea as to the
4  size of the bolts themselves. How long -- while I'm
5  doing that, can you tell us how long it took you to
6  remove just the nut from the first bolt?
7      A. Probably a minute, you know. It was quite a
8  long bolt.
9      Q. And did you -- what type of wrench did you
10  use to take it off?
11     A. They were just hand tightened. They
12  weren't -- there was no -- when they -- I guess when
13  they put them in place, no torque was applied to
14  tighten the nuts. They were just hand tight. You
15  could unscrew them.
16         MR. WATERHOUSE: Objection,
17  nonresponsive.
18     Q. (BY MR. TINNING) So it was done with one
19  hand or two hands?
20     A. One hand.
21     Q. And on Exhibit 9 here, especially on B at
22  the bottom --
23     A. Uh-huh.
24     Q. -- does that show the --
25     A. Yeah, that shows --

Page 26

1      Q. -- the bolt in question that we're talking
2  about? The size of --
3      A. Yeah, the size, yeah.
4      Q. And if we can turn and show that --
5      A. Sure.
6      Q. -- so that we can get the glare off for the
7  jury. The bolt we're talking about is the one on the
8  pad in front of the generator at that point?
9         THE VIDEOGRAPHER: Sir, would you like
10  to hold it so that it'll get closer?
11         MR. TINNING: Sure. Just let me know
12  when you get it focused.
13         THE VIDEOGRAPHER: Right there.
14     Q. (BY MR. TINNING) And the bolt on the pad is
15  the one you're referring to?
16     A. Uh-huh.
17     Q. And that's a "yes"?
18     A. Yes.
19     Q. And is that the one you actually took out?
20     A. I --
21         MR. WATERHOUSE: Objection, form.
22     Q. (BY MR. TINNING) Or the one Mr. --
23     A. I don't -- I don't know.
24     Q. It would be either the one Mr. Zamora --
25     A. Is that the same day? The 23rd?

Page 27

1      Q. Yes, sir.
2      A. Yeah, that would be the one I took out.
3      Q. All right. Once you've taken it out, did
4  Mr. Zamora begin taking his out on the other side?
5  The companion?
6      A. He was unscrewing it and he was in the
7  process, but he did not remove it. Shortly after I
8  removed mine, it was -- I believe Roland and Todd had
9  a discussion, and I can't remember which one said,
10  but it was decided to go ahead and leave the bolts in
11  and we would just remove the nuts off the bolts and
12  just go ahead and lower the generator, and the
13  generator would set down on the boards and the bolts
14  would ride up, so we would not remove the bolts.
15     Q. All right. And is that what was then being
16  done?
17     A. Yes. In fact, the only bolt that was taken
18  out was the one I had taken out.
19     Q. Okay. And was any reason given at the time
20  that was said?
21     A. I believe there was some -- a remark made
22  that one of the reasons was, you know, not to --
23  probably not to lose -- I think it was not to lose
24  components, bolts or whatnot, you know. They didn't
25  want to lose these bolts because, you know, they were

Page 28

1  hard to replace. They had to come in -- ship them
2  in. This was a time sensitive project.
3      Q. What, if any, safety reason was given for
4  leaving the bolts in place?
5         MR. WATERHOUSE: Objection, form.
6      Q. (BY MR. TINNING) You can go ahead and
7  answer.
8      A. None.
9      Q. And at this time, Mr. Zamora was where?
10     A. He was still standing, you know, right next
11  to the jacking plate.
12     Q. And we see on Exhibit No. 1 there's -- the
13  nut is off one of the bolts on this particular
14  jacking plate.
15     A. Uh-huh.
16     Q. Do you remember if yours was the right or
17  the left one that came off on the one you were
18  working on?
19     A. I don't remember.
20     Q. Okay. When you had finished removing the
21  nut from the one that you took off, had Mr. Zamora
22  already begun working on the other one or had he not
23  yet begun working on the other one?
24     A. He had began unscrewing, taking the nut off
25  and -- in fact, we had to take the nuts off, so he

Page 45

1  himself in terms of his purpose for being there with
2  this generator since he's from ABB and the
3  generator's from an ABB company?  What did he say
4  his -- he told you what he did, but what did he say
5  his purpose was in being there?
6      A. His purpose -- actually, he was with ABB.
7  C. H. Robinson -- they contracted C. H. Robinson to
8  handle logistics.  C. H. Robinson contracted our
9  services to perform the physical aspects of this
10  particular lift.  I was -- we were under their
11  direction.  They supplied all the diagrams as far as
12  how we were going to secure it and what was needed.
13  And he was the engineer on site that -- excuse me --
14  that was ensuring that, you know, we place the car --
15  excuse me -- the generator on the car as per his
16  diagram.  We secured it as per his diagram.
17      Q. You say his.  You keep saying --
18      A. ABB, Roland's --
19      Q. Okay.
20      A. -- you know, to satisfy his requirements,
21  you know.  This was his project, his generator.  You
22  know, he knew what needed to be done and what did not
23  need to be done.  You know, we were there just to
24  perform the actual labor --
25          MR. WATERHOUSE: Objection.

Page 46

1      A. -- myself and --
2          MR. WATERHOUSE: Objection,
3  nonresponsive.  I didn't mean to cut you off.
4          THE WITNESS: Sure.
5      Q. (BY MR. TINNING) C. H. Robinson, in other
6  words, was going to be the transporter.  You-all were
7  doing the lift to get it to C. H. Robinson to
8  transport the ABB generator?
9      A. Right.
10      Q. Okay.  The diagrams you referred to, were
11  those ever given from Mr. Snyder to you to actually
12  see to go about doing the lift?
13      A. Yes.
14      Q. Was there any instruction on the -- any of
15  the written information that Mr. Snyder gave you on
16  the plans that showed that these jacking plates need
17  to be removed very cautiously and they weigh a lot or
18  any information like that?
19      A. On the diagrams of the actual generator
20  itself, there's no description or indication or
21  reference to jacking plates whatsoever.
22      Q. The actual drawings and diagrams don't even
23  show a generator.
24      A. They don't even show it.  In fact, when it
25  arrived on the barge and myself, Todd and Roland went

Page 47

1  to look at it, that was the first time or the first
2  impression that we had, you know, that jacking plates
3  were actually going to be there.  Before that, there
4  was no indication on any diagrams or by verbal, you
5  know, in regard to jacking plates.
6      Q. The width requirements you were talking
7  about to transport this by rail through Mexico that
8  you said required that the jacking plates have to
9  come off --
10      A. Yes.
11      Q. -- are those well documented?  I mean, a
12  source that you had for that, in other words, or
13  railroad requirements that are well-known to anybody
14  that --
15      A. Actually --
16          MR. WATERHOUSE: Objection, objection,
17  form.  I'm sorry.  Go ahead.
18      Q. (BY MR. TINNING) How did you find out about
19  that?
20      A. C. H. Robinson was handling the rail -- the
21  transportation aspects.  Our only job was to lift it
22  out of the barge and put it on the car and secure
23  it.  That was as far as our responsibilities went.
24      Q. Well, at this safety meeting in the morning
25  when it was presented, however it was presented that

Page 48

1  the jacking plates had to come off, there is a
2  problem because of the width requirement for the rail
3  transportation of the generator, was there -- what,
4  if any, protest or complaint was there by Mr. Snyder
5  about having to do that?
6      A. None.
7          MR. WATERHOUSE: Objection, form.
8      Q. (BY MR. TINNING) Okay.  And then even after
9  Mr. Zamora's accident, Mr. Snyder was there when the
10  remaining jacking plates were being taken off?
11      A. Right.
12      Q. You indicated earlier that this was what you
13  thought was the second of five times that heavy
14  things like this came from ABB through the port; is
15  that right?
16      A. Yes.
17      Q. Was there a similar piece of equipment like
18  this generator that came in either before or
19  afterwards where these jacking plates were present
20  either in the hold or on the unit itself?
21      A. Yes.  In fact, I believe it was the next
22  lift that came in was a generator identical to the
23  one -- to the one that we were handling when the
24  accident took place.
25      Q. And was Mr. Snyder present for that lift?

Charles E. Cherrington                   CondenseIt™                          January 7, 2000

Page 149

1    Q. Okay. There's another one to his right
2  whose name is Baumann spelled B-A-U-M-A-N-N. Does
3  that --
4    A. No.
5    Q. -- ring a bell?
6    A. (Moving head side to side.)
7    Q. And there is one other person I want to ask
8  you about that's listed that's a Mr. -- and I -- the
9  print is a little faint. Along with Mr. Rebholz on
10 Exhibit 45 there's another gentleman by the name of
11 Mulach, it appears, or Mulach, M-U-L-A-C-H. Does
12 that ring a bell at all?
13   A. No.
14       THE VIDEOGRAPHER: Excuse me. The
15 microphone.
16       MR. TINNING: Thank you.
17   Q. (BY MR. TINNING) There's one other that
18 lists a man by the name of -- and again, the print is
19 even less clear. It may be Silap, S-I-L-A-P, or
20 A-P-T-E-R maybe on Exhibit 42.
21   A. No, no recollection.
22   Q. That doesn't ring a bell?
23   A. No.
24   Q. You do believe, though, you have documents
25 that will show the name of the engineer that was the

Page 150

1  counterpart later to Mr. Snyder on the later --
2    A. I believe I do.
3    Q. Was he also from Germany?
4    A. Yes. I think he was from the same office
5  that Roland was from.
6    Q. You told me that and I just wanted to be
7  sure I followed up and asked you if he had an office
8  or a residence that you know of in the United
9  States.
10   A. No.
11   Q. There was no tilt, no sway, no pop by the
12 crane operator before the accident occurred?
13   A. No. It was very smooth.
14   Q. Okay. And very level?
15   A. Very level.
16   Q. As far as the information about this
17 generator was concerned, who did you look to between
18 yourself, the people from C. H. Robinson and
19 Mr. Snyder as being most informed or most
20 knowledgeable about this product, this generator and
21 how it was to be off-loaded?
22   A. Roland, Mr. Snyder.
23   Q. And was that because he represented that he
24 was an engineer from the company where it had come
25 from?

Page 151

1    A. Yes.
2        MR. WATERHOUSE: Objection, form.
3    Q. (BY MR. TINNING) Why was that that you
4  relied on him and looked to him?
5    A. He was the engineer and I assume that he had
6  experience and -- in these lifts before. He had
7  done -- if I remember talking to him correctly prior
8  to lift, you know, he had done several of these.
9  They had several projects around the world and he had
10 been present in other parts of the world and whatnot,
11 and it's assumed that, you know, he'd seen this done
12 before and he was a design engineer and he had a
13 little more -- some knowledge about it.
14   Q. And was that why he indicated he wanted to
15 be present and even participated in how the lift was
16 to be done?
17       MR. WATERHOUSE: Objection, form.
18   A. I believe so. I don't really know his
19 reasoning.
20   Q. (BY MR. TINNING) Well, did he actually
21 participate, though, in things being done the way
22 they were done?
23   A. Yes.
24   Q. Was there any contract that you know of
25 between ABB and your employer, Schaefer Stevedoring?

Page 152

1    A. No, not that I'm aware of, no.
2    Q. The only one you know of would be the one
3  with Brownsville Barge & Crane --
4    A. Yes.
5    Q. -- for this lift with Oscar Zamora?
6    A. Yes.
7    Q. Could you go back also and check and see if
8  we've got any other diagrams or do you believe 40
9  through 46 are the only diagrams that pertain to
10 Oscar Zamora's lift that you got?
11   A. Yeah, that's the only ones I had in
12 reference to that particular lift.
13   Q. And did you take these with you to the
14 safety meeting that -- where it was discussed how to
15 safely make this lift that morning?
16   A. Yes, I had -- I had a copy with me. I think
17 Todd had a copy and I'm sure Roland had a copy.
18   Q. Did Mr. Snyder ever indicate to you that you
19 did not have all the copies you were supposed to have
20 and that they hadn't all been forwarded to you?
21   A. No.
22       MR. WATERHOUSE: Objection, form.
23   Q. (BY MR. TINNING) What, if anything, did
24 Mr. Snyder indicate to you about your diagrams as to
25 whether or not they were complete? Did he give you