10/01/2004 FRI 10:51 FAX [TX/RX NO 5141] @002

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| ABB KRAFTWERKE AKTIENGESELLSCHAFT, ET AL. **Plaintiffs** | § § § § |
| v. | § § C.A. No. B-03-192 |
| C. H. ROBINSON COMPANY | § § |
| **Defendant.** | § § |

United States District Court
Southern District of Texas
FILED

SEP 3 0 2004

Michael N. Milby, Clerk of Court
By Deputy Clerk _____

## ORDER

BE IT REMEMBERED that on September 30, 2004, the Court considered all pending motions and the responses and replies thereto. The Court **DENIES** Plaintiff's Motion for Application of Swiss Law [Dkt. No. 26], **DENIES** in part and **GRANTS** in part Defendant's Amended Motion to Dismiss [Dkt. No. 34], **GRANTS** Plaintiffs' Motion for Extension of Time to File Affidavits [Dkt. No. 31-1], Plaintiffs' Motion for Delay on Ruling [Dkt. Nos. 31-2 & 36-1], Plaintiffs' Motion to Attach Affidavit to Previously Filed Motion [Dkt. No. 39-1], and **GRANTS** Defendant's Motion for Leave to File Surreply [Dkt. No. 37-1].

### I. Factual and Procedural Background

Plaintiffs originally filed this lawsuit in the United States District Court for the Southern District of Texas, Galveston Division. Determining the case had no ties to the Galveston Division and substantial ties to the Brownsville Division, the Court *sua sponte* transferred the action to this Court. As complete diversity exists, this Court has federal diversity jurisdiction pursuant to 28 U.S.C. § 1332. This case arises out of a contract for the shipment of a turbine generator from Manheim, Germany through the Port of Brownsville, Texas, to Monterrey, Mexico. Plaintiffs ABB Kraftwerke Aktiengesellscaft ("ABB") manufactured the generator and arranged for its shipment to the Port of Brownsville.

On February 19, 1999, ABB Alstom Power (Switzerland) Ltd. ("ABB") contracted with Defendant Robinson to transport the generator from the Port of Brownsville to

EX.15

10/01/2004 FRB 10:51  [TX/RX NO 5141] @ 003

Monterrey. *See Def's Response to Motion for Application of Swiss law, Ex. A* (contract between ABB and Robinson, ¶ 3). According to Defendant's Motion to Dismiss, Plaintiff ABB Kraftwerke Aktiengesellschaft was not a party to this contract. A review of the attached contract reveals a signature of execution by ABB Alstom Power, formerly known as ABB Power Generation. Plaintiffs make no distinction between the two ABB companies in their complaint, but mention their connection in their response to Defendant's Amended Motion to Dismiss when they state that ABB Kraftwerke, the manufacturer of the generator, made an "inter-company" transfer of the generator to ABB Power Generation. Pls' Response, at p. 8 [Dkt. No. 8]. Thus, the Court refers to Plaintiffs collectively as ABB.

Robinson then contracted with Schaefer Stevedoring ("Schaefer") to provide stevedoring services at the Port of Brownsville, which included transferring the generator from a lash barge and loading it onto a railway car at the dock. *See Pls' First Amended Cmplt.* ¶ 10. Schaefer contracted with Brownsville Barge & Crane for the use of its "Atlantic Giant," a floating crane barge that was the only crane in the geographic area capable of lifting a generator of such size. *See id.*

On or about March 23, 1999, the day of the rescheduled lift of the generator, representatives from Robinson and ABB were on location at the Port to answer questions concerning the lift and the generator respectively. Immediately prior to the lift, a representative of Brownsville Barge presented Robinson and ABB with an indemnity agreement covering any accident that might occur during the lift. Brownsville Barge informed the parties that it would not use the Atlantic Giant to make the lift if the indemnity agreement was not signed. Allegedly feeling pressure to ensure the lift went forward that day in light of impending deadlines concerning transportation of the generator to Monterrey, ABB signed the indemnity agreement. Robinson, however, refused to sign the agreement. *See id.* ¶¶ 13, 14, 15, 16.

Unfortunately, during the lifting of the generator Oscar Zamora, Sr., a longshoreman at the Port working for Schaefer, was killed when a jacking plate fell from the generator as it was suspended by the crane. Zamora's family filed suit in the 357th Judicial District Court of Cameron County, Texas, for wrongful death against ABB,

2

10/01/2004 FRI 10:51  [TX/RX NO 5141] @004

Robinson, and Brownsville Barge. This lawsuit eventually settled. Brownsville Barge, however, filed a cross-claim against ABB in which it asserted "ABB owed it contractual indemnity for the legal fees it incurred in defending against the Zamora family's claims." *ABB Kraftwerke Aktiengesellschaft v. Brownsville Barge & Crane, Inc.*, 115 S.W.3d 287, 290 (Tex. App. –Corpus Christi-Edinburg 2003, review denied). The Appellate Court affirmed the trial court's grant of summary judgment in favor of Brownsville Barge, holding the indemnity agreement clearly demonstrated Brownsville Barge's intent to shift its risk to ABB. *Id.* at 292. Furthermore, the court determined ABB "may have been constrained[" in its decision to sign the indemnity contract in the face of Brownsville Barge's refusal to use the Atlantic Giant if the agreement was not signed, but there was no economic duress as "ABB could have refused to execute the indemnity agreement as Robinson chose to do." *Id.* at 294. The Court thus upheld the indemnity agreement between ABB and Brownsville Barge.

Although Plaintiffs identify only one cause of action in their Amended Complaint, breach of contract, it is clear Plaintiffs seek indemnity from Robinson. Plaintiffs state, "C.H. Robinson breached its contract with ABB by failing to ensure that all contractual requirements were in place prior to the lift, resulting in ABB being forced to sign an indemnity agreement on the docks just prior to the lift." Pl's Cmplt. ¶ 30. "ABB seeks all monies paid on behalf of defending Brownsville Barge & Crane's Cross-claim, . . . and for all costs and expenses involved in the same as a result of C.H. Robinson's breach of contract." *Id.* ¶ 35. "ABB seeks all amounts paid in settlement and defense of the Zamora litigation as a result of C.H. Robinson's breach of contract." *Id.* ¶ 36. Plaintiffs maintain, however, that Robinson also breached the contract because Robinson failed to perform the work in a "good and workmanlike manner," did not perform all services for which they contracted, failed to properly ensure that its sub-contractors were competent and familiar with the generator they were to lift from the lash barge to the railcar, failed "to exercise proper managerial skills and control over its sub-contractors, and failed to provide experienced personnel to supervise the lift. *Id.* ¶ 22-33. Plaintiffs allege that "no legal harm resulted to Plaintiffs until May of 2000 [because Robinson's] actions were not in and of themselves unlawful or of such a

3

US DISTRICT COURT        Fax:9565482598        Oct 1 2004 10:48    P.04

nature to cause damage to Plaintiff's solely based on their nature." *Id.* ¶ 32.

There are two substantive motions before the Court: Plaintiffs' Motion for Application of Swiss Law and Defendant's Amended Motion to Dismiss, filed after Plaintiffs amended their original complaint. Although Plaintiffs did not file a response to Defendant's Amended Motion to Dismiss, the Court references and considers their earlier filed response and reply to Defendant's original Motion to Dismiss. *See* Dkt. Nos. 11 & 13. The Court analyzes these motions in turn.

## II.  Choice of Law

### A.  Parties' Arguments

Plaintiffs argue in their Motion for Application of Swiss Law that Robinson negotiated and signed the contract in Switzerland; "the documents relating to the equipment originated in Switzerland and were sent from Switzerland to Defendant C.H. Robinson"; and Robinson was "responsible for management of the transfer from the lash barge to the railcar and for obtaining all permits and requirements for the transfer for the railcar travel and to oversee the equipment transfer to Monterrey." Pl's Motion, at pp. 1-2 [Dkt No. 26].

Defendant counters that under the *Restatement (Second) of Conflict of Laws*, nearly all factors favor the application of Texas law. Furthermore, Defendant argues in opposition to Plaintiff, that the statue of limitations issue raised in its Motion to Dismiss should be determined by applying the laws of the forum in which the case is brought. Additionally, Defendant argues the indemnity issues are governed by the same law as the underlying claim—that is Texas law applies because the indemnity contract was signed in Texas, interpreted in Texas by Texas courts, governed by Texas law, and adjudicated to final judgment in Texas courts.

### B.  Choice of Law Legal Standards – Breach of Contract Claim

A forum state's conflict of laws rules are considered substantive law, and as a federal court with diversity jurisdiction sitting in Texas, this Court applies Texas choice-of-law rules. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *see also Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 311 (5th Cir. 2000). In the absence of a choice of law contract clause, the Texas Supreme Court has adopted the "most

4

significant relationship" test from the *Restatement (Second) of Conflict of Laws* for contract disputes. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984). *Duncan* revoked the *lex loci contractus* rule, which previously governed conflict of laws analysis in contract cases, and announced that "the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue." *Id.* at 431. The Court looks to the quality of those contacts with the forum. *Id.* at 421. The contacts are evaluated within the general framework of principals laid out in section 6 of the *Restatement*. *Id.* at 420-21 n.5.

Section 188 of the *Restatement* offers specific guidance for resolving which law applies to contract cases. These factors include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Restatement* § 188. *See also DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678-79 (Tex. 1990), *cert. denied* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991) (adopting section 188 of the *Restatement*); *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 705 (5th Cir. 1999). Additionally, the *Restatement* states the contacts are "to be evaluated according to their relative importance with respect to the particular issue." *Restatement* § 188.

Section 196 of the *Restatement* also applies to this case, as Plaintiffs have pled the contract was in the nature of a service contract, which included the transportation of the generator and the management of the "project" on behalf of ABB. Pl's Cmplt. ¶ 22. Section 196 states:

> The validity of a contract for the rendition of services and the rights created thereby are determined in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

*Restatement* § 196. Therefore, when an agreement provides for the performance of

5

10/01/2004 F  10:51  [TX/RX NO 5141] @007

personal services in a single forum, this factor generally outweighs other factors and the law of the state in which the performance is to be performed controls absent a more significant relationship with another state as revealed by section 6 of the *Restatement*. *See DeSantis*, 793 S.W.2d at 679. Section 6 of the *Restatement* lists seven factors to consider in the "most significant relationship" test: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of these states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of the result, and (g) ease in the determination and application of the law to be applied." *Restatement* § 6.

In its choice of law analysis the Court may make factual determinations, unlike the Court's analysis for motions to dismiss or for summary judgment. *See Nunez v. Hunter Fan Co.*, 920 F. Supp. 716, 717-18 (S.D. Tex. 1996) (citations omitted). The reasoning behind this rule is that a jury will ultimately determine the facts on the merits if facts are disputed, and thus preliminary factual conclusions does not impinge on the right to have a jury make factual determinations later. *See Vaz Borralho v. Keydril Co.*, 696 F.2d 379, 386-87 (5th Cir. 1983) (overruled on other grounds) (citations omitted).

Defendant submits evidence in the form of affidavits, the contract executed by ABB and Robinson, letters of negotiation between the parties, and the complaint filed in the related state case. Plaintiffs submit the affidavit of a Swiss lawyer to demonstrate both that an actual conflict exists between the law in Texas and Switzerland and that Plaintiffs' claims would not be barred by the statue of limitations and Plaintiffs' indemnity claim would not be limited under Swiss law as it would be under Texas law. Although the Court has granted Plaintiffs permission to file the affidavit of David N. Huegin, a licensed Swiss attorney, upon review of this affidavit, the Court gives it little weight. The affidavit contains legal conclusions that are matters of law for this Court to decide. Furthermore, the affiant does not provide full cites to the allegedly relevant Swiss law, copies of the relevant law with translations are not provided, and the affiant, legal counsel to ABB Switzerland Ltd., is not disinterested. Thus, any conclusions that

6

Swiss law does not bar Plaintiffs' claims in this case are legally conclusory and not reliable because Mr. Huegin has an interest in this case by virtue of his position as legal counsel to ABB. *See* Fed. R. Civ. P. 44.1; *Haywin Textile Products, Inc. v. Int'l Finance Inv.*, 137 F. Supp. 2d 431, 435 (S.D.N.Y. 2001).

In light of the fact that performance of the contract did not take place solely in one forum, and the parties disagree as to how the Court should determine where performance of the contract took place, rather than rely on the presumption in section 196 of the *Restatement* that the law of the forum where performance of the contract was conducted applies, the Court will discuss all the factors identified by the *Restatement* for analyzing the choice of law for a contract claim. Finally, for the sake of conducting a thorough review of the pending motions and arguments, the Court will analyze the contract under the substantial contacts test and assume there is an actual conflict between Texas and Swiss law. *See Schneider Nat'l Transport v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2003) (noting no choice-of-law analysis is necessary in the absence of an actual conflict of laws); *Houston Casualty Co. v. Certain Underwriters at Lloyd's London*, 51 F. Supp. 2d 789, 799 (S.D. Tex. 1999).

### 1. Place of Contracting

The parties agree that the contract was signed in Switzerland. Plaintiffs point out that a representative of Robinson traveled to Switzerland for this purpose. Defendant does not dispute this fact. *See* Def's Response, Ex. A1 (contract).

### 2. Place of Negotiation of the Contract

Plaintiffs combine their arguments concerning the negotiations of the contract and the place of performance of the contract. In fact, Plaintiffs barely address the issue of negotiation at all, except to the extent that they reference various documents relating to the management of the project, which they argue originated in Switzerland. Conversely, Defendant argues that two letter quotations, which contained important information about transportation of the generator, constituted negotiations that preceded execution of the contract, were incorporated by reference into the contract, and originated from Robinson's office in Keller, Texas. These letter documents are attached to Defendant's Response, and show Robinson's letterhead with its address in

10/01/2004 FRI 10:51 [TX/RX NO 5141] Ø009

Keller, Texas. *Id.* at Ex. A1 (CHR ABB 00043, 00045, 00047, 00050, 00054-57). Plaintiffs focus on the fact that ABB returned its acceptance of Robinson's proposal from Switzerland. But, as Defendant points out, it was faxed to Robinson's office in Texas. Based on the evidence presented by Defendant, and the argument of both parties, the negotiations in this case predominantly took place through a series of correspondence originating in *both* Switzerland and Texas, as will commonly be the case in contract negotiations between companies operating in different countries.

### 3. Place of Performance

The parties, although not in disagreement per se, place different emphasis on the location of performance of the contract. Indisputably, the contract calls for performance in Texas and Mexico, but not in Switzerland. *See* Def's Motion, at p. 14, Ex. A, p. 3, ¶ 3 (contract); Pl's Original Cmplt. ¶ 5. Plaintiffs agree that "without doubt" the place of performance includes Texas. Pls' Partial Reply, at p. 11. Plaintiffs argue,

> [f]or some reason Robinson denies that the documentation with regard to the subject matter of the management of the project was either obtained by Defendant when in Switzerland or sent to Defendant from Switzerland. With the exception of obtaining permits for the rail travel which was required by the Mexican government for the Mexican portion of the transportation of the heavy equipment, the documents necessary for insuring that the management of this project could be successfully undertaken all originated in Switzerland or were sent from Switzerland. These were either obtained by Jim Hamilton when he was in Switzerland, negotiating and signing the contract or were sent from Switzerland at a later date. None of these documents originated in Texas. Defendant is attempting to confuse the court by stating that the management of the project is the "subject of the contract." The subject of the contract is the management of the transportation of the equipment.

*Id.* Plaintiffs do not attach to their motion or reply the documents mentioned above, but the Court assumes they are the same documents discussed in relation to the negotiating of this contract. Indeed, despite Plaintiffs' attack on what Plaintiffs believe to be Robinson's "erroneous" application of basic concepts in this case, Plaintiffs present little argument concerning the place of performance, choosing instead to focus on the origination of documents relating to the negotiation of the contract. *See* Pls' Partial Reply, at pp. 11-12.

8

It is undisputed that no portion of the performance of the contract is in Switzerland. Furthermore, although Plaintiffs argue differently, the correspondence between the parties and the allegations in the complaint focus more on the seemingly onerous task of transporting the generator from the lash barge to the railcar, via the Atlantic Giant, at the *Port of Brownsville in Texas*. Plaintiffs cite Defendant's experience in making such lifts as a reason for entering into the contract with Robinson. Additionally, the project entailed the securing of permits and rail passes, which would ultimately allow the railcar to cross from Texas into Mexico. Plaintiffs argue "the shortest amount of distance involved in the movement of the project was from the Port of Brownsville to the Mexican border." Pls' Reply, at p. 12. Plaintiffs point out that under the contract Defendant was also responsible for unloading the generator once it reached its destination in Monterrey, Mexico. *See id*. Nevertheless, the actual distance the generator traveled between the Port of Brownsville to Monterrey, Mexico, or the time during which this was to have occurred is less important than the *qualitative* nature of the contact with Texas. *See Duncan*, 665 S.W.2d at 421. Although it would be reasonable to conclude more of the contract performance occurred in Texas, in the most careful of analyses, the Court will determine the performance of the contract was divided between Texas and Mexico.

### 4. Location of the Subject Matter of the Contract

Plaintiffs make the same arguments concerning the subject matter of the contract—that is, the contract encompassed the management of transportation of the generator, which implicated Mexico more than Texas. As discussed above, the Court disagrees. The subject matter of the contract involved the transportation and lift of the generator from and in both Texas and Mexico. It is not clear, as Plaintiffs wish to make it seem, that the unloading of the generator from the railcar in Mexico is more important than the lift from the barge to the railcar. Without either service or task completed, Robinson would have certainly been in breach of its contract with ABB.

### 5. Domicile, Residence, Nationality, Place of Incorporation and Place of Business of the Parties

Plaintiff ABB Kraftwerke Aktiengesellschaft is organized under the laws of

9

Germany, and Plaintiff ABB Alstom Power is organized under the laws of Switzerland. *See* Pls' Original Cmplt. ¶ 1. Defendant represents that although it is domiciled in Minnesota, it maintained offices in Texas during the time at issue in this suit, and thus Texas was a place of business. *See* Def's Response, Ex. A (affidavit of General Counsel) (testifying Robinson maintained an office in Keller, Texas until late 1999, and person negotiating and executing the contract worked in the Keller, Texas office). Plaintiffs in their reply state that the attached document from the Texas Department of State lists Minnesota as Robinson's address. Additionally, Plaintiffs state "[t]he only listing in the Secretary of State's office regarding Texas for C.H. Robinson are the agents for service." Pls' Reply, at p. 13. Plaintiffs neglect to mention that the only document attached to their response, which is a Texas Franchise Tax Report, lists Sugarland, Texas *as Robinson's principal place of business.* Despite Plaintiffs' arguments otherwise, Robinson has presented evidence that it conducted business in Texas, and Plaintiffs' own submitted evidence negates any argument that Robinson has no connection, or a tenuous connection, to Texas. Thus, although Defendant is incorporated in Delaware, and is domiciled in Minnesota, it maintained a place of business in Texas, and thus both Texas and Switzerland constitute locales that should be considered in the Court's analysis.

Although there are many instances in which both Texas and Switzerland are implicated in this choice of law analysis, the Court determines that based on the above factors, Texas law is favored over Swiss law. The contract was executed in Switzerland, but no performance of the contract occurred in Switzerland; a large portion of the contract's performance occurred in Texas; negotiations occurred in both Texas and Switzerland; the subject of the contract does not involve Switzerland, but rather Texas and Mexico; and the domicile, residence, and place of business of the parties includes Switzerland and Texas. Overall, the Court concludes that based on these factors, Texas law should apply.

Having addressed the above factors, the Court turns to the seven factors listed under section 6 of the *Restatement.* Again, the Court must focus on the quality of the contacts, not the number of contacts with a forum. *See Gulf Consol. Servs., Inc. v.*

*Corinth Pipeworks, S.A.*, 896 F.2d 1071, 1075 (5th Cir. 1990) ("Some contacts are more important than others because they implicate state policies underlying the particular substantive issue."). As the Court will discuss below, Texas law should apply.

The parties make few arguments dedicated solely to the seven factors listed in section 6, and the Court will not construct these arguments for them. The Court again finds these factors weigh in favor of applying Texas law. The Court cannot say the needs of the interstate and international systems would be better served by applying either law as the contract is one for the transportation of a generator from Germany to Monterrey, Mexico. Additionally, there are no policies identified by the parties that would militate in favor of applying one forum's laws over the other, nor do policies of the field of contract law suggest Texas or Swiss law should be applied. Indeed, the application of Texas law to this contract has little impact on Switzerland, except to say that Switzerland has a general interest because an allegedly aggrieved party is organized under Swiss law. Moreover, if such a large impact would result, Plaintiffs have neglected to bring such impact to the attention of the Court.

To the extend that Plaintiffs argue they had an expectation that Swiss law would apply to this dispute, the Court does not find this argument persuasive. Plaintiffs were aware that Robinson conducted business, and at least some negotiations with Plaintiffs, from its office in Keller, Texas. Plaintiffs sent correspondence to Robinson in Texas. In addition, a significant portion of Robinson's performance of the contract was to be conducted in Texas and Robinson would conduct no performance in Switzerland. Any expectation, therefore, that Swiss law would undoubtedly apply despite the fact that the contract would in part be performed in Texas belies common sense. Furthermore, did Plaintiffs wish to ensure that regardless of performance location Swiss law would be applied, they had the option of including a choice of law provision in the contract. In conclusion, Texas has the more significant relationship to the contract at issue in this suit than does Switzerland. To the extent that Plaintiffs in passing note that Mexico has an even greater interest in the contract than Texas, the Court disagrees. Only partial performance of the contract took place in Mexico, and thus all other factors favor the application of Texas law over Mexican law. *See Pruitt v. Levi Strauss & Co.*, 932 F.2d

458, 461-62 (5th Cir. 1991) ("[o]ther states . . . might have similar interests in the application of their respective . . . laws, but these interests are much more attenuated when the aggrieved party is an out-of-state resident."); *see also Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 891 (5th Cir. 1991) ("Texas has a strong interest in the protection of its citizens," and other state's "interest in the protection of citizens of foreign states is less significant"). Texas has the most significant relationship to the contract at issue in this case.

### C. Choice of Law --Statute of Limitations Relating to the Contract Claim

Defendant argues the laws of the forum state govern matters of procedure, regardless of whether the laws of a foreign state govern substantive matters. *See Def's Response*, at p. 7 (citing *Johansen v. E.I. DuPont De Nemours & Co.*, 810 F.2d 1377, 1381 (5th Cir. 1987). The Court agrees that Texas choice of law rules establish that generally statute of limitations are procedural in nature and thus governed by the laws of the forum state. *See Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 4 (Tex. 1999). But, as Plaintiffs point out, one exception to this general rule is where a foreign forum's substantive laws create the cause of action and contained within this substantive law is its own statue of limitations. *See Intevep, S.A. Research & Tech. Support Establishment v. Sena*, 41 S.W.3d 391, 394 (Tex. App.--Dallas 2001, no pet.). Texas has not yet adopted the *Restatement's* most significant relationship test for statute of limitations, contained in section 142.

Plaintiffs argue that the Swiss statutory law that applies contains a statute of limitations of its own, and thus this limitations period applies. In this case, however, the Court has determined that Texas substantive law applies, and thus Plaintiffs' cause of action for contract does not arise from a statute that includes its own statute of limitations. Thus, under Texas law, the statute of limitations for contract cases is four years from the accrual of the cause of action. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(5); *Kansa Reinsurance Co., Ltd. v. Congressional Mortgage Corp. of Tex.*, 20 F.3d 1362, 1368 (5th Cir. 1994).

12

### D. Choice of Law Standard — Indemnity Claim

Plaintiffs do not identify an indemnity claim as such, but it is clear they seek damages in the form of a return of the amount "paid on behalf of defending Brownsville Barge & Crane's Cross-claim." Pls' Original Cmplt. ¶ 34. In the wake of Defendant's arguments that Plaintiffs seek indemnity, Plaintiffs do not deny this characterization of their claims.

In addition to the factors listed above in section 6 of the *Restatement*, the Court again applies the "most significant relationship" test for torts, as articulated in section 145 of the *Restatement*. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000). The Court considers: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation, and place of business of parties, and (d) the place where the relationship, if any, between the parties is centered.

Defendant has properly articulated the *general* rule in choice of law analysis as it applies to indemnity claims. As applying to indemnity claims, the Court focuses on the particular substantive issue, not the controversy at large. *See BDO Seidman, L.L.P. v. Bracewell & Patterson, L.L.P.*, 2003 WL 124829, at * 2-3 (Tex. App.—Dallas 2003) (citing *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000)); *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 2002 WL 31628769, at * 6 ("What is determinative is which state has the most significant relationship *with respect to the indemnity issue*.") (emphasis in original). *See also Restatement*, § 173, cmt. a. Section 173 of the *Restatement* addresses indemnity among tortfeasors and directs courts to use the contacts listed above when it applies the factors outlined in section 6.

### 1. Place Where the Injury Occurred

As Defendant expresses in its brief, Plaintiffs signed an indemnity agreement, for which they in turn seek indemnity from Defendant, in Brownsville, Texas. Likewise, Texas courts adjudicated Brownsville Barge's cross-claim against Plaintiffs in Texas. The place of the injury—that is, the payment Plaintiffs made to Brownsville Barge, which concerns the indemnity issue, occurred in Texas. No other state or country has an interest in this claim. As a note, the conclusion would be no different were the Court to

13

consider the underlying injury that gave rise to the indemnity agreement because that injury too arose in Texas.

### 2. Place Where the Conduct Causing the Injury Occurred

The conduct causing the injury, whether this be defined as Defendant's alleged negligence causing the death of Mr. Zamora, or the actual signing of the indemnity agreement all occurred in Texas. No other conclusion is suggested by the parties or supported by argument or evidence.

### 3. Domicile, Residence, Nationality, Place of Incorporation, and Place of Business of Parties

The Court has already discussed this factor *supra*.

### 4. Place Where the Relationship, if any, Between the Parties is Centered

The relationship of the parties concerning the indemnity issue is centered in Texas. The breach alleged to have caused ABB to sign the indemnity agreement occurred in Texas. Furthermore, the negligence at issue in the underlying suit occurred in Texas, with the exception of the Zamora family's claims based on the manufacture of the generator. No part of the parties' relationship concerning the indemnity claim occurred outside of Texas.

The Court thus concludes that Texas law applies to all claims and issues in this case.

### III. Defendant's Motion to Dismiss

Defendant's Motion to Dismiss focuses on two issues: (1) whether Plaintiffs' claim for breach of contract is barred by Texas' statute of limitations, and (2) whether the law supports Plaintiffs' indemnity claim. In the alternative, Defendant argues that even if Plaintiffs' breach of contract claim is not statutorily barred, Plaintiffs have otherwise failed to allege facts that state a claim for relief.

### A. Rule 12(b)(6) Standard

A motion to dismiss for failure to state a claim is "viewed with disfavor and is rarely granted." *Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 365 (5th Cir. 2000); *Lowrey v. Texas A & M University System*, 117 F.3d 242, 247(5th

Cir. 1997), quoting *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982). Fifth Circuit law dictates that a district court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *See Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). *See also Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). A complaint will not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). *See also Baton Rouge Bldg. & Constr. Trades Council AFL-CIO v. Jacobs Constructors, Inc.*, 804 F.2d 879, 881 (5th Cir. 1986). The Fifth Circuit has held, however, that dismissal is appropriate "if the complaint lacks an allegation regarding a required element necessary to obtain relief." *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995) (citation omitted).

### B. Statute of Limitations for Breach of Contract Claim

The statute of limitations for a breach of contract claim under Texas law is four years. *See* Tex. Civ. Prac. & Rem. Code § 16.004 (Vernon 2002). Generally, a cause of action for contract accrues when a wrongful act causes injury, and thus the limitations period begins running from that point. *See Jackson v. West Telemarketing Corp Outbound*, 245 F.3d 518, 523-24 (5th Cir. 2001); *S.V. v. R.V.*, 933 S.W.2d 1 (Tex. 1996). For contract claims the cause of action generally begins to accrue at the time the contract is breached. *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002). The discovery rule is an exception to this rule, and "defers accrual of certain causes of action until the plaintiff knew, or exercising reasonable diligence, should have known of the wrongful act causing injury." *Salinas v. Gary Pools, Inc.*, 31 S.W.3d 333, 335 (Tex. App. 2000) (citations omitted); *see also Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001). But, the discovery rule affords protection in only limited instances: cases involving fraudulent concealment and cases where the nature of the injury is inherently undiscoverable and the injury itself is objectively verifiable. *See S.V.*, 933 S.W.2d at 6 (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996)).

Defendant argues Plaintiffs' breach of contract claim is barred by the statute of

15

10/01/2004 F   10:51 [TX/RX NO 5141] ☑ 017

limitations because Plaintiffs filed this suit on July 16, 2003, and thus any acts, omissions, or breaches that occurred before July 16, 1999, are barred. In essence, Defendant argues the only discernable breach of contact occurred on or near March 23, 1999, the date upon which Plaintiffs signed the indemnity agreement and Oscar Zamora, Sr. was killed due to Defendant's alleged breach of the contract between Robinson and ABB. More specifically, Plaintiffs allege in their amended complaint that on the morning of the lift, "appropriate lifting procedures were not in place," and "improper management of the project by C. H. Robinson" led to the accident, caused ABB to sign the indemnity agreement, and constituted, in part, a breach of the contract because Robinson "fail[ed] to preform the work it contracted for in a good and workmanlike manner." Pls' First Amended Original Cmplt, ¶¶ , 17, 24. As Defendant points out, with one exception, all allegations of fact that relate to a possible breach occurred on or before March 23, 1999. Plaintiffs additionally allege that following the accident, they were "required to re-evaluate the management of the project by [Robinson]" and "perform[ ] services which were the contractual responsibility of Defendant following the Zamora accident." Id. ¶¶ 19-21.

To survive the statute of limitations defense, Plaintiffs have raised the discovery rule in their amended complaint[1] and in their response to Defendant's first Motion to Dismiss. They argue the statute of limitations did not begin to run in this case until they suffered a legal harm, which did not occur until May 2000. Id. ¶ 32. Plaintiffs state they were "simply not injured on [the date of the accident, March 23, 1999]." Pls' Response, at p. 11 [Dkt. No. 11]. Plaintiffs then argue the mismanagement of the project continued after this date, "which would have been a continuing tort" because they had "to step-in and take over management duties of C. H. Robinson involving other shipments after th[is] date." Id. Finally, Plaintiffs contend that signing the indemnity agreement on the day of the lift is not a breach of contract without a legal harm. See Id.

---

[1] Plaintiffs do not plead the discovery rule by name, but they clearly indicate the injury for which they seek relief did not accrue until May 2000, over a year after the contract between ABB and Robinson was executed in February 1999. Plaintiffs argue the discovery rule in their response to Defendant's first Motion to Dismiss.

16

Plaintiffs do not allege, nor do they argue in their response that they could not discover their injury due to fraudulent concealment.

### C. Analysis of Discovery Rule to Breach of Contract Claim

As a matter of law, the Court determines the discovery rule cannot apply to this case as pled or argued in the parties' motions and responses. However, as will be discussed below, to the extent Plaintiffs allege breaches of contract occurred after March 23, 1999, which caused them legal injury, the Court will not dismiss this claim at this stage, but rather will await the submission of summary judgement motions, if forthcoming, to make a determination.

Texas courts have held many times that "[a]s a rule, . . . a cause of action accrues when a wrongful act causes some legal injury, *even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred.*" *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997) (citing *S.V.*, 933 S.W.2d at 4). However Plaintiffs may wish to couch their breach of contract claim, and the Court acknowledges they intend to plead some breaches of the contract occurred after the date of the accident at the Port, Plaintiffs believe an injury occurred at least in part when they were forced to sign the indemnity agreement as a result of Defendant's breach of the contract. The breach they reference encompasses alleged mismanagement of the project, failure to properly supervise and instruct sub-contractors, and failure to generally manage the project in a good workmanship-like manner. The breaches Plaintiffs refer to in part were mis-steps that necessarily had to occur before the accident on March 23, 1999, the date, or near to the date, the indemnity agreement was signed. Plaintiffs' argument that it was not until later when Brownsville Barge actually attempted successfully to obtain payment from ABB for contractual indemnity that they discovered the injury is not persuasive. Plaintiffs were fully aware of the action that led to their ultimate indemnity payment to Brownsville Barge on the day they signed the agreement. Once they signed the indemnity agreement, and the accident took place, which Plaintiffs allege would not have occurred but for Defendant's mismanagement of the project, Plaintiffs became aware of the alleged breaches that proximately caused the accident. According to Plaintiffs, they had no legal injury at this

point, and would never have a legal injury if Brownsville Barge never attempted to recover against ABB for liability incurred through settlement of the wrongful death suit brought by the Zamora family. Thus, the essence of Plaintiffs' argument is that their legal injury arose when some of their damages were sustained, which was not until they knew Brownsville Barge filed a claim after July 1999.

Unfortunately, neither the parties nor this Court have unearthed case law directly on point. As a result, case law that is cited refers to the more common circumstances in which the discovery rule is applied. For example, in legal or medical malpractice cases in which a layperson would not, or could not, discern that anything was amiss. *Murphy v. Campbell*, cited by Defendant, held the accrual of an accounting malpractice claim, which included a claim for faulty tax advice, was governed by the discovery rule even though the person suffered a legal injury from the faulty advice at the time it was given, but did not actually discover the injury until later when the taxpayer learned something of the injury upon notification of the IRS's audit. 964 S.W.2d at 271. In that case, the Court determined the accounting malpractice was inherently undiscoverable and objectively verifiable. *Id.* But, the Court stated the claim arose at the first sign of trouble--the IRS audit, and not when the IRS report and final determination were issued.

Of course, Plaintiffs urge this Court to hold that the date on which Brownsville Barge filed its cross-claim against ABB was the date, analogous to the IRS audit in *Murphy*, the injury was discovered, and no legal injury accrued until ABB was certain the Zamoras would file suit and Brownsville Barge would seek indemnity from ABB. In *Murphy*, the court held litigation need not be completed before the claim is considered to have accrued. *Id.* at 270.

The alleged breaches leading to the signing of the indemnity agreement occurred before the execution of the indemnity agreement, and thus the legal wrong occurred at that time. "[T]he statute [of limitations] begins to run from the time the act is committed *even where little, if any, actual damage occurs immediately.*" *Hunton v. Guardian Life Ins. Co. of America*, 243 F.Supp.2d 686, 702-03 (S.D. Tex. 2002) (citing *Atkins v. Crosland*, 417 S.W.2d 150, 153 (Tex. 1967) (emphasis added). As Plaintiffs admit, it was not the signing of the indemnity agreement that constituted a legal wrong,

18

but rather the alleged breaches that led to the accident, which then triggered their liability under the indemnity agreement. The breach of the contract was not concealed to Plaintiffs–an accident occurred and a longshoreman was killed. Plaintiffs' representative was on scene and witnessed at least some management problems that allegedly led to the accident. The fact that Plaintiffs did not recognize the alleged breaches as such does not trigger discovery rule protection. *Cf. Hunton*, 243 F.Supp.2d at 704-05 (holding that under Plaintiffs' own theory a breach of contract occurred when Defendant failed to perform according to the contract and not when the Defendant actually charged Plaintiffs premiums beyond those specified in the contract).

The Court holds that as factually pled and legally argued, Plaintiffs have not convincingly raised the discovery rule to survive a statute of limitations defense on their contract claim. To the extent, therefore, that Plaintiffs allege breach(es) of contract that occurred before March, 1999, they are barred by the statute of limitations. The Court is bothered, however, by the fact that Plaintiffs, albeit vaguely, assert in their amended complaint that breaches of the contract occurred after July, 1999. In an abundance of caution, and despite the fact that the Court is dubious that Plaintiffs have adequately pled breach of contract claims occurring after July 1999, the Court will deny this portion of Defendant's Motion to Dismiss. Defendant is of course free to file a motion for summary judgment at any time, which the Court can consider along with Plaintiffs' response.

**D. Indemnity Claim**

Defendant argues Plaintiffs have no basis under Texas law to support a claim for indemnity. *See* Pls' Amended Original Cmplt. ¶¶ 34-36. Under Texas law, two categories of indemnity exist: (1) common law indemnity and (2) contractual indemnity. Unlike contractual indemnity, common law indemnity in Texas is extremely circumscribed, and thus the general rule is that common law indemnity no longer exists in Texas. *See, e.g., Cypress Creek Utility Serv. Co. v. Muller*, 640 S.W.2d 860, 864 (Tex. 1982). Typically, therefore, if a party desires indemnification for its negligence, it must contract for such protection. *See Hardy v. Gulf Oil Corp. v. Bouygues Offshore U.S.A., Inc.*, 949 F.2d 826, 830 (5th Cir. 1992). Only two exceptions apply to the

10/01/2004 FRI 10:51 [TX/RX NO 5141] ☑021

abolishment of common law indemnity in Texas.  Common law indemnity survives in products liability actions to protect an innocent retailer.  *See Duncan*, 665 S.W.2d at 432.  Additionally, common law indemnity exists "in negligence actions to protect a defendant whose liability is purely vicarious in nature."  *Hardy*, 949 F.2d at 831 (citing *e.g., Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 819-20 (Tex. 1984)).

It is undisputed that ABB does not have a claim for contractual indemnity against Robinson because no such agreement exists.  And as to the indemnity agreement between ABB and Brownsville Barge, it is important to recall that Robinson refused to sign this agreement in which ABB agreed to indemnify Brownsville Barge for any loss it incurred during the lift of the generator at the Port of Brownsville.  Moreover, the first exception to the limitation of common law indemnity does not apply in this case because this is not a product liability claim.  Rather, Plaintiffs claim they were liable to Brownsville Barge in the underlying suit based on vicarious liability because at all times relevant to this suit, Robinson was acting as ABB's agent.  Because of this alleged agency relationship, Plaintiffs seek to recover indemnity from Robinson.

More specifically, Plaintiffs seek indemnity for expenses incurred in their defense of the state claim brought by the Zamora family against ABB, Robinson, and Brownsville Barge.  Plaintiffs also seek the amounts paid in the Zamora lawsuit, which eventually settled.  Separate from the settlement just mentioned, Brownsville Barge filed a cross-claim in state court against ABB in which it asserted contractual indemnity. Brownsville Barge argued "ABB owed it contractual indemnity for the legal fees it incurred in defending against the Zamora family's claims."  Finally, Plaintiffs seeks all monies "that may be paid in any judgment obtained by Brownsville Barge."  Pls' Amended Original Cmplt. ¶ 35.

As a result, ABB only partly seeks indemnification from Robinson based on a theory of vicarious liability--a theory that Robinson vigorously contests.  Plaintiffs also seek to shift to Robinson their own *contractual* liability to Brownsville Barge under the indemnity agreement signed by ABB and Brownsville Barge.  This argument is problematic because Plaintiffs do not seek recovery in a negligence action from a joint tortfeasor based on vicarious liability.  In fact, Plaintiffs' liability to Brownsville Barge

was not based in negligence at all, but rather based on contract. Defendant Robinson did not force Plaintiffs ABB to sign the indemnity agreement, and yet Plaintiffs now seek recovery because only they entered into an indemnity contract with Brownsville Barge.

To the extent Plaintiffs seek recovery for other expenses paid in the settlement of the Zamora lawsuit for negligence, Plaintiffs argue their causes of action are based upon vicarious liability because Robinson was acting as its agent. Robinson counters by arguing common law indemnity can only accrue when liability in the underlying action was actually based on vicarious liability and not solely based on direct liability. *See, e.g., Compton v. Texaco, Inc.*, 42 S.W.3d 354, 361-62 (Tex. App. –Houston [14th Dist.] 2001, pet. denied). Furthermore, the general rule is that common law indemnity does not arise based solely on a contractual relationship. *See Astra Oil Co., Inc. v. Diamond Shamrock Refining Co.*, 89 S.W.3d 702, 706 (Tex. App.–Houston [1st Dist.] 2002, pet. denied); *American Alloy Steel, Inc. v. Armco, Inc.*, 777 S.W.2d 173, 175 (Tex. App. –Houston [14th Dist.] 1989, no writ). Although Plaintiffs cite no authority that a contractual relationship alone will support vicarious liability, Plaintiffs do argue Robinson was acting as its agent, and thus ABB was liable vicariously for Robinson's negligence.

Frankly, the Court does not see how Plaintiffs will prove that an agency relationship exists based solely on the contract, or that Plaintiffs were sued in the underlying lawsuit under a theory of vicarious liability. Nevertheless, in its response to a Motion to Dismiss, Plaintiffs are not required to *prove* their claim. Because Plaintiffs pled that Robinson was ABB's agent, and failed to "live up to the terms of this agency relationship," the Court will most cautiously deny Defendant's Motion to Dismiss Plaintiffs' indemnity claim. As previously stated, Defendant will have the opportunity to file a motion for summary judgment. At that point, if it is appropriate and if Plaintiffs cannot provide evidence of the existence of vicarious liability based on an agency relationship giving rise to the right of common law indemnity, or otherwise demonstrate indemnity would be appropriate as a matter of law, the Court will grant summary judgment.

### IV. Conclusion

21

The Court **DENIES** Plaintiff's Motion for Application of Swiss Law [Dkt. No. 26], **DENIES** in part and **GRANTS** in part Defendant's Amended Motion to Dismiss [Dkt. No. 34], **GRANTS** Plaintiffs' Motion for Extension of Time to File Affidavits [Dkt. No. 31-1], Plaintiffs' Motion for Delay on Ruling [Dkt. Nos. 31-2 & 36-1], Plaintiffs' Motion to Attach Affidavit to Previously Filed Motion [Dkt. No. 39-1], and **GRANTS** Defendant's Motion for Leave to File Surreply [Dkt. No. 37-1].

DONE this 30th day of September 2004, at Brownsville, Texas.

Hilda G. Tagle
United States District Judge

22

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **ABB KRAFTWERKE** | § | |
| **AKTIENGESELLSCHAFT, and** | § | |
| **ABB ALSTOM POWER** | § | |
| **(SWITZERLAND) LTD., formerly known** | § | |
| **as ABB POWER GENERATION, LTD.** | § | |
| | § | |
| **Plaintiffs** | § | **CIVIL ACTION NO. B-03-192** |
| | § | |
| **vs.** | § | |
| | § | |
| **C.H. ROBINSON COMPANY** | § | |
| | § | |
| **Defendant** | § | |

**DEFENDANT C.H. ROBINSON COMPANY'S AMENDED**
**NOTICE OF ORAL DEPOSITION OF CORPORATE REPRESENTATIVE OF**
**ABB ALSTOM POWER (SWITZERLAND) LTD.**

To: Plaintiff, ABB KRAFTWERKE AKTIENGESELLSCHAFT, and ABB ALSTOM POWER (SWITZERLAND) LTD., formerly known as ABB POWER GENERATION, LTD., through their attorney of record, Justin L. Williams, 600 Leopard St., Suite 1810, Corpus Christi, Texas 78473.

Please take notice that under Federal Rule of Civil Procedure 30, Defendant, C.H. Robinson Company, will take the oral deposition of ABB ALSTOM POWER (SWITZERLAND) LTD. on Wednesday, December 15, 2004 at 2:00 P.M. at the offices of McGinnis, Lochridge & Kilgore, LLP, 3200 One Houston Center, 1221 McKinney St., Houston, Texas 77006.

1.     ABB Alstom Power (Switzerland) Ltd. is directed to designate a person or persons to testify who have the most knowledge on its behalf in the following matters:

a.     The relationship between C.H. Robinson and ABB Power Generation, Ltd.;

EX. 14

b.    Factual bases, if any exist, to support the contention that C. H. Robinson was an agent of ABB Power Generation, Ltd.;

c.    Any purported breaches of the February 19, 1999 contract, which Plaintiffs contend occurred on or after July 16, 1999;

d.    Factual bases, if any exist, to support the contention that Plaintiff ABB Alstom Power (Switzerland) Ltd.'s liability in the underlying lawsuits was purely vicarious in nature;

e.    The relationship between ABB Power Generation, Ltd. and each of the Plaintiffs; and

f.    The whereabouts and means of contacting:

> Sandro Lepori
> Alfred Koller
> Roland Schneider
> Lucerio Moreli.

2.    The deposition will be recorded stenographically by a qualified reporter for all purposes authorized under the Federal Rules of Civil Procedure.

Respectfully submitted,

McGINNIS, LOCHRIDGE & KILGORE, L.L.P.

By: _Karen C. Ciotti_____
    Steven J. Watkins
    State Bar No. 20927700
    So. Dist. Bar No. 146
    Karan C. Ciotti
    State Bar No. 05226300
    So. Dist. Bar No. 16874
3200 One Houston Center
1221 McKinney Street
Houston, Texas 77010
Telephone: (713) 615-8500
Facsimile: (713) 615-8585

ATTORNEYS FOR DEFENDANT
C.H. ROBINSON COMPANY

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and complete copy of the above and foregoing Defendant C.H. Robinson Company's Amended Notice of Oral Deposition of Corporate Representative of ABB Alstom Power (Switzerland) Ltd. has been served via facsimile and via certified mail, return receipt requested, on this the 19th day of November, 2004, to the following:

Justin L. Williams
The Law Office of Justin L. Williams, P.C.
600 Leopard Street, Suite 1810
Corpus Christi, Texas 78473

Karan C. Ciotti
_____
Karan C. Ciotti

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ABB KRAFTWERKE                )
AKTIENGESELLSCHAFT,           )
ET AL.,                       )
                              )
          PLAINTIFFS,         )
                              )
VS.                           ) CIVIL ACTION
                              ) NO. B-03-192
                              )
C.H. ROBINSON COMPANY,        )
                              )
          DEFENDANT.          )


**********************************************************

ORAL DEPOSITION OF

JOHN R. BARRY,

CORPORATE REPRESENTATIVE OF THE PLAINTIFFS

DECEMBER 15, 2004

**********************************************************


     ORAL DEPOSITION OF JOHN R. BARRY, produced as a
witness at the instance of the Defendant, and duly
sworn, was taken in the above-styled and numbered cause
on DECEMBER 15, 2004, from 3:04 p.m. to 3:55 p.m.,
before Shanna Obenberger, CSR in and for the State of
Texas, reported by machine shorthand, at the offices of
McGinnis, Lochridge & Kilgore, L.L.P, 3200 One Houston
Center, 1221 McKinney Street, Houston, Harris County,
Texas, pursuant to the Federal Rules of Civil Procedure.


JOB NUMBER:


ROSS REPORTING SERVICES, INC.   281-484-0770

c79764e0-5e2c-11d9-ae32-00d0b780bcf2

EX.17

Page 14

1    understanding?

2         A.    Yes, as outlined in the complaint.

3         Q.    Can you tell me as the plaintiffs' corporate

4    representative what your understanding is of how C.H.

5    Robinson breached this contract?

6         A.    Well, after having reviewed the documentation

7    provided by ABB's attorney, it's my conclusion that

8    there was a contract issued between the two parties, ABB

9    and C.H. Robinson.  It was what I refer to as a

10   lump-sum, turnkey contract.  I think representatives of

11   C.H. Robinson even referred to "turnkey services" that

12   they would provide.  And in my industry that's all

13   encompassing in terms of soup-to-nuts, A-to-Z.

14              Their agreement, what they sold -- their

15   service was to move a piece of equipment from point A to

16   point B and to take care of all requirements, services,

17   needs that may be necessary to get it from point A to

18   point B, its final destination at the job site.

19              There was scope of services that they

20   agreed to do for a certain price, and they had operator

21   management, agency control and had abilities to some

22   part commit ABB to obligations for services and monies

23   over and above the contract price through some informal

24   agreements, I suspect, since there's no change orders to

25   the contract or anything, but there's subsequent

c79764e0-5e2c-11d9-ae32-00d0b780bcf2

Page 15

1    billings from C.H. Robinson to ABB for services that

2    they referred to as contingency services and what-not.

3        Q.   Okay.  Let's back up a little bit here.  When

4    you say "turnkey contract," I want to make sure I

5    understand what you mean.  And I think your definition

6    of "turnkey contract" was wrapped up in the response

7    that you just gave me, but just to be clear for the

8    record:  Tell me what you mean when you say "turnkey

9    contract."

10       A.   What I mean by it is an agreement -- an

11   obligation to perform certain services for a certain

12   price, and it's all encompassing in nature.  In the EPC

13   industry that I'm in, a contractor may enter into an EPC

14   lump-sum, turnkey contract with an owner; and in

15   exchange for a certain amount of money, the EPC

16   contractor would perform the engineering design

17   services, the procurement services, the construction

18   services and assumes a lot of risk in connection with

19   those turnkey services, and he's paid handsomely for it.

20               I mean, the owners recognize that because

21   it's turnkey, they have to pay additional sums, because

22   there's scheduling implications, there's performance

23   complications, there's all these risks that you're

24   asking a turnkey contractor to assume.  I mean, it could

25   be labor issues and soil conditions and political risks

ROSS REPORTING SERVICES, INC.  281-484-0770

c79764e0-5e2c-11d9-ae32-00d0b780bcf2

Page 16

1    and things of that nature.  And until that plant is

2    turned over to the owner where the owner can turn a key

3    and operate it and produce revenue -- that's where

4    "turnkey" comes from -- then the obligations and the

5    risks are with that turnkey contractor.

6                And at the point that he turns over the

7    plant for operation to turn the key, turn the switch to

8    produce product in accordance with the obligations under

9    the contract, you know, the risk is with that turnkey

10   contractor.

11               Now, "turnkey" was used by C.H.

12   representatives in their depositions, and, you know,

13   whether or not that fits some industry definition, I

14   don't know.

15        Q.   Okay.  Tell me what "EPC" stands for.

16        A.   Engineering, procurement and construction.

17        Q.   And you said that that's the side of the

18   business that you're involved in.

19        A.   ABB Lummus Global is an EPC company.

20        Q.   Okay.  You also in your response earlier

21   referenced "operator management, agency control."  Tell

22   me what you mean by that.

23        A.   Well, I mean, the document says -- refers to

24   C.H. Robinson as operator.

25        Q.   Tell me what you mean by "agency control."

Page 19

1    Q.    I think the last question I asked you is

2  redundant, but I just want to make sure I'm getting

3  whatever information you might have about this.

4         Do you know of anything that C.H. Robinson

5  was supposed to do under this contract that they didn't

6  do or that they did improperly after July 16, 1999?

7    A.    I do not know.

8    Q.    Do you know when C.H. Robinson completed

9  performing services for ABB under this contract?

10   A.    No, I do not.

11   Q.    Let me show you another document that we'll

12  mark Exhibit 4.

13         Hold on.  I don't believe that's the

14  complete document.

15              (Barry Exhibit Number 4 was marked for

16              identification and is attached hereto.)

17   Q.    (BY MS. CIOTTI)  Exhibit Number 4 is actually

18  two pages. ·

19   A.    Yeah.

20   Q.    Have you seen that document before?

21   A.    Yes.

22   Q.    Can you identify it for me?

23   A.    It's a letter and invoice from C.H. Robinson

24  to ABB, invoicing for services rendered, also

25  referencing an amount to cover project contingency costs

Page 25

1      Q.   With that understanding, that you can't give

2   me a legal definition for agency, tell me why it is that

3   you believe C.H. Robinson was acting as ABB's agent.

4      A.   Well, they undertook responsibilities on

5   behalf of a benefit to ABB, and those responsibilities

6   are outlined in general in their contract which outlines

7   in general scope of services, and the representations

8   that were made, you know, verbally and in meetings,

9   which are referenced in some of the depositions, by C.H.

10  Robinson to ABB and the fact that they were operator and

11  under a fixed price contract subject to compensation for

12  additional services, you know, and said they would

13  execute all services necessary to move the generator

14  from the barge and deliver it to the job site.  And they

15  had, in my opinion, total control and responsibility for

16  the execution, which goes to lump-sum, turnkey services.

17              MS. CIOTTI:  Can we take a break?

18              MR. WILLIAMS:  Sure.

19              (Recess was taken from 3:42 p.m. to

20              3:48 p.m.)

21      Q.   (BY MS. CIOTTI)  Mr. Barry, I just want to go

22  over the topics that were listed in the notice of

23  deposition and make sure that we've covered all these.

24  And right now I'm looking at Exhibit Number 1.

25              Exhibit Number 2 and Exhibit Number 1, the

ROSS REPORTING SERVICES, INC.   281-484-0770

c79764e0-5e2c-11d9-ae32-00d0b780bcf2

1  STATE OF TEXAS:

2

3        I, Shanna Obenberger, a Certified Shorthand

4  Reporter in and for the State of Texas, certify that the

5  examination of JOHN R. BARRY was correctly reported in

6  shorthand by me at the time and place and under the

7  agreement set forth in said caption and has been

8  transcribed from machine shorthand into typewriting

9  under my supervision in the foregoing transcript and

10  that said transcript contains a correct record of the

11  proceedings had at said time and place and that I am not

12  attorney for or relative of any of said parties, or

13  otherwise interested in the event of said action.

14

15        GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this,
   the 3rd day of January, 2004.

16

17

18

19  Shanna Obenberger, CSR/RPR
    Certificate Number: 6847

20  Expiration: 12/31/05

21  Ross Reporting Services, Inc.
    Registration No. 169

22  11706 Playa Court
    Houston, Texas 77034

23  (281) 484-0770

24

25

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ABB KRAFTWERKE | § | |
| AKTIENGESELLSCHAFT, and | § | |
| ABB ALSTOM POWER (SWITZERLAND) | § | |
| LTD., formerly known as ABB POWER | § | |
| GENERATION, LTD. | § | |
| Plaintiffs | § | Civil Action No. B-03-192 |
| VS. | § | |
| | § | |
| C. H. ROBINSON COMPANY | § | |
| Defendant | § | |

### PLAINTIFFS' ANSWERS AND OBJECTIONS TO DEFENDANT
### C. H. ROBINSON'S FIRST SET OF INTERROGATORIES

TO:   Defendant, C. H .ROBINSON, by and through their attorney of record, Mr. Steven
J. Wakins, McGINNIS, LOCHRIDGE & KILGORE, L.L.P., 3200 One Houston
Center, 1221 McKinney Street, Houston, Texas 77010.

COMES NOW, Plaintiffs, ABB KRAFTWERKE AKTIENGESELLSCHAFT, and

ABB ALSTOM POWER (SWITZERLAND) LTD., formerly known as ABB POWER

GENERATION, LTD. (hereinafter referred to as "ABB" or "ABB Plaintiffs"), and file this

their ANSWERS AND OBJECTIONS TO DEFENDANT C. H. ROBINSON'S FIRST SET

OF INTERROGATORIES.

Respectfully submitted,

The Law Office of Justin L. Williams, P.C.
600 Leopard Street, Suite 1810
Corpus Christi, Texas 78473
Telephone:   (361) 888-7702
Facsimile:   (361) 888-7717

Page 1 of 3

EX. 18

By: _____

Justin L. Williams
State Bar Number 00795384

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document was

forwarded on this the 14th day of December, 2004, to all counsel of record, as listed below

and in the manner designated:

**CERTIFIED MAIL, RRR and FACSIMILE:**
Mr. Steven J. Watkins
Ms. Karan C. Ciotti
McGINNIS, LOCHRIDGE & KILGORE, L.L.P.
3200 One Houston Center
1221 McKinney Street
Houston, Texas 77010

Justin L. Williams

Page 2 of 3

**PLAINTIFFS' ANSWERS AND OBJECTIONS TO DEFENDANT**
**C. H. ROBINSON'S FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1:**

Identify all communications between Defendant and Plaintiffs relating to the February 19, 1999 contract, which communications occurred on or after July 16, 1999.

**ANSWER:**

At this time, Plaintiff is aware of at least the following: letter of July 19, 1999 from Jim Hamilton to Sandro Lepori and ABB letters, and money in response to Hamilton's letter. Lepori is the one who has possession of these documents and information and Plaintiff has been unable to obtain these as of the date of these answers. There may be more documents and communications regarding the shipments subsequent to the one involved in the Zamora accident - these are being obtained.

**INTERROGATORY NO. 2:**

Identify all communications between Defendant and Plaintiffs relating to the shipments that are the subject of the February 19, 1999 contract, which communications occurred on or after July 16, 1999.

**ANSWER:**

Same as above.

**INTERROGATORY NO. 3:**

Identify all services performed by Defendant pursuant to the February 19, 1999 contract, which services were performed on or after July 16, 1999.

**ANSWER:**

Unaware at this time of any services performed after that date.

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

ABB KRAFTWERKE                      §
AKTIENGESELLSCHAFT, and             §
ABB ALSTOM POWER (SWITZERLAND)      §
LTD., formerly known as ABB POWER   §
GENERATION, LTD.                    §
                        Plaintiffs  §        Civil Action No. B-03-192
VS.                                 §
                                    §
C. H. ROBINSON COMPANY              §
                        Defendant   §

### PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT
### C. H. ROBINSON'S FIRST REQUESTS FOR PRODUCTION

TO:   Defendant, C. H .ROBINSON, by and through their attorney of record, Mr. Steven
      J. Wakins, McGINNIS, LOCHRIDGE & KILGORE, L.L.P., 3200 One Houston
      Center, 1221 McKinney Street, Houston, Texas 77010.

      COMES NOW, Plaintiffs, ABB KRAFTWERKE AKTIENGESELLSCHAFT, and

ABB ALSTOM POWER (SWITZERLAND) LTD., formerly known as ABB POWER

GENERATION, LTD. (hereinafter referred to as "ABB" or "ABB Plaintiffs"), and file this

their RESPONSES AND OBJECTIONS TO DEFENDANT C. H. ROBINSON'S FIRST

REQUESTS FOR PRODUCTION.

                          Respectfully submitted,

                          The Law Office of Justin L. Williams, P.C.
                          600 Leopard Street, Suite 1810
                          Corpus Christi, Texas 78473
                          Telephone:   (361) 888-7702
                          Facsimile:   (361) 888-7717

                          Page 1 of 3

By: _____
Justin L. Williams
State Bar Number 00795384

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document was

forwarded on this the 14th day of December, 2004, to all counsel of record, as listed below

and in the manner designated:

**CERTIFIED MAIL, RRR and FACSIMILE:**
Mr. Steven J. Watkins
Ms. Karan C. Ciotti
McGINNIS, LOCHRIDGE & KILGORE, L.L.P.
3200 One Houston Center
1221 McKinney Street
Houston, Texas 77010

Justin L. Williams

Page 2 of 3

PAGE 7/8 * RCVD AT 12/14/2004 4:44:11 PM [Central Standard Time] * SVR:HOU-FAX/3 * DNIS:3885 * CSID:888 7717 * DURATION (mm-ss):01-54

## PLAINTIFFS' ANSWERS AND OBJECTIONS TO DEFENDANT
## C. H. ROBINSON'S FIRST REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

The settlement agreement(s) between you and the Zamora family.

**RESPONSE:**

Will supplement. In the process of obtaining a copy of the agreement.

**REQUEST FOR PRODUCTION NO. 2:**

All documents reflecting communications between Plaintiffs and Defendant <u>on or after</u> July 16, 1999.

**RESPONSE:**

Previously produced letters.

Page 3 of 3