## AFFIDAVIT OF BEN G. CAMPBELL

STATE OF MINNESOTA       §

                             §

COUNTY OF HENNEPIN      §

On this day, Ben G. Campbell appeared before me, the undersigned notary public. After I administered an oath to him, upon his oath, he said:

1. My name is Ben G. Campbell. I am competent to make this affidavit. The facts stated within this affidavit are within my personal knowledge and are true and correct.

2. I am Senior Counsel for C.H. Robinson Company. In that capacity, I maintain the written contract files for our customers. These files contain certain documents relating to contracts between C.H. Robinson Company and its customers, including documents like the final invoice, CHR/ABB 000308-000311, attached to Defendant C.H. Robinson Company's Motion for Summary Judgment.

3. These records are kept by C.H. Robinson Company in the regular course of business. Also, it was the regular course of C.H. Robinson Company's business for an employee or representative of C.H. Robinson Company with knowledge of the acts, events, conditions, or opinions contained in the records to make the records or transmit information to be included in the records. The records attached to this affidavit were made at, near, or reasonably soon after the time of the acts, events, and conditions set forth by, or from information transmitted by, a person with knowledge of these matters. The attached records are the original records or exact duplicates of the original records.

Name: Ben G. Campbell
Title: Senior Counsel

SWORN TO and SUBSCRIBED before me by Ben G. Campbell on 25 th February, 2005.

Notary Public, State of Minnesota

Noelle Dawn Rodriguez
(Printed or Stamped Name of Notary)
My Commission Expires: 01/31/07

NOELLE DAWN RODRIGUEZ
Notary Public
Minnesota
My Commission Expires January 31, 2007

EX. 19

**C.H. ROBINSON COMPANY**



July 19, 1999

129 Keller Hicks Road
Keller, TX
76248-4438
817.431.3146
fax 817.431.3425

Mr. Sandro Lepori
General Manager Transport Logistics
Gas Turbine and Combined-Cycle Power Plants
ABB Power Generation Ltd.
Dept. KWGP-L
CH-5401 Baden / Switzerland

Dear Sandro,

Attached please find the final two invoices for the Monterrey project.

Invoice # 0157-657510 in the amount of $32,200.00 U. S. is for the delivery of the two smaller transformers, per our quotation dated February 3, 1999 (copy attached).

Invoice # 0157-657505 in the amount of $52,840.08 U. S. covering project contingency costs. Per our initial agreement, our price included $55,000 in contingency money for excessive detention, demurrage, riders, special train, tie down, etc. costs that happen in a project of this magnitude.  Below please find items included in the contingency amount:

    1).  Additional tide down costs for generator and turbine to ABB specifications above AAR requirements.
    2).  Additional charges for changing generator covers on first generator.
    3).  Special switches on PTRA for empty equipment expediting.
    4).  Special train service on UP for empty equipment expediting.
    5).  Spreader Bars for turbine lifts.

Also enclosed is a customer satisfaction survey we would like you to complete and return.

If you have any further questions, please do not hesitate to call.

Best Regards,

Jim Hamilton
General Manager - Multimodal Heavy Transport

CHR / ABB
000308

EX. A

REMIT TO:                                          Branch:              Fort Worth Branch
C. H. Robinson                                     Phone:               817 431-3146
SDS 12-0805                                        Invoice Date:        07/19/99
P. O. Box 86                                       Invoice Number:      0157-657510
Minneapolis, MN. 55486-0805

```
*******************************
*        .   INVOICE        *
*******************************
```

BILL TO:     ABB POWER GENERATION
             DEPT. KWGP-L
             CH-5401 BADEN/SWITZERLAND

SHIPPER:
             PORT OF BROWNSVILLE
             BROWNSVILLE,TX

CONSIGNEE:   ABB
             HUINALA,NL MEXICO


| DESCRIPTION OF CHARGES | AMOUNT |
|---|---|
| TRANSPORTATION FROM BROWNSVILLE,TX TO JOB SITE IN HUINALA. | |
| TWO TRANSFORMERS ($16100 US EACH) | $32,200 |

PLEASE PAY THIS AMOUNT          $ 32,200



NET DUE: 30 DAYS

CHR / ABB
000309

REMIT TO:                                  Branch:          Fort Worth Branch
C. H. Robinson                             Phone:           817 431-3146
SDS 12-0805                                Invoice Date:    07/19/99
P. O. Box 86                               Invoice Number:  0157-657505
Minneapolis, MN. 55486-0805

```
*********************************
*          INVOICE           *
*********************************
```

BILL TO:    ABB POWER GENERATION
            DEPT. KWGP-L
            CH-5401 BADEN/SWITZERLAND

SHIPPER:
            PORT OF BROWNSVILLE
            BROWNSVILLE,TX

CONSIGNEE:  ABB
            HUINALA,NL MEXICO

| DESCRIPTION OF CHARGES | AMOUNT |
|---|---|
| DELIVERY OF 2ND TURBINE  FROM BROWNSVILLE TO HUINALA | $52,840.08 |

```
=========================================
```
PLEASE PAY THIS AMOUNT          $52,840.08

NET DUE: 30 DAYS

CHR / ABB
000311

**Page 1**

```
1                        NO. 99-04-1644-E

2   GRACIELA ZAMORA,              )  IN THE DISTRICT COURT OF
    INDIVIDUALLY AND ON           )
3   BEHALF OF THE ESTATE OF       )
    HER LATE HUSBAND OSCAR        )
4   ZAMORA, SR.; AND ON BEHALF    )
    OF THEIR MINOR SURVIVING      )
5   SON OSCAR ZAMORA, JR.; AND    )
    OLIVIA ZAMORA, THE            )
6   SURVIVING MOTHER OF THE       )
    LATE OSCAR ZAMORA, SR.;       )
7   AND ON BEHALF OF ALL THOSE    )
    ENTITLED TO RECOVER FOR THE   )
8   TRAGIC, UNTIMELY DEATH OF     )
    THE LATE OSCAR ZAMORA, SR.    )  357TH JUDICIAL DISTRICT
9        Plaintiffs               )
    and                           )
10  ANGIE ZAMORA                  )
         Intervenor               )
11                                )
    v.                            )
12                                )
    ABB KRAFTWERKE                )
13  AKTIENGESELLSCHAFT,           )
    ABB ALSTOM POWER              )
14  (SWITZERLAND), LTD.,          )
    FORMERLY KNOWN AS ABB         )
15  POWER GENERATION, LTD.        )
    and BROWNSVILLE BARGE         )
16  & CRANE, INC.                 )  CAMERON COUNTY, TEXAS

17            ORAL AND VIDEOTAPED DEPOSITION OF

18                    April 25, 2000

19       ORAL AND VIDEOTAPED DEPOSITION OF JAMES HAMILTON,
    produced as a witness at the instance of the Defendants
20  ABB Kraftwerke Aktiengesellschaft and ABB Alstom Power
    (Switzerland) Ltd., f/k/a ABB Power Generation, Ltd.,
21  and duly sworn, was taken in the above-styled and
    numbered cause on April 25, 2000, from 9:26 a.m. to
22  11:30 a.m., before Gloria Carlin, CSR No. 498 in and
    for the State of Texas, reported by Stenographic
23  method, at the offices of Hill Gilstrap, 1400 West
    Abram Street, Arlington, Texas, pursuant to the Texas
24  Rules of Civil Procedure, Notice and the provisions
    stated on the record.
25
```

**Page 2**

```
1                  A P P E A R A N C E S

2   For the Plaintiff:
       William J. Tinning, Esq. (VIA TELEPHONE)
3      LAW OFFICE OF WILLIAM J. TINNING
       1013 Bluff Drive
4      Portland, Texas 78374

5   For the Defendants ABB Kraftwerke Aktiengesellschaft
    and ABB Alstom Power (Switzerland), Ltd., f/k/a ABB
6   Power Generation, Ltd.:

7      Justin L. Williams, Esq.
       WILLIAMS, KASPERITIS & COHAN
8      5959 S. Staples, Suite 204
       Corpus Christi, Texas 76102
9
    For C.H. Robinson & The Witness:
10
       Tom Lockhart, Esq.
11     ADAMS & GRAHAM, L.L.P.
       222 E. Van Buren, West Tower
12     P.O. Drawer 1429
       Harlingen, Texas 78551
13
    Also Present:  David Crenshaw, Videographer
14                 Accurate Evidence Legal Video
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                        INDEX

2   Appearances . . . . . . . . . . . . . . . .     2

3   Stipulations. . . . . . . . . . . . . . . .     4

4

5   JAMES HAMILTON

6      Examination by Mr. Williams. . . . . . .     4
       Examination by Mr. Tinning . . . . . . .    71
7      Re-Examination by Mr. Williams . . . . .    87
       Re-Examination by Mr. Tinning. . . . . .    93
8      Re-Examination by Mr. Williams . . . . .    94

9   Signature and Changes . . . . . . . . . . .    97
    Reporter's Certificate. . . . . . . . . . .    99
10
11                      EXHIBITS
    NO.  DESCRIPTION              MARKED  IDENTIFIED
12   1   Photograph                 52       52
     2   Photograph                 52       52
13   3   Photograph                 52       54
     4   Photograph                 70       70
14   5   Documents from ABB         83       81
     6   Contract                   83       81
15   7   Photograph                 92       92

16

17           REQUESTED DOCUMENTS/INFORMATION
    DESCRIPTION                          Page/Line
18  None

19                  CERTIFIED QUESTIONS

20  NO.                                  Page/Line
    None
21
22
23
24
25
```

**Page 4**

```
1        THE REPORTER:  Any stipulation y'all
2   want on the record?
3        MR. WILLIAMS:  Taken pursuant to the
4   Rules.
5        MR. TINNING:  Tom, are you going to have
6   your guys read and sign?
7        MR. LOCKHART:  Yes.
8        MR. TINNING:  Good.  Okay.
9        MR. LOCKHART:  Well, let me just ask
10  him.  Jim, you as the witness, you have the right to
11  read over the written transcript to ensure its
12  correctness and then sign it in front of a notary or
13  you can waive that, that's up to you.
14       THE WITNESS:  I can -- I think I'll
15  waive it.
16       MR. LOCKHART:  Okay.  Do you hear that,
17  Bill?
18       MR. TINNING:  Yeah, I did.  That's fine.
19  It's being videoed, isn't it?
20       MR. LOCKHART:  Yes.
21       (REPORTER'S NOTE:  After the deposition
22  concluded Mr. Lockhart informed Reporter that Mr.
23  Hamilton would like to read and sign and Mr. Lockhart
24  followed that up with a letter requesting same dated
25  April 27, 2000.)
```

EX. 20

Page 93

1   A. No.
2   Q. Whose job was it to ensure that the rail car
3 was set up properly as depicted in photo 7?
4   A. The responsibility was for the stevedore,
5 Schaefer, to ensure that it was set up at the direction
6 of C.H. Robinson and ABB.
7   Q. Whose responsibility was it to ensure that
8 the generator was properly aligned over the rail car so
9 the jacking plates would fit into the openings on the
10 rail car?
11   A. The responsibility was for Schaefer
12 Stevedoring to ensure that it was lined up at the
13 direction of C.H. Robinson and ABB.
14     MR. WILLIAMS: Thank you very much, sir.
15 Pass the witness.
16     MR. TINNING: Did you pass?
17     MR. WILLIAMS: Yes.
18     RE-EXAMINATION
19 BY MR. TINNING:
20   Q. One last thing, Mr. Hamilton, ABB is the
21 company that hired both C.H. Robinson and the
22 Brownsville Barge & Crane and everybody downstream, not
23 the other way around; correct?
24   A. ABB --
25   Q. Correct?

Page 94

1   A. ABB hired C.H. Robinson and C.H. Robinson
2 hired the other subcontractors.
3   Q. And ABB directly hired Brownsville Barge &
4 Crane; correct?
5   A. No. They did that in combination with
6 Schaefer Stevedoring.
7   Q. Were you even aware that there was a direct
8 contract entered into by Roland Schneider on behalf of
9 ABB there with Brownsville Barge & Crane?
10   A. In -- in connection with Schaefer
11 Stevedoring.
12   Q. Okay. But the bottom line is between ABB and
13 C.H. Robinson, ABB hired C.H. Robinson, not the other
14 way around; correct?
15   A. Yes, ABB hired C.H. Robinson, correct.
16   Q. Thank you very much. Are all your answers
17 still complete, true and correct?
18   A. Absolutely.
19     MR. TINNING: Thank you.
20     RE-EXAMINATION
21 BY MR. WILLIAMS:
22   Q. Okay. From the standpoint of the manager or
23 facilitator of this transfer of this generator from the
24 last barge down to the location in Mexico, when you
25 were present at C.H. Robinson with your experience, did

Page 95

1 you have -- did you have any -- would you have had any
2 misgivings about Robinson's ability to perform that job
3 on behalf of ABB?
4   A. No.
5   Q. Would you have ever given any indication to
6 anyone at ABB that they should hire another -- another
7 transportation company?
8   A. If I felt we could not do the job, I
9 absolutely would.
10   Q. And did you ever tell anybody that you
11 thought there would be any problems with C.H. Robinson
12 performing the job that they contracted with ABB to
13 perform?
14   A. No.
15   Q. In fact, as -- the opposite actually
16 occurred, in that you told them that you would actually
17 be able to handle the job and to handle it competently
18 and correctly?
19   A. And I feel we did.
20     MR. WILLIAMS: Thank you very much, sir.
21     MR. TINNING: No further questions.
22 Thank you very much, Mr. Hamilton.
23     MR. WILLIAMS: That's it.
24     THE WITNESS: You bet.
25     THE VIDEOGRAPHER: We're off the record.

Page 96

1     (Deposition concluded at 11:30 a.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
1              IN THE UNITED STATES DISTRICT COURT

            FOR THE SOUTHERN DISTRICT OF TEXAS

2                    BROWNSVILLE DIVISION

3   ABB KRAFTWERKE AKTIENGESELLSCHAFT, ET AL.*

                 Plaintiff,              *

4                                        *

    VS.                                  * CIVIL ACTION

5                                        * NO. B:03-CV-192

                                         *

6   C.H. ROBINSON COMPANY                *

                 Defendants.             *

7

8

9   ***********************************************************

10            ORAL DEPOSITION OF TODD STREVER

11  ***********************************************************

12                                            COPY

13

14

15        ANSWERS AND DEPOSITION OF TODD STREVER, produced

16  as a witness at the instance of the Defendant, taken in

17  the above-styled and -numbered cause on the 21st day of

18  January, 2005, A.D., beginning at 2:54 p.m. before Jarneka

19  Epps, a Certified Shorthand Reporter in and for the State

20  of Texas, in the offices of C.H. Robinson, located at 5650

21  North Riverside Drive, Suite 210, Fort Worth, Texas, in

22  accordance with the Federal Rules of Civil Procedure and

23  the agreement hereinafter set forth.

24

25
```



Todd Strever

1    could secure the correct rail equipment.  We used them to

2    supply to the railroads, so that we could acquire the

3    correct clearance necessary to move over a given route.

4    We used them to determine what the proper methodology

5    would be to tie the pieces down and secure them to the

6    rail cars.  I would say those are probably the main

7    things.

8        Q.    Did ABB give you any direction on what rail

9    equipment to use to transport the equipment?

10       A.    No.

11       Q.    Did they give you any direction about how to go

12   about procuring clearance for transporting the equipment?

13       A.    No, that was our expertise.

14       Q.    Did they -- other than the rods versus ties issue

15   that Mr. Williams asked you about earlier, and I believe

16   that's what it was.  Was it rods versus ties to be used in

17   tying down the equipment?

18       A.    Rod versus cable, I think.

19       Q.    Rods versus cable.  Did they give you any other

20   specifics about the methodology of securing the equipment

21   that C.H. Robinson was moving?

22       A.    I don't specifically recall but, I mean, tie

23   downs -- when you -- tie downs of a particular item have

24   to meet railroad guidelines and specifications, so our job

25   at Robinson is to communicate that to the railroads so

Todd Strever

1  that -- so that we secure the pieces correctly and that

2  information was passed onto ABB.

3      Q.    What are the railroad guidelines specifications

4  that you would have to meet?

5      A.    It's different for every piece.

6      Q.    Is there a name for those guidelines and

7  specifications as a group, like is it a particular code of

8  regulations?

9      A.    It is.  They have to meet AAR specifications,

10  American Association of Railroads, and they define based

11  on center of gravity and dimensions and the car that you

12  use to haul.  It has to be secured in a specific way so

13  that it's safe.

14      Q.    Did ABB give you any direction about how to

15  comply with AARR regulations?

16      A.    No.  Again, that would be our expertise.

17      Q.    Did you have any reason to believe that ABB had

18  any expertise in AARR regulations?

19      A.    No.  I'm assuming that's why they hired us.

20      Q.    I'm going to ask you a few questions about this

21  set of documents that's been marked as Exhibit No. 2.  The

22  first page appears to be a letter dated July 19th, 1999

23  from Jim Hamilton to Sandro Lepori; is that correct?

24      A.    Yes.

25      Q.    Can you tell me whether the second page of

Todd Strever

1          MR. WILLIAMS:  They were just stapled

2   together is how I'm going them.  I'm not trying to say

3   that they were all at the same time.  I think those

4   documents went with that letter that you're talking about

5   and somehow or another things got in between those

6   whenever they were stapled.

7          MS. CIOTTI:  I didn't expect that you were

8   trying to say they all went together.  I just wanted to

9   make sure it was clear for the record.

10      Q.   (By Ms. Ciotti) Okay.  You've told me,

11  Mr. Strever, that to your knowledge ABB did not have any

12  expertise in AAR regulations; is that correct?

13      A.   Yes.

14      Q.   Did they have any expertise in customs

15  regulations that C.H.R. needed to meet in order to

16  transport this equipment?

17      A.   Over the border in Mexico?

18      Q.   Right.

19      A.   I believe we provided those service for them

20  also.

21      Q.   How about port regulations?  Did they give you

22  any specific direction on how to meet port regulations or

23  give you any other indication that would lead you to

24  believe they had some expertise in port regulations?

25      A.   No, we coordinated that.

Todd Strever

```
 1        Q.    Did ABB tell you what kind of railroad car to

 2   use?

 3        A.    No.

 4        Q.    Did they tell you how to coordinate inspections

 5   with the Mexican Rail Association?

 6        A.    No.

 7        Q.    Did they tell you how to go about getting

 8   clearance approval?

 9        A.    No.

10        Q.    Mr. Roland Schneider was there in Brownsville on

11   the day that the accident occurred; is that correct?

12        A.    Yes.

13        Q.    Can you tell me what his role was that day, what

14   his purpose was in being there?

15        A.    He was -- he was an ABB representative that was

16   there to advise on information that we needed regarding

17   the pieces themselves.

18        Q.    Can you tell me more specifically what sort of

19   information he would have provided regarding the pieces

20   themselves?

21        A.    Well, if we had questions about maybe how to

22   secure the piece to a crane, just in general, just so that

23   it didn't effect the product in a negative way or maybe

24   how it should be secured not to effect the product itself

25   but still to meet the regulations, just technical type
```

Todd Strever

1    ABB and then ABB paid them directly?

2        A.    C.H. Robinson would have paid those costs.

3        Q.    Did C.H. Robinson perform work -- while you were

4    working at C.H. Robinson, did C.H. Robinson perform work

5    for businesses other than ABB?

6        A.    Yes.

7        Q.    Do you know whether ABB -- the work for ABB was a

8    substantial portion of C.H. Robinson's business at this

9    time in 1999?

10        A.    Our particular division or the company as a

11    whole?

12        Q.    The company as a whole.

13        A.    I would say probably not very significant.

14        Q.    Did ABB furnish C.H. Robinson with any tools or

15    supplies or materials that C.H. Robinson would have needed

16    to transport the equipment for ABB?

17        A.    Just what came with the piece -- the piece

18    itself, maybe some of the wood that was attached to it,

19    those types of things, just packaging, those sorts of

20    things.

21        Q.    Would the subcontractors that were hired by C.H.

22    Robinson have furnished things like the crane that was

23    used to move the generator?

24        A.    Yes.

25        Q.    How about the barge, where did that come from?

Todd Strever

```
 1    STATE OF            )
 2                I, Jarneka Epps, a Certified Shorthand
 3    Reporter in and for the State of Texas, do hereby certify
 4    that, pursuant to the agreement hereinbefore set forth,
 5    there came before me on the 21st day of January, A.D.,
 6    2005, at 2:54 p.m., at the offices of C.H. Robinson,
 7    located at 5650 North Riverside Drive, Suite 210, in the
 8    City of Fort Worth, State of Texas, the following named
 9    person, to-wit:  Todd Strever, who was by me duly
10    cautioned and sworn to testify the truth, the whole truth
11    and nothing but the truth of his knowledge touching and
12    concerning the matters in controversy in this cause; and
13    that he was thereupon carefully examined upon his oath and
14    his examination reduced to writing under my supervision;
15    that the deposition is a true record of the testimony
16    given by the witness, same to be sworn to and subscribed
17    by said witness before any Notary Public, pursuant to the
18    agreement of the parties; and that the amount of time used
19    by each party at the deposition is as follows:
20                Mr. Williams - 00 hours, 47 minutes,
21                Ms. Ciotti - 00 hours, 19 minutes.
22                I further certify that I am neither attorney
23    nor counsel for, nor related to or employed by, any of the
24    parties to the action in which this deposition is taken,
25    and further that I am not a relative or employee of any
```

1   attorney or counsel employed by the parties hereto, or

2   financially interested in the action.

3           I further certify that before the completion

4   of the deposition, the Deponent, Todd Strever, and/or the

5   Plaintiff/Defendant _____ did _____ did not _____

6   request to review the transcript.

7           In witness whereof, I have hereunto set my

8   hand and affixed my seal this 26 day of January A.D.,

9   2005.

10

11

12

13

14                      Jarneka Epps By DMA
                        JARNEKA EPPS, CSR

15                      Esquire Deposition Services

                        1700 Pacific Avenue, Suite 4750

16                      Dallas, Texas  75201

                        Cert. No. 8043

17                      Cert. Expires 12-31-05

                        (214) 257-1436

18

19

20

    Taxable Cost:  $_____

21

22

23

24

25

CAUSE NO. 2000-06-2326-E

| | | |
|---|---|---|
| BROWNSVILLE BARGE & CRANE, | )( | IN THE DISTRICT COURT |
| INC., | )( | |
|      Plaintiff | )( | |
| | )( | |
| VS. | )( | |
| | )( | CAMERON COUNTY, TEXAS |
| ABB KRAFTWERKE | )( | |
| AKTIENGESELLSCHAFT AND ABB | )( | |
| ALSTOM POWER (SWITZERLAND), | )( | |
| LTD., F/K/A ABB POWER | )( | |
| GENERATION, LTD., | )( | |
|      Defendants | )( | 357TH JUDICIAL DISTRICT |

---

ORAL AND VIDEOTAPED DEPOSITION OF
SANDRO A. LEPORI
MAY 1, 2001

---

ORAL AND VIDEOTAPED DEPOSITION OF SANDRO A.

LEPORI, produced as a witness at the instance of the

PLAINTIFF, taken in the above styled and numbered cause

on MAY 1, 2001, reported by RHONDA A. MARTIN, Certified

Court Reporter No. 4297, in and for the State of Texas,

at the offices of Royston, Rayzor, Vickery & Williams,

L.L.P., 55 Cove Circle, Brownsville, Texas, pursuant to

the Texas Rules of Civil Procedure.

COPY

BRYANT & STINGLEY, INC.
McAllen     Harlingen     Brownsville
(956)618-2366  (956)428-0755  (956)542-1020



10:54:18  1     Q.  So where did C.H. Robinson's role begin?

10:54:21  2     A.  It began from arrival, Brownsville, free out,

10:54:26  3  up to final destination.

10:54:28  4     Q.  Okay.  And would you explain to the jury what

10:54:31  5  the term "free out" means?

10:54:32  6     A.  "Free out" means that the steamship line is not

10:54:35  7  responsible to unload the goods from their conveyance

10:54:40  8  onto another conveyance or onto the pier.

10:54:51  9     Q.  Okay.  Did -- so ABB hired Forest Line to bring

10:54:57 10  the generator to the Port of Brownsville, correct?

10:54:59 11     A.  Correct.

10:55:00 12     Q.  And then ABB hired C.H. Robinson to off-load --

10:55:09 13  or, actually, to -- to take the generator from where it

10:55:14 14  was positioned on the LASH barge to its ultimate

10:55:18 15  destination in Mexico; is that correct?

10:55:21 16     A.  That is correct.

10:55:31 17     Q.  And did ABB hire C.H. Robinson on a fixed

10:55:40 18  price?

10:55:41 19     A.  Yes.

10:55:42 20     Q.  And for X number of dollars, they were to take

10:55:45 21  the generator from its position on the LASH barge to

10:55:52 22  its ultimate destination in Mexico?

10:55:54 23     A.  Yes.

10:55:54 24     Q.  And who made the decision at ABB to retain C.H.

10:55:59 25  Robinson?

BRYANT & STINGLEY, INC.
McAllen       Harlingen       Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

CAUSE NO. 99-04-1644-E

1

| | | |
|---|---|---|
| GRACIELA ZAMORA, INDIVIDUALLY | * | IN THE DISTRICT COURT |
| AND ON BEHALF OF THE ESTATE | * | |
| OF HER LATE HUSBAND OSCAR | * | |
| ZAMORA, SR. AND HIS ONLY | * | |
| CHILD OSCAR ZAMORA, JR. AND | * | |
| ON BEHALF OF OLIVIA ZAMORA, | * | |
| THE SURVIVING MOTHER AND | * | |
| ONLY SURVIVING PARENT OF | * | |
| OSCAR ZAMORA, SR. | * | |
| | * | |
| AND ALL OTHERS ENTITLED TO | * | |
| BRING A CAUSE OF ACTION FOR | * | |
| HIS DEATH | * | |
| Plaintiffs | * | |
| and | * | |
| | * | |
| ANGIE ZAMORA | * | |
| Intervenor | * | 357TH JUDICIAL DISTRICT |
| | * | |
| VS. | * | |
| | * | |
| ABB KRAFTWERKE | * | |
| AKTIENGESELLSCHAFT, | * | |
| | * | |
| ABB ALSTOM POWER (SWITZERLAND) | * | |
| LTD., FORMERLY KNOWN AS | * | |
| ABB POWER GENERATION, LTD., AND | * | |
| | * | |
| BROWNSVILLE BARGE & CRANE, | * | |
| INC. | * | |
| Defendants | * | CAMERON COUNTY, TEXAS |

COPY

ORAL AND VIDEOTAPED DEPOSITION OF

JOSE CRUZ GARCIA, JR.

MARCH 13, 2000

ORAL AND VIDEOTAPED DEPOSITION OF JOSE CRUZ GARCIA, JR.,

produced as a witness duly sworn by me at the instance of the

Plaintiffs, taken in the above styled and numbered cause on

EX. 23

Page 18

1  go back over one of the things that you just told us. You
2  said it was determined that these -- the grippers or jacking
3  plates had to come off. Was that something that came from --
4  well, who was it that was issuing those instructions?
5      A. Charles was telling me that that was -- Charles was
6  telling me to hold the load. You know, don't move the load.
7  That's when I put some tag -- the tag lines, I tie them to
8  the dock, both of them, so the generator won't be moving.
9      Q. Right. So it won't sway?
10     A. Right. Then I went around -- at that time, I went
11  around so that I can tell the people that everything was
12  going to be stopped until further notice from these people --
13  from Mr. Charles and Mr. Snyder.
14     Q. And you're saying you actually saw Mr. Snyder,
15  then, telling Charles? Not the other way around? Charles
16  was telling -- excuse me -- Mr. Snyder was telling Charles,
17  then Charles was telling everyone else?
18     A. He was telling me to hold the load. Then from
19  there on, I would stop on the load, because I work just on
20  the load, you know. I was the signal man from the generator.
21     Q. When you say, "signal man," that's the person that
22  actually, then, gives the hand signals to the crane
23  operator?
24     A. Yes. And also I had a radio.
25     Q. And that was also to the crane operator?

Page 19

1      A. Telling him to stop -- dog everything. Don't
2  move. Don't come up. Dog everything.
3      Q. And that means keep everything right where it is?
4      A. Yes, sir.
5      Q. And was, in fact, the load suspended the way that
6  you wanted it to be, the way you signaled it to be? Did the
7  crane operator do what you signaled him to do?
8      A. Yes, sir.
9      Q. Okay. Was there any problem with how the crane
10  operator did his job, that you saw? Did the crane operator,
11  in other words, do what he was told correctly?
12     A. Yes.
13     Q. And in the picture it even shows, if we look back
14  at, say -- I think Picture No. 2, the load is actually
15  suspended. Is that the way it was suspended once the order
16  had been given down from Mr. Snyder to just hold the load?
17     A. Yes. It was a steady load. It was --
18     Q. Held in place?
19     A. Yes.
20     Q. You say you didn't see the accident, but you came
21  around after the accident. Tell us what you saw when you
22  came around after the accident, and the jacking plate -- or
23  the gripping plate, as you call it -- was off and the man was
24  down. What did you find?
25     A. When I went around -- because I heard a noise.

Page 20

1  That's when I believe the blade got hit on the concrete. And
2  the man was already laying down with the gripper on his right
3  side, on the side of him. It was not on top of him. I
4  believe it hit, and then jumped back to the right side. And
5  he was laying there.
6      Q. Was the man still conscious? Awake?
7      A. Yes.
8      Q. What was he doing at that time when you first came
9  around?
10     A. He tried or -- he tried to stand up. Then people
11  calmed him down, to stay on the floor so he wouldn't get hurt.
12     Q. How long were you there around the man after that,
13  more or less?
14     A. I do not remember exactly, but I would say about
15  fifteen minutes.
16     Q. And for how long of that fifteen minutes was the
17  man that we now know as Mr. Zamora, was he awake?
18     A. Well, it was for fifteen minutes. Then those other
19  people were helping him.
20     Q. Well, the whole time that you were there, was the
21  man what we call conscious? Was he awake?
22     A. Yes.
23     Q. Okay. And was he -- well, from the time you came
24  around and saw him, was it obvious to you from what you saw
25  that he was hurt? Hurt bad?

Page 21

1      A. Yes.
2      Q. And from what you heard, and then from what you saw
3  when you came around, he had been knocked to the ground? You
4  said you even heard either him or the jacking plate hit the
5  concrete, hit the ground, the deck?
6      A. Yes.
7      Q. Had there been any discussion before this -- had
8  anyone said, Mr. Garcia, before this happened, that only a
9  certain number of those bolts actually held that gripper in
10  place, held it on?
11     A. At work?
12     Q. Yes?
13     A. When we were making the lift?
14     Q. Yes, sir? Did anybody ever say that before this
15  accident at all? Did they say only two of the bolts, or all
16  four of the bolts, or anything like that held this gripper in
17  place? Had anybody ever said that only the two bottom bolts
18  hold it in place, for instance?
19     A. Nobody -- nobody said a word. Plus, it don't have
20  no warnings or it don't have no sign of what they'll do.
21  Nobody said nothing -- I didn't hear them.
22     Q. Was there any -- let me get another photograph
23  that's a little closer, too, of this. And I'll mark it No. 4.
24     (Deposition Exhibit No. 4 was marked for
25  identification.)

Page 22

1    Q. (By Mr. Tinning)  On No. 4, it shows one of the
2    other of the four grippers or jacking plates that's still on.
3    It doesn't have any decal around it, does it, or instruction?
4    A. It don't have a -- it didn't have no instructions,
5    or warning, or if the bolts were in, the top ones.  So nobody
6    said nothing.
7    Q. Okay.  Picture No. 4 is a true and accurate picture
8    of the way the jacking plate was, even the one that fell off,
9    before it fell off?  That would be what it looked like?
10   A. Yes.
11   Q. There were no instructions around it, or on it, or
12   no decals saying don't remove it?  Nothing?
13   A. It was nothing.  No instructions.  No warning.  No
14   nothing.
15   Q. Did you or anyone there have any meetings before
16   this lift to talk about how the lift was going to be done?
17   A. Before, my supervisor -- my supervisor, he told me
18   that was the rigging that we were going to use, but not at
19   the meeting of telling me about the grippers, because that's
20   concerning somebody else or the same people who's buying this.
21   Q. Okay.  So you didn't have anyone tell you at any
22   meeting before the lift that these grippers, first of all,
23   were going to be -- that they were in the way or that they
24   needed to come off?  No one told you that?
25   A. No one told me about this, because that don't

Page 23

1    concern to my lifting.  That's concerning to the people who
2    buy or were selling it, because that was not in my way.
3    Because I only was going to lift the generator, so it was up
4    to somebody else or the people who was involved then.
5    Q. Okay.  I understand.  In other words, the first
6    time you heard that there was a problem with these grippers
7    or these jacking plates was when you got the word from
8    Mr. Cherrington to hold the lift because these things had to
9    come off?  That's the first time you realized or heard that
10   was a problem?
11   A. Yes.
12   Q. Okay.  And you saw that instruction coming from
13   Mr. Snyder, who then passed it to Mr. Cherrington, who then
14   passed it down to the crew?
15   A. That's correct.
16   Q. Were you there also, Mr. Garcia, after -- after the
17   accident, Mr. Zamora goes away; the ambulance comes; of
18   course, the load still has to be finished, right?
19   A. Yes.
20   Q. Were you there to finish with the lift and get this
21   loaded and out of the Port of Brownsville?
22   A. Yes.
23   Q. Okay.  What happens once the lift was to be
24   finished?  In other words, Mr. Zamora has left in the
25   ambulance.  There's still a lift that has to be finished.

Page 24

1    There's still three jacking plates that are still on the
2    compressor.  What was done with those other three grippers or
3    jacking plates to finish the lift?  Were they left on?  Were
4    they taken off?  What was done?
5    A. They left them on.  They left them on.  Just the
6    one that fell down on the concrete, that was the only one.
7    After I set the generator, we took off.  And I don't know
8    what they did, if they took them off or they left them on.
9    But when I left -- when I left the Port, the jacking plates
10   were still there on the generator.
11   Q. Okay.  Had the generator been put down in place on
12   the rail car?  In other words, the lift finished when you
13   left?
14   A. Yes, sir.
15   Q. In other words, the generator was lowered all the
16   way down onto the rail car and the three jacking plates that
17   were left were still on there when you left?
18   A. That's correct.
19   Q. Okay.  What time did you leave the Port that day
20   when the load -- when the lift was finished?
21   A. I would say about five, five-fifteen.
22   Q. Okay.  And more or less, what time did the accident
23   happen?
24   A. We started working around eleven.  So at about -- I
25   don't know.  Eleven -- we started working at eleven.

Page 25

1    I didn't -- I don't have a watch and I didn't check on the
2    time.
3    Q. I understand.  So at least some hours after the
4    accident is when you left that day?  Maybe four or five hours
5    afterwards, more or less, is when you left after the accident
6    happened?
7    A. Yes.
8    Q. Okay.  The lift, as far as your part was concerned,
9    it was finished when you left that day?
10   A. Yes, sir.
11   Q. Okay.  So if the jacking plates, the grippers, were
12   taken off, they would have been taken off after you left at
13   more or less five in the afternoon?
14   A. Yes.
15   Q. Okay.  Did you ever see Mr. Snyder again with any
16   other lifts after this particular lift that day?
17   A. No.
18   Q. Have you seen any other compressors like this come
19   through the Port of Brownsville since then?
20   A. Well, that was the only -- the only time that they
21   sent me to work on that generator.
22   Q. Okay.  Were there any others like it or similar to
23   it that had these kind of grippers or jacking plates that had
24   come through there that you remember -- any other time, in
25   other words?

Page 30

1  know. And I was taking it there from -- you know, too. And
2  then he was telling Mr. Charles.
3     Q. And that's my question, because -- did you actually
4  hear Snyder in English tell Cherrington to take the jacking
5  plate off, or did you get that from Cherrington?
6     A. I hear from Snyder telling Charles on the way --
7  the bolts are in the way. And Charles, I told him, "You-all
8  got to tell me -- one of you got to tell me either take it
9  off -- stop the load or not." Then Charles told me that
10  those bolts were in the way, to dog off everything.
11     Q. Okay. And if you remember hearing Mr. Snyder, just
12  tell me that you remember him saying that. But did Snyder
13  actually say, "Take the bolts and the nuts off," or is that
14  something that you just got from Cherrington?
15     A. From Mr. Charles.
16     Q. That's what Cherrington told you? And he's
17  the guy that you were taking instructions from, correct?
18     A. Correct.
19     Q. Okay. You assume that came from Snyder, from the
20  discussion Cherrington and Snyder had, right?
21     A. They both -- they were on the side. One of -- you
22  know, Cherrington -- Mr. Snyder was on the back and Charles
23  was in front and I was right there close to them.
24     Q. Okay. And I'm saying, though, Cherrington is the
25  one that told you this? That's correct, right?

Page 31

1     A. Yes, sir.
2     Q. Okay. And you assume that came from Snyder, but
3  you didn't actually hear Snyder say that to Cherrington, did
4  you?
5     MR. THARPE: Objection; form. Go ahead.
6     A. Mr. Snyder told Charles. I heard him. They were
7  close to me.
8     Q. (By Mr. Williams) Okay. So you actually heard --
9     A. Yes. And then Charles told me to dog everything
10  because the bolts were in the way.
11     Q. Okay. Do you know why they had to take the bolts
12  off of the -- of the one jacking plate and why they were able
13  to set the other three down on the rail car?
14     A. No, sir. They didn't tell me nothing of -- they
15  were taking those decisions on themselves because they said
16  it was going to be in the way.
17     Q. Okay.
18     MR. WILLIAMS: Do you have an exhibit sticker
19  -- what is the next one, Bill?
20     THE COURT REPORTER: Five.
21     (Deposition Exhibit No. 5 was marked for
22  identification.)
23     Q. (By Mr. Williams) Mr. Garcia, let me take --
24  Exhibit No. 5, does that look like one of the jacking plates
25  after it was set down on the rail car? The generator setting

Page 32

1  on the rail car?
2     A. Yes, sir.
3     Q. Okay. If you look at the generator with the
4  jacking plates setting on the rail car, there is an opening
5  in the wood that it's setting on; is that correct?
6     A. Yes, sir.
7     Q. Would you hold that up for the camera, please.
8     A. (Witness complies.)
9     MR. WILLIAMS: Zero in on that so you can see
10  the opening. Okay.
11     Q. (By Mr. Williams) Okay. You can set it down. Were
12  there openings in the wood on the rail car for all four of
13  the jacking plates to fit into?
14     A. I did not pay attention to that.
15     Q. Okay. But you see there, in the opening here, on
16  the one that's No. 5, there's no reason here, is there, to
17  take either the bolts or the nuts off because there is an
18  opening here and it fits right down into it, correct?
19     A. Correct.
20     Q. So if there was an opening for all four, they would
21  have no reason to take that jacking plate off, would they;
22  is that correct?
23     A. That's correct.
24     Q. Was there a longshoreman there on a piece of
25  equipment attached to the rail car to move the rail car back

Page 33

1  and forth? A front-end loader, or a cherry picker, something
2  or another sitting there?
3     a.  Yes. It was a forklift.
4     Q. Okay.
5     A. It was a forklift. We were using it to move it
6  back or forth. You know, front or back.
7     Q. And is the reason for that because that when you
8  swing the generator around on the crane and you set it there,
9  that it would be easier to adjust your rail car than to try
10  to move this big generator and get it swinging back and
11  forth? You've got to move it a little up or back -- the rail
12  car, to get it situated?
13     A. We have the -- that's why they had the forklift.
14  And that's why -- when we swing back to it, we were not
15  swinging back or forth. We had the load steady, and they
16  were using the forklift themselves to move it back or forward.
17     Q. And Mr. Cherrington was in charge of that man on --
18  that man that was part of the Schaeffer crew, the
19  longshoreman on the forklift?
20     A. His crew.
21     Q. Schaeffer crew, right?
22     A. I don't know if it was Schaeffer, but Schaeffer --
23  Cherrington -- Charles, they were giving, you know, orders
24  for him whether to move it forward or do it back.
25     Q. Okay. So whoever he worked for, there was somebody

Page 46

1  BY MR. TINNING:
2      Q. (By Mr. Tinning) If you could hold up No. 5, the
3  big one there, while we talk about it.
4      A. (Witness complies.)
5      Q. When you first saw either this picture or this
6  jacking plate, your impression was those top two bolts help
7  hold that jacking plate on, wasn't it?
8      A. All four of them. I thought it was all four of
9  them.
10     Q. So if there was an order to take off the two bottom
11 bolts like you were talking about, your impression was, when
12 you first saw it, that the two top bolts would, in fact, be
13 securing equipment or would hold it on, even with the two
14 bottom bolts off, correct?
15     A. Correct.
16     Q. Okay. Let's go now to one of the other pictures,
17 the one that you've got there with the gap in the rail car.
18 I think it is the second-to-the-bottom. It will show where
19 the bolts fit into the slots that was created by the wood
20 stacked onto the rail car.
21     MR. TINNING: And for the videographer, the
22 one on the right, I guess, would be the better one, the one
23 marked No. 4.
24     Q. (By Mr. Tinning) If there really was a gap in the
25 bottom so that the nuts and the bolts would not have any

Page 47

1  problem on the rail car, then really, Roland Snyder had
2  absolutely no reason to order that the nuts or the bolts come
3  off, correct?
4      A. Correct.
5      Q. Now, if the problem, on the other hand, was that
6  the jacking plate was going to stick out too wide outside
7  from the side of the rail car by the part that's on the top
8  part of the jacking plate, if that was the reason that the
9  jacking plate needed to come totally off, then what you're
10 saying is, just like in this picture, there was absolutely no
11 instruction, no decal, no picture on the compressor, or the
12 jacking plates on the generator, or the jacking plate that
13 said the two top bolts don't hold anything and you need to
14 take those off first, or -- it really didn't say anything on
15 how to take it off, if it needed to come off, did it?
16     A. Correct. It didn't have no warnings at all.
17     Q. And the only reason that the nuts or the bolts were
18 coming off is because you actually heard the instruction come
19 from Roland Snyder that they had to come off?
20     A. That's correct.
21     Q. Okay. Thank you very much. You know, one last
22 thing. The jobs out at the Port of Brownsville, those are
23 good jobs, aren't they? Good paying jobs?
24     A. Here in the Valley, yes.
25     Q. And to keep your job, or any job, it's important to

Page 48

1  do what the boss tells you, in your experience; isn't that
2  true?
3      A. Yes. To --
4      Q. And you heard Roland Snyder tell Mr. Cherrington
5  that these bolts and the nuts had to come off on the bottom?
6      A. Yes.
7      Q. And that's what Mr. Zamora, with what we know now,
8  was trying to do when he got hurt or that's what he had
9  actually done?
10     A. I believe so. I didn't saw (sic) him.
11     Q. Okay. But you saw what happened after the bolt
12 came --
13     A. After the -- yes.
14     Q. Okay. Thank you very much.
15     FURTHER  EXAMINATION
16 BY MR. WILLIAMS:
17     Q. (By Mr. Williams) Just a couple more, Mr. Garcia,
18 real quick. Did you ever see anybody else other than Roland
19 Snyder and Cherrington give any instructions to any of the
20 longshoremen or any of the other people out there?
21     A. I did not pay attention to that.
22     Q. Okay. Did Snyder give any instructions directly to
23 you?
24     A. Not Snyder.
25     Q. Did he -- did he give any instructions -- did you

Page 49

1  see him or hear him give any instructions directly to any of
2  the workers there at the Port during this lift?
3      A. Not that I -- not that I saw.
4      Q. All of the --
5      A. Only to Mr. Charles.
6      Q. All of the instructions that you are aware of of
7  any kind that Snyder would have given would have come to
8  Cherrington, correct?
9      A. From Mr. Charles. Yes.
10     Q. Do you know what information was available to
11 Cherrington about whether or not the two top bolts on the
12 jacking plate held the jacking plate in place or not?
13     A. Can you repeat that.
14     Q. Yeah. Do you know whether Cherrington had
15 information that would have provided him the answer of
16 whether or not the two top bolts held the jacking plate in
17 place or not?
18     MR. THARPE: Objection; form.
19     MR. TINNING: Join.
20     Q. (By Mr. Williams) Do you know that? I'm just
21 asking you if you know.
22     A. No.
23     Q. Okay. But you would expect that if that
24 information was available to Mr. Cherrington, that he
25 certainly would use that information in giving any

1

CAUSE NO. 99-04-1644-E

| | |
|---|---|
| GRACIELA ZAMORA, INDIVIDUALLY | * IN THE DISTRICT COURT |
| AND ON BEHALF OF THE ESTATE | * |
| OF HER LATE HUSBAND OSCAR | * |
| ZAMORA, SR. AND HIS ONLY | * |
| CHILD OSCAR ZAMORA, JR. AND | * |
| ON BEHALF OF OLIVIA ZAMORA, | * |
| THE SURVIVING MOTHER AND | * COPY |
| ONLY SURVIVING PARENT OF | * |
| OSCAR ZAMORA, SR. | * |
| | * |
| AND ALL OTHERS ENTITLED TO | * |
| BRING A CAUSE OF ACTION FOR | * |
| HIS DEATH | * |
| Plaintiffs | * |
| and | * |
| | * |
| ANGIE ZAMORA | * |
| Intervenor | * 357TH JUDICIAL DISTRICT |
| | * |
| VS. | * |
| | * |
| ABB KRAFTWERKE | * |
| AKTIENGESELLSCHAFT, | * |
| | * |
| ABB ALSTOM POWER (SWITZERLAND) | * |
| LTD., FORMERLY KNOWN AS | * |
| ABB POWER GENERATION, LTD., AND | * |
| | * |
| BROWNSVILLE BARGE & CRANE, | * |
| INC. | * |
| Defendants | * CAMERON COUNTY, TEXAS |

---

ORAL AND VIDEOTAPED DEPOSITION OF



MARCH 13, 2000

---

ORAL AND VIDEOTAPED DEPOSITION OF ALFREDO ARTEAGA,

produced as a witness duly sworn by me at the instance of the

Plaintiffs, taken in the above styled and numbered cause on

EX. 25

**Page 10**

1 Q. ███████████████████████████████
2 ███████████████████████████████
3 ███████
4 A. It was very fast. I saw the ███████████
5 and they went to -- and ███████████████
6 again. And at that moment, I turned ███████
7 that I have. And when I turned to ██ back, I saw that
8 people were scared. I heard one of my friends scream that
9 somebody had been ███ And ██████, I didn't see
10 ███ and I realized ██████████ -- as I looked
11 and I saw that something bad ███████ was bad. I
12 immediately got m ███████████████ that an
13 accident had ██████████████████ rich m
14 ███████████████████████████
15 ███████████████████
16 Q. Which is your company, Mr. Arteaga?
17 A. AMFELS. I work for AMFELS and the crane is from
18 Brownsville Barge & Crane.
19 Q. You said the jacking plate was off. Could you hold
20 up the picture again that shows the jacking plate that was
21 off.
22 A. (Witness complies.)
23 Q. It was off -- go ahead -- it was off from the side
24 like it is in the picture? Down on the ground?
25 A. When we picked it up, everything was there. When I

**Page 11**

1 turned back, that's when I realized that it wasn't there at
2 all.
3 Q. Could you see it on the ground or the man on the
4 ground when you turned back around?
5 A. I couldn't see it because this was on a barge.
6 When we picked this up from the barge, then the barge was
7 here and the dock was over here. So I couldn't see.
8 Q. I understand. Maybe if we show Picture No. 3 and
9 you can tell the jury where you were in relation to which
10 side -- where the man was and where you were. On which side
11 of the generator, the big green machine there?
12 A. I was over here on the side of the water.
13 Q. And where was the man and the jacking plate when it
14 came off? Which side?
15 A. To the left-hand side.
16 Q. Okay. Can you turn the picture around now for the
17 jury and tell them the same thing. You would have been on
18 the water side, correct?
19 A. Yes.
20 Q. And the man and the jacking plate that came off
21 would have been to the left side of you?
22 A. Yes.
23 Q. And you could not -- ███████ see the activity
24 but you couldn't see the ██████████ jacking plate on the
25 ground because of the barge, correct?

**Page 12**

1 A. Correct.
2 Q. Okay. Thank you very much. Did you ███ about
3 the instruction to take the bolts off that were being taken
4 off just before the accident happened?
5 MR. WILLIAMS: Objection; form.
6 A. No. No.
7 Q. (By Mr. Tinning) Who was on the radio that you
8 heard about that the bolts needed to come off? Whose voice?
9 What --
10 A. With the experience that I have, I saw that they
11 were going to be -- those bolts were going to be in the way.
12 And I saw that they started loosen ██ them, and the
13 flagger said, "Let's pick it up -- we ██████████████
14 because they're in the way. The bo ██ are ███████"
15 Q. I see. So ██████ ███████████████
16 ███ -- you -- you ███ that they were ███████ off ██
17 because they were in the way ██████████████████
18 telling you to do with the load?
19 A. Right. Right. My flagge ██ the flagger was --
20 the way that they told me, "We're going ████████ because
21 they're in the way." But I already knew that they were in
22 the way.
23 Q. Your flagger was Jose Garcia?
24 A. Yes. He was in charge.
25 Q. Okay. He was in charge of the signals to you?

**Page 13**

1 A. To me. Yes. To me.
2 Q. Do you know -- sorry -- do you know who was
3 in charge of the gang or the crew that was doing the work in
4 getting the load onto the rail car?
5 A. I just saw that there were several American persons
6 there speaking and signaling to this, and to take this off,
7 but I could not hear them because I was far away.
8 Q. You were in the cab of your crane far away?
9 A. Yes. About a hundred feet away. Yeah.
10 Q. Do you know who Roland Snyder is?
11 A. No.
12 Q. Did you ever see the man that was hurt, yourself up
13 close, after the accident?
14 A. No.
15 Q. And your job did not have anything to do with the
16 -- what is the -- the ground crew?
17 A. No.
18 Q. Okay. Have you told me everything you know;
19 basically, about the accident?
20 A. Yes. Yes, I said everything. But I still feel
21 that this accident would not have happened if in the ██████
22 ██ the motor right here, they would have put a warning ██
23 ███ bolts were not fastened on the unit.
24 Q. From what you saw and from the way the jacking
25 plates looked, you thought the top two bolts helped hold the

CAUSE NO. 2000-06-2326-E

| | | |
|---|---|---|
| BROWNSVILLE BARGE & CRANE, INC. | )( | IN THE DISTRICT COURT |
| Plaintiff | )( | |
| | )( | |
| VS. | )( | |
| | )( | CAMERON COUNTY, TEXAS |
| ABB KRAFTWERKE AKTIENGESELLSCHAFT, and ABB ALSTOM POWER (SWITZERLAND) LTD, F/K/A ABB POWER GENERATION, LTD. | )( | |
| Defendants | )( | 357TH JUDICIAL DISTRICT |

---

ORAL AND VIDEOTAPED DEPOSITION OF
CHARLES CHERRINGTON
MAY 16, 2001

---

ORAL AND VIDEOTAPED DEPOSITION OF CHARLES

CHERRINGTON, produced as a witness at the instance of

the DEFENDANTS, taken in the above styled and numbered

cause on MAY 16, 2001, reported by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at the offices of Willette & Guerra, L.L.P.,

3505 Boca Chica Boulevard, Suite 460, Brownsville,

Texas, pursuant to the Texas Rules of Civil Procedure.



COPY

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755      (956)542-1020

EX 25

1      A.   You know, I'm not a party to this, and I'm not

2   going to speculate or --

3      Q.   Okay.   Would you be able to answer my question

4   if you went through and read Exhibit A?   I mean, I

5   just -- I'm not trying to get your --

6      A.   Yeah.   I'm not an attorney.   I mean, I don't

7   really --

8      Q.   You don't know what that says?

9      A.   Right.   I, you know -- I don't -- I'm not going

10  to speculate one way or the other what it says.

11     Q.   Okay.   But certainly, if the parties signed off

12  on something, they'd be bound by it, correct?

13              MR. WILLIAMS:   Objection, form.

14              THE WITNESS:   Just signed, just, you

15  know -- Exhibit A, paragraph, it says, you know, signed

16  by ABB, Roland Schneider.

17     Q.   Okay.   Charles, did you ever talk to Roland at

18  all or not?

19     A.   When -- a day prior or two days prior, he came

20  down, you know, before we did the lift, and, you know,

21  we went over what we were going to do.

22     Q.   Okay.   And did he tell you what his job was

23  here when he was here in Brownsville, what he came for?

24     A.   No, he did not.

25     Q.   Okay.   Did he talk to you or did y'all converse