Multi-Page™

No. 99-04-1644-E

Zamora vs. Abb Kraftwerke Aktiengesellschaft

James Hamilton

April 25, 2000

**MERIT COURT REPORTERS - FORT WORTH, TEXAS**

**(817) 336-3042 * 1-800-336-4000**

EX. A

No. 99-04-1644-E　　　　　　　　　　　Multi-Page™　　　　　　　　　　James Hamilton
Zamora vs. Abb Kraftwerke Aktiengesellschaft　　　　　　　　　　　　　　April 25, 2000

```
                                              Page 1
 1                 NO. 99-04-1644-E
 2   GRACIELA ZAMORA,            ) IN THE DISTRICT COURT OF
     INDIVIDUALLY AND ON         )
 3   BEHALF OF THE ESTATE OF     )
     HER LATE HUSBAND OSCAR      )
 4   ZAMORA, SR.; AND ON BEHALF  )
     OF THEIR MINOR SURVIVING    )
 5   SON OSCAR ZAMORA, JR.; AND  )
     OLIVIA ZAMORA, THE          )
 6   SURVIVING MOTHER OF THE     )
     LATE OSCAR ZAMORA, SR.;     )
 7   and ON BEHALF OF ALL THOSE  )
     ENTITLED TO RECOVER FOR THE )
 8   TRAGIC, UNTIMELY DEATH OF   )
     THE LATE OSCAR ZAMORA, SR.  ) 357TH JUDICIAL DISTRICT
 9       Plaintiffs              )
     and                         )
10   ANGIE ZAMORA                )
         Intervenor              )
11                               )
     V.                          )
12                               )
     ABB KRAFTWERKE              )
13   AKTIENGESELLSCHAFT,         )
     ABB ALSTOM POWER            )
14   (SWITZERLAND), LTD,         )
     FORMERLY KNOWN AS ABB       )
15   POWER GENERATION, LTD.      )
     and BROWNSVILLE BARGE       )
16   & CRANE, INC.               ) CAMERON COUNTY, TEXAS
     -------------------------------------------------
17          ORAL AND VIDEOTAPED DEPOSITION OF
                     JAMES HAMILTON
18                   April 25, 2000
     -------------------------------------------------
19         ORAL AND VIDEOTAPED DEPOSITION OF JAMES HAMILTON,
     produced as a witness at the instance of the Defendants
20   ABB Kraftwerke Aktiengesellschaft and ABB Alstom Power
     (Switzerland) Ltd., f/k/a ABB Power Generation, Ltd.,
21   and duly sworn, was taken in the above-styled and
     numbered cause on April 25, 2000, from 9:26 a.m. to
22   11:30 a.m., before Gloria Carlin, CSR No. 498 in and
     for the State of Texas, reported by Stenographic
23   method, at the offices of Hill Gilstrap, 1400 West
     Abram Street, Arlington, Texas, pursuant to the Texas
24   Rules of Civil Procedure, Notice and the provisions
     stated on the record.
25
```

```
                                              Page 2
 1              A P P E A R A N C E S
 2   For the Plaintiff:
         William J. Tinning, Esq. (VIA TELEPHONE)
 3       LAW OFFICE OF WILLIAM J. TINNING
         1013 Bluff Drive
 4       Portland, Texas  78374

 5   For the Defendants ABB Kraftwerke Aktiengesellschaft
     and ABB Alstom Power (Switzerland), Ltd., f/k/a ABB
 6   Power Generation, Ltd.:

 7       Justin L. Williams, Esq.
         WILLIAMS, KASPERITIS & GOWAN
 8       5959 S. Staples, Suite 204
         Corpus Christi, Texas  78102
 9
     For C.H. Robinson & The Witness:
10
         Tom Lockhart, Esq.
11       ADAMS & GRAHAM, L.L.P.
         222 E. Van Buren, West Tower
12       P.O. Drawer 1429
         Harlingen, Texas  78551
13
     Also Present:  David Crenshaw, Videographer
14                  Accurate Evidence Legal Video
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 3
 1                    INDEX
 2   Appearances . . . . . . . . . . . . . . . . . .  2
 3   Stipulations. . . . . . . . . . . . . . . . . .  4
 4
 5   JAMES HAMILTON
 6     Examination by Mr. Williams. . . . . . . . .  4
       Examination by Mr. Tinning . . . . . . . . . 71
 7     Re-Examination by Mr. Williams . . . . . . . 87
       Re-Examination by Mr. Tinning. . . . . . . . 93
 8     Re-Examination by Mr. Williams . . . . . . . 94
 9   Signature and Changes . . . . . . . . . . . .  97
     Reporter's Certificate. . . . . . . . . . . .  99
10
                       EXHIBITS
11
     NO.  DESCRIPTION                 MARKED  IDENTIFIED
12    1   Photograph                    52       52
      2   Photograph                    52       54
13    3   Photograph                    52       54
      4   Photograph                    70       70
14    5   Documents from ABB            83       81
      6   Contract                      83       81
15    7   Photograph                    92       92
16
              REQUESTED DOCUMENTS/INFORMATION
17
     DESCRIPTION                              Page/Line
18   None
19          CERTIFIED QUESTIONS
20   NO.                                      Page/Line
     None
21
22
23
24
25
```

```
                                              Page 4
 1       THE REPORTER:  Any stipulation y'all
 2   want on the record?
 3       MR. WILLIAMS:  Taken pursuant to the
 4   Rules.
 5       MR. TINNING:  Tom, are you going to have
 6   your guys read and sign?
 7       MR. LOCKHART:  Yes.
 8       MR. TINNING:  Good.  Okay.
 9       MR. LOCKHART:  Well, let me just ask
10   him.  Jim, you as the witness, you have the right to
11   read over the written transcript to ensure its
12   correctness and then sign it in front of a notary or
13   you can waive that, that's up to you.
14       THE WITNESS:  I can -- I think I'll
15   waive it.
16       MR. LOCKHART:  Okay.  Do you hear that,
17   Bill?
18       MR. TINNING:  Yeah, I did.  That's fine.
19   It's being videoed, isn't it?
20       MR. LOCKHART:  Yes.
21       (REPORTER'S NOTE:  After the deposition
22   concluded Mr. Lockhart informed Reporter that Mr.
23   Hamilton would like to read and sign and Mr. Lockhart
24   followed that up with a letter requesting same dated
25   April 27, 2000.)
```

Case 1:03-cv-00192   Document 67-2   Filed in TXSD on 03/21/2005   Page 3 of 14

No. 99-04-1644-E                    Multi-Page™                    James Hamilton
Zamora vs. Abb Kraftwerke Aktiengesellschaft                       April 25, 2000

Page 9

1  Q. When did you leave the railroad?
2  A. I left the railroad in August of '95.
3  Q. And what did you do when you left?
4  A. I started a company, Logistic Partners,
5  Incorporated, focusing on heavy haul shipments.
6  Q. All right. How long did you stay with that
7  company?
8  A. I actually abolished that company and went to
9  work for C.H. Robinson in, I believe it was October of
10 1995, to take the Business Plan that we had for
11 Logistic Partners and execute it at C.H. Robinson.
12 Q. Okay. Tell me what type of business had C.H.
13 Robinson been involved in prior to the time that you
14 took your Business Plan and moved to C.H. Robinson?
15 A. C.H. Robinson is a third-party logistics
16 provider, and they're also a produce brokerage. About
17 35 to 40 percent of their revenues come from produce
18 sales, and the other 60 percent, 65 percent comes from
19 transportation brokerage.
20 Q. Okay. Explain those two different things.
21 What is a produce broker, to start with?
22 A. A produce broker is a person, a company that
23 buys produce from the grower and then sells it to the
24 retail outlets, through a wholesaler.
25 Q. Okay.

Page 10

1  A. Basically a transportation broker takes
2  transportation, works with carriers and then matches
3  the carriers with the shippers.
4  Q. Was C.H. Robinson involved in the
5  transportation brokerage business prior to your joining
6  the company?
7  A. Yes.
8  Q. What types of transportation were they
9  involved in prior to your joining the company?
10 A. They were involved primarily in truck and
11 rail and air -- excuse me -- and LTL.
12 Q. And what is LTL?
13 A. Less than truckload.
14 Q. Okay. Were they involved significantly in
15 heavy load transportation?
16 A. No, no.
17 Q. Did they have any departments that were
18 involved in heavy load transportation prior to your
19 joining the company?
20 A. No.
21 Q. Did they have any personnel with experience
22 in heavy load transportation prior to the time of your
23 joining the company?
24 A. Limited, limited.
25 Q. What was -- what was your role with C.H.

Page 11

1  Robinson when you joined them in 1995?
2  A. I was the General Manager of the heavy haul
3  multimodal transport division.
4  Q. Okay. And what would -- how many people did
5  you have in your department at that time?
6  A. When I started there were two.
7  Q. And it was you and who else?
8  A. Sonia Kimmons.
9  Q. And what was her --
10    THE REPORTER: Kimmons?
11 A. Kimmons, K-I-M-M-O-N-S.
12 Q. (BY MR. WILLIAMS) What was her position?
13 A. She was administrative. We -- we both did
14 everything at that point in time. We were just
15 starting the business unit out.
16 Q. All right. This -- the accident we're
17 involved in occurred at the Port of Brownsville in
18 1999. Tell us how the division involved with heavy
19 transport for C.H. Robinson had evolved between your
20 creating it or your starting it in 1995 and 1999?
21 A. Justin, I -- I don't think I understand the
22 question.
23 Q. Yeah.
24 A. If --
25 Q. Sure. What I'm asking you is you're telling

Page 12

1  us that you had moved over and took your Business Plan
2  and actually started, I believe, the -- the heavy
3  transport portion of C.H. Robinson's business back in
4  1995?
5  A. Yes.
6  Q. All right. How had that evolved from the
7  time you started with an administrative person in '95
8  up until the time of early 1999, prior to the time of
9  this accident?
10 A. Okay. Basically what our service offering
11 was initially is a third-party logistics company
12 focused on heavy haul transport and the multimodal
13 concepts, truck, rail, truck, barge, whatever the case
14 may be required in the movement of dimensional or
15 excessive weight transportations. So what we had
16 started with is there were -- our marketing strategy
17 encompassed both going after machinery, the
18 Caterpillars, the John Deere, the J.I. Cases, as well
19 as project cargo, which is great big things for like
20 power generation, chemical plants, those type areas,
21 and so we had a two -- two-phased -- two-phased
22 initiative there, and again, it was third-party
23 logistics provider. And so we had started out, and the
24 project cargo side was high margin business, higher
25 risk. The machinery side was more competitive with

No. 99-04-1644-E                                  Multi-Page™                                   James Hamilton
Zamora vs. Abb Kraftwerke Aktiengesellschaft                                                    April 25, 2000

**Page 17**

1 of dimensional -- was it the same size, let me put it
2 this way -- generator that was involved in their
3 project as the one that was involved in the ABB
4 Monterrey project?
5   A. The dimensions are similar. There could be a
6 couple of inches variances. The generator of ABB, to
7 the best of my recollection, is significantly heavier,
8 and I would define significantly by 10 to 15 percent.
9   Q. Okay, and what are we talking about in terms
10 of weight for these generators?
11   A. The ABB generator is 716,500 pounds, and I
12 believe, if memory serves me, it's been a while, I
13 think the Siemens Westinghouse generator was in the
14 600,000 pound area.
15   Q. Okay. What type of problems for a
16 transportation company does equipment of that weight
17 present?
18   A. If you have the proper equipment it doesn't
19 present any problems.
20   Q. Okay. Once you had met with Mr. Lepori in
21 Monterrey, what was the next involvement you had with
22 the ABB project?
23   A. I followed up in November with phone calls to
24 Sandro, I had submitted a quotation to him for pricing
25 after our meeting and then I followed up again in

**Page 18**

1 December with a telephone call to Sandro, and then in
2 mid to late January of '99 he called me up and asked to
3 see if we were still interested in doing the job.
4   Q. All right. Do you remember what the
5 quotation that you provided ABB was for your services
6 in moving the generator?
7   A. I -- that's a -- can you define the question
8 a little bit better?
9   Q. Yeah. How much did you tell them it was
10 going to cost them to get the generator moved?
11   A. I don't -- I don't have recall.
12   Q. Okay. Do you have an approximate range of
13 what it would have --
14   A. Oh, it was probably 700,000, 800,000,
15 900,000, right in that area.
16   Q. Okay. And what is it exactly that you told
17 -- that you proposed to Mr. Lepori that C.H. Robinson
18 would do for the money that y'all were talking about?
19   A. Well, I -- I think our initial proposal was
20 to just take it from rail in to Monterrey and then
21 transload it to truck and deliver it FAS foundation
22 free alongside. In discussions with Sandro, it was,
23 well, we're not going to come in with heavy lift ships,
24 so we have to get, you know, cranes and barges and, you
25 know, figure out the water side of it, and so we were

**Page 19**

1 very excited and wanted to go through and help him
2 secure the cranes and develop the process on exactly
3 how we'd take it from the water mode to the land mode.
4   Q. Okay. What was your next involvement after
5 those discussions occurred?
6   A. Then it was putting together the plan,
7 finding the crane, did we want to do it in Houston, did
8 we want to do it in Corpus, did we want to do it in
9 Brownsville, going through with our connections in the
10 heavy haul business, find out what the capacities were,
11 what we could develop in putting together the plan.
12   Q. What did that entail to go through and decide
13 how to exactly transport this generator from the ocean
14 transport to the siding --
15   A. Getting the drawings -- I'm sorry.
16   Q. -- to the siding in Monterrey.
17   A. Okay. First getting ABB drawings of the --
18 of the product, and then taking those drawings to the
19 various vendors that had the capability to do the
20 lifting and the transloading and the securing.
21   Q. Okay.
22     MR. WILLIAMS: I'm getting a cup of
23 coffee, Bill, so there's a very short technical delay.
24   Q. (BY MR. WILLIAMS)  At that time when you say
25 getting the drawings, what drawings would you have

**Page 20**

1 acquired from ABB in order to start with looking at the
2 various options that you would have to transport the
3 generator?
4   A. Just their transport drawings of the pieces
5 that we'd be bringing in. The pieces that we were
6 being responsible to bring in were the turbine, the
7 generator and the transformers.
8   Q. All right. Was that going to come in one
9 shipment or more than one shipment?
10   A. Multiple shipments.
11   Q. What different options did you -- go through
12 with me briefly the various options and why you ended
13 up deciding on the Port of Brownsville and the mode of
14 transportation that was used to get the generators to
15 Monterrey.
16   A. Our first port of choice was Houston, okay,
17 and the reason Houston is is because this is not an
18 unusual commodity going through Houston. It's a heavy
19 haul port. It's probably the number one heavy haul
20 port for project cargo in North America and definitely
21 the United States. And we knew that port extremely
22 well. However, our problems came in getting from rail
23 down into Mexico with these pieces, and there were
24 clearance issues, because of the weight and the size,
25 and what we had found is the best clearance was through

MERIT COURT REPORTERS - FORT WORTH, TEXAS                                    Page 17 - Page 20
(817) 336-3042 * 1-800-336-4000

Page 25

1  Q. Okay. Is it -- how is the normal and
2  customary means of providing information on equipment
3  and movement of equipment in your business, how is that
4  information normally exchanged?
5     A. It is usually either faxed or emailed or
6  copy, hard copy is presented.
7  Q. What I'm asking is what is the -- is it --
8  does somebody write out a booklet and tell yo
9  something, or how is the information on the e
10 equipment, what is it that -- how is the dimen
11 all the things that you need to know about th
12 equipment, how is that given to you and then
13 give that to other people?
14    A. It depends on the requirement of the
15 and, of course, the -- the load itself, at w
16 is required. In this particular case with ABB they
17 require specific drawings that show different angles
18 and all this kind of detail. So what we in turn do is
19 we go to the carrier, who is our subcontractor, and
20 because we did not have in-house engineers, and we went
21 to them and had their engineers draw up the plans and
22 show us exactly what goes on. The railroad doesn't
23 offer that service, so we gave the equipment drawings
24 to ABB, and they, in turn, put the pieces on the -- on
25 the rail equipment, and we used that as engineering

Page 26

1  drawings for the rail.
2     Q. What other companies provided drawings to you
3  to provide to ABB?
4     A. To the best of my recollection, Telleria, of
5  course, the rail equipment owners for the rail cars,
6  and then Brownsville Barge & Crane. It may have been
7  AMFELS that did the drawing.
8     Q. What information or drawing -- what was
9  provided to them in order for them to be able to do the
10 drawings they did?
11    A. We gave them, again, the drawings that ABB
12 had presented to us of the pieces.
13    Q. Now, are they -- would these be described as
14 engineering drawings?
15    A. Yeah, you could -- you could -- you could
16 classify them as that.
17    Q. Were they transportation drawings?
18    A. That's a better definition of them.
19    Q. Is that the normal way --
20    A. Transport drawings, yes.
21    Q. Is that the normal way that information is
22 exchanged in your business about things like this?
23    A. When you're lucky it's the -- it's the best
24 way. I wouldn't say it's the normal way. Excuse me.
25      THE VIDEOGRAPHER: Need to go off the

Page 27

1  record?
2       MR. WILLIAMS: Off the record for a
3  second.
4       (Brief recess for phone call.)
5       THE VIDEOGRAPHER: We're back on the
   record.
       THE REPORTER: The last question and
   answer, "Is that the normal way that information is
   exchanged in your business about things like this?"
       ANSWER: "When you're lucky it's the --
   it's the best way. I wouldn't say it's the normal
   way."
       Q. (BY MR. WILLIAMS) Why is it the best way?
       A. Because then you know exactly what you're
   dealing with, or you hope you know exactly what you're
   dealing with, and it eliminates the opportunities for
17 surprises when it actually comes to execution.
18    Q. Do the people that you're dealing with, the
19 various contractors that you end up entering into
20 contracts with, such as Brownsville Barge & Crane, such
21 as AMFELS, such as the railroad, do they have people
22 involved who are capable or should be capable of
23 reading transportation drawings?
24    A. Yeah, yes, yes.
25    Q. Did you personally meet and provide the

Page 28

1  transportation drawings to these various companies?
2     A. Yes. I believe in this case I did. I can't
3  recall if I personally met with the TFM or not. I had
4  numerous meetings with them and I can't remember
5  exactly sitting down and talking about this specific
6  case with them, but I do know that I met with Schaefer
7  and gave them the drawings and I do know that I met
8  with Brownsville Barge & Crane and gave them the
9  drawings.
10    Q. All right. Would you tell us to the best of
11 your recollection sitting here today how -- what the
12 discussions, first with Schaefer, and then with
13 Brownsville Barge & Crane entailed, tell us what you
14 went over about what they were going to do.
15    A. My first call was to the Port of Brownsville
16 to discuss bringing in these heavy pieces, which is a
17 new market for them. They've been kind of out of that
18 business. And asked for references on who could help
19 us through the port activity and the stevedore end and
20 rail tie-downs and steps like that and they gave us a
21 list of two or three stevedores, of which we contacted,
22 of which Schaefer was the only one that showed the kind
23 of interest that we felt important, that they would be
24 a good partner and we could go forward with, and very
25 responsive to our needs. So once we determined that we

Case 1:03-cv-00192  Document 67-2  Filed in TXSD on 03/21/2005  Page 6 of 14

No. 99-04-1644-E                                           James Hamilton
Zamora vs. Abb Kraftwerke Aktiengesellschaft    Multi-Page™    April 25, 2000

Page 33

1 that to the TFM and -- and it was approved. If I can
2 back up a second here, to help ABB with their tie-down
3 we provided them copies of the AAR, Association of
4 American Railroad open top loading manuals, which is as
5 close to a governing body of open top rail loading
6 shipments that there is in the United States and
7 Canada. At this particular time it wasn't a party to
8 the Mexican railroads. They were doing a
9 restructuring, a privatization of the railroad industry
10 in Mexico, and so at this time they weren't a party to
11 AAR. They followed it and we shared with them what
12 those recommendations were and gave them copies of the
13 tie-down requirements.
14    Q. Okay. Can you tell me what -- what was
15 Telleria's involvement in this project?
16    A. Telleria was contracted by us to take the
17 piece, pieces off the rail car at Apodaca, and put it
18 on -- Apodaca, Mexico, and put it on their
19 transporters, their hydraulic trailers, and then take
20 it the 11 miles, 20 kilometers to the jobsite, and put
21 it alongside the foundation. Then we had another
22 contract with ABB's subcontractor to take it off the
23 transporters and rough set it on the foundation, but
24 that was with the subcontractor of ABB's.
25    Q. Okay. You actually -- C.H. Robinson actually

Page 34

1 contracted with Telleria?
2    A. Yes.
3    Q. Who were the contracts -- the companies
4 involved in the transport from the Port of Brownsville
5 to the project site in Monterrey that C.H. Robinson
6 contracted with?
7    A. The Brownsville Rio Grande International
8 Railroad, the Union Pacific Railroad and the TFM
9 Railroad and Telleria.
10    Q. All right. Did you have contracts with any
11 of the people to move it from the lash barge to the
12 rail car?
13    A. That contract was done through Brownsville
14 Barge & Crane -- excuse me -- Schaefer Stevedoring.
15    Q. Did C.H. Robinson have a contract with
16 Schaefer Stevedoring for that move?
17    A. I don't think we had a formal contract. We
18 just had a quotation and an agreement.
19    Q. What did your contract with ABB end up saying
20 that would be provided by -- what services were C.H.
21 Robinson to provide to ABB?
22    A. We were to provide transportation management,
23 okay, the modes, and the planning and, geez, I'm trying
24 to -- we have a standard -- we had our standard form --
25 and the equipment, I think, is what we provided.

Page 35

1    Q. What -- tell us in -- you know, what all did
2 that end up entailing?
3    A. What we like to do is a turnkey, and the way
4 that we sell it is turnkey. Okay, we'll take -- we'll
5 take it from here and we'll take it to there, and we'll
6 do everything that's required in between.
7    Q. Is that what turnkey means, you'll take care
8 of everything?
9    A. Right.
10    Q. All right. Is that what you were to provide
11 in this particular instance?
12    A. Yes, the management, the logistics, the
13 third-party logistics coordination.
14    Q. All right. And how did you end up -- how
15 were you -- did you end up going about accomplishing
16 this?
17    A. As -- as I've explained this morning, we went
18 through and met with the people, worked with ABB to get
19 the drawings, put together the plan, brought the people
20 together and as a nonasset based organization, brought
21 the people with the assets all together and facilitated
22 the transactions.
23    Q. Okay. Let me back up a second and talk to
24 you a little bit about Todd Strever. Tell me about his
25 background.

Page 36

1    A. Todd was -- we hired Todd -- trying to
2 remember. I believe it was the summer of '97 that we
3 hired Todd. It could have been the summer -- no. It
4 was the summer of '97 that we hired Todd. Todd had
5 about five and a half years with the Union Pacific
6 Railroad, and he was for a couple of three years in the
7 heavy haul segment, and that's where I first became
8 aware of Todd and first met Todd.
9        And then he moved out of that commodity
10 group about the same time that we were really starting
11 to expand and wanted his expertise and his -- and his
12 skills. So we hired Todd to come on board with us in,
13 I believe it was August of '97.
14    Q. Okay. Other than yourself and Todd, did you
15 have people involved at C.H. Robinson who had the type
16 of experience with heavy transportation that was
17 involved in the ABB project?
18    A. Yes.
19    Q. Who were those people?
20    A. We had Homero Cardona, who was familiar and
21 was our Mexican manager at that point in time, and we
22 had hired Homero in June of '97 from a crane company,
23 from Biersa Crane Fabricating, and at that point in
24 time we had all these Westinghouse projects coming up
25 in Mexico, and so we definitely needed some expertise

Case 1:03-cv-00192   Document 67-2   Filed in TXSD on 03/21/2005   Page 7 of 14

No. 99-04-1644-E                    Multi-Page™                James Hamilton
Zamora vs. Abb Kraftwerke Aktiengesellschaft                   April 25, 2000

Page 41

1  A. Yes.
2  Q. The movement at the Port of Brownsville, did
3  that require the jacking lugs?
4  A. No.
5  Q. And the jacking lugs, as we've looked at the
6  drawings and had some testimony in this case, it's my
7  understanding from that testimony that the jacking lugs
8  stick out further than anything else on the generator;
9  is that correct?
10 A. To the best of my recollection.
11 Q. And did the jacking lugs, as a result of the
12 dimensions, did they -- with the gen -- the generator
13 with the jacking lugs on it, did that exceed the width
14 dimensions allowed by the Mexican railroad?
15 A. To the best of my recollection, it would --
16 that's normal, because your jacking lugs -- your
17 jacking lugs stick out even further than your lifting
18 lugs on ABB's equipment, so, yeah, to my recollection,
19 that's an accurate statement.
20 Q. When did C.H. Robinson -- when did y'all
21 become aware of the fact that the jacking lugs exceeded
22 the dimensional constraints of the Mexican railroad?
23 A. Well, the -- they weren't an issue, because
24 the jacking lugs were -- are to be taken off for
25 transport.

Page 42

1  Q. Okay. When was that first discussed or how
2  did you come about that information?
3  A. It was on -- it was on the drawing, the
4  original drawings, the transport drawings from ABB.
5  Q. Okay. And what did those original drawings
6  tell you?
7  A. That the jacking lugs are removed for
8  transport.
9  Q. Okay.
10 A. So you can take that dimension out and just
11 look at the -- the flat dimension.
12 Q. Okay. Were -- did you discuss the removal of
13 the jacking lugs with whatever company was going to be
14 involved in that?
15 A. No.
16 Q. Okay. As part of the plan of the movement of
17 the -- the generator from the -- excuse me -- from the
18 lash barge to the rail car, was it ever discussed at
19 what point in time the jacking plates would -- would be
20 removed?
21 A. I wasn't involved in all the conversations.
22 I know that I never had any conversation discussing the
23 jacking lugs.
24 Q. Okay. Did you ever anticipate in -- up to
25 the time that the generator arrived, or prior to the

Page 43

1  time the generator arrived how that job would actually
2  be accomplished?
3  A. No.
4  Q. Okay. Were you originally going to be the
5  person that was going to be on-site at the time that
6  the generator was moved from the lash barge to the rail
7  car?
8  A. I was going to be there. I was also -- Todd
9  was our project coordinator on this scope, so Todd
10 would definitely have been there. I can't recall what
11 my schedule was or what my scheduling would be. I know
12 that I wanted to be there, but we had some dates,
13 slippage of dates and stuff like that and I had some
14 other commitments.
15 Q. During the time of -- during the time of this
16 project from the time that you originally got the
17 contract or right prior to that time were there some
18 changes in the managerial structure at C.H. Robinson
19 that occurred?
20 A. Oh, I'm sure there were. Changes happen
21 regularly.
22 Q. Well, what I'm asking about, did you take on
23 some extra responsibilities as a result of somebody
24 leaving C.H. Robinson?
25 A. No, not that I'm aware of.

Page 44

1  Q. Okay. What was your -- what was the job
2  scope of your Project Manager on-site in Brownsville, I
3  think you were saying Todd Strever?
4  A. Correct.
5  Q. What was he supposed to be doing?
6  A. To facilitate and execute the plan, the
7  transport plan.
8  Q. Okay. Would the transport plan have included
9  in his job responsibilities facilitating the removal of
10 the jacking plates for the transport on the railroad
11 car?
12 A. Yes. Anything that came up, any issues that
13 came up, according to the plan, outside the plan,
14 whatever was involved, he was there to facilitate and
15 coordinate the execution.
16 Q. Okay. Did -- was the generator shipped with
17 a generator cover on it?
18 A. Oh, I'm sure. They can't ship them with them
19 open. And there's -- there's a couple of different
20 type of covers that they have.
21 Q. Uh-huh.
22 A. And I don't remember if we did a cover
23 change. Some we do cover changes on, and some we don't
24 do cover changes on. And my memory is fuzzy if we did
25 a cover change on this one. I think we did.

Case 1:03-cv-00192    Document 67-2    Filed in TXSD on 03/21/2005    Page 8 of 14

No. 99-04-1644-E                          Multi-Page™                           James Hamilton
Zamora vs. Abb Kraftwerke Aktiengesellschaft                                    April 25, 2000

**Page 49**

1 facilitate the removal of the jacking plates or would
2 it just be done by hand?
3   A. It depends on the -- on the specific piece.
4 If -- if it was safe to do it by hand and was allowed
5 by hand, I'd do it by hand. If it required machinery,
6 I'd definitely get machinery.
7   Q. Did you ever become aware of the particular
8 dimensions or weights of these particular jacking
9 plates?
10   A. Yes.
11   Q. And --
12   A. After the incident.
13   Q. And do you know how much they weigh?
14   A. I believe they're around 860 -- I've heard
15 various things, 860 is the number that sticks out the
16 most in my mind.
17   Q. Is that a piece of -- how would you remove
18 that?
19   A. I would definitely have a fork truck to lift
20 860 pounds, or a Pettibone or something like that. I
21 would not do that manually.
22   Q. All right. Do you recall how the rail car
23 was supposed to be facilitated or set up for the
24 transfer of the generator?
25   A. No, not in exact detail. I mean, I know that

**Page 50**

1 we had crossbeams of certain widths, okay, and I'm
2 trying to think if they're like 10, 6, because the ABB
3 generator has a ring around the bottom or a rim, okay,
4 and that has to be fully supported. The center of the
5 generator cannot bear any weight. So -- and the sides
6 would over -- would fit the bottom of the flat car, the
7 deck of the flat car would fit that bottom if we didn't
8 put beams across. So we had to put -- for some reason,
9 10 foot 6 is sticking in my mind, and I think we had
10 eight beams, eight to 10 beams.
11   Q. Okay. That were welded across the flatbed?
12   A. Right, that were -- right. Parallel to each
13 other, perpendicular to the flatbed.
14   Q. And that would support the outer rim of the
15 generator?
16   A. Right, it would give it full support all the
17 way around.
18   Q. Were the -- was the generator to be set
19 straight onto these steel beams, or was there to be
20 additional setup of a platform on which it was to be
21 set?
22   A. You never put -- I'm sorry. You never put
23 steel on steel. You always put wood in between.
24   Q. Why is that?
25   A. Sliding, friction. You've got to have the

**Page 51**

1 wood in there.
2   Q. All right. How was the wood to be
3 configured, if you remember?
4   A. I -- I don't recall if -- I believe we had
5 two by fours and two by sixes or one by sixes, wood
6 that was on the -- that was like on the perimeter of
7 the generator itself.
8   Q. Okay. Were they to be all the way around or
9 were there any openings in the -- that was to be set up
10 in the wood?
11   A. My understanding is that there were some
12 openings for the wood so that we could stick the bolts
13 into the beams and have -- have some separation so that
14 we could put a bolt in and secure it to the beam.
15   Q. All right. Was there any -- do you know on
16 the generator whether or not there was any particular
17 problem with any piece of the generator that may have
18 set down further than other pieces?
19   A. Right. What I got, Justin, was feedback from
20 Todd and Roland that the wood was in the way of the
21 holes, and if they removed the nuts with the generator
22 in the air, or before it was set down, it would give
23 them much better clearance, and then there was some
24 issue with the wood. And I'm real fuzzy on what that
25 was, but there was -- I know that there were some

**Page 52**

1 issues, and Roland and Todd and Charlie were working
2 through the issues and came up with the resolution, and
3 I was just brought into the loop after the fact.
4   Q. And you're talking about discussions that you
5 had with Roland Schneider and Todd Strever after this
6 accident?
7   A. No. I believe we had some discussions --
8 well, I can't recall. I really can't recall if it
9 happened before or after.
10     THE WITNESS: In a couple of minutes I'm
11 going to have to --
12     MR. WILLIAMS: Why don't we go off the
13 record?
14     (Discussion off the record.)
15     (Recess from 10:29 to 10:37 a.m.)
16     THE VIDEOGRAPHER: We're back on the
17 record.
18   Q. (BY MR. WILLIAMS) Mr. Hamilton, did you --
19 had you actually seen any of the ABB generators prior
20 to the time of their transportation to the Port of
21 Brownsville?
22   A. No, not that I recall.
23     (EXHIBIT(S) NO. 1 through 3 MARKED.)
24   Q. (BY MR. WILLIAMS) I'm going to hand you
25 what's been marked as Deposition Exhibit 1, and I

Case 1:03-cv-00192  Document 67-2  Filed in TXSD on 03/21/2005  Page 9 of 14

No. 99-04-1644-E  Multi-Page™  James Hamilton
Zamora vs. Abb Kraftwerke Aktiengesellschaft  April 25, 2000

**Page 57**

1 Q. You don't know whether or not they could have
2 used the same mobile crane that they used to remove the
3 generator cover to remove the jacking plates at the
4 time it was in the lash barge?
5 A. Yeah. I don't know why they couldn't or why
6 they didn't. They certainly could have. I think it's
7 reasonable, but I don't know.
8 Q. All right. Is there any rules or regulations
9 that govern the removal of the jacking plates or taking
10 loose the connections of the jacking plate at the time
11 that it was actually done?
12    MR. TINNING: Form.
13 A. There are -- by rules and regulations, you
14 know, there's OSHA standards that you have safety rules
15 and regulations and understandings, so I'm sure that
16 those were in place. And as far as -- as I know, not
17 being there, they were all followed.
18 Q. (BY MR. WILLIAMS) Do you know when, at what
19 point in time, where they were on the lift when the
20 actual jacking plate fell on Mr. Zamora?
21 A. No, I really don't.
22 Q. Do you know whether or not the generator had
23 been set down on the rail car at that time or whether
24 it was still a suspended load?
25 A. I only have hearsay. I wasn't there.

**Page 58**

1 Q. Okay. Well, assume with me that the
2 testimony is that the generator itself had not at that
3 point in time been set down on the rail car. With that
4 assumption from the testimony of the witnesses, are
5 there any rules and regulations that govern the
6 activities at that particular point in time?
7 A. Not that I'm aware of.
8 Q. Okay. Do you know whether or not it would be
9 normal and customary in your industry to remove the
10 jacking plates while the load is suspended over the
11 rail car?
12 A. Customary, I can't answer to. I don't know
13 customary. I just don't know the answer to that.
14 Q. Okay. Are there any particular problems that
15 are presented by loosening attachments, a device like
16 the jacking plate, while it's suspended over a rail
17 car?
18 A. Well, I don't -- usually it's not good
19 judgment to work on a piece while it's hanging.
20 Q. And why is that?
21 A. Well, you just -- you just never know, you
22 know. Things happen. If you're going to work on a
23 piece while it's hanging in the air, you definitely
24 have jack stands around the corners to protect it in
25 case something slips, but usually to work on a piece

**Page 59**

1 that's hanging is -- is not prudent judgment. But
2 there could be exceptions.
3 Q. Prior to the time of removing any of the
4 attaching devices, should the jacking plate be secured
5 by use of some kind of mechanical device, such as a
6 crane or a forklift or something?
7 A. Could you -- I'm sorry, could you say the
8 question again?
9 Q. Sure. Assuming -- if we assume for a moment,
10 in looking at Exhibit No. 1, Deposition No. 1, you can
11 see that there are four screws, two upper screws and
12 two lower screws. After the accident we obviously know
13 that the two upper screws do not attach the jacking
14 plate to the generator. But assuming for a moment that
15 that wasn't the case, assuming that all four of the
16 screws actually attached and held the generator -- the
17 jacking plate to the generator, okay?
18 A. Uh-huh.
19 Q. Before you loosen or take off any of the
20 attaching devices, even with all four holding, should
21 there be any precautions taken?
22 A. Well, obviously when you look at the piece,
23 it gives the appearance that it might be heavy, okay,
24 and the fact that it's jacking a 700,000 pound piece of
25 machinery, it's going to be pretty stout. So in

**Page 60**

1 looking at the piece, one would think that you would
2 probably want to put a fork truck with a sling and wrap
3 it to support it while you take the pieces out.
4 Q. Do you know of any reason that -- that that
5 could not have been done prior to the time of removing
6 any of the bolts, any bolts attaching the jacking lug
7 to the generator?
8 A. No, I don't, I don't know of any reason.
9 Q. If you look at the two different screws that
10 are depicted in Exhibits 2 and 3, can you tell me --
11 describe the two different screws to me?
12 A. Yes. One screw is threaded all the way to
13 the head, and one screw has a spacer before the threads
14 start of about 15 inches.
15 Q. All right. How is it your understanding or
16 what is your understanding of what occurred at the time
17 that this accident happened?
18    MR. TINNING: Form.
19 A. What is my understanding?
20 Q. (BY MR. WILLIAMS) Yes.
21 A. My understanding is that there was discussion
22 about taking the bolts out while it was in the air
23 because of the wood not being able to get a wrench
24 underneath, more challenging to do that, so it was
25 determined by Roland, Charles and Todd to remove the

Case 1:03-cv-00192    Document 67-2    Filed in TXSD on 03/21/2005    Page 10 of 14

No. 99-04-1644-E                                          Multi-Page™                                     James Hamilton
Zamora vs. Abb Kraftwerke Aktiengesellschaft                                                              April 25, 2000

Page 65

1 the conversation.
2  Q. Okay. Did you have a discussion with him
3 about how they should be removed if -- if the
4 discussion was that we're going to have to remove them?
5  A. No. I don't have recollection of that.
6  Q. Okay. In -- if you had -- as I understand
7 your testimony, you had originally intended to be
8 present at the Port of Brownsville?
9  A. I was present.
10  Q. During this generator -- during the actual
11 move where Mr. --
12  A. Not -- I had to leave, but I was present
13 when -- when Roland and Robert came over from
14 Switzerland, I met them at the airport, made sure they
15 were here, comfortably, arrived comfortably. I believe
16 it was on a weekend, and we wanted someone to meet them
17 down there at the airport, so I went and did that --
18  Q. Okay.
19  A. -- and then my plan was to leave.
20  Q. All right. Had the generator arrived on the
21 lash barge at that time?
22  A. No.
23  Q. All right. Were you there at any time prior
24 to the move of the generator from the lash barge to the
25 rail car?

Page 66

1  A. Prior to that, yes.
2  Q. Did you view the generator in the lash barge?
3  A. No. I was way prior.
4  Q. Okay. That -- that wasn't a very good
5 question. What I'm trying to say, were you there at
6 the same time that the generator was there in the lash
7 barge?
8  A. No, sir.
9  Q. Okay. If you had been present at the time
10 this generator had been moved from the -- the lash
11 barge to the rail car, are there any things that you
12 would have done differently than was done on this
13 particular move?
14  A. I -- I can't answer that. I don't know. I
15 mean, I don't know.
16  Q. Would you -- I'm sorry if I interrupted you.
17  A. I -- I'm just -- I don't know.
18  Q. Okay. Would you have -- with your experience
19 in the rail industry, would you have allowed men to
20 work on the generator while it was suspended above the
21 rail car?
22  A. I -- I probably would have raised great
23 concerns over that.
24  Q. Why is that?
25  A. I -- I just don't believe you should work on

Page 67

1 anything that's suspended. I just -- I don't do it.
2  Q. Would you have allowed them to loosen any of
3 the attaching devices at all prior to the time that the
4 jacking plate had been secured by use of a mechanical
5 device?
6  A. I -- I can't answer that question. I'd have
7 to see what the circumstances were around it. I
8 just -- I don't know.
9  Q. Well, in retrospect, would you have inspected
10 the -- the jacking plate, looked at it prior to the
11 time that you were going to have to -- if you were
12 going to have to remove it, prior to the time that you
13 removed it to see what you were going to have to do in
14 order to safely remove the jacking plate from the
15 generator?
16  A. Yes.
17  Q. And would you have asked any questions, if
18 you had any questions about how the jacking plate was
19 attached to the generator?
20  A. I would have -- I would have definitely
21 conferred with the ABB representative on what the
22 process is to take it -- take it off.
23  Q. And you've testified, and we obviously know
24 after this, after the fact that the two top bolts are
25 -- are nonattaching devices, that they are, as you

Page 68

1 described, tension devices?
2  A. Correct.
3  Q. Would -- there's no warning label or no
4 sticker or no instructions on the generator describing
5 that to people who would be removing the device;
6 correct?
7  A. Correct, on that particular exhibit, no.
8  Q. On the photo that we see here --
9  A. Right.
10  Q. -- we don't see anything that would have told
11 the workers that these were not attaching devices?
12  A. Correct.
13  Q. What would be the job responsibilities in
14 order to -- of the people there who were in charge of
15 this move, who were going to be moving this, to ensure
16 that they were able to safely do that?
17  A. I think their responsibilities would be to
18 ensure that that was removed safely.
19  Q. And how --
20  A. Have that information.
21  Q. And how would they go about obtaining that
22 information?
23  A. They would -- they would confer with the
24 manufacturer, the -- the owner of the piece.
25  Q. Okay. In looking at the jacking plate -- in

Case 1:03-cv-00192  Document 67-2  Filed in TXSD on 03/21/2005  Page 11 of 14

No. 99-04-1644-E  Multi-Page™  James Hamilton
Zamora vs. Abb Kraftwerke Aktiengesellschaft  April 25, 2000

Page 73

1 assume with me further that that's, in fact, what
2 Mr. Zamora and Mr. Cherington were doing in the
3 presence of Mr. Roland Schneider. Would you expect
4 Todd Strever to overrule Mr. Schneider if that's, in
5 fact, what occurred?
6   A. No.
7   Q. Would you, in fact, expect Mr. Strever to
8 follow Mr. Schneider's instructions about the movement
9 of the generator onto the rail car? I'm sorry, I
10 didn't hear your answer.
11   A. Well, I haven't answered, because I -- I
12 don't -- the question is if I would allow -- would
13 expect Mr. Strever to follow Mr. Schneider's direction?
14   Q. Or instructions. You told me previously that
15 Mr. Schneider was there to -- to answer questions, and
16 I think your words were give directions about the
17 movement of this particular generator.
18   A. Yeah.
19   Q. Is that right?
20   A. Well, he was to give -- he was to stop the
21 work if he felt something was going wrong that could
22 damage the piece.
23   Q. All right. Was he there also to stop
24 something if it was being done unsafe and might damage
25 the workers or hurt the workers themselves?

Page 74

1   A. Oh, absolutely. I mean, I don't think that
2 was his primary focus, but he certainly wouldn't, you
3 know, let people do something that was going to cause
4 them problems.
5   Q. In other words, if Mr. Schneider was allowing
6 these jacking bolts to be removed, knowing that only
7 two of them -- two of the bolts, that is, held the
8 jacking plates on and seeing that other people may be
9 taking out the last bolt or the last nut, you would
10 certainly expect Mr. Strever to follow instructions, if
11 Mr. Schneider had given them, to stop doing that?
12   A. Yes.
13   Q. Okay. And I think you answered this earlier,
14 but to make it clear for the record, when it comes to
15 knowledge about this particular generator and the
16 jacking plates, you would agree that the manufacturer
17 is in a position to know more about those jacking
18 plates and the generator than anyone else there at the
19 port?
20   A. Yes.
21   Q. And that would be true even when compared to
22 Mr. Strever, you would say that the manufacturer and
23 his representative would have more knowledge about the
24 jacking plates and the generator than even Todd
25 Strever; correct?

Page 75

1   A. Yes.
2   Q. Now, you were not there personally at the
3 time this accident happened, as I understand it. Is
4 that right?
5   A. That is correct.
6   Q. But you did apparently talk to Mr. Schneider
7 from ABB about the accident or at least about the
8 jacking plates either before or after the accident?
9   A. Yes, after the accident.
10   Q. Did Mr. Schneider in that conversation, sir,
11 indicate to you in some words or in some way that he
12 felt at least partly responsible for this accident?
13   A. No.
14   Q. That he could have prevented it in some way?
15   A. Not that I have recollection of.
16   Q. Did he indicate, sir, any remorse whatsoever?
17   A. Oh, he indicated great remorse and tragedy
18 for what had happened.
19   Q. Did he indicate, sir, that at any time that
20 he had ordered that there be a work stoppage in
21 removing the nuts that held on the jacking plates?
22   A. That there be a work -- could you repeat the
23 question, please?
24   Q. Sure. Did Mr. Schneider ever indicate to you
25 that -- that he ordered work to stop in taking the nuts

Page 76

1 off of the retaining bolts on the jacking plates?
2   A. No.
3   Q. In fact, sir, he indicated that that was
4 going on in front of him with his express consent?
5   A. Yes, sir.
6   Q. And did he indicate -- I wasn't sure if it
7 was clear whether or not it was intentional or if it
8 was a mistake that ABB made in sending this generator
9 over with the jacking plates still attached. You said
10 that was only detected by you and Mr. Schneider at the
11 port, so was this sent over as a part of -- part of
12 ABB's plan with the jacking plates attached or was that
13 a mistake that they were sent over attached?
14   A. I really can't answer that. I don't know the
15 answer.
16   Q. Was there any clear indication from the
17 documents as to whether or not the jacking plates were
18 to be attached or not attached?
19   A. The transport drawing shows the jacking
20 plates attached, but they're flagged as removed for
21 transport.
22   Q. And the jacking plates were not going to be
23 needed -- well, first of all, they were not needed to
24 be transported to the Port of Brownsville from what you
25 told me; correct?

No. 99-04-1644-E                                    Multi-Page™                                James Hamilton
Zamora vs. Abb Kraftwerke Aktiengesellschaft                                                   April 25, 2000

Page 81

1 May of '99, it still has his cover letter on them and
2 they are attached by a rubberband.
3        MR. TINNING: Well, I don't want to
4 limit him with the time constraints we have to try to
5 accommodate -- to accommodate you, Mr. Hamilton, so if
6 you would please at the conclusion of the deposition
7 take as much time as you need to verify that all the
8 documents, in other words, that were sent from ABB
9 about these jacking plates and this generator for this
10 shipment are, in fact, attached as the next numbered
11 exhibit, which I believe is going to be No. 5, if my
12 numbering is correct here.
13    A. Yes, sir.
14    Q. (BY MR. TINNING)  Would you do that for me?
15    A. Yes, sir.
16    Q. You said there was a written contract between
17 C.H. Robinson and ABB for this?
18    A. Yes, sir.
19    Q. And that was actually signed and entered into
20 in Switzerland, I think you said?
21    A. Yes, sir.
22    Q. Was that contract in English?
23    A. Yes, it was. There was -- there was also one
24 in Mexico.
25    Q. All right. But the part that would actually

Page 82

1 deal with the work that was being done at the Port of
2 Brownsville and that -- that transportation leg, that
3 part of the shipment, that would have been signed and
4 covered by the Swiss -- Swiss signed contract; correct?
5    A. Correct.
6    Q. Could you also get a copy of that for us, a
7 full copy of that contract and attach that as then the
8 next numbered exhibit in order?
9        MR. LOCKHART: I'm sorry, Bill, he
10 doesn't -- he doesn't have access to the Robinson
11 records anymore.
12       MR. TINNING: No, I know he doesn't, but
13 I'm asking you to provide those --
14       MR. LOCKHART: Yeah.
15       MR. TINNING: -- there on behalf of C.H.
16 Robinson. Since he was there when it was signed he can
17 verify that it's -- it's a true and correct copy of the
18 one that was actually signed in Switzerland when he was
19 there.
20       MR. LOCKHART: Yeah. I don't have a
21 problem with that. I'm just saying logistically, he
22 doesn't have access, so we'll --
23       MR. TINNING: With the same proviso,
24 Mr. Hamilton, so that you can have full opportunity and
25 enough time to verify it is full and complete, would

Page 83

1 you, when you get through with the deposition, and also
2 go through the transport drawings and shipment papers,
3 also then with this particular numbered exhibit, go
4 through the contract, be sure it's all there so we can
5 get a full copy of that, on the con -- of the contract
6 on your deposition?
7    A. Yes, sir.
8        (EXHIBIT(S    ) 5 & 6 MARKED.)
9    Q. (BY MR. TINNING) Were there any complaints
10 made to you about how Todd Strever handled his job
11 there at the Port of Brownsville by ABB?
12    A. No, sir.
13    Q. Even still that would be true to this day;
14 correct?
15    A. Yes.
16    Q. When you talked with Mr. Lepori for ABB,
17 either at the initial discussions there in Mexico or
18 later in Switzerland or anywhere else up until the time
19 this accident occurred, did he give you any specific
20 information about the clearances for the railroad and
21 whether or not there were going to even be jacking
22 plates attached and how that would affect the
23 transport, did he give you any information like that?
24    A. No, sir, other than the transport drawings
25 that they provided.

Page 84

1    Q. The same ones that we're going to have
2 attached to your deposition?
3    A. Yes, sir.
4    Q. Okay. Have you talked to Todd Strever since
5 the accident about the accident?
6    A. Yes.
7    Q. And likewise, did -- did Todd express sorrow
8 that it happened, but -- but did he also express
9 likewise to you that he really didn't -- the accident
10 came about as a surprise to him, and he really didn't
11 feel like he had done anything wrong?
12    A. Correct.
13    Q. You have been to the Port of Brownsville, at
14 least from time to time?
15    A. Yes, sir.
16    Q. You said, for instance, that you were
17 satisfied that they had a very good and adequate crane
18 to make the lift for this, the Gulf Atlantic?
19    A. Yes.
20    Q. You don't have any complaints about that
21 crane and how it was operated at the time of this
22 accident, do you?
23    A. No.
24    Q. And as a matter of fact, again, if
25 Mr. Schneider had been there and felt that there was

### Page 89

1 the Port of Brownsville with regard to the transfer of
2 the generator?
3    A. Yes.
4    Q. All right. So it's not any -- any problem
5 that arose -- obviously, we know we had a problem,
6 because we had a tragic death there. It's not a result
7 of the lack of knowledge on Mr. Schneider's part?
8    A. Not that I'm aware of.
9    Q. Okay. With regard to actual lifts, moving
10 heavy equipment from a barge to a rail car, of the
11 people at the Port of Brownsville, who were the people
12 that were in charge of that operation?
13       MR. TINNING: Objection, form.
14    A. The -- the people in charge would be
15 Brownsville Barge & Crane, okay, because they're
16 actually in charge of the piece, okay. Now, as they're
17 doing the lift, they'll follow direction, but they're
18 in charge, it's under their hook, so, you know, they --
19 they will do whatever the customer requires them to do
20 that's within reasons of safety, as far as they're
21 concerned, and they're not going to do anything that
22 they feel is unsafe.
23    Q. (BY MR. WILLIAMS) Okay. So from the
24 standpoint of safety, of working on the lift, of safely
25 transferring the lift, is it -- is part of that the

### Page 90

1 responsibility of the crane operator, Brownsville Barge
2 & Crane?
3    A. As well as the stevedore, who is actually
4 working the ground part of it. It's a combination.
5 These are the two entities that are actually doing the
6 work and are responsible for the piece itself, because
7 it is under their due care.
8    Q. And obviously, if Mr. Schneider sees anything
9 that - that he sees is unsafe or potentially unsafe,
10 Mr. Schneider, in your opinion, should make that known
11 and should stop the operations if that is occurring?
12    A. Yes, he should.
13    Q. Should Mr. Strever have that responsibility?
14    A. Yes, he should.
15    Q. As the experts -- who is it that you -- that
16 was hired of the companies there, who would be the
17 actual people who were supposed to be knowledgeable
18 about transferring a heavy equipment such as this
19 generator from a lash barge to a rail car?
20    A. The crane company, the stevedore, the
21 manufacturer and ourselves.
22    Q. Okay. So there's not just one person there
23 that's supposed to be able to know what's going on;
24 there's a combination of people there who had that
25 responsibility?

### Page 91

1    A. Absolutely.
2    Q. With regard to expertise at actually
3 performing the job --
4    A. Uh-huh.
5    Q. -- who has that expertise on location?
6    A. The -- the crane company would have expertise
7 for their -- for their scope, because there's different
8 scopes, and there's experts in different fields. The
9 crane company would have expertise for their scope, the
10 stevedore would have to have expertise for their scope.
11 The manufacturer and the third-party logistic company
12 should have expertise in all the scopes and an
13 understanding of what the process is.
14    Q. All right. Let me quickly take -- have you
15 take a look at a -- some of the photographs from the
16 actual scene in Brownsville and let's get this one
17 marked as the --
18       MR. WILLIAMS: Bill, how many --
19       MR. TINNING: Two. I had two exhibits.
20       MR. WILLIAMS: All right. We're going
21 to take -- I'm going to take stickers 5 and 6 and I'm
22 going to just put them over here so that those will not
23 be used, and they will be available for Mr. Tinning's
24 exhibits. Then I'm going to take number 7, and -- if I
25 can get it off.

### Page 92

1       (EXHIBIT(S) NO. 7 MARKED.)
2    Q. (BY MR. WILLIAMS) Let me hand you what's
3 been number -- what's been numbered Exhibit 7. It's
4 two pictures, one with the -- that have been used in
5 other depositions, one with the jacking plate on the
6 ground, one with the jacking plate -- a jacking plate
7 attached to the generator. Take a quick look at that,
8 please.
9    A. Uh-huh.
10    Q. All right. Look at the one with the jacking
11 plate attached to the generator there.
12    A. Uh-huh.
13    Q. In that scenario, is the rail car set up with
14 openings in the wood for the bolts and nuts so the
15 jacking plate can fit inside?
16    A. Yes.
17    Q. Is that how the rail car was supposed to be
18 set up to accept the generator?
19    A. Yes, to the best of my knowledge.
20    Q. If the rail car had been set up in that
21 manner and the -- and the openings had -- and had been
22 set properly on the rail car where the jacking plate
23 fit within those openings, would there have been any
24 need to loosen the nuts or the bolts prior to the time
25 of setting the jacking plate on the rail car?

No. 99-04-1644-E  Multi-Page™  James Hamilton
Zamora vs. Abb Kraftwerke Aktiengesellschaft  April 25, 2000

Page 97

```
        CHANGES AND SIGNATURE
     TO THE ORAL DEPOSITION OF
            JAMES HAMILTON
             April 28, 2000

 PAGE    LINE    CHANGE        REASON
```

Page 98

1  I, JAMES HAMILTON, have read the foregoing deposition
2  and hereby affix my signature that same is true and
3  correct, except as noted above.
4
5
                      JAMES HAMILTON
6  STATE OF _____ )
7  COUNTY OF _____ )
8    Before me, _____, on this day
   personally appeared JAMES HAMILTON, known to me (or
9  proved to me under oath or through _____
   (description of identity card or other document) to be
10 the person whose name is subscribed to the foregoing
   instrument and acknowledged to me that they executed
11 the same for the purposes and consideration therein
   expressed.
12    (Seal)  Given under my hand and seal of office
   this _____ day of _____, _____.
13
14                    _____
                      Notary Public in and for the
15                    State of _____
16

Page 99

```
                    NO. 99-04-1644-E

GRACIELA ZAMORA,            )  IN THE DISTRICT COURT OF
INDIVIDUALLY AND ON         )
BEHALF OF THE ESTATE OF     )
HER LATE HUSBAND OSCAR      )
ZAMORA, SR. AND ON BEHALF   )
OF THEIR MINOR SURVIVING    )
SON OSCAR ZAMORA, JR.; AND  )
OLIVIA ZAMORA, THE          )
SURVIVING MOTHER OF THE     )
LATE OSCAR ZAMORA, SR.;     )
and ON BEHALF OF ALL THOSE  )
ENTITLED TO RECOVER FOR THE )
TRAGIC, UNTIMELY DEATH OF   )
THE LATE OSCAR ZAMORA, SR.  )  357TH JUDICIAL DISTRICT
     Plaintiffs             )
and                         )
ANGIE ZAMORA                )
     Intervenor             )
                            )
v.                          )
                            )
ABB KRAFTWERKE              )
AKTIENGESELLSCHAFT,         )
ABB ALSTOM POWER            )
(SWITZERLAND), LTD,         )
FORMERLY KNOWN AS ABB       )
POWER GENERATION, LTD.      )
and BROWNSVILLE BARGE       )
& CRANE, INC.               )  CAMERON COUNTY, TEXAS
```

                REPORTER'S CERTIFICATION
              DEPOSITION OF JAMES HAMILTON
                    April 25, 2000

     I, Gloria Carlin, Certified Shorthand Reporter in
and for the State of Texas, hereby certify to the
following:
     That the witness, JAMES HAMILTON, was duly sworn
by the officer and that the transcript of the oral
deposition is a true record of the testimony given by
the witness;
     That the deposition transcript was submitted on
5-4-00 to the witness or to the attorney for the
witness for examination, signature and return to Gloria

Page 100

     That the amount of time used by each party at the
deposition is as follows:
     William Tinning - (00:18)
     Justin L. Williams - (01:36)
     Tom Lockhart - (00:00)
     That pursuant to information given to the
deposition officer at the time said testimony was
taken, the following includes counsel for all parties
of record:
     William Tinning, Attorney for Plaintiffs;
     Justin L. Williams, Attorney for Defendants ABB
Kraftwerke Aktiengesellschaft and ABB Alstom Power
(Switzerland) Ltd., f/k/a ABB Power Generation, Ltd.;
     Tom Lockhart, Attorney for C.H. Robinson and the
Witness.
     I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.
     Further certification requirements pursuant to
Rule 203 of TRCP will be certified to after they have
occurred.
     Certified to by me this 4th day of May, 2000.

                    _Gloria Carlin_ (signature)
                    Gloria Carlin, CSR No. 498
                    Expiration Date: 12/31/00
                    Merit Court Reporters
                    309 W. 7th Street, Suite 600
                    Fort Worth, Texas  76102
Job No. 000425GJC   (817) 336-3042  (800) 336-4000