1            IN THE UNITED STATES DISTRICT COURT

        FOR THE SOUTHERN DISTRICT OF TEXAS

2                 BROWNSVILLE DIVISION

3   ABB KRAFTWERKE AKTIENGESELLSCHAFT, ET AL.*

            Plaintiff,              *

4                                   *

    VS.                             * CIVIL ACTION

5                                   * NO. B:03-CV-192

                                    *

6   C.H. ROBINSON COMPANY           *

            Defendants.             *

7

8

9   ***********************************************************

10            ORAL DEPOSITION OF TODD STREVER

11  ***********************************************************

12                                      COPY

13

14

15        ANSWERS AND DEPOSITION OF TODD STREVER, produced

16  as a witness at the instance of the Defendant, taken in

17  the above-styled and -numbered cause on the 21st day of

18  January, 2005, A.D., beginning at 2:54 p.m. before Jarneka

19  Epps, a Certified Shorthand Reporter in and for the State

20  of Texas, in the offices of C.H. Robinson, located at 5650

21  North Riverside Drive, Suite 210, Fort Worth, Texas, in

22  accordance with the Federal Rules of Civil Procedure and

23  the agreement hereinafter set forth.

24

25

RECEIVED

JAN 2 7 2005

EX. B

```
 1                    A P P E A R A N C E S
 2    FOR THE PLAINTIFF:
 3         MR. JUSTIN WILLIAMS
           Law Offices of Jusin L. Williams, P.C.
 4         600 Leopard Street, Suite 1810
           Corpus Christi, Texas 78473
 5         (361) 888-7702
           (361) 888-7717 (Fax)
 6
 7    FOR THE DEFENDANT:
 8         MS. KARAN CIOTTI
           McGinnis, Lochridge & Kilgore, L.L.P.
 9         3200 One Houston Center
           1221 McKinney Street
10         Houston, TX 77010
           (713) 615-8534
11         (713) 615-8585 (Fax)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    I N D E X

 2    Appearances...............................Page   2

 3    Exhibit Index.............................Page   4

 4    Stipulations..............................Page   5

 5    Examination by Mr. Williams...............Page   5

 6    Examination by Ms. Ciotti.................Page  26

 7    Further Examination by Mr. Williams.......Page  35

 8    Further Examination by Ms. Ciotti.........Page  41

 9    Signature and Corrections.................Page  43

10    Reporter's Certificate....................Page  45

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Todd Strever

Page 4
January 21, 2005

1                  E X H I B I T   L I S T

2    No.    Description                           Page

3

1    E-mail correspondence                          9

4

5    2    Documents                                 16

6

3    Contract beween ABB and C.H. Robinson         17

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE REPORTER:  Do you have any agreements or

3     stipulations?

4              MS. CIOTTI:  Pursuant to the Federal rules,

5     right?

6              MR. WILLIAMS:  Right.

7              MS. CIOTTI:  And I am representing Todd for

8     purposes of this deposition.

9                    TODD STREVER,

10    having been first duly cautioned and sworn to testify the

11    truth, the whole truth and nothing but the truth,

12    testified on his oath as follows:

13                    EXAMINATION

14    BY MR. WILLIAMS:

15        Q.   State your name for the record, please.

16        A.   Todd Strever.

17        Q.   Mr. Strever, it's been a while since we -- you --

18    underlying in a different lawsuit, so let me ask you just

19    a few questions about the current information.  Where are

20    you currently employed?

21        A.   Burlington Northern Santa Fe Railway.

22        Q.   And what are your job duties?

23        A.   I am director of sales in their industrial

24    products business unit.

25        Q.   And where do you work at?

Todd Strever

1      A.    Right here in Fort Worth.

2      Q.    Okay.  Back in 1999 were you employed by C.H.

3    Robinson?

4      A.    Yes.

5      Q.    What was your title or your job with C.H.

6    Robinson back then?

7      A.    Let's see.  At the time I left the company I was

8    director of business development, if I remember

9    correctly.

10     Q.    Okay.

11     A.    Manager of business development.

12     Q.    And what were your job duties as manager of

13   business development?

14     A.    Identify, secure new business for the branch of

15   C.H. Robinson that I worked for.

16     Q.    You were involved in a shipment of power

17   generation equipment from the port of Brownsville to the

18   power project outside of Monterrey, Mexico that C.H.

19   Robinson was working on behalf of ABB, correct?

20     A.    Correct.

21     Q.    What was your job with regard to that project?

22     A.    That particular project, I acted as kind of a

23   project manager.

24     Q.    Okay.  In order to accomplish the movement of the

25   heavy generators and transformers that were involved in

Todd Strever

1    the Monterrey power project C.H. Robinson entered into a

2    contract with ABB?

3        A.   Yes.  I believe we did.

4        Q.   And the -- for purposes of that contract you were

5    hired for the specific goal of the transportation of the

6    equipment from Brownsville to Monterrey?

7                MS. CIOTTI:  Object to form.

8                You can answer.

9        A.   Yes.  I mean, we were -- that's what our

10   branch -- our operation did.  We were a logistics

11   provider.

12       Q.   (By Mr. Williams) Okay.  And you -- I'm not sure

13   whether or not -- were y'all involved in some other

14   projects for ABB at various times?

15       A.   Well, I just -- I don't recall.

16       Q.   Okay.  But as far as this project or this

17   specific contract goes, it was specifically involving the

18   movement of the transformers from Brownsville to

19   Monterrey, correct?

20               MS. CIOTTI:  Object to form.

21       A.   Yes.  I believe so.  I mean, I don't remember a

22   lot of the details but, yeah, the pieces came from the

23   port of Brownsville into Mexico.  I believe they all went

24   to Montreal -- to Monterrey.

25       Q.   (By Mr. Williams) You were not involved with

Todd Strever

```
 1   regard to the shipment from the manufacturer facilities in

 2   Mannheim, Germany until the time they arrived in the port

 3   of Brownsville, correct?

 4       A.   That's correct.

 5       Q.   And you had a specific objective to accomplish on

 6   behalf of ABB that you entered into the contract for,

 7   correct?

 8       A.   Correct.

 9       Q.   You were authorized by ABB to -- about the terms

10   of the contract to manage the shipment of the goods from

11   Monterrey to -- I mean from Brownsville to Monterrey,

12   correct?

13       A.   Yes.

14       Q.   And while you were authorized to manage that, you

15   were subject to ABB giving you directions with regard to

16   specifics that they might want to have done with regard to

17   the movement of this equipment?

18            MS. CIOTTI:   Object to form.

19       A.   Yes.

20       Q.   (By Mr. Williams) The -- in fact of the matter

21   is, that during the time that y'all were gathering

22   information and deciding how to accomplish the various

23   parts that were required to move the equipment from the

24   port in Brownsville to Monterrey, you got directions from

25   ABB on various things with regard to move, such as using
```

Todd Strever

1    cable to tie down the various pieces of equipment as

2    opposed to using rods, correct?

3        A.    I don't have a specific memory of cable versus

4    rods but, yeah, there was a dialogue about logistical

5    concerns associated with that -- with the scope of work

6    that we were going to perform.

7        Q.    And with regard to that, you would get directions

8    from ABB, correct?

9            MS. CIOTTI:    Object to form.

10       A.    Yes.    I mean there was information that we needed

11   from ABB.

12           (Exhibit No. 1 marked.)

13       Q.    (By Mr. Williams) Okay.    Just one second.

14           We have these stapled documents marked as

15   Exhibit 1.

16           MS. CIOTTI:    Do you have another copy,

17   Justin?

18           MR. WILLIAMS:    I don't.    You can take a look.

19           MS. CIOTTI:    Where did these come from?

20           MR. WILLIAMS:    I'm not sure.

21           MS. CIOTTI:    This I haven't seen before.

22           MR. WILLIAMS:    I asked my secretary to gather

23   the correspondence yesterday for the deposition and

24   obviously somebody's seen some of them before.    Somebody's

25   marked on them but I don't recall having seen them in this

Todd Strever

```
 1   case, so I don't know where she found them but we

 2   obviously need to stop and get you a copy.  I assumed they

 3   had been produced to you.

 4            MS. CIOTTI:  No.  I haven't seen this.

 5            MR. WILLIAMS:  Take a look at this too.  Make

 6   sure you got everything there as well.

 7            (Break was taken from 3:06 p.m. to 3:24 p.m.)

 8       Q.   (By Mr. Williams) Mr. Strever, the whole purpose

 9   of this project was that ABB was selling power generation

10   equipment to a power plant in Monterrey, Mexico, correct?

11       A.   To the best of my knowledge, yes.

12       Q.   And Robinson's job was to help ABB get that

13   equipment to Monterrey?

14       A.   Correct.

15       Q.   Okay.  There -- the equipment was not owned by

16   Robinson, correct?

17       A.   Correct.

18       Q.   Robinson's job was to help -- specifically,

19   involved in the transportation of ABB equipment to where

20   they were selling it in Monterrey, correct?

21       A.   Correct.

22       Q.   Okay.  In that regard, the details of how you did

23   your job were subject to being changed by ABB if they

24   saw -- if they saw fit or they came up with a better way

25   to do something, and they wanted you to do it a different
```

Todd Strever

```
 1    way, correct?

 2              MS. CIOTTI:  Object to form.

 3        A.   Can you -- I'm sorry.  Can you ask that again?

 4        Q.   (By Mr. Williams) Sure.

 5              For instance, you would agree with me that

 6    using a rod versus a cable to tie down a generator on a

 7    rail car, that's one of the details of the job that y'all

 8    were helping to perform for ABB, correct?

 9        A.   Yeah.  Tie down was one of pieces of the surface

10    we were provided.

11        Q.   And ABB had the right to tell you, we want to use

12    a rod versus a cable or a cable versus a rod, correct?

13        A.   They did, however, in the scheme or the scope of

14    the work.  There's also other regulations and stipulations

15    that we had to meet, including the railroad had to approve

16    what the tie down schematic looked like.  It had to meet

17    engineering approval before they would transport it, so

18    there were more pieces to the puzzle than just that.

19        Q.   Subject to it, you know, you weren't going to

20    violate any law and you had to make sure that the railroad

21    would accept the equipment for transportation or you

22    weren't going to be able to get it to Monterrey?

23        A.   Correct.

24        Q.   Subject to that, ABB had the right to tell you to

25    use rods versus cables or cables versus rods, correct?
```

Todd Strever

1    A.   Yes.

2    Q.   There were certain details that you required

3  authorization from ABB to accomplish during this project,

4  correct?

5            MS. CIOTTI:  Object to form.

6    A.   You'd have to be more specific.

7    Q.   (By Mr. Williams) Okay.  Let's look at -- who is

8  Tom Ferguson?  Do you know who he is?

9    A.   He was a counterpart of mine at C.H. Robinson.

10    Q.   I'm going to hand you a memo that says Tom

11  Ferguson on the top of it, and it says to Roland Schneider

12  and cc to Todd Strever, and it's dated in a European date,

13  99-02-22, which I assume that's February 22nd, 1999?

14    A.   I assume so, yes.

15    Q.   Okay.  If you look down to the third paragraph at

16  the body of that.  It says, Require authorization of one

17  inch -- also require authorization of one inch threaded

18  rods secured to loaded lugs for lashing and securing to

19  car.  Also need by AM on the next day, February 23rd,

20  '99.  It doesn't say the next day, but I put that in

21  there.

22            MS. CIOTTI:  Object to form.

23    Q.   (By Mr. Williams) Actually, it reads, Also need

24  by AM on 2-23-99; is that correct?

25    A.   Yes.

Todd Strever

```
 1        Q.    And that would be an instance of where
 2   Mr. Ferguson on behalf of C.H. Robinson sought
 3   authorization from ABB in order to use a particular method
 4   of securing?
 5        A.    Yes.  I mean, it confuses me a little bit that
 6   this note's from C.H. Robinson but it's on ABB
 7   letterhead.  Is that just because it was printed that way?
 8        Q.    I believe so.
 9        A.    Yeah.  It appears to me that what Tom was doing
10   here is just confirming one of these -- the requirements
11   and tying the piece down with ABB.
12        Q.    Okay.  Now, were you involved with Mr. Hamilton
13   in discussions with ABB about which port would be used to
14   unload the equipment, whether they were going to go to
15   Brownsville, to Corpus or to Houston?
16        A.    No.  That was already established.
17        Q.    Okay.  Do you know whether or not whether the
18   decision to use the port of Brownsville was ultimately
19   made by or authorized by ABB?
20            MS. CIOTTI:  Object to form.
21        A.    I don't know the answer to that.
22        Q.    (By Mr. Williams) That would be something we'd
23   have to ask Jim Hamilton?
24        A.    Yeah, Jim would know.
25        Q.    When you were actually at the port of Brownsville
```

Todd Strever

1   for the movement of the transformer, Roland Schneider was

2   there with you at that time, correct?

3       A.   Yes.

4       Q.   If for instance, Mr. Schneider had asked that you

5   obtain another crane or a forklift to secure the jacking

6   plate prior to the -- prior to it being unloaded onto the

7   rail car, would you have followed those instructions and

8   done that?

9       A.   I guess I'm confused.  Obtained a different crane

10  or --

11      Q.   No, another crane.

12      A.   Okay.

13      Q.   If you had crane, the Atlantic Giant, that was

14  lifting the transformer from the lash board onto the rail

15  car, correct?

16      A.   Right, the generator, correct?

17      Q.   And if Mr. Schneider had asked you to obtain

18  another crane or to obtain a forklift to secure the

19  jacking plate prior to the time that the lug boats were

20  removed, would you have done that?

21      A.   I mean, yes we could have considered that,

22  absolutely.

23      Q.   I think we talked in your first deposition -- and

24  we talked about in looking back at the events that

25  happened with regard to Oscar Zemora (phonetic) that

Todd Strever

1  knowing at the time of your deposition -- if you had known

2  at the port of Brownsville that day that it would have

3  been prudent to obtain a forklift or a crane to secure the

4  jacking plate prior to the time that the bolts were taken

5  off of it that way it wouldn't have fallen on Mr. Zemora;

6  is that correct?

7          MS. CIOTTI:  Object to form, calls for

8  speculation.

9      A.   I guess I'm not sure what the question was.

10     Q.   (By Mr. Williams) Would you agree with me --

11 obviously, it's a number of years later and looking back

12 that it would have been prudent considering what happened

13 that day at the port to have obtained a crane or a

14 forklift to secure the jacking plate prior to the time the

15 bolts were removed from it?

16     A.   Yeah.  I mean with hindsight being 20/20 that

17 might have remedied the situation.

18     Q.   Obviously, if it was properly secured and the

19 crane or the forklift or whatever securing device was

20 sufficient to hold the jacking plate and you had -- the

21 parties had secured that prior to the time that the bolts

22 were removed, it would not have fallen on Mr. Zemora?

23     A.   Correct.

24     Q.   And if ABB had asked you to obtain a crane or a

25 forklift in order to secure that jacking plate, would you

Todd Strever

1    have done so?

2        A.   Yes.

3        Q.   There are -- there's at least one letter that

4    talks about contingency costs, were you aware that C.H.

5    Robinson had provisions so that they could bill ABB for

6    contingency costs that were incurred on behalf of ABB and

7    the management of this project?

8        A.   Define contingency cost?

9        Q.   Well, if you look at --

10           MR. WILLIAMS:  Let's go ahead and mark these

11   as No. 2.

12           (Exhibit No. 2 marked.)

13       Q.   (By Mr. Williams) If you look at Deposition

14   Exhibit No. 2, the first page of it.  It's a July 19th,

15   1999 letter from Jim Hamilton to Sandro Lepori.

16           MS. CIOTTI:  You're going to mark this whole

17   thing Exhibit 2?

18           MR. WILLIAMS:  Yeah.  And we'll staple

19   them -- staple it together.  I think that's --

20       Q.   (By Mr. Williams) Okay.  If you refer to the

21   second invoice there or the paragraph that talks about a

22   second invoice.  It talks about contingency cost does it

23   not?

24       A.   Yes, right here.  Is this what you're talking

25   about?

Todd Strever

```
 1        Q.    Yes.

 2        A.    Yes, it does.

 3        Q.    Were you involved in incurring any of the

 4   contingency costs that are listed in Mr. Hamilton's

 5   letter?

 6        A.    Specific knowledge, it's difficult for me to

 7   remember but I would assume so.  Being there on the

 8   project, this scope of work would have been going on while

 9   I was there.

10        Q.    Okay.

11        A.    And that's typical of a job like that.

12        Q.    So you have -- essentially you had authority

13   under the contract to incur a certain amount of expenses

14   on behalf of ABB and then those would be charged to ABB

15   under the contract?

16        A.    Yes.  It's very typical that additional expenses

17   are incurred in this kind of work.

18        Q.    You -- the contract itself is -- you've -- you've

19   looked at it before, have you not?

20        A.    Very briefly.

21        Q.    And this is marked as Lepori No. 4 from a

22   deposition that occurred in May -- on May 1st, 2001.

23   We're going to mark this as No. 3 to your deposition.

24              (Exhibit No. 3 marked.)

25        Q.    (By Mr. Williams) The contract is a cover page,
```

Todd Strever

```
 1    an index, two pages and then two letters that are

 2    attached.  I don't think that the drawings -- there's some

 3    transportation bid qualifications.  I'm not sure if the

 4    rest of these were part of the contract.  Can you take a

 5    look and see?

 6        A.   Okay.

 7             MS. CIOTTI:  What do you want him to see?

 8             MR. WILLIAMS:  See if I'm correct that the

 9    contract as designated is -- up to the pictures that are

10    stapled to it from that exhibit.

11             MS. CIOTTI:  You want him to tell you whether

12    or not this is the actual contract?

13             MR. WILLIAMS:  Yes.

14             MS. CIOTTI:  And whether or not everything in

15    there is part of the contract?

16        Q.   (By Mr. Williams) Well, tell me if he agrees that

17    the -- the simplest way that the contract is the title

18    page, the index, the two pages where it's signed by

19    Lepori/Hamilton and the two letters that are attached that

20    are referenced.  This is the contract, up to the pictures

21    that are stapled?

22        A.   I assume so.  I mean, I don't recall but I would

23    assume that's the document.

24        Q.   Okay.  Is this fairly typical of contract

25    documents for the management of a project like this, the
```

Todd Strever

1    movement of this type of heavy equipment?

2         A.   Is that specific contract common?

3         Q.   Yes.

4         A.   Portions of it are.

5         Q.   Okay.  The contract obviously -- there are --

6    would you agree that there are a lot of different problems

7    that could arise that you may not foresee during movement

8    of equipment like this between Texas and the U.S. and

9    Mexico?

10        A.   Yes.

11        Q.   It would be impossible to for see every problem

12   that is going to occur or every cost that you're going to

13   incur as a result of those problems and write it all down

14   in some kind of document?

15        A.   Correct.

16        Q.   You have to be able to have authorization to do

17   things as they come up in order to get the project

18   accomplished, do you not?

19        A.   Yes.

20        Q.   And you had that authority on behalf of ABB to do

21   the things that were necessary to get this equipment from

22   the port of Brownsville to Monterrey?

23        A.   I believe so.  That's what's addressed with

24   contingencies.

25        Q.   Okay.  You were aware that Mr. Hamilton went to

Todd Strever

1    Switzerland in order to sign this contract, correct?

2        A.   I know he made -- I think more than one trip to

3    Switzerland to secure this business.  I'm not specifically

4    aware where he was when he signed the contract.

5        Q.   Were you involved in -- Mr. Hamilton told us in

6    his deposition that he originally met with Mr. Lepori and

7    original negotiations for doing this work occurred in

8    Mexico, were you involved in any of those original

9    meetings?

10                MS. CIOTTI:  Object to form.

11       A.   No.

12       Q.   (By Mr. Williams) Were you involved in any of the

13   meetings in Switzerland with regard to the negotiations of

14   the contract?

15       A.   No.

16       Q.   Did your involvement with the contract occur

17   after Robinson had secured the contract from ABB?

18       A.   Yes.

19       Q.   So anything with regard to the negotiations of

20   the contract or things leading up to that is going to be

21   things that Mr. Hamilton -- from C.H. Robinson standpoint

22   Mr. Hamilton would be the person to ask?

23       A.   Yes.

24       Q.   As part of your management duties, is the person

25   for Robinson and Brownsville at the time of the movement

Todd Strever

```
 1   of the generators were -- would you say that you -- it was
 2   necessary for you to familiarize yourself with the
 3   transportation drawings?
 4        A.    Yes.  For the -- for certain amount of
 5   information that we needed to take from those drawings.
 6        Q.    Would it also have been necessary to provide
 7   those to the contractors that you had hired to perform
 8   various jobs in order to get the equipment moved?
 9        A.    Yes.
10        Q.    And would you have discussed the transportation
11   drawings and the details of how you were going to
12   accomplish the various moves that were involved with the
13   various people that you hired?
14        A.    Yes.
15        Q.    Now, I believe that the jacking plates that
16   actually fell on Mr. Zemora were going to be used in
17   Monterrey to move the equipment by -- was it skids, you
18   were going to use to move it to Monterrey?
19             MS. CIOTTI:  Object to form, assumes facts
20   not in evidence.
21             Go ahead, you can answer.
22        A.    Yeah.  I believe that was the case.
23        Q.    (By Mr. Williams) Tell us exactly how -- once you
24   got the equipment to Monterrey, how it was going to be off
25   loaded from the rail cars and moved to the ultimate site
```

Page 22
January 21, 2005

Todd Strever

1    where it was to be installed?

2        A.    I can't really say because that wasn't -- we had

3    an individual in Mexico, Amero (phonetic) Cardona, that

4    was going facilitate that work being done, so I wasn't

5    intimately involved with that part of the operation.

6        Q.    Were you aware that they were going to be moved

7    by skidding?

8        A.    I believe so.  At the time I was probably aware

9    of it.

10        Q.    What is that, skidding?

11        A.    Actually, I've never seen it take place but it's

12    a process where the piece is lifted up through hydraulic

13    means, moved over during a period of time, sat down, then

14    the pieces are moved, the lifting apparatus are moved,

15    jacked up, moved over, little by little.  A piece this

16    size, you know, pretty involved process.

17        Q.    Okay.

18        A.    That's my understanding of it.

19        Q.    And were you aware that the jacking plates were

20    going to be used for this skidding process?

21        A.    I don't specifically recall but I would assume

22    so.

23        Q.    And you were also aware that the jacking plates,

24    they created an extra dimensional problem for you on the

25    rail car that you were putting the generator on at the

Todd Strever

```
 1    port of Brownsville?

 2        A.   Correct.

 3        Q.   They had to be taken off in order to fit

 4    clearances, etc. on the port of Brownsville to Mexico,

 5    right?

 6        A.   Yes.

 7        Q.   So they needed to be there to be able to be used

 8    in Monterrey but they needed to be taken off for the

 9    shipment to Monterrey?

10             MS. CIOTTI:  Object to form.

11        A.   Correct.

12        Q.   (By Mr. Williams) Were you involved in subsequent

13    generator or transformer shipments that went from

14    Brownsville to Monterrey after the one involving Oscar

15    Zemora's death?

16        A.   I don't believe so.  I think that that generator

17    was the last piece that I was involved with.  I believe

18    so.

19        Q.   Was there someone else with C.H. Robinson that

20    would have been involved in the subsequent shipments?

21        A.   I assume so, but I don't specifically recall.

22        Q.   Now, with regard to the additional expenses that

23    you -- that were incurred on behalf of ABB in order to

24    accomplish this.  You didn't -- you being C.H. Robinson,

25    Robinson provided invoices for those expenses to show that
```

Todd Strever

1    they were incurred on behalf of ABB, correct?

2        A.    I would assume so.  I would assume that we would

3    bill for that work.

4        Q.    If you look at the second page of Exhibit 2.

5    There's an invoice and it says billed to ABB Power

6    Generation in Baden/Switzerland and it's in regard to the

7    transportation from Brownsville, Texas to a job site in

8    Huinala, NL, which I assume that's the name of the town

9    outside of Monterrey?

10        A.    I would assume so.

11        Q.    Okay.  Is that correct that you sent an invoice

12    to ABB for an accounting of what was the extra expenses

13    that were incurred?

14            MS. CIOTTI:  Object to form, calls for

15    speculation.

16        A.    I can't say if that invoice is for the

17    contingency cost or for something else.  I don't think it

18    specifies in there.

19        Q.    (By Mr. Williams) Had you ever seen -- this looks

20    like a letter from ABB power from generation in

21    Switzerland from Sandro Lepori to Jim Hamilton and it

22    looks like it's dated February 1st, '99.  It's the third,

23    fourth, fifth page of Exhibit 2, had you seen that

24    before?

25            MS. CIOTTI:  Let me show it to him, so we