1  know we're looking at the same thing.

2        MR. WILLIAMS:  You are.

3        MS. CIOTTI:  It's marked CHR ABB 00054 in the

4  bottom right-hand corner?

5        MR. WILLIAMS:  Correct.  04 -- five-four

6  through five-six.

7        MS. CIOTTI:  Okay.  So just these three

8  pages?

9        MR. WILLIAMS:  Right.

10     A.   I don't recall if I saw that back then or not.

11     Q.   (By Mr. Williams) Okay.  How about the next page

12  which is a -- looks like a surveyor drawing and it has --

13  Roland Schneider's name is written on there it looks like,

14  and then at the top it looks like someone has written,

15  Todd, please, share with Amfels.  This is lifting lug

16  diagram?

17     A.   Again, I don't specifically remember this

18  document.

19     Q.   Okay.

20        MR. WILLIAMS:  Let me take just a second.  I

21  think that I am through with Mr. Strever.  Are you going

22  to have any questions?

23        MS. CIOTTI:  Yeah, I am, not too many.

24        MR. WILLIAMS:  Why don't you go ahead.  I can

25  look at my notes while you're doing that.

Page 26
January 21, 2005

Todd Strever

```
 1                        EXAMINATION
 2    BY MS. CIOTTI:
 3        Q.   Mr. Strever, Mr. Williams asked you earlier about
 4    whether or not you or C.H. Robinson was subject to
 5    specifics from ABB regarding the movement of the
 6    equipment, do you recall that?
 7        A.   Yes.
 8        Q.   What sort of specifics did ABB give you about the
 9    movement of the equipment?
10        A.   It was important that we had as dialogue with
11    them about the drawings associated with the pieces that we
12    were transporting, things likes size and weight, center of
13    gravity, so that we knew how to match up different
14    transportation requirements with the pieces themselves.
15        Q.   Other than providing you with information,
16    drawings, for example, about the equipment itself, did
17    they give you any other direction about the means of
18    transporting the equipment?
19             MR. WILLIAMS:  Objection, form.
20             MS. CIOTTI:  Okay.  Let me rephrase it.
21        Q.   (By Ms. Ciotti) What did you use these drawings
22    for?  I'm going to back up a little bit and do it piece by
23    piece.  What did you use the drawings for?
24        A.   We used them for -- again, to determine the size
25    and the shape and the weight of the items, so that we
```

Todd Strever

1  could secure the correct rail equipment.  We used them to

2  supply to the railroads, so that we could acquire the

3  correct clearance necessary to move over a given route.

4  We used them to determine what the proper methodology

5  would be to tie the pieces down and secure them to the

6  rail cars.  I would say those are probably the main

7  things.

8      Q.   Did ABB give you any direction on what rail

9  equipment to use to transport the equipment?

10     A.   No.

11     Q.   Did they give you any direction about how to go

12  about procuring clearance for transporting the equipment?

13     A.   No, that was our expertise.

14     Q.   Did they -- other than the rods versus ties issue

15  that Mr. Williams asked you about earlier, and I believe

16  that's what it was.  Was it rods versus ties to be used in

17  tying down the equipment?

18     A.   Rod versus cable, I think.

19     Q.   Rods versus cable.  Did they give you any other

20  specifics about the methodology of securing the equipment

21  that C.H. Robinson was moving?

22     A.   I don't specifically recall but, I mean, tie

23  downs -- when you -- tie downs of a particular item have

24  to meet railroad guidelines and specifications, so our job

25  at Robinson is to communicate that to the railroads so

1    that -- so that we secure the pieces correctly and that

2    information was passed onto ABB.

3        Q.    What are the railroad guidelines specifications

4    that you would have to meet?

5        A.    It's different for every piece.

6        Q.    Is there a name for those guidelines and

7    specifications as a group, like is it a particular code of

8    regulations?

9        A.    It is.  They have to meet AAR specifications,

10   American Association of Railroads, and they define based

11   on center of gravity and dimensions and the car that you

12   use to haul.  It has to be secured in a specific way so

13   that it's safe.

14       Q.    Did ABB give you any direction about how to

15   comply with AARR regulations?

16       A.    No.  Again, that would be our expertise.

17       Q.    Did you have any reason to believe that ABB had

18   any expertise in AARR regulations?

19       A.    No.  I'm assuming that's why they hired us.

20       Q.    I'm going to ask you a few questions about this

21   set of documents that's been marked as Exhibit No. 2.  The

22   first page appears to be a letter dated July 19th, 1999

23   from Jim Hamilton to Sandro Lepori; is that correct?

24       A.    Yes.

25       Q.    Can you tell me whether the second page of

Todd Strever

1   Exhibit No. 2, which appears to be an invoice for $32,200

2   dated July 19th, 1999, does this go with this first page?

3       A.   I would assume so.

4       Q.   How about this third page that is -- appears to

5   be a letter from Sandro Lepori to James Hamilton dated

6   February 1st, 1999.  Would this letter have been sent with

7   the July 19th letter that's page 1 of Exhibit 2?

8       A.   What's the date on that one?  They wouldn't seem

9   like that go together to me unless I'm missing something.

10  Is that the same date?

11      Q.   No.  This is February 1st, '99.

12      A.   Okay.  So your question is, does this goes with

13  this?

14      Q.   Right.

15      A.   I would not think so.

16      Q.   Okay.  And just generally, if you can answer this

17  question.  Does it appear to you that all these documents

18  that have been marked as Exhibit No. 2 go together for any

19  reason?

20      A.   No, it looks -- you mean as far as -- I mean,

21  they all involve the scope of the work for ABB but it

22  looks like they're different communications sent at

23  different times.

24      Q.   Okay.  That's what it looked like to me but I

25  wanted to make sure we were on the same page.

Page 30
January 21, 2005

Todd Strever

```
 1              MR. WILLIAMS:  They were just stapled
 2    together is how I'm going them.  I'm not trying to say
 3    that they were all at the same time.  I think those
 4    documents went with that letter that you're talking about
 5    and somehow or another things got in between those
 6    whenever they were stapled.
 7              MS. CIOTTI:  I didn't expect that you were
 8    trying to say they all went together.  I just wanted to
 9    make sure it was clear for the record.
10         Q.   (By Ms. Ciotti) Okay.  You've told me,
11    Mr. Strever, that to your knowledge ABB did not have any
12    expertise in AAR regulations; is that correct?
13         A.   Yes.
14         Q.   Did they have any expertise in customs
15    regulations that C.H.R. needed to meet in order to
16    transport this equipment?
17         A.   Over the border in Mexico?
18         Q.   Right.
19         A.   I believe we provided those service for them
20    also.
21         Q.   How about port regulations?  Did they give you
22    any specific direction on how to meet port regulations or
23    give you any other indication that would lead you to
24    believe they had some expertise in port regulations?
25         A.   No, we coordinated that.
```

Todd Strever

```
 1        Q.   Did ABB tell you what kind of railroad car to
 2   use?
 3        A.   No.
 4        Q.   Did they tell you how to coordinate inspections
 5   with the Mexican Rail Association?
 6        A.   No.
 7        Q.   Did they tell you how to go about getting
 8   clearance approval?
 9        A.   No.
10        Q.   Mr. Roland Schneider was there in Brownsville on
11   the day that the accident occurred; is that correct?
12        A.   Yes.
13        Q.   Can you tell me what his role was that day, what
14   his purpose was in being there?
15        A.   He was -- he was an ABB representative that was
16   there to advise on information that we needed regarding
17   the pieces themselves.
18        Q.   Can you tell me more specifically what sort of
19   information he would have provided regarding the pieces
20   themselves?
21        A.   Well, if we had questions about maybe how to
22   secure the piece to a crane, just in general, just so that
23   it didn't effect the product in a negative way or maybe
24   how it should be secured not to effect the product itself
25   but still to meet the regulations, just technical type
```

Todd Strever

```
 1    details associated with the product itself in transport.

 2    Almost to protect the piece so that the things we were

 3    doing wouldn't damage it or alter it in any way.

 4         Q.   Would Mr. Schneider -- if you can answer this

 5    question, would Mr. Schneider have had more knowledge or

 6    information about the product than anyone else who was on

 7    site that day the accident happened?

 8         A.   Yes, absolutely.

 9         Q.   Would he had had the most knowledge of anybody

10    who was there that day about how the jacking plates were

11    secured to the generator?

12         A.   Yes.

13         Q.   Mr. Williams asked you earlier about costs that

14    were incurred on behalf of ABB, and I think we were

15    talking specifically at that time about contingency

16    costs.  Did C.H. Robinson pay contingency costs itself and

17    then bill ABB for those contingency costs or did ABB pay

18    the vendors directly for any contingency costs that were

19    incurred, if you know?

20         A.   Well, typically C.H. Robinson pays the

21    contingency cost.

22         Q.   How about payments to the subcontractors who were

23    used to transport the generator on the date that the

24    accident occurred, would C.H. Robinson have paid those

25    subcontractors directly or would those subcontracts billed
```

1    ABB and then ABB paid them directly?

2        A.    C.H. Robinson would have paid those costs.

3        Q.    Did C.H. Robinson perform work -- while you were

4    working at C.H. Robinson, did C.H. Robinson perform work

5    for businesses other than ABB?

6        A.    Yes.

7        Q.    Do you know whether ABB -- the work for ABB was a

8    substantial portion of C.H. Robinson's business at this

9    time in 1999?

10       A.    Our particular division or the company as a

11   whole?

12       Q.    The company as a whole.

13       A.    I would say probably not very significant.

14       Q.    Did ABB furnish C.H. Robinson with any tools or

15   supplies or materials that C.H. Robinson would have needed

16   to transport the equipment for ABB?

17       A.    Just what came with the piece -- the piece

18   itself, maybe some of the wood that was attached to it,

19   those types of things, just packaging, those sorts of

20   things.

21       Q.    Would the subcontractors that were hired by C.H.

22   Robinson have furnished things like the crane that was

23   used to move the generator?

24       A.    Yes.

25       Q.    How about the barge, where did that come from?

Page 34
Todd Strever                                                January 21, 2005

1      A.    I don't know.  ABB lined that up, so I'm not

2   sure.  I believe --

3      Q.    Oh, the barge came from Europe; is that correct?

4      A.    Well, if my memory is correct, I think the piece

5   was loaded into the barge, put on a ship, moved to New

6   Orleans, and then the barge was taken off the ship and

7   then moved down to Brownsville but that was all -- all the

8   water piece we were not involved with.

9      Q.    C.H. Robinson was not involved with the movement

10   of the generator until it got to Brownsville; is that

11   correct?

12      A.    That's correct.

13      Q.    Did C.H. -- excuse me.  Did ABB pay C.H. Robinson

14   by the time it took to move the generator.  For example,

15   did they pay C.H. Robinson by the number of days that C.H.

16   Robinson employees expended on the project or did they

17   just pay per the project?

18      A.    Well, it was -- just in looking back through the

19   papers it appears that it was a flat fee and then there

20   were probably some invoices for some contingency items

21   that came up but I don't believe it was tied to time.

22      Q.    In looking back at the contract -- have we marked

23   that as a separate document.

24      A.    Uh-huh.

25      Q.    The contract's been marked Exhibit 3 to your

Todd Strever

1    deposition.  It has another mark on here, Lepori Exhibit

2    No. 4; is that right?

3        A.   Yes.

4        Q.   In looking over this document in the scope of

5    work that it calls for and you may have to look not just

6    at the contract but in these attachments, it talks about

7    the movement of different equipment.  What I'd like to

8    find out is if you know when C.H.R. completed its

9    performance of the contract?

10       A.   If I know when it was completed?

11       Q.   Yeah, if you can recall.

12       A.   I don't.  I don't specifically know.

13            MS. CIOTTI:  Pass the witness back to you.

14                   FURTHER EXAMINATION

15   BY MR. WILLIAMS:

16       Q.   Mr. Strever, one of the things that the generator

17   came with when it came with the last barge was it came

18   with wood framing.  Specifically, there was a softer part

19   of the underbelly of the generator that you, Robinson and

20   your contractors had to use on the rail car to protect the

21   generator, correct?

22       A.   Yes.

23       Q.   Now, that was part of the equipment that you used

24   in your job that was furnished by ABB, correct?

25       A.   Yes.  It came from the barge onto the rail car.

Page 36
January 21, 2005

Todd Strever

1    Q.   Also, do you recall whether or not ABB supplied

2    you with spreader bars?  I know there was discussion that

3    Amfels had no spreader bars and there was an e-mail passed

4    back and forth about that.  Do you know whether the

5    spreader bars were supplied by ABB?

6    A.   I do not know specifically but I would that would

7    be unlikely.

8    Q.   If you look at Hamilton's -- in Exhibit 1,

9    Hamilton's 2/21/99 memo down at item 10, he writes to

10   Sandro, Roland and Robert, Amfels has no spreader bar,

11   Versabar providing quote 2/22 estimated to be around

12   12,500.  What is cost of ABB spreaders?  Do you see that?

13   A.   I do.

14   Q.   That was something that was inquired about by

15   Mr. Hamilton?

16   A.   Yes.

17   Q.   And you do not know whether or not they ended up

18   using ABB spreaders?

19   A.   I remember the issue but I don't know what the

20   resolution was.

21   Q.   If you had to go ahead and pay 12,500 for

22   additional spreader bars that were outside of the

23   contract, you would have been able to bill that to ABB,

24   would you not?

25   A.   Yes, with their approval.

Todd Strever                                                    January 21, 2005

1    Q.   Okay.   Now, when we look at Exhibit 2, you have

2    the July 19th letter and an invoice, which is the second

3    page of that and then you have a February letter that

4    doesn't appear to be part of that that covers three pages,

5    correct?  You talked about that with Ms. Ciotti, right?

6    A.   Yes.

7    Q.   You also then have a Esis International Inc. out

8    of Rotterdam surveyor letter with some notes that we've

9    talked about that doesn't appear to be part of that July

10   19th, letter, correct?

11   A.   Correct.

12   Q.   And then there's another copy of the letter that

13   has written on it, Sandro, originals FedEx'd today,

14   thanks, Jim.  That's not on the first copy but it appears

15   to be the same letter, correct?

16   A.   Correct.

17   Q.   And then another copy of what appears to be the

18   same letter without that writing, another copy of the

19   invoice, correct?

20   A.   Correct.

21   Q.   A February 5th letter that obviously is not part

22   of the July 19th letter, correct?

23   A.   Correct.

24        MS. CIOTTI:  Would you just, for the record,

25   reference the numbers down at the bottom?

1      Q.    It's 309 CHR/ABB 00389310 is the February 5th

2    letter.  Then there's CHR/ABB 000311, which is an invoice

3    to ABB in the amount of $52,840.08 from C.H. Robinson.

4    Now, that does appear to be part of -- or should be

5    attached as part of the July 19th letter; is that correct?

6                MS. CIOTTI:   Object to form.

7      Q.    (By Mr. Williams) If you look at what is

8    referenced, that invoice number and the amount and that's

9    on the contingency billing?

10     A.    It does appear that that invoice goes with the

11   letter.

12               MS. CIOTTI:   Specify which invoice and which

13   letter.

14     A.    The invoice is CHR/ABB 000311 and the letter is

15   000308.  But I don't know if it's for contingency

16   charges.  You can't tell by that invoice.

17     Q.    Okay.  The next attachments 000312, 313, those

18   two -- actually, strike that.

19               The next page 000312 appears to be a C.H.

20   Robinson customer satisfaction survey?

21     A.    Yeah, I made that.

22     Q.    That's your creation?

23     A.    Yeah.

24     Q.    And that appears to be something that was also

25   enclosed with the letter of -- Hamilton's letter of July

1  19th, 1999, which is referenced in the various forms

2  starting with 000308, correct?

3       A.   It could be, yeah.  Was it referenced in there?

4       Q.   Also enclosed is a customer satisfaction survey.

5       A.   Yes.

6       Q.   So that would have gone with the letter.  Can you

7  identify what is 000375, 379?

8       A.   Yeah.  Those two document are -- I believe those

9  are just project planning sheets that we did, and I think

10  it's Microsoft project, more just for internal tracking

11  and planning.

12       Q.   All right.  What about 001?  I think that's 025?

13       A.   Yeah.  That one I do not recognize.

14       Q.   That's a bill of lading.  Bill of lading is

15  001031.

16            MS. CIOTTI:  Let me see.

17            MR. WILLIAMS:  That's what it says, fax bill

18  of lading.

19       Q.   (By Mr. Williams) It's from Brent Bohnsack?

20       A.   Uh-huh.

21       Q.   Then you have 001041 to Charles from Todd S.  Do

22  you know what this is?

23       A.   It just appears to be some information that we

24  needed from ABB to -- that would be required for the tie

25  down procedures, so we knew how specifically to do it.

Todd Strever

1    Q.   Okay.   Now, Mr. Schneider was at the port as

2    we've discussed with Mr. Saudi (phonetic) is ABB's

3    representative, correct?

4    A.   Yes.

5    Q.   He -- as we -- I think could all agree more about

6    the ABB equipment than anyone else there, correct?

7    A.   Yes.

8    Q.   If there were any directions he gave to you with

9    regard to performing the lift in a certain way in order to

10   keep from damaging the equipment that would be something

11   you would be expected to follow, correct?

12   A.   Yes.

13   Q.   Absent any directions from ABB that violated

14   railroad regulations, port regulations or any of the

15   things that you couldn't do because they violate somebody

16   else's rules or some statute or law, you were going to

17   follow ABB's directions in accomplishing this task were

18   you not?

19   A.   Yes, we would consider it.

20   Q.   And that's one of the reasons that Exhibit 1, all

21   of these e-mails back and forth with questions with regard

22   to -- for instance, the skid -- jacking skids versus lift

23   off question is being presented to ABB in one e-mail that

24   would be an example of that, correct?

25        MS. CIOTTI:   Object to form, calls for

1    speculation.

2        A.    Yes.  That would be part of the dialogue and just

3    understanding the materials we were transporting.

4                MR. WILLIAMS:  Okay.  Thank you very much.  I

5    think that's it.

6                        FURTHER EXAMINATION

7    BY MS. CIOTTI:

8        Q.    Let me ask you briefly about the e-mails that

9    have been marked Exhibit No. 1.  Do you have recollection

10   of receiving any of these e-mails?

11       A.    No.

12       Q.    Were you a -- are you shown as a sender or

13   recipient of any of these e-mails?

14       A.    On most of them no, but this one here it looks

15   like I'm copied on that one.

16       Q.    And that one is the February 25th, 1999 e-mail

17   that was sent at 00:12?

18       A.    Yes.

19       Q.    And then another February 23rd at 00:06?

20       A.    Yes.

21       Q.    And then another February 22nd, 1999 at 21:13?

22       A.    Yes.

23       Q.    And then another one February 21st, 1999 at

24   23:11; is that correct?

25       A.    Yes.

Todd Strever

1      Q.    It looks like in the February 21st, 1999 e-mail

2   that was sent from Jim Hamilton to Sandro Lepori that you

3   were cc' ed on, it looks as though he's responding -- that

4   Jim Hamilton is responding in numbers 1 through 15 to some

5   points that were raised elsewhere, not in this e-mail; is

6   that correct?

7      A.    Yes.

8      Q.    Do you remember what those points were?  What

9   Mr. Hamilton's comments that are numbered 1 through 15

10   were made in response to?

11      A.    I do not know.

12      Q.    Are the tie down procedures that are to be

13   followed -- are those dependent on the specifications of

14   the equipment that's going to be moved?

15      A.    That's part of it.

16      Q.    What's the other part?

17      A.    Well, it has to be secured for AR regulations and

18   then obviously if there's some reason that the particular

19   product, we need to alter those for some special reason

20   for the product and we need to take that into

21   consideration.

22            MS. CIOTTI:  I think that's all I have.

23            MR. WILLIAMS:  That's it, Mr. Strever.  Thank

24   you very much again for your time.

25            (End of proceedings at 4:18 p.m.)

```
 1                    CORRECTIONS AND SIGNATURE

 2      PAGE/LINE           CORRECTION          REASON FOR CHANGE

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      I,                    have read the foregoing
2  deposition and hereby affix my signature that same is true
3  and correct except as noted herein.

4

5
                              TODD STREVER
6                             CA# B:03-CV-192

7

THE STATE OF          )

8
          Subscribed and sworn to before me by the said
9
witness                  , on this the      day of       ,
10
2005.

11

12

13                             NOTARY PUBLIC IN AND FOR
                               THE STATE OF TEXAS
14

My Commission Expires:

15

16

17

18

19

20

21

22

23

24

25

Todd Strever

```
1    STATE OF        )
2              I, Jarneka Epps, a Certified Shorthand
3    Reporter in and for the State of Texas, do hereby certify
4    that, pursuant to the agreement hereinbefore set forth,
5    there came before me on the 21st day of January, A.D.,
6    2005, at 2:54 p.m., at the offices of C.H. Robinson,
7    located at 5650 North Riverside Drive, Suite 210, in the
8    City of Fort Worth, State of Texas, the following named
9    person, to-wit:  Todd Strever, who was by me duly
10   cautioned and sworn to testify the truth, the whole truth
11   and nothing but the truth of his knowledge touching and
12   concerning the matters in controversy in this cause; and
13   that he was thereupon carefully examined upon his oath and
14   his examination reduced to writing under my supervision;
15   that the deposition is a true record of the testimony
16   given by the witness, same to be sworn to and subscribed
17   by said witness before any Notary Public, pursuant to the
18   agreement of the parties; and that the amount of time used
19   by each party at the deposition is as follows:
20              Mr. Williams - 00 hours, 47 minutes,
21              Ms. Ciotti - 00 hours, 19 minutes.
22              I further certify that I am neither attorney
23   nor counsel for, nor related to or employed by, any of the
24   parties to the action in which this deposition is taken,
25   and further that I am not a relative or employee of any
```

Todd Strever

1  attorney or counsel employed by the parties hereto, or

2  financially interested in the action.

3           I further certify that before the completion

4  of the deposition, the Deponent, Todd Strever, and/or the

5  Plaintiff/Defendant _____ did _____ did not _____

6  request to review the transcript.

7           In witness whereof, I have hereunto set my

8  hand and affixed my seal this 26 day of January A.D.

9  2005.

10

11

12

13

14          Jarneka Epps By DMA

            JARNEKA EPPS, CSR

            Esquire Deposition Services

15          1700 Pacific Avenue, Suite 4750

16          Dallas, Texas  75201

            Cert. No. 8043

17          Cert. Expires 12-31-05

            (214) 257-1436

18

19

20

    Taxable Cost:  $_____

21

22

23

24

25