1

1    UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF TEXAS
2              BROWNSVILLE DIVISION

3  ABB KRAFTWERKE              )
   AKTIENGESELLSCHAFT,         )
4  and ABB ALSTOM POWER        )
   (SWITZERLAND), LTD.,        )
5  formerly known as ABB       )
   POWER GENERATION, LTD.,     )
6                              )
        Plaintiffs,            )
7                              )
   VS.                         ) CIVIL ACTION NO. B-03-192
8                              )
   C.H. ROBINSON COMPANY,      )
9                              )
        Defendant.             )
10

11

12   **********************************************

13        ORAL AND VIDEOTAPED DEPOSITION OF

14                 TOM FERGUSON

15             FEBRUARY 25, 2005

16   **********************************************

17

18        ORAL AND VIDEOTAPED DEPOSITION of TOM

19  FERGUSON, produced as a witness at the instance of

20  the Plaintiffs, and duly sworn, was taken in the

21  above-styled and numbered cause on the 25th day of

22  February, 2005, from 11:11 a.m. to 12:20 p.m., before

23  Lisa D. Huneycutt, CSR in and for the State of Texas,

24  reported by machine shorthand, at the offices of

25  McGINNIS, LOCHRIDGE & KILGORE, 3200 One Houston Center,

RECEIVED
MAR 0 1 2005
EX H.

2

1   1221 McKinney, Houston, Texas   77002, pursuant to the

2   Federal Rules of Civil Procedure, notice, and the

3   provisions stated on the record or attached hereto.

4

5                   A P P E A R A N C E S

6

7   FOR THE PLAINTIFFS:

8         Mr. Justin L. Williams
          THE LAW OFFICE OF JUSTIN L. WILLIAMS
9         600 Leopard Street, Suite 1810
          Corpus Christi, Texas   78473
10        PHONE:   361-888-7702
          FAX:   361-888-7717
11        E-MAIL:   jlwlaw@sbcglobal.net

12
    FOR THE DEFENDANT:
13
          Ms. Karan C. Ciotti
14        McGINNIS, LOCHRIDGE & KILGORE
          3200 One Houston Center, 1221 McKinney
15        Houston, Texas   77002
          PHONE:   713-615-8534
16        FAX:   713-328-1834
          E-MAIL:   kciotti@mcginnislaw.com
17

18

19

20  ALSO PRESENT:

21        Mr. Robb Pendland, Video Technician
          HOUSTON REPORTING AND VIDEO
22        1010 Lamar, Suite 1400
          Houston, Texas   77002
23        PHONE:   713-739-1400

24

25

I N D E X

                                                    PAGE

Appearances ...................................    2

TOM FERGUSON

        Examination by Mr. Williams ................    4

        Examination by Ms. Ciotti ..................   30

        Further Examination by Mr. Williams ........   36

        Further Examination by Ms. Ciotti ..........   40

Signature and Changes ..........................   42

Reporter's Certificate .........................   44


E X H I B I T S

NUMBER & DESCRIPTION                               PAGE

    Exhibit 1 .................................. 30
        Notice of Deposition

    Exhibit 2 .................................. 30
        Invoices

    Exhibit 3 .................................. 30
        Agreement

4

1           VIDEO TECHNICIAN:  We're now beginning

2    this deposition.  The date is February 25th, 2005.  The

3    time is approximately 11:11 a.m.  We're now on the video

4    record.

5                    THOMAS FERGUSON,

6    called as a witness, having been first duly sworn, was

7    examined and testified as follows:

8                       EXAMINATION

9    BY MR. WILLIAMS:

10        Q.    State your name for the record, please.

11        A.    Thomas E. Ferguson.

12        Q.    Mr. Ferguson, have you ever been deposed

13   before?

14        A.    No, sir.

15        Q.    Okay.  Just a couple of quick things to make

16   it go smoother.

17            First of all, in everyday conversation, we

18   sometimes anticipate what the other person's going to

19   say.

20            If you'll let me finish my question before you

21   start your answer, even if you know what the question's

22   going to be; that way, only one of us is talking at a

23   time, and the court reporter can take it down easier.

24   Even if the video would come out clearer, she needs to

25   type down the booklet.

1          The second thing is, you need to speak out

2   loud.  You need to give a verbal response, either, yes,

3   no or whatever answer the question calls for.

4          And last, if you -- instead of shaking your

5   head -- because that will come out on the video; but

6   likewise, it's hard for the court reporter to then have

7   to interpret whether your shake is a yes or no or some

8   other answer.

9          If you don't understand any of my questions,

10  which is likely at some point in time, then just tell me

11  you don't understand it, and I'll try to rephrase it or

12  restate the question in a manner that we -- that you can

13  understand so that you won't be answering something

14  where you're guessing at what I'm asking, okay?

15       A.    Okay.

16       Q.    Who do you work for?

17       A.    I work for C.H. Robinson.

18       Q.    And what is your job?

19       A.    I am a sales manager for the company.

20       Q.    And where are you located?

21       A.    Our location -- the office that I work out of

22  is in Iowa City.  Our corporate office is located out

23  of Eden Prairie, Minnesota.

24       Q.    Okay.  Where is C.H. Robinson incorporated?

25       A.    In Delaware.

1     Q.   And its principal place of business, is that

2 in Eden Prairie, Minnesota?

3     A.   That is correct.

4     Q.   Were you involved at all in the contract

5 between C.H. Robinson and ABB, or the ABB entities,

6 that is made the basis of this lawsuit?

7     A.   No.

8     Q.   Is there anyone currently employed with C.H.

9 Robinson, to your knowledge, who was involved with that

10 contract?

11     A.   No.

12     Q.   What happened to the division -- or let me

13 back up.

14        Was there a separate division of C.H.

15 Robinson, or a group, some type of identifiable workers

16 or employees that were involved in this contract?

17     A.   Say that again, please.

18     Q.   Yes.  Was there a separate division -- I know

19 there wasn't a separate corporation that was involved.

20 It was C.H. Robinson, correct?

21     A.   Correct.

22     Q.   Now, was there a separate division within

23 C.H. Robinson that handled this contract?

24     A.   I wouldn't call it a separate division.  I

25 would say a branch.

1    Q.    Okay.  And how would you identify that branch?

2    A.    As doing the multimodal heavy haul.

3    Q.    And for people who have no idea what that is,

4 give us some kind of explanation for what that is.

5    A.    That is moving the equipment of great

6 magnitude, these transformers or generators, moving

7 those from Point A to Point B.

8    Q.    Okay.  How did that branch come into

9 existence?

10    A.    That was started, I believe back in 1995, by

11 Jim Hamilton, at that time the general manager of the

12 Keller office, the Keller, Texas office.

13        And he had his own company, which he then had

14 some connection with C.H. Robinson up in Minnesota, and

15 started that division in Keller, Texas.  I believe it

16 was in 1995.

17    Q.    Okay.  And when did that branch or division

18 cease to exist as such?

19    A.    Sometime in 1999.  I believe midsummer.

20    Q.    Do you know where Mr. Hamilton is at this

21 time?

22    A.    No, I do not.  I've heard that he was in

23 Florida, but I have not talked to him in a very long

24 time.

25    Q.    Okay.  The branch of C.H. Robinson that was

1   involved in the ABB contract that was -- I guess they
2   were managed by Mr. Hamilton?
3       A.   Yes.
4       Q.   They were -- were they, in your opinion,
5   competent in performing the contracts that they entered
6   into?
7       A.   Yes.
8       Q.   They were not inexperienced with regard to
9   movement of heavy equipment, such as the generators and
10  transformers involved in the ABB contract?
11      A.   They were very experienced.
12      Q.   They did not require directions as to how to
13  do every aspect of their job from the people they
14  contracted with, did they?
15            MS. CIOTTI:  I'm going to object to the
16  form of the question.
17      A.   They --
18      Q.   (BY MR. WILLIAMS)  Let me -- let me rephrase
19  that.  That's not a very good question.
20            With regard to the terms of the contracts they
21  entered into, such as the ABB contract, for managing the
22  movement of heavy equipment, in your opinion, were they
23  experts in that kind of movement?
24      A.   Can you be more specific on "they."
25      Q.   "They" being that division, whoever was --

1  whoever was asked to do a particular task under the

2  terms of the contract for Robinson.

3      A.   Yes.   The people involved were capable of

4  doing what we were hired to do, C.H. Robinson.

5      Q.   Okay.   They -- they -- let me start a

6  different way.

7           You have looked at the terms of this contract?

8      A.   Yes.

9      Q.   Are you aware of the fact that some of the

10 problems or some of the things that they were trying

11 to solve in the movement of the generators and the

12 transformers from the Port of Brownsville to the

13 location in Mexico involved rail clearances, for

14 instance?

15     A.   Yes.

16     Q.   You have equipment that comes into Brownsville

17 that has certain dimensions, and those dimensions don't

18 meet clearances, so you have to take some parts of the

19 equipment off in order to get to the -- to meet the rail

20 clearances.

21          Were you aware of that?

22     A.   Yes.

23     Q.   They would be experts in understanding how

24 to remove pieces of heavy equipment, would they not?

25     A.   Who would be experts?

1    Q.   C.H. Robinson, the people that were involved

2  in -- in this project with ABB.

3    A.   Our subcontractors are the experts at making

4  sure that the piece fits within the parameters that the

5  railroad has given clearance for.

6    Q.   Are you -- do you know whether or not

7  Robinson -- this division of Robinson had been involved

8  in moving this type of equipment prior to the ABB

9  contract?

10    A.   Yes, we were.

11    Q.   Can you tell us some examples of movements

12  of this type of equipment they had been involved in.

13    A.   We had done multiple shipments for

14  Westinghouse at that time.  I believe now it's Siemens

15  Westinghouse.  But multiple shipments of generators,

16  transformers, turbines for Siemens Westinghouse, in

17  addition to other cargo of that size and magnitude for

18  other customers.

19    Q.   So that division of C.H. Robinson was well

20  aware that there are times that you have to take pieces

21  of equipment apart in order to meet rail clearances?

22    A.   Yes.

23    Q.   That would not be something that was any

24  surprise to them, from knowledge of the -- of the

25  drawings, of what size the equipment was, and knowledge

1 of what the rail clearances were?

2     A.   Correct.

3     Q.   And that would be within the aspects of the

4 contract for them to be aware of those two pieces of

5 information -- one, what the rail clearances was; and

6 two, what the size of the equipment was -- so that they

7 would know that they would have to match those two up

8 for the equipment to be transferred?

9            MS. CIOTTI:  Object to the form of the

10 question.

11     A.   Yeah.  I wouldn't say necessarily inside a

12 contract; but inside the scope of the particular --

13 of a particular job, there would be conversations and

14 dialogue to make sure that whatever piece of freight

15 was shipping could be cleared from Point A to Point B.

16     Q.   (BY MR. WILLIAMS)  I mean, that's -- that's --

17 if you're shipping a piece of equipment, like a

18 generator, from Point A to Point B, one of the main

19 concerns is that it fits in the rail clearances,

20 correct?

21     A.   Correct.

22     Q.   And that's one of the major parts of

23 obtaining the -- one of the major reasons you obtain

24 transportation drawings, for instance?

25     A.   Yes.

1    Q.    So that you can see the dimensions of the

2   equipment, and if anything needs to be taken off of the

3   equipment; and if it does, what needs to be taken off,

4   so that it meets the rail clearances?

5    A.    Correct.

6    Q.    Okay.  Are you aware of the circumstances

7   surrounding when the initial contact took place between

8   C.H. Robinson and ABB that eventually resulted in this

9   contract?

10    A.    Yes.  I believe it was back in '98, I believe.

11  I'm not exactly sure what time.  Two gentlemen were in

12  Mexico -- I believe it was Sandro Lepori, if I've

13  pronounced his name correctly, and Roland Schneider were

14  in, I believe, Juarez, Mexico and talking to a customs

15  agent, and that agent happened to drop C.H. Robinson's

16  name, because they were involved in a Westinghouse

17  project in Mexico on a similar scope to what ABB was

18  looking forward to doing for one of their customers.

19    Q.    And how did you come about the knowledge of

20  this information?

21    A.    Reading depositions.

22    Q.    Okay.  Tell me what all you've done to prepare

23  for your deposition today.

24    A.    I have consulted with Ms. Ciotti and looked

25  over some depositions and some other documents.

1      Q.    Okay.  Prior to familiarizing yourself with

2 the depositions in the case and the documents in the

3 case, did you have any personal knowledge of any of the

4 events surrounding this contract?

5      A.    Other than being in the office at that time

6 back in 1999, that's the only information that I have.

7 And again, that was five-plus years ago.  And a little

8 bit of knowledge, yes; but factual knowledge, no.

9      Q.    Okay.  Is the Keller office still open?

10     A.    It's actually in Fort Worth.  That office,

11 per se, is closed down.  That particular branch, the

12 multimodal heavy haul branch, is shut down, but there

13 is a -- what we call a traditional transportation office

14 in Fort Worth.

15     Q.    Did Jim Hamilton travel to Monterey to meet

16 with either Sandro or Roland or both of them?

17     A.    I don't recall.

18     Q.    Did Mr. Hamilton end up making two trips to

19 Switzerland involving the negotiations and eventually

20 the signing of the contract between ABB and C.H.

21 Robinson?

22     A.    I know he did make a trip to Switzerland.  I

23 don't know if it was one or two.

24     Q.    Do you know anything with regard to the

25 settlement between C.H. Robinson and the Zamora

1  plaintiffs?

2       A.    That there was -- it was settled.  I know --

3  that's all I know.

4       Q.    Do you know why C.H. Robinson entered into

5  that settlement?

6       A.    No.

7       Q.    Do you know if any ABB representative ever

8  traveled to Keller with regard to the negotiations or

9  signing of the contract between ABB and C.H. Robinson?

10      A.    Not that I'm aware of.

11      Q.    Is the extent of your knowledge with regard

12  to what went on in the negotiation of this contract the

13  things that you have read in the depositions?

14      A.    Yes.

15      Q.    Specifically, which depositions have -- have

16  you read?

17      A.    I've read the deposition of Jim Hamilton, Todd

18  Strever, Charles.  Sandro, I've looked briefly at, and

19  then Roland Schneider.

20      Q.    Jim Hamilton, Roland Schneider, Charles

21  Charrington?

22      A.    Correct.

23      Q.    And Todd Strever?

24      A.    Uh-huh.

25      Q.    Any others that you can recall?

1        A.    No.

2        Q.    Okay.  Have you ever been involved personally

3   in any of the type of work that was the basis of the

4   contract between Robinson and ABB?

5        A.    No.

6              Can you rephrase that again, actually.

7        Q.    Yes.  Have you ever been involved in managing

8   the movement of transformers or generators, the heavy

9   equipment such as that involved in the ABB/C.H. Robinson

10  contract?

11       A.    Yes.

12       Q.    Tell us -- tell me when and what that was.

13       A.    I worked with the Siemens Westinghouse

14  account, and then other project cargo, which would be

15  the other freight that I'd mentioned prior.

16       Q.    What did you do to familiarize yourself with

17  the generators and transformers that were to be moved

18  for Siemens Westinghouse?

19       A.    On-the-job training, like that.

20       Q.    Would you do such things as review

21  transportation drawings?

22       A.    I would look at that; yes.

23       Q.    Would you compare transportation drawings

24  with any rail clearances that you were going to -- if

25  you were using railcars for the -- I guess the first

1 thing I should ask you is, how was the equipment moved?

2 Was it moved by rail, by truck?  How?

3     A.    It depended on the size of the piece and

4 the -- and where it was going from and going to.

5     Q.    Okay.  How many of these moves for Siemens

6 Westinghouse, or Westinghouse, were you involved in?

7     A.    I don't recall.  Several.

8     Q.    Okay.  Do you remember where the location of

9 those projects were?

10     A.    Typically, they were out of Charlotte, North

11 Carolina -- Pineville, North Carolina, actually,

12 Pensacola, Florida and Hamilton, Ontario, to various

13 locations.

14     Q.    Okay.  Were the transformers and generators

15 typically sent by rail, or were they sent over the road

16 by truck?

17     A.    Again, that depended on the project and the

18 size of the piece that was being shipped.

19     Q.    Okay.  In either event, would you need to

20 know about clearances and the sizes --

21     A.    Yes.

22     Q.    -- of pieces of equipment?

23          And how would you obtain that information?

24     A.    We would obtain that information from the

25 customer.

1    Q.    And in what form would the customer provide

2  that to you, typically?

3    A.    Typically, it would be a drawing, or either by

4  phone or e-mail or fax.  But the best way would be by

5  drawing.

6    Q.    And that's an industry standard, so to speak?

7    A.    Yes.

8    Q.    Were you ever involved in the moves of the

9  equipment, for instance, from the -- where it was placed

10  on a railcar?

11    A.    No.

12    Q.    Okay.  Were you involved in any of the moves

13  where a piece of the equipment had to be removed in

14  order to meet clearances?

15    A.    Can you be a little more specific on -- as

16  far as "removed."

17    Q.    Yeah.  Let's say that -- well, let's use

18  something similar to what happened here, like a

19  generator that has jacking lugs on it, and when the

20  jacking lugs are in place, it doesn't meet the rail

21  clearance, so they have to be removed for the shipment

22  by rail.

23        Anything similar to that that you can --

24    A.    No.

25    Q.    What would you, in your industry, typically

1  do to familiarize yourself with pieces of equipment

2  that have to be -- such as jacking plates, that have to

3  be removed in order to meet rail clearances?

4                    MS. CIOTTI:  Object to the form of the

5  question.

6      A.    Can you rephrase that.

7      Q.    (BY MR. WILLIAMS)  Maybe.

8              If you have something like a jacking plate

9  that you know you're going to have to remove from a

10  generator, for instance, in order for the equipment to

11  meet the rail clearances, what do you do to get ready or

12  to familiarize yourself with that equipment so you know

13  how to safely remove it?

14                    MS. CIOTTI:  I'm going to object again

15  to the form of the question.

16                    I don't want to be contrary, Justin,

17  but I think I understood him to say that he had not

18  personally been involved in a situation like that

19  before.

20                    MR. WILLIAMS:  Okay.

21                    MS. CIOTTI:  And I don't --

22                    MR. WILLIAMS:  Let me -- let me --

23                    MS. CIOTTI:  I don't think it's within

24  the scope of his deposition notice.

25                    If he can answer, that's great.  I just

19

1 want to --

2                    MR. WILLIAMS:  Let me -- do you --

3                    MS. CIOTTI:  -- go on the record with

4 my objection.

5                    MR. WILLIAMS:  Sure.

6      Q.    (BY MR. WILLIAMS)  In your experience with

7 the Siemens Westinghouse account, did you become

8 familiar with various pieces of the equipment that

9 y'all transported that you would need to remove pieces

10 or reconfigure pieces on a railcar or a truck so that

11 they would meet clearances?

12      A.    I did become familiar, yes.

13      Q.    And what would you typically do to familiarize

14 yourself how to safely ensure that that job was done?

15      A.    Specifically on the Westinghouse, we provided

16 the rail transportation only on the domestic side.

17 That's what I specifically handled.

18           So as far as any removement of apparatuses or

19 any other type of device from a particular unit, that

20 is something that we did not get involved with --

21      Q.    Okay.

22      A.    -- on the shipper side.

23      Q.    All right.  What is your understanding of the

24 relationship created by the contract between Robinson

25 and ABB?

1              MS. CIOTTI:   Object to the form of the

2  question.

3              Go ahead and answer if you can.

4      A.    Can you say that a little more clearly, as far

5  as -- be a little more specific.  What are you looking

6  for, as far as "relationship"?

7      Q.    (BY MR. WILLIAMS)  What -- what type of, if

8  you know -- and you may not -- you may not know.  And

9  if this is one of the questions you don't know, just

10  tell me you don't know.

11             What kind of relationship was created by the

12  contract and its terms between Robinson and ABB?

13     A.    I don't know.

14     Q.    Okay.  What were the -- what was the job that

15  Robinson was supposed to handle for ABB as a result of

16  the contract?

17     A.    As opposed to the contract (sic), we were to

18  handle the transportation aspect from the Port of

19  Brownsville to the final destination in Mexico.

20     Q.    You're aware that an accident happened at

21  the Port of Brownsville?

22     A.    Yes.

23     Q.    Do you know what went wrong to cause that

24  accident to occur?

25     A.    Reading the depositions, I know that a piece

1 fell off the generator and struck a gentleman.

2     Q.    And you would agree with me that that was not

3 something that was supposed to occur?

4     A.    Absolutely.

5     Q.    Do you know why it occurred?

6     A.    Basically, what happened, from what I've read

7 in the depositions, is that a jacking plate fell off

8 while it was suspended over the railcar, waiting to be

9 centered.

10     Q.    Do you know whether or not anyone is supposed

11 to work on equipment such as this by any -- if there's

12 any regulations that govern the working on heavy

13 equipment, such as this generator, when it's suspended

14 by crane?

15     A.    I do not know.

16     Q.    Is that something that typically, this

17 division of C.H. Robinson would deal with, regulations

18 involving any -- that would involve any of their aspects

19 of transportation under this contract?

20     A.    That would be handled by our subcontractors,

21 as they are the experts in that type of field, to make

22 sure all those rules and regulations, if there are,

23 were met.

24     Q.    Okay.  Do you know Todd Strever?

25     A.    Yes.

1    Q.    Did you know what Todd Strever's job was back
2 in 1999?

3    A.    Director of Marketing Development, or Manager
4 of Business Development, something like that.

5    Q.    In reading the depositions, did you come
6 across any discussion of a contract that was presented
7 to Mr. Strever by one of the subcontractors in the Port
8 of Brownsville?

9    A.    Yes.

10    Q.    Specifically, Brownsville Barge & Crane
11 presented an indemnity agreement to Mr. Strever and
12 Mr. Schneider.  Did you read about that?

13    A.    Yes.

14    Q.    Did Mr. Strever have the authority to enter
15 into that type of contract on behalf of C.H. Robinson?

16    A.    No.

17    Q.    Did you read where Brownsville Barge & Crane
18 said that they weren't going to let the lift go forward
19 if somebody didn't sign that contract?

20    A.    Yes.

21    Q.    Robinson was aware at the time that the
22 contract was entered into by ABB -- with ABB that there
23 were liquidated damage clauses in their contract with
24 the Monterey -- for the Monterey power plant?

25                    MS. CIOTTI:  Object to the form of the

1  question.

2          Again, Justin, I don't want to be

3  difficult, but I think we're getting outside the scope

4  of his deposition notice.

5          He can answer if he can.

6      A.    I don't -- I did not read anything about

7  that.

8      Q.    (BY MR. WILLIAMS)  Okay.  With regard to the

9  contract between ABB and Robinson, arranging for the

10 subcontractors for the lift was Robinson's job, wasn't

11 it?

12     A.    Say that again now.

13     Q.    The contract between ABB and Robinson -- I

14 think you told me that the -- that the job Robinson was

15 to perform was to arrange for the transportation of the

16 equipment from the Port of Brownsville to the job site

17 in Monterey, correct?

18     A.    Correct.

19     Q.    That would include arranging for the

20 subcontractors, then, to make sure that the -- that

21 the transportation occurred?

22     A.    Correct.

23     Q.    If a subcontractor says they're not going to

24 do their part of the work and you can't get the lift

25 done at that time, whose -- who would that fall onto?

1     A.    That would full under C.H. Robinson to bring

2 a new solution and a resolution to the problem, and

3 provide options to the customer at that point, which

4 was ABB, and let them know what options are available.

5     Q.    Okay.  Did you know what options would have

6 been available, other than the use of the Brownsville

7 Barge & Crane Atlantic Giant, to make this lift at that

8 time?

9     A.    No.

10     Q.    Do you know what it is that C.H. Robinson

11 claims, as far as ABB's claim that they were acting as

12 their agent under this contract?

13     A.    Say that one more time now.

14     Q.    Yeah.  Do you know what it is -- what is C.H.

15 Robinson's position with regard to ABB's claim that they

16 were acting as ABB's agent at the time of this accident

17 in Brownsville?

18     A.    We were an independent contractor.  ABB was

19 our customer.

20     Q.    Okay.  What is the factual basis of your

21 knowledge with regard to C.H. Robinson acting as an

22 independent contractor?

23     A.    Can you state that a little more clearly.

24 I'm not following you.

25     Q.    Okay.  Factually, why is it that you say

1  that -- or that C.H. Robinson says that they were an

2  independent contractor of ABB at this time?

3      A.   Because we were under the sole responsibility

4  to take -- for the transportation plan, to move their

5  product, which they hired C.H. Robinson to do, ABB, to

6  move it from Texas into Mexico.

7      Q.   And where did you -- what is it, factually,

8  that you base this on?

9      A.   On the information that I've read.

10     Q.   Okay.  The depositions?

11     A.   Correct.

12     Q.   Okay.  What, factually, is C.H. Robinson's

13  contention with regard to ABB's claim that they were

14  held liable for what C.H. Robinson did or did not do?

15          MS. CIOTTI:  Object to the form of the

16  question.

17     A.   I'm -- I don't know how to answer that.

18     Q.   (BY MR. WILLIAMS)  Okay.  Do you -- C.H.

19  Robinson is contending in this lawsuit, as I understand

20  it, that ABB was not held liable for what Robinson did

21  or did not do.

22          Do you understand that?

23     A.   Yes.

24     Q.   Okay.  Why is it that C.H. Robinson

25  factually -- factually, why is it C.H. Robinson makes

1 that contention?

2    A.    I'm not an attorney.  I don't know how to

3 quite answer that.  I mean --

4    Q.    You don't know any of the bases for that

5 contention, other than the things which are contained

6 in the depositions that you've read?

7    A.    That is correct.

8    Q.    You don't have an independent basis to say,

9 "Factually, there's something out there, other than

10 what I've read from Mr. Strever, Mr. Charrington,

11 Mr. Schneider, Mr. Lepori or Mr. Hamilton"?

12    A.    Correct.

13    Q.    Okay.  And there is no one with C.H. Robinson,

14 to your knowledge, who would have any factual basis

15 for any of the defenses to this claim, any factual

16 knowledge, that is still employed by Robinson, correct?

17    A.    As far as my knowledge.

18            MS. CIOTTI:  Object to the form of the

19 question.

20            THE WITNESS:  I don't -- no, there is

21 no -- that I recall or that I know of, that works for

22 C.H. Robinson.

23    Q.    (BY MR. WILLIAMS)  Anyone with Robinson who

24 would testify in this matter would -- that is currently

25 employed by Robinson would have to obtain their

1   information from -- in the same manner that you have,

2   from reading the depositions and the documents in the

3   case?

4        A.    Correct.

5        Q.    Is there anything you independently know,

6   have knowledge of, outside of the depositions or the

7   documents, with regard to negotiations surrounding

8   this contract?

9        A.    No.

10       Q.    Do you know if anyone from Eden Prairie, the

11  home office of C.H. Robinson, ever was involved in any

12  aspect of this contract?

13       A.    I do not know that.

14       Q.    Would this contract have had to have been

15  approved by someone in Eden Prairie, either the form

16  of the contract or the fact that it was being entered

17  into?

18       A.    That, I don't know.  I would assume so.

19       Q.    Your contracts with Westinghouse and -- or

20  Westinghouse -- Siemens Westinghouse for the movement of

21  that type of equipment, would they typically have been,

22  either the form of the contract or the actual contract

23  itself, approved by the home office?

24       A.    Those were done prior to my employment at

25  Robinson, and I don't know about that.

1     Q.   Okay.  Would Mr. Hamilton have had the

2  authority to enter into the indemnity contract presented

3  to Robinson by Brownsville Barge & Crane on behalf of

4  C.H. Robinson?

5     A.   No.

6     Q.   Who with Robinson would have had that

7  authority to approve that?

8     A.   I'm not exactly sure.  I know it's going to

9  be at least an executive up there.

10     Q.   Was this branch of C.H. Robinson shut down as

11  a result of -- either totally or partially a result of

12  the Zamora lawsuit and accident?

13             MS. CIOTTI:  Object to the form of the

14  question.

15     A.   I don't know.

16     Q.   (BY MR. WILLIAMS)  Mr. Hamilton had the

17  authority to enter into the contract or sign the

18  contract on behalf of ABB -- sign the contract on

19  behalf of C.H. Robinson with ABB?

20     A.   The contract that I have reviewed?  Yes.

21     Q.   Why would he have the authority to sign that

22  contract, but not have the authority to sign the

23  contract with Brownsville Barge & Crane?

24             MS. CIOTTI:  Object to the form of the

25  question.

1          Again, you're going into stuff that's
2    outside the scope of the deposition notice.
3          If he can answer, that's fine.
4    A.    I don't know.
5    Q.    (BY MR. WILLIAMS)  How did you come up with
6    the information that Mr. Strever would not have the
7    authority to sign the BBC indemnity clause?
8    A.    Talking with our corporate office.
9    Q.    Okay.  And that information would be the same
10   for Mr. Hamilton?
11   A.    That is correct.
12   Q.    And how would you have the information -- how
13   did you obtain the information that Mr. Hamilton had
14   the authority to enter into the contract on behalf of
15   Robinson with ABB?
16   A.    That is -- it doesn't have to do with
17   liability terms or indemnity.
18          A sales contract, which is basically what
19   that contract was, doesn't have to be approved by our
20   corporate office.
21          MR. WILLIAMS:  Thank you very much for
22   your time.  I told you it was going to be short.
23          THE WITNESS:  Thank you.
24          VIDEO TECHNICIAN:  We're now going off
25   the record.  The time is approximately 11:47 a.m.