30

1  We're now ending this deposition.

2                MS. CIOTTI:  I'm going to have a few

3  questions.

4                MR. WILLIAMS:  Oh, we're not ending this

5  deposition.

6                MS. CIOTTI:  If we could take a quick

7  break --

8                MR. WILLIAMS:  Sure.

9                MS. CIOTTI:  -- I would appreciate it.

10               (Discussion off the record.)

11               (Brief recess taken.)

12               (Exhibit Nos. 1 through 3 were marked

13                for identification.)

14               VIDEO TECHNICIAN:  We're now back on the

15 record.  The time is approximately 12:08 p.m.

16                         EXAMINATION

17 BY MS. CIOTTI:

18     Q.   Mr. Ferguson, while we were off the record,

19 we marked three exhibits.

20          I'd like for you, first of all, to look at

21 what we've marked Exhibit No. 1.

22     A.   (Witness complies.)

23     Q.   And tell me if that's your notice of

24 deposition.

25     A.   Yes, it is.

1    Q.   Okay.  And the next thing I want to ask you

2   about is a question that Mr. Williams asked you earlier

3   about Mr. Hamilton making a trip to Switzerland for the

4   negotiation and signing of the contract.

5        Do you recall that question?

6    A.   Yes, I do.

7    Q.   Okay.  First of all, I would like you to look

8   at what we've marked Exhibit No. 3.

9    A.   (Witness complies.)  Okay.

10   Q.   When Mr. Williams was talking about the

11  contract between C.H. Robinson and ABB, is that the

12  contract that you were understanding him to talk about?

13   A.   Yes.

14   Q.   Okay.  I just wanted to be clear for the

15  record.  It's not a trick question or anything.

16       Where did the negotiations that led up to the

17  signing of that contract take place?

18   A.   Partly in Keller, Texas, and via e-mail,

19  phone, fax, back and forth.

20       I'd say the majority of it was negotiated

21  over here in the States, and then Jim went over and

22  then signed the contract over --

23   Q.   Okay.

24   A.   -- in Switzerland.

25   Q.   Okay.  Another question that Mr. Williams

1   asked you earlier that I wanted to get some

2   clarification on -- and I may not be getting this

3   exactly right.

4        He asked you something about where you got

5   clearances and dimensions from of the -- the product

6   that was being moved, and you said from the customer.

7        When he asked you about dimensions, what was

8   your understanding of what he meant by that?

9        A.   The dimensions of the piece of freight that

10  was being shipped.

11       Q.   Okay.  And as far as clearances, tell me what

12  your understanding of that term is.

13       A.   That is what we obtain from the railroad.

14  We get the dimensions from the customer, provide that

15  information to the railroad, and they, in turn, say,

16  "Yes, it will clear," or, "No, it will not clear."

17       Q.   Okay.  So clearance information would come

18  from the railroad?

19       A.   That is correct.

20       Q.   Okay.  Did C.H. Robinson ever agree to act as

21  an agent for ABB?

22       A.   No.

23            MR. WILLIAMS:  Objection; form.

24       Q.   (BY MS. CIOTTI)  Do you know how C.H. Robinson

25  was paid for the services it provided under the contract

1  marked as Exhibit No. 3?

2      A.    It was paid on a per -- per basis of -- I

3  mean, it was a lump sum.  I mean, we -- it shows right

4  there on the contract that it's -- we were paid a fixed

5  amount.

6      Q.    With some provision for contingency costs --

7      A.    Absolutely.

8      Q.    -- correct?

9      A.    Correct.

10     Q.    Is that normal to do that in a -- in a

11 contract that you sign with one of your customers, to

12 have a provision for contingency costs?

13     A.    Yes.

14     Q.    Do you know who supplied the equipment that

15 C.H. Robinson needed to move the generator involved in

16 Mr. Zamora's accident from the barge to the railcar?

17     A.    Our subcontractors.

18     Q.    And when you say "our subcontractors," tell

19 me who you mean by that.

20     A.    Schaefer Stevedoring, Brownsville Barge &

21 Crane, the railroad.  They provided the necessary tools

22 to move the product.

23     Q.    Okay.  Is Brownsville Barge & Crane one of

24 C.H. Robinson's subcontractors?

25     A.    No, I don't believe so.  I believe they were

1    a subcontractor of Schaefer Stevedoring.

2        Q.    Okay.  And how about the railroad?  Is the

3    railroad one of C.H. Robinson's --

4        A.    No.

5        Q.    -- subcontractors?

6        A.    No, it's not.

7        Q.    Okay.  Is C.H. Robinson an independent

8    business from ABB?  And if you need me to clarify that

9    question --

10        A.    Yeah.  Why don't you do that, please.

11        Q.    Does C.H. Robinson operate independently of

12    ABB?

13        A.    Yes.

14        Q.    Okay.  Is ABB -- is that where C.H. Robinson

15    gets the majority of its business?

16        A.    No.

17        Q.    In 1999, did C.H. Robinson get the majority.

18    of its business from ABB?

19        A.    No.

20        Q.    Do you know whether C.H. Robinson even got a

21    significant part of its business from ABB in 1999?

22        A.    No, it wasn't a significant part -- a

23    significant amount, I should say.

24        Q.    This was a big contract --

25        A.    It was a big contract for sure.  But, I mean,

1  it wasn't -- in the overall percentage, it wasn't a lot.

2      Q.    Okay.  As far as the work that C.H. Robinson

3  agreed to perform for ABB, did ABB control all the

4  details of that work?

5      A.    No.

6            MR. WILLIAMS:  Objection; form.

7      Q.    (BY MS. CIOTTI)  Did they have the right to

8  control all the details of that work?

9      A.    They were our customer, and we would obviously

10 listen to what they had objections to or input.  But

11 they hired us to move these pieces from Point A to

12 Point B.

13     Q.    The last thing I'd like for you to do is look

14 at what we've marked Exhibit No. 2, and see if you can

15 tell me what that is.

16     A.    (Witness complies.)

17           It looks like a letter to Sandro --

18     Q.    Lepori?

19     A.    -- Lepori for the -- it looks like an invoice

20 for approximately $52,840.                              .

21     Q.    Okay.  Was that the last invoice on the

22 Monterey project?

23     A.    I believe so, yes.

24     Q.    And can you tell me from looking at that when

25 C.H. Robinson would have completed the work it did for

1 ABB under the contract, the contract that we've marked

2 Exhibit No. 3?.

3     A.    Right.  On a -- on a contract of this size,

4 typically what happens is, the job will get finished,

5 and then we wait half a month, 15 to 30 days or so, to

6 make sure all the invoices that we have for contingency

7 costs or any other charges that may be forgot about and

8 they come in -- we want to make sure that we provide

9 basically one lump sum to the customer for the job that

10 we've done, instead of sending out multiple invoices.

11         So on this particular one, I would say that,

12 you know, it was done well before the 19th of July.

13     Q.    Okay.  And when you talk about invoices coming

14 to C.H. Robinson, who are those invoices coming from?

15     A.    From our subcontractors.

16             MS. CIOTTI:  Okay.  I believe that's all

17 I have.

18             MR. WILLIAMS:  Just a few more.

19                 FURTHER EXAMINATION

20 BY MR. WILLIAMS:

21     Q.    Mr. Ferguson, you don't have any personal

22 knowledge, with regard to this project, of whether or

23 not ABB gave any directions to C.H. Robinson with

24 regard to how the work was to be done, do you?

25     A.    I don't have any personal knowledge, no.

1    Q.    You don't know whether ABB supplied any of

2  the equipment that was used in the transportation or

3  not?

4    A.    No.  I -- to my knowledge, they did not supply

5  any equipment.

6    Q.    Okay.  But all of this knowledge is just --

7  is coming from what you read in the depositions?

8    A.    Correct.

9    Q.    You do not have any independent knowledge of

10  whether or not there was equipment that was used for the

11  transportation that was provided or paid for by ABB?

12    A.    That is correct.

13    Q.    You don't have any knowledge with regard to,

14  for instance, whether there were conversations about ABB

15  providing certain things?

16    A.    Correct.

17    Q.    Do you know what spreader bars are?

18    A.    Yes.

19    Q.    Do you know whether ABB paid for the spreader

20  bars that were used in the lift in Brownsville?

21    A.    I do not know if they did or not.

22    Q.    Okay.  That would be part of the equipment

23  that was used for the transportation of the generators,

24  would it not?

25    A.    It very well could be; yes.

38

1    Q.   Okay.  How do you know that the contract was
2  negotiated mostly in the States?

3    A.   Common sense.  And typically, on a job this
4  size -- I mean, Jim went over and signed the contract in
5  Switzerland, you know, for 700 and whatever -- actually,
6  I don't know the exact dollar amount.

7         But typically, you wouldn't fly across the
8  ocean to kind of whip something together and sign a big
9  contract like this.

10        Looking back from what I've seen on
11 conversations from Jim and from Sandro, I mean, on
12 letterhead that it was sent from Keller, and then the
13 contract was signed over in Switzerland.

14   Q.   Were you aware that Mr. Hamilton actually
15 made two trips to Switzerland?

16   A.   Again, I don't -- I know he made one.  I'm
17 not aware that he made a second one.  He could have.

18   Q.   Okay.  A project like this -- would you say
19 this is a significant movement of equipment?  You've
20 got multiple shipments, and it involves multiple moves?

21   A.   It was a very nice project; yes.

22   Q.   Okay.  Would it -- typically, you'd have more
23 than one face-to-face meeting for the negotiations of
24 a -- of a project this size?

25   A.   Possibly.

39

1    Q.   That wouldn't surprise you if that had

2  occurred, would it?

3    A.   No.

4         MS. CIOTTI:  Object to the form of the

5  question.

6    Q.   (BY MR. WILLIAMS)  Would that be something

7  that would typically occur in the industry, that there

8  would be more than one face-to-face meeting during the

9  negotiations and signing of the contract?

10   A.   I wouldn't call it typical, but it can happen.

11   Q.   Okay.  And you're just -- you're not factually

12  aware of whether or not Mr. Hamilton made a -- prior to

13  signing the final negotiations and the signing of the

14  contract, you're not aware of whether or not he made

15  another trip to Switzerland involving the negotiations?

16   A.   That is correct.

17   Q.   Okay.  Do you know what is involved in

18  skidding equipment, such as these -- when we use the

19  term "skidding of equipment," such as these generators

20  or transformers?

21   A.   No, I sure don't.  That's kind of out of my

22  realm.

23   Q.   Okay.  So you wouldn't have any knowledge of

24  whether or not the skidding of the equipment from

25  railcars to trucks in -- let me see if I can remember

1   how to pronounce this -- Apocada?  Was it Apocada?

2                    MS. CIOTTI:  Apodaca, I think.

3        Q.   (BY MR. WILLIAMS)  -- Apodaca, Mexico, and

4   then the skidding from the trucks to the pad or site

5   on location, was a more difficult operation than the

6   lifting of the equipment by crane from the barges to

7   the railcar?

8        A.   I -- I wouldn't know that.

9                    MR. WILLIAMS:  Okay.  Thank you very

10  much.

11                   MS. CIOTTI:  One more quick one.

12                   FURTHER EXAMINATION

13  BY MS. CIOTTI:

14       Q.   Mr. Ferguson, in addition to reviewing several

15  depositions, did you also review a number of documents

16  in preparation for your deposition today?

17       A.   Yes.

18       Q.   That would include the contract?

19       A.   Yes.

20       Q.   And include correspondence between ABB and

21  C.H. Robinson?

22       A.   Yes.

23       Q.   Would it also include -- and I guess this is

24  included within correspondence -- a number of e-mails

25  between C.H. Robinson and ABB?

41

1       A.    Yes.

2       Q.    Are there any other documents that you recall

3  reviewing in preparation for your deposition?

4       A.    Other than what was provided to me, no.

5             MS. CIOTTI:  Okay.  That's all I have.

6             MR. WILLIAMS:  Okay.  Thank you very much

7  for your time.

8             THE WITNESS:  Thank you.

9             VIDEO TECHNICIAN:  We're now going off

10  the record.  The time is approximately 12:20 p.m.

11  We're ending this deposition.

12             (Deposition proceedings concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

42

## CHANGES AND SIGNATURE

| | PAGE | LINE | CHANGE | REASON |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | _____ | _____ | _____ | _____ |
| 4 | _____ | _____ | _____ | _____ |
| 5 | _____ | _____ | _____ | _____ |
| 6 | _____ | _____ | _____ | _____ |
| 7 | _____ | _____ | _____ | _____ |
| 8 | _____ | _____ | _____ | _____ |
| 9 | _____ | _____ | _____ | _____ |
| 10 | _____ | _____ | _____ | _____ |
| 11 | _____ | _____ | _____ | _____ |
| 12 | _____ | _____ | _____ | _____ |
| 13 | _____ | _____ | _____ | _____ |
| 14 | _____ | _____ | _____ | _____ |
| 15 | _____ | _____ | _____ | _____ |
| 16 | _____ | _____ | _____ | _____ |
| 17 | _____ | _____ | _____ | _____ |
| 18 | _____ | _____ | _____ | _____ |
| 19 | _____ | _____ | _____ | _____ |
| 20 | _____ | _____ | _____ | _____ |
| 21 | _____ | _____ | _____ | _____ |
| 22 | _____ | _____ | _____ | _____ |
| 23 | _____ | _____ | _____ | _____ |
| 24 | _____ | _____ | _____ | _____ |
| 25 | _____ | _____ | _____ | _____ |

43

```
 1              CHANGES AND SIGNATURE

 2    PAGE   LINE   CHANGE                        REASON

 3    ____   ____   _____      _____

 4    ____   ____   _____      _____

 5    ____   ____   _____      _____

 6    ____   ____   _____      _____

 7    ____   ____   _____      _____

 8    ____   ____   _____      _____

 9    ____   ____   _____      _____

10    ____   ____   _____      _____
```

11      I, TOM FERGUSON, have read the foregoing deposition
and hereby affix my signature that same is true and
12  correct, except as noted above.

13

14                        _____

                          TOM FERGUSON
15

16  THE STATE OF _____  )
    COUNTY OF _____   )
17              Before me, _____, on this day
    personally appeared TOM FERGUSON, known to me (or
18  proved to me under oath or through _____)
    (description of identity card or other document) to be
19  the person whose name is subscribed to the foregoing
    instrument and acknowledged to me that they executed
20  the same for the purposes and consideration therein
    expressed.
21              Given under my hand and seal of office
    this _____ day of _____, 2005.

22

23

24                        _____
                          Notary Public in and for
                          the State of _____
25                        My Commission Expires: _____

HOUSTON REPORTING SERVICE
713-739-1400

1  THE STATE OF TEXAS)

2  COUNTY OF HARRIS  )

3          I, LISA D. HUNEYCUTT, Certified Shorthand

4  Reporter in and for the State of Texas, do hereby

5  certify that the matters set forth in the caption to

6  the foregoing deposition are true and correct; that the

7  witness appeared before me at the time and place set

8  forth; that said witness was first duly sworn to tell

9  the truth, and thereupon proceeded to testify in said

10 cause; that the questions of counsel and the answers

11 of said witness were taken down in shorthand by me and

12 thereafter reduced to typewriting under my direction;

13 and that the foregoing pages comprise a true, correct

14 and complete transcript of the testimony given and the

15 proceedings had during the taking of said deposition.

16          I further certify that I am neither counsel,

17 attorney or relative of either party, or otherwise

18 interested in the events of this suit.

19          GIVEN UNDER MY HAND AND SEAL OF OFFICE on

20 this the 28th of February, 2005.

21

22          _____

23          Lisa D. Huneycutt
           Texas CSR No. 6529
           Expiration Date: 12-31-2005
24         1010 Lamar, Suite 1400
           Houston, Texas  77002
25         713-739-1400

HOUSTON REPORTING SERVICE
713-739-1400

L A W Y E R ' S    N O T E S

| Page | Line | |
|------|------|---|
| | | |

**HOUSTON REPORTING SERVICE**
Registered Professional Reporters
1010 Lamar, Suite 1400
Houston, Texas 77002
(713) 739-1400

FORM 003