1

CAUSE NO. 99-04-1644-E

| | |
|---|---|
| GRACIELA ZAMORA, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF HER LATE HUSBAND OSCAR ZAMORA, SR. AND HIS ONLY CHILD OSCAR ZAMORA, JR. AND ON BEHALF OF OLIVIA ZAMORA, THE SURVIVING MOTHER AND ONLY SURVIVING PARENT OF OSCAR ZAMORA, SR. | * IN THE DISTRICT COURT |
| AND ALL OTHERS ENTITLED TO BRING A CAUSE OF ACTION FOR HIS DEATH<br>    Plaintiffs<br>and | COPY |
| ANGIE ZAMORA<br>    Intervenor | 357TH JUDICIAL DISTRICT |
| VS. | |
| ABB KRAFTWERKE AKTIENGESELLSCHAFT, | |
| ABB ALSTOM POWER (SWITZERLAND) LTD., FORMERLY KNOWN AS ABB POWER GENERATION, LTD., AND | |
| BROWNSVILLE BARGE & CRANE, INC.<br>    Defendants | CAMERON COUNTY, TEXAS |

ORAL AND VIDEOTAPED DEPOSITION OF



MARCH 13, 2000

ORAL AND VIDEOTAPED DEPOSITION OF ALFREDO ARTEAGA,

produced as a witness duly sworn by me at the instance of the

Plaintiffs, taken in the above styled and numbered cause on

LITIGATION RESOURCES (956) 425-7600

**Page 6**

these stipulations and agreements, it will be treated by the parties hereto and may be used herein with the same force and effect as though all statutes and rules relating to the taking and returning into court of depositions had been fully complied with.

—oOo—

**Page 7**

ADELA GARCIA-MORENO, The Interpreter, having first been duly sworn to translate, to the best of her ability, from English to Spanish and from Spanish to English, translated the following proceedings:

ALFREDO ARTEAGA, having first been duly sworn, testified as follows:

EXAMINATION

BY MR. TINNING:

Q. [illegible]
A. [illegible]
Q. Mr. Arteaga, my name is Bill Tinning. I represent the Zamora family. Before I ask you what happened to Oscar Zamora Senior, I want to tell you how this works. First, I know you understand some English. True?
A. Yes.
Q. But you need to pretend you know no English right now.
A. Okay.
Q. Because the court reporter has to listen for just one voice, and it makes it easier if she's just listening for the translator.
A. Okay.
Q. If you know the answer to a question before she translates it, please wait; again, so the court reporter can get the correct, full answer.

**Page 8**

A. Okay.
Q. If you don't understand something, please ask and we'll try to ask it in a better way.
A. Okay.
Q. You understand that you're giving testimony just as if you were in the courtroom?
A. Yes.
Q. Okay. I want to ask you about Mr. Zamora's accident. And I want to first ask you what your job was, and where you were, and I'll try to go in that order. Okay?
A. Yes.
Q. I won't try to ask you anything that's misleading or confusing. If I do, it's an accident, so please tell me. Okay?
A. Okay.
Q. Thank you. [illegible] your job?
A. I operate a machine.
Q. [illegible]
A. Yes. Cranes.
Q. Do you operate the big cranes like is shown in the picture in front of you, on Picture No. 1?
A. Yes. I'm the operator for the crane.
Q. And could you hold up Picture No. 1 in front of you to show the camera — show the jury.

**Page 9**

A. Yes.
Q. What is the name of that crane?
A. Atlantic Giant.
Q. How long have you been a crane operator [illegible]?
A. [illegible]
Q. You can take it down now. Were you operating that crane on the day Mr. Zamora got hurt?
A. Yes.
Q. Did you see the accident with Mr. Zamora?
A. Part of it.
Q. Tell us what you saw.
A. We picked up the lift. We put it under the railroad car. We lowered it, and something was in the way that we're talking about, these bolts here. And I was told by my flagger to pick it up just a little. So I picked it up a little bit. We stopped everything. I fixed my drag.
Q. The brake?
A. The brake. And people started working here.
Q. And you're gesturing around what we've called the yellow jacking plate shown on No. 5, correct?
A. Yes. I call it a motor support.
Q. Did you see what happened to [illegible]?
A. No, not [illegible]

Page 10

1  [redacted]
2  [redacted]
3  [redacted] crane?
4  A. It was very fast. [redacted]
5  and they went to -- and [redacted]
6  again. And at that moment I turned [redacted]
7  that I have. And then I turned to [redacted] I saw that
8  people were scared [redacted] screams that
9  somebody had been [redacted] I didn't see
10 this, and I realized [redacted] so I looked
11 and I saw that something bad -- that something was bad. I
12 immediately got [redacted] that an
13 accident had [redacted] to need an
14 [redacted]
15 [redacted]
16 Q. Which is your company, Mr. Arteaga?
17 A. AMFELS. I work for AMFELS and the crane is from
18 Brownsville Barge & Crane.
19 Q. You said the jacking plate was off. Could you hold
20 up the picture again that shows the jacking plate that was
21 off.
22 A. (Witness complies.)
23 Q. It was off -- go ahead -- it was off from the side
24 like it is in the picture? Down on the ground?
25 A. When we picked it up, everything was there. When I

Page 11

1  turned back, that's when I realized that it wasn't there at
2  all.
3  Q. Could you see it on the ground or the man on the
4  ground when you turned back around?
5  A. I couldn't see it because this was on a barge.
6  When we picked this up from the barge, then the barge was
7  here and the dock was over here. So I couldn't see.
8  Q. I understand. Maybe if we show Picture No. 3 and
9  you can tell the jury where you were in relation to which
10 side -- where the man was and where you were. On which side
11 of the generator, the big green machine there?
12 A. I was over here on the side of the water.
13 Q. And where was the man and the jacking plate when it
14 came off? Which side?
15 A. To the left-hand side.
16 Q. Okay. Can you turn the picture around now for the
17 jury and tell them the same thing. You would have been on
18 the water side, correct?
19 A. Yes.
20 Q. And the man and the jacking plate that came off
21 would have been to the left side of you?
22 A. Yes.
23 Q. And you could not -- [redacted] see the activity,
24 but you couldn't see the man or the jacking plate on the
25 ground because of the barge, correct?

Page 12

1  A. Correct.
2  Q. Okay. Thank you very much. Did you [redacted]
3  the instruction to take the bolts off that were being taken
4  off just before the accident happened?
5  MR. WILLIAMS: Objection; form.
6  A. No. No.
7  Q. (By Mr. Tinning) Who was on the radio that you
8  heard about that the bolts needed to come off? Whose voice?
9  What --
10 A. With the experience that I have, I saw that they
11 were going to be -- those bolts were going to be in the way.
12 And I saw that they started loosening them before the
13 flagger said, "Let's pick it up -- we're [redacted]
14 because they're in the way. The bolts are in the way."
15 [redacted] I see. So [redacted]
16 [redacted] -- you -- you saw that they were [redacted] off
17 because they were in the way and they were [redacted]
18 telling you to do with the load?
19 A. Right. Right. My flagger -- the flagger was --
20 the way that they told me, "We're going to [redacted]
21 they're in the way." But I already knew [redacted]
22 the way.
23 Q. Your flagger was Jose Garcia?
24 A. Yes. He was in charge.
25 Q. Okay. He was in charge of the signals to you?

Page 13

1  A. To me. Yes. To me.
2  Q. Do you know -- sorry -- do you know who was
3  in charge of the gang or the crew that was doing the work in
4  getting the load onto the rail car?
5  A. I just saw that there were several American persons
6  there speaking and signaling to this, and to take this off,
7  but I could not hear them because I was far away.
8  Q. You were in the cab of your crane far away?
9  A. Yes. About a hundred feet away. Yeah.
10 Q. Do you know who Roland Snyder is?
11 A. No.
12 Q. Did you ever see the man that was hurt, yourself up
13 close, after the accident?
14 A. No.
15 Q. And your job did not have anything to do with the
16 -- what is the -- the ground crew?
17 A. No.
18 Q. Okay. Have you told me everything you know,
19 basically, about the accident?
20 A. Yes. Yes, I said everything. But I still feel
21 that this accident would not have happened if in the [redacted]
22 the motor right here, they would have put a warning [redacted]
23 these bolts were not fastened on the unit.
24 Q. From what you saw and from the way the jacking
25 plates looked, you thought the top two bolts helped hold the

1

CAUSE NO. 99-04-1644-E

| | |
|---|---|
| GRACIELA ZAMORA, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF HER LATE HUSBAND OSCAR ZAMORA, SR. AND HIS ONLY CHILD OSCAR ZAMORA, JR. AND ON BEHALF OF OLIVIA ZAMORA, THE SURVIVING MOTHER AND ONLY SURVIVING PARENT OF OSCAR ZAMORA, SR. | * IN THE DISTRICT COURT |
| AND ALL OTHERS ENTITLED TO BRING A CAUSE OF ACTION FOR HIS DEATH | |
| Plaintiffs | |
| and | |
| ANGIE ZAMORA | |
| Intervenor | * 357TH JUDICIAL DISTRICT |
| VS. | |
| ABB KRAFTWERKE AKTIENGESELLSCHAFT, | |
| ABB ALSTOM POWER (SWITZERLAND) LTD., FORMERLY KNOWN AS ABB POWER GENERATION, LTD., AND | |
| BROWNSVILLE BARGE & CRANE, INC. | |
| Defendants | * CAMERON COUNTY, TEXAS |

COPY

---

ORAL AND VIDEOTAPED DEPOSITION OF

JOSE CRUZ GARCIA, JR.

MARCH 13, 2000

---

ORAL AND VIDEOTAPED DEPOSITION OF JOSE CRUZ GARCIA, JR., produced as a witness duly sworn by me at the instance of the Plaintiffs, taken in the above styled and numbered cause on

Page 10

1  So it's also important for the same reason that you give us
2  out-loud, verbal answers. Will you do that, too?
3      A. I will.
4      Q. And we'll try to remind you about that, if that
5  becomes a problem through this. I'm not going to try to ask
6  you anything that's a trick question or that's confusing to
7  you. It may happen -- it probably will happen -- and I'm not
8  doing it on purpose. If it should happen, let me know,
9  because I'm not trying to mislead you or ask you any trick
10 questions. Okay?
11     A. Yes.
12     Q. With that out of the way, so you'll know what I'm
13 going to do, I want to go over what you do. I already have a
14 good idea from what we know coming here to ask for your
15 deposition what kind of job you do and where you were at the
16 time this happened to Mr. Zamora, but I want to go through
17 that with you for the jury's benefit to let them know how it
18 is that you're familiar with the accident. Then I want to go
19 through the accident itself, and what the people were doing
20 out there, and what you were doing out there. And I will try
21 to do that in that order, unless I should forget something we
22 need to go back and cover. So I won't try to go out of order
23 to make you be jumping back and forth or to confuse you. Let
24 me go over your job first. What is it that you do for a
25 living, Mr. Garcia?

Page 11

1      A. I'm a crane operator and I work for AMFELS.
2      Q. And does AMFELS stand for anything? Is that an
3  abbreviation, or just the name?
4      A. That's the name of the company. AMFELS.
5      Q. Where do you usually operate a crane for them?
6      A. Any crane that they put me on. I'll operate a
7  forklift, cherry pickers, and do a little bit of supervising,
8  too, on the side of the job too, for the same company, from
9  my experience that I have on working for the company for
10 eleven -- over eleven years.
11     Q. Okay. And what kind of -- well, let me ask it this
12 way. How big a crane would you operate from time to time?
13     A. I operate a 40,000 metavolt, 41,000 metavolt
14 derrick barge. It's 150 ton. And I also operate the Giant.
15 That's a 700-ton crane.
16     Q. Now, does that describe the weight of the crane, or
17 how much the crane can lift? What does that mean?
18     A. That's the Atlantic Giant. That's the name of the
19 crane.
20     Q. Okay.
21     A. That's a barge on the water, a floating barge.
22     Q. What does AMFELS have to do with Brownsville Barge
23 & Crane? Do they work for each other, or are they separate
24 companies? What is the difference in the relationship
25 between those two companies?

Page 12

1      A. Those are the owners of the floating equipment or
2  in charge of the floating equipment.
3      Q. Does that include the floating crane you were just
4  talking about?
5      A. Yes.
6      Q. So you operate a crane at the Port of Brownsville.
7  And when it's one of the ones out on the water, it would
8  sometimes be their crane?
9      A. Yes.
10     Q. Okay. The accident that we're talking about with
11 Mr. Zamora, whose crane would you be operating at the time
12 his accident happened? Brownsville Barge & Crane, or someone
13 else, or --
14     A. No. The same crane.
15     Q. Okay. The one you were just talking about?
16     A. The Atlantic Giant.
17     Q. And we may have a picture here. Let's see if it
18 shows up here. We have some pictures that were taken at the
19 scene of the accident. They even have the date on the bottom
20 of the pictures here. And I'm showing you one that's marked
21 -- let me turn to it where you can see the number -- No. 6.
22 That's how it's been numbered. And the one that I'm giving
23 you, we'll get it re-marked, if it's the right one. I want
24 to slide it over to you. And there appears to be
25 cranes shown in the picture that look like they're out over

Page 13

1  the water. Would any of those be the type cranes you're
2  talking about?
3      A. This is only one crane. This is the Atlantic
4  Giant, the one that we make the lift.
5      Q. Is that the one involved on the day Mr. Zamora's
6  accident happened, too?
7      A. Yes.
8      Q. Let me get you to -- if you can turn that around in
9  front of you. We'll mark it as Exhibit 1 for your
10 deposition.
11         (Deposition Exhibit No. 1 was marked for
12 identification.)
13     Q. (By Mr. Tinning    ) And let the video operator give us
14 a signal when he can get the glare off it and get a good,
15 tight shot for the jury to see what we're talking about.
16         THE VIDEOGRAPHER: The one on the bottom?
17         MR. TINNING: Yes. The one on the bottom.
18     Q. (By Mr. Tinning    ) And the crane that's on the --
19 what would be now the right-hand side of the photograph is
20 the one that you're talking about that was involved in the
21 lift the day Mr. Zamora got hurt?
22     A. Can I turn it around?
23     Q. Oh, sure.
24     A. This is only one crane. This is the boom and this
25 is the gantry. It's only one crane. That's the Atlantic

Page 14

Giant.

Q. Okay. I'm sorry, I misunderstood you. You're right. If you can turn now and hold it up and show the jury, the angle, the larger, derrick-looking structure is the boom, and then the gantry are the two smaller ones that are straight up in the photograph?

A. Yes, sir.

Q. And that's a crane that you would have operated and been at on the day the accident happened?

A. I was a signal man.

Q. That's what I said, that you were at -- you weren't operating it that day, but you were out there that day?

A. Yes.

Q. And you can put the photograph down now. Thank you very much, Mr. Garcia. The object that was to be lifted, what was it that you were trying to lift or assisting with the lift on that day?

A. It was a generator.

Q. Okay. I think we've got --

A. That's what they -- what Charles told me, and Snyder, that it was a generator.

Q. And I think we have got a shot of it, too. I'm going to put a sticker right by the one we just used, so we can keep track of our exhibit numbers here. That's Exhibit 1.

Page 15

    (Deposition Exhibit No. 2 was marked for identification.)

Q. (By Mr. Tinning    ) Let me show you what I've marked as Exhibit No. 2. And it's behind a pickup truck, so that the jury can get an idea of how large that generator is. Does Exhibit No. 2 show a true and correct copy or representation of what you just called a generator that was involved on the day of Mr. Zamora's accident?

A. Yes, sir.

Q. Okay. And if you could turn that now around for the cameraman so he can have the jury follow along with us. And it's the one that's on top that we have got Exhibit No. 2 on. And it's actually suspended by the crane that we had in Picture No. 1, correct?

A. Correct.

    THE VIDEOGRAPHER: Okay.
    MR. TINNING: All right.

Q. (By Mr. Tinning    ) Thank you very much, Mr. Garcia. Now, where were you when you first realized there had been an accident with the man we now know as Mr. Zamora?

A. I was on the opposite side where they were working on the gripper. I was checking. At that time, they told me to stop everything because bolts were involved and we were going to hit on the rail car -- on the rail car.

Q. Okay.

Page 16

A. I put two tag lines to the dock and went around to let the people know that it was going to be staying there for a while until further notice from Mr. Charles and Snyder. At that time when I came back, the accident had -- that people was on the concrete, on the floor, with that gripper on the side of him. I didn't saw (sic) the accident when it happened.

Q. Okay. You just saw after the accident?

A. After the accident.

    (Deposition Exhibit No. 3 was marked for identification.)

Q. (By Mr. Tinning) And what you're calling a gripper, I've got another photo that's a little tighter or closer view of that generator that you just showed us in No. 2 -- I've marked it as No. 3. It's the yellow -- we've had other people call it a jacking plate. Is that what you're calling a gripper?

A. That's what I call it, but it's a jacking plate. I don't know the name of that --

Q. It doesn't matter. I just want to be sure we're saying the same --

A. It's the same -- the yellow -- yellow frame.

Q. All right. And let me ask you to hold up No. 3, then. That's what you've called a gripper and other people have called a jacking plate, is what you just referred to as

Page 17

something that had to be or was going to be in the way or had to come off; is that right?

A. The people, they think that it was in the way. Snyder and Charles. They thought that it was in the way and that's why they were going to remove it. Not myself.

Q. I'm with you. And the bolt that you referred to, do we have a shot of the bolts that actually go through the yellow jacking plate -- or as you put it, the gripper? Is that the bolts you were referring to?

A. Yes.

Q. And you indicated -- and you can put that down now, Mr. Garcia. Thank you. You indicated that people, as you put it, said that this had to come off. Were you able to determine from being around the compressor or the generator as it was being lifted who was actually issuing the instructions about whether or not this needed to come off and who was -- "in charge" may be too strong a word -- but actually the one giving instructions?

A. It was -- Mr. Snyder was giving instructions to Charles, and Charles was telling me what I needed to do.

Q. And was it that way the whole time you were out there? Mr. Snyder would tell Mr. Cherrington, and then -- Charles, as you called him, and --

A. Yes.

Q. Were you there when -- you indicated -- I want to

**Page 18**

1  go back over one of the things that you just told us. You
2  said it was determined that these -- the grippers or jacking
3  plates had to come off. Was that something that came from --
4  well, who was it that was issuing those instructions?
5      A. Charles was telling me that that was -- Charles was
6  telling me to hold the load. You know, don't move the load.
7  That's when I put some tag -- the tag lines, I tie them to
8  the dock, both of them, so the generator won't be moving.
9      Q. Right. So it won't sway?
10     A. Right. Then I went around -- at that time, I went
11 around so that I can tell the people that everything was
12 going to be stopped until further notice from these people --
13 from Mr. Charles and Mr. Snyder.
14     Q. And you're saying you actually saw Mr. Snyder,
15 then, telling Charles? Not the other way around? Charles
16 was telling -- excuse me -- Mr. Snyder was telling Charles,
17 then Charles was telling everyone else?
18     A. He was telling me to hold the load. Then from
19 there on, I would stop on the load, because I work just on
20 the load, you know. I was the signal man from the generator.
21     Q. When you say, "signal man," that's the person that
22 actually, then, gives the hand signals to the crane
23 operator?
24     A. Yes. And also I had a radio.
25     Q. And that was also to the crane operator?

**Page 19**

1      A. Telling him to stop -- dog everything. Don't
2  move. Don't come up. Dog everything.
3      Q. And that means keep everything right where it is?
4      A. Yes, sir.
5      Q. And was, in fact, the load suspended the way that
6  you wanted it to be, the way you signaled it to be? Did the
7  crane operator do what you signaled him to do?
8      A. Yes, sir.
9      Q. Okay. Was there any problem with how the crane
10 operator did his job, that you saw? Did the crane operator,
11 in other words, do what he was told correctly?
12     A. Yes.
13     Q. And in the picture it even shows, if we look back
14 at, say -- I think Picture No. 2, the load is actually
15 suspended. Is that the way it was suspended once the order
16 had been given down from Mr. Snyder to just hold the load?
17     A. Yes. It was a steady load. It was --
18     Q. Held in place?
19     A. Yes.
20     Q. You say you didn't see the accident, but you came
21 around after the accident. Tell us what you saw when you
22 came around after the accident, and the jacking plate -- or
23 the gripping plate, as you call it -- was off and the man was
24 down. What did you find?
25     A. When I went around -- because I heard a noise.

**Page 20**

1  That's when I believe the blade got hit on the concrete. And
2  the man was already laying down with the gripper on his right
3  side, on the side of him. It was not on top of him. I
4  believe it hit, and then jumped back to the right side. And
5  he was laying there.
6      Q. Was the man still conscious? Awake?
7      A. Yes.
8      Q. What was he doing at that time when you first came
9  around?
10     A. He tried or -- he tried to stand up. Then people
11 calmed him down, to stay on the floor so he wouldn't get hurt.
12     Q. How long were you there around the man after that,
13 more or less?
14     A. I do not remember exactly, but I would say about
15 fifteen minutes.
16     Q. And for how long of that fifteen minutes was the
17 man that we now know as Mr. Zamora, was he awake?
18     A. Well, it was for fifteen minutes. Then those other
19 people were helping him.
20     Q. Well, the whole time that you were there, was the
21 man what we call conscious? Was he awake?
22     A. Yes.
23     Q. Okay. And was he -- well, from the time you came
24 around and saw him, was it obvious to you from what you saw
25 that he was hurt? Hurt bad?

**Page 21**

1      A. Yes.
2      Q. And from what you heard, and then from what you saw
3  when you came around, he had been knocked to the ground? You
4  said you even heard either him or the jacking plate hit the
5  concrete, hit the ground, the deck?
6      A. Yes.
7      Q. Had there been any discussion before this -- had
8  anyone said, Mr. Garcia, before this happened, that only a
9  certain number of those bolts actually held that gripper in
10 place, held it on?
11     A. At work?
12     Q. Yes?
13     A. When we were making the lift?
14     Q. Yes, sir? Did anybody ever say that before this
15 accident at all? Did they say only two of the bolts, or all
16 four of the bolts, or anything like that held this gripper in
17 place? Had anybody ever said that only the two bottom bolts
18 hold it in place, for instance?
19     A. Nobody -- nobody said a word. Plus, it don't have
20 no warnings or it don't have no sign of what they'll do.
21 Nobody said nothing -- I didn't hear them.
22     Q. Was there any -- let me get another photograph
23 that's a little closer, too, of this. And I'll mark it No. 4.
24         (Deposition Exhibit No. 4 was marked for
25 identification.)

**Page 22**

1  Q. (By Mr. Tinning) On No. 4, it shows one of the
2  other of the four grippers or jacking plates that's still on.
3  It doesn't have any decal around it, does it, or instruction?
4  A. It don't have a -- it didn't have no instructions,
5  or warning, or if the bolts were in, the top ones. So nobody
6  said nothing.
7  Q. Okay. Picture No. 4 is a true and accurate picture
8  of the way the jacking plate was, even the one that fell off,
9  before it fell off? That would be what it looked like?
10  A. Yes.
11  Q. There were no instructions around it, or on it, or
12  no decals saying don't remove it? Nothing?
13  A. It was nothing. No instructions. No warning. No
14  nothing.
15  Q. Did you or anyone there have any meetings before
16  this lift to talk about how the lift was going to be done?
17  A. Before, my supervisor -- my supervisor, he told me
18  that was the rigging that we were going to use, but not at
19  the meeting of telling me about the grippers, because that's
20  concerning somebody else or the same people who's buying this.
21  Q. Okay. So you didn't have anyone tell you at any
22  meeting before the lift that these grippers, first of all,
23  were going to be -- that they were in the way or that they
24  needed to come off? No one told you that?
25  A. No one told me about this, because that don't

**Page 23**

1  concern to my lifting. That's concerning to the people who
2  buy or were selling it, because that was not in my way.
3  Because I only was going to lift the generator, so it was up
4  to somebody else or the people who was involved then.
5  Q. Okay. I understand. In other words, the first
6  time you heard that there was a problem with these grippers
7  or these jacking plates was when you got the word from
8  Mr. Cherrington to hold the lift because these things had to
9  come off? That's the first time you realized or heard that
10  was a problem?
11  A. Yes.
12  Q. Okay. And you saw that instruction coming from
13  Mr. Snyder, who then passed it to Mr. Cherrington, who then
14  passed it down to the crew?
15  A. That's correct.
16  Q. Were you there also, Mr. Garcia, after -- after the
17  accident, Mr. Zamora goes away; the ambulance comes; of
18  course, the load still has to be finished, right?
19  A. Yes.
20  Q. Were you there to finish with the lift and get this
21  loaded and out of the Port of Brownsville?
22  A. Yes.
23  Q. Okay. What happens once the lift was to be
24  finished? In other words, Mr. Zamora has left in the
25  ambulance. There's still a lift that has to be finished.

**Page 24**

1  There's still three jacking plates that are still on the
2  compressor. What was done with those other three grippers or
3  jacking plates to finish the lift? Were they left on? Were
4  they taken off? What did they do?
5  A. They left them on. They left them on. Just the
6  one that fell down on the concrete, that was the only one.
7  After I set the generator, we took off. And I don't know
8  what they did, if they took them off or they left them on.
9  But when I left -- when I left the Port, the jacking plates
10  were still there on the generator.
11  Q. Okay. Had the generator been put down in place on
12  the rail car? In other words, the lift finished when you
13  left?
14  A. Yes, sir.
15  Q. In other words, the generator was lowered all the
16  way down onto the rail car and the jacking plates that
17  were left were still on there when you left?
18  A. That's correct.
19  Q. Okay. What time did you leave the Port that day
20  when the load -- when the lift was finished?
21  A. I would say about five, five-fifteen.
22  Q. Okay. And more or less, what time did the accident
23  happen?
24  A. We started working around eleven. So at about -- I
25  don't know. Eleven -- we started working at eleven.

**Page 25**

1  I didn't -- I don't have a watch and I didn't check on the
2  time.
3  Q. I understand. So at least some hours after the
4  accident is when you left that day? Maybe four or five hours
5  afterwards, more or less, is when you left after the accident
6  happened?
7  A. Yes.
8  Q. Okay. The lift, as far as your part was concerned,
9  it was finished when you left that day?
10  A. Yes, sir.
11  Q. Okay. So if the jacking plates, the grippers, were
12  taken off, they would have been taken off after you left at
13  more or less five in the afternoon?
14  A. Yes.
15  Q. Okay. Did you ever see Mr. Snyder again with any
16  other lifts after this particular lift that day?
17  A. No.
18  Q. Have you seen any other compressors like this come
19  through the Port of Brownsville since then?
20  A. Well, that was the only -- the only time that they
21  sent me to work on that generator.
22  Q. Okay. Were there any others like it or similar to
23  it that had these kind of grippers or jacking plates that had
24  come through there that you remember -- any other time, in
25  other words?