## Page 1

CAUSE NO. 9__-1644-E

GRACIELA ZAMORA, ET AL · IN THE DISTRICT COURT
VS. · 357TH JUDICIAL DISTRICT
ABB KRAFTWERKE AKTIENGESELLSCHAFT, · 
ET AL · CAMERON COUNTY, TEXAS

VIDEOTAPED DEPOSITION OF
ANDREAS REBHOLZ
TAKEN ON APRIL 7, 2000

VIDEOTAPED DEPOSITION OF ANDREAS REBHOLZ, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 7th day of April, 2000, from 1:40 p.m. to 2:20 p.m., before Kimberly Del Bosque, CSR, in and for the State of Texas, reported by machine shorthand, at the Hotel Venice Bauer, Campo S. Moise 1459, San Marco 30124, Venice, Italy, pursuant to the Texas Rules of Civil Procedure.

## Page 2

APPEARANCES

FOR THE PLAINTIFFS:

MR. WILLIAM J. TINNING
Law Office of William J. Tinning
1013 Bluff Drive
Portland, Texas 78374

FOR THE DEFENDANTS, ABB KRAFTWERKE AKTIENGESELLSCHAFT AND ABB ALSTOM POWER (SWITZERLAND) LTD, FORMERLY KNOWN AS ABB POWER GENERATION, LTD.:

MR. JUSTIN WILLIAMS
MR. PAT KASPERITIS
Williams, Kasperitis & Gowan
5959 S. Staples, Suite 204
Corpus Christi, Texas 78413

FOR THE DEFENDANT, BROWNSVILLE BARGE & CRANE, INC.:

MR. KEITH N. UHLES
Royston, Rayzor, Vickery & Williams, L.L.P.
55 Cove Circle
P.O. Box 3509
Brownsville, Texas 78523-3509

ALSO PRESENT:

Christine Weise and Gisela Isten, Interpreters
Daniel de Feydeau

## Page 3

INDEX
                                              Page
Appearances ................... 2
EXAMINATION OF ANDREAS REBHOLZ
  By Mr. Tinning ............. 4

Signature and Changes ............. 20
Reporter's Certificate ............ 22

## Page 4

ANDREAS REBHOLZ,
having been first duly sworn, testified as follows:

EXAMINATION
BY MR. TINNING:

Q  Could you give us your full name, please, sir?
A  Andreas Rebholz.
Q  Mr. Rebholz, my name is Bill Tinning, and I represent the family of the late Oscar Zamora. Do you understand you're giving testimony today just as if you were in Brownsville, Texas, in front of the judge and the jury under oath?
A  Yes.
Q  Have you ever testified before?
A  No.
Q  I will ask you questions that need to be translated, so it's important that you wait and give us out loud, verbal answers only after the translation has been made to you in German, okay?
A  Yes.
Q  I'm not going to ask you any trick questions. If you don't understand any question, please tell me so I can rephrase it.
A  Okay.
Q  Where do you work?
A  I work with ABB Alstom Power.

Page 5

```
1    Q   And is that the Swiss ABB or the German ABB?
2    A   The Swiss company.
3    Q   And where in Switzerland do you work for ABB?
4    A   I work in Baden.
5    Q   And how long have you worked for ABB?
6    A   It will be ten years in summer.
7    Q   And what do you do for ABB?
8    A   The first eight years I was construction engineer
9  and the design engineer in the department for steam turbines,
10 and for two years I've been working with the transport
11 logistics department.
12   Q   What kind of engineer are you?
13   A   I'm a mechanical engineer.
14   Q   And do you have a degree in engineering?
15   A   Yes.
16   Q   From which university or college?
17   A   Okay. I studied in Germany at the Technical School
18 at Waldshut.
19   Q   Waltzberg?
20       THE INTERPRETER: Waldshut, that's
21 W-a-l-d-s-h-u-t.
22   Q   Would that be equivalent to a university degree?
23   A   It's a poly-technical degree.
24   Q   How many years do you go to school to get that
25 degree?
```

Page 6

```
1    A   Two years, four semesters.
2    Q   Did you ever help make decisions for ABB about the
3  placement of instructions on how to remove the jacking plates
4  on the jacking plate with the generator it's attached to?
5    A   I was present at discussions.
6    Q   Did any of those discussions occur before the
7  accident with Mr. Zamora?
8    A   No.
9    Q   They only occurred after the accident to Mr. Zamora?
10   A   Talks at which I was present or which I know of took
11 place after the accident.
12   Q   And you don't know of any that occurred before the
13 accident?
14   A   I don't know.
15   Q   After these discussions about the jacking plates,
16 was the decision not to place any instructions or decals on the
17 generator or the jacking plate about how to remove the jacking
18 plate?
19   A   Okay. We discussed different things. We discussed
20 what to do, how to do it, where to do it, and then we decided
21 we did not need to do that because the jacking lugs would be --
22 would be removed at the Rotterdam port by qualified personnel.
23   Q   Who was in charge of those discussions where this
24 was decided?
25   A   It would be my boss, Roland Schneider, my technical
```

Page 7

```
1  boss.
2    Q   And because of the change in procedure, that is, to
3  remove the jacking plates in Rotterdam, it was decided no decal
4  or instruction was needed on the generator or jacking plate
5  itself, correct?
6    A   So if nothing is there -- if there's nothing there
7  to be removed, I do not need any warning decals.
8    Q   Some of the generators, though, still are sent out
9  with jacking plates to certain locations, correct?
10   A   As far as I know, no.
11   Q   Okay. Are the jacking plates sent separately with
12 the generator in case they're needed?
13   A   Yes.
14   Q   But even so, there's no instruction on the generator
15 or the jacking plate how to put it on or take it off the
16 generator, correct?
17   A   That's correct, but when -- when those jacking lugs
18 are removed they are removed by qualified personnel, and when
19 they are put on again they will be put on again by qualified
20 personnel on-site.
21   Q   Is it required that someone from ABB go with the
22 generator until it reaches its final destination?
23   A   Yes.
24   Q   And that person is supposed to be sure that only
25 qualified personnel, as you put it, put on or take off the
```

Page 8

```
1  jacking plates, correct?
2    A   Okay. So it's not this person's task to make sure
3  that qualified personnel does this job. This is regulated
4  before by procedures.
5    Q   ABB procedures?
6    A   Yes, that's true.
7    Q   And the person like Roland Schneider who goes with
8  the generator, the person from ABB who goes with the generator,
9  would know how to put the jacking plates on correctly and
10 safely or take them off correctly and safely?
11   A   Yes.
12   Q   And part of that ABB person going with the
13 generator's job, if they observe the jacking plates being taken
14 on or put off -- taken off incorrectly, is to advise that it's
15 being done unsafely or incorrectly?
16   A   If this person sees that, of course.
17   Q   And it is the person like Mr. Schneider or the ABB
18 representative -- part of their job to oversee the transport of
19 the generator and the jacking plates, correct?
20   A   Could you please rephrase the question?
21   Q   Part of the ABB representative, like Mr. Schneider
22 who's going with the generator to the final point of
23 destination's job is to oversee the transport of the generator
24 and the jacking plates and everything that goes with the
25 generator, correct?
```

## Page 9

1  A  Okay. It's this person's task to be present and to
2  be there if questions are asked, not to give consultancy or
3  advice.
4  Q  For the whole time that the generator is transported
5  all the way to its final destination that would be true,
6  correct?
7  A  I don't think I can say that generally, as a general
8  rule. I don't know.
9  Q  Well, if Mr. Schneider has already said that, would
10 you disagree with him?
11 A  No, I would not disagree with him, but I can only
12 answer to something I really know.
13 Q  Well, have you ever been the ABB representative
14 assigned to go with the generator to deliver?
15 A  Yes.
16 Q  And when you did that job, you made sure that the
17 generator was safely transported and correctly transported all
18 the way to the final destination, correct?
19 A  Yes. As far as I possibly could do that, I did it.
20 Q  Did any of the generators you accompanied have
21 jacking plates on them?
22 A  Yes.
23 Q  Did the jacking plates have to be taken off at some
24 point even at the final destination?
25 A  No, because on the generators I was responsible for,

## Page 10

1  there was no transfer to a train car. They were only
2  transferred on trucks, and there we didn't have any problems
3  with clearance restrictions.
4  Q  So your situations would have been different from
5  Mr. Schneider's situation in Brownsville with this generator?
6  A  I wasn't there in Brownsville, but from what I have
7  heard I can say that that's correct.
8  Q  Has Mr. Schneider ever talked to you about what
9  happened in Brownsville with this accident?
10 A  Yes, we have discussed the accident several times.
11 Q  And has Mr. Schneider told you that if he had
12 insisted that the nuts and bolts stay on the jacking plates
13 that this accident would not have happened?
14 A  As far as I know, Mr. Schneider -- Mr. Schneider
15 never said that nuts or bolts had to be taken off.
16 Q  That's not my question. Has Mr. Schneider ever told
17 you that in some way he feels responsible for this accident
18 with Mr. Zamora?
19 A  Yes. He has said to me that this was a very tragic
20 event and that he is very sad it happened, but he also said
21 that if he had seen it he would have done everything possible
22 to prevent it.
23 Q  Part of Mr. Schneider's job was to oversee the lift
24 and transfer to the rail car of this generator?
25 A  He was present as an advisor, not as a supervisor.

## Page 11

1  Q  An advisor about how to safely and correctly
2  transfer the generator from the barge to the rail car?
3  A  Yes. If there had been any questions, he would have
4  answered.
5  Q  And Mr. Schneider was supposed to provide
6  information about how to safely and correctly transfer the
7  generator from the barge to the rail car to the people doing
8  that job, correct?
9  A  That was not his job. His job was to be present and
10 to be there when problems occurred so if there had been any
11 problems he could have -- he would have been the person to talk
12 to and to ask for advice.
13 Q  Was part of Mr. Schneider's job to let people know
14 that if the jacking plates didn't need to come off that
15 only two bolts held on the jacking plates?
16 A  Has he been -- had he been asked or had anybody
17 asked -- or told him they wanted to remove the jacking bolts, I
18 don't know.
19 Q  Well, if someone wanted to remove the jacking
20 plates, Mr. Schneider would be expected to provide information
21 on how to do that, correct?
22 A  It can be clearly seen from the transport drawings
23 how the jacking plates are to be removed, and at that moment
24 there was no reason to remove them.
25    MR. TINNING: Nonresponsive.

## Page 12

1  Q  It's Mr. Schneider's job to send out the transport
2  documents that would show how to remove the jacking plates?
3  A  I don't really understand your question. What do
4  you mean by how to remove the jacking lug? I mean, do you want
5  the single steps, one, two, three, four?
6  Q  Well, let's start with the easiest first. There are
7  four bolts on the jacking plate, correct?
8  A  Yes.
9  Q  Only two of those bolts actually hold the jacking
10 plate on to the generator, correct?
11 A  Correct.
12 Q  There is no decal or instruction on either the
13 jacking plate or the generator that says only two of these
14 bolts hold this jacking plate on, correct?
15 A  That's correct. But we don't need those decals
16 because you can easily see that the two upper bolts do not keep
17 the jacking lug attached to the generator, and Roland Schneider
18 was present and he could have asked -- he could have answered
19 questions.
20 Q  He could have answered questions if someone knew to
21 ask a question about which two bolts held it on, correct?
22 A  Can you please repeat the question?
23 Q  You're assuming someone knows enough information to
24 be able to ask a question of Roland Schneider, correct?
25 A  Okay. I don't know that. I don't know what kind of

ABB KRAFTWERKE v. BROWNSVILLE BARGE & CRANE   Tex.   287
Cite as 115 S.W.3d 287 (Tex.App.—Corpus Christi 2003)

ABB KRAFTWERKE AKTIENGE-SELLSCHAFT and ABB Alstom Power (Switzerland) Ltd., f/k/a ABB Power Generation, Ltd., Appellants,

v.

BROWNSVILLE BARGE & CRANE, INC., Appellee.

No. 13–01–00756–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

Aug. 28, 2003.

Rehearing Overruled Oct. 2, 2003.

Family of longshoreman who was fatally injured during the lifting of a 325-metric-ton generator from a barge onto a railway car brought action against manufacturer of generator, transportation company hired by manufacturer, and owner of the floating crane that made the lift. Crane owner filed cross-claim against manufacturer, seeking contractual indemnity for its legal fees. After underlying lawsuit settled, the 404th District Court, Cameron County, Abel C. Limas, J., entered summary judgment for crane owner on the indemnity claim. Manufacturer appealed. The Court of Appeals, Hinojosa, J., held that: (1) indemnity agreement was a valid and enforceable contract; (2) manufacturer's promise to indemnify crane owner in exchange for owner's lifting services was valid consideration for indemnity agreement; and (3) crane owner's refusal to provide crane lifting services without indemnification agreement did not amount to economic duress, as would invalidate agreement.

Affirmed.

1. Indemnity ⇐27, 30(8)

Indemnity agreement between manufacturer of 325-metric-ton generator and owner of floating crane used to lift generator from barge to railway car, by which manufacturer agreed to indemnify crane owner for liability resulting from crane owner's own future negligence, was a valid and enforceable contract, even though crane owner did not sign the contract, where crane owner made it clear that execution of lift was dependent on manufacturer's signing of indemnity agreement, and manufacturer's representative did sign agreement and return it to crane owner.

2. Indemnity ⇐31(1)

A contract of indemnity is an original obligation between the contracting parties, independent of other agreements.

3. Indemnity ⇐31(1)

Indemnity contracts are construed under normal rules of contract construction.

4. Indemnity ⇐27

An indemnity agreement must meet the criteria of a binding contract to be an original obligation and stand on its own.

5. Contracts ⇐15, 16, 34, 42

The requirements of a binding contract are: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding.

6. Contracts ⇐47

Consideration is a fundamental element of a valid contract.

7. Indemnity ⇐30(1)

The "express negligence doctrine" requires that the intent of the party seeking indemnity from the consequences of that party's own future negligence must be ex-

pressed in unambiguous terms within the four corners of the contract.

See publication Words and Phrases for other judicial constructions and definitions.

**8. Indemnity ⊜30(1)**

The conspicuousness requirement for an indemnity agreement demands that significant terms must appear on the face of the agreement in such a way as to attract the attention of a reasonable person.

**9. Contracts ⊜35**

The absence of a signature on a contract does not necessarily destroy its validity.

**10. Contracts ⊜35**

As long as the parties give their consent to the terms of a contract, and there is no evidence of an intent to require both signatures as a condition precedent to it becoming effective as a contract, signatures are not a required factor in the making of a valid contract.

**11. Indemnity ⊜27**

Generator manufacturer's promise to indemnify owner of floating crane, which was used to lift generator from barge to railway car, for liability resulting from owner's negligence in exchange for crane owner's lifting services was valid "consideration" for indemnity agreement.

See publication Words and Phrases for other judicial constructions and definitions.

**12. Contracts ⊜10(1)**

A contract must be based upon a valid consideration, in other words, mutuality of obligation.

**13. Contracts ⊜50**

"Consideration," as an element of contract, is defined as either a benefit to the promisor or a loss or detriment to the promisee.

**14. Contracts ⊜50**

Surrendering a legal right represents valid "consideration" for a contract.

**15. Contracts ⊜10(1), 85**

A contract that lacks consideration lacks mutuality of obligation and is unenforceable.

**16. Contracts ⊜88**

There is a presumption that a written contract is supported by consideration.

**17. Indemnity ⊜100**

The party asserting lack of consideration had the burden to prove that there was no consideration for an indemnity agreement.

**18. Indemnity ⊜27**

Lifting services contract between owner of crane and provider of stevedoring services for lifting 325-metric-ton generator from a barge onto a railway car did not already obligate crane owner to perform lifting services at time crane owner, as indemnitee, and generator's manufacturer, as indemnitor, entered into indemnity agreement, and thus, indemnity agreement did not fail for lack of consideration, where lifting services contract stated that its terms would apply if manufacturer elected to use crane services and if crane owner agreed to provide such services.

**19. Indemnity ⊜27**

Floating crane owner's refusal to provide crane to lift generator from barge to railway car unless generator's manufacturer signed indemnity agreement did not amount to a threat to commit an act that crane owner had no legal right to do, and crane owner was not a party to manufacturer's financial distress occasioned by delay in delivering generator to purchasers, and thus, indemnity agreement was not coerced by economic duress, as would invalidate agreement, where manufacturer

ABB KRAFTWERKE v. BROWNSVILLE BARGE & CRANE   Tex.  **289**
Cite as 115 S.W.3d 287 (Tex.App.—Corpus Christi 2003)

and crane owner were not parties to any prior agreement, and manufacturer's compulsion to deliver generator without further delay was due to its third-party contract with purchasers; manufacturer was not forced to sign indemnity agreement against its free will.

**20. Contracts ⇐95(1)**

The elements of economic duress, as may invalidate a contract, are: (1) a threat to do something that a party has no legal right to do; (2) illegal exaction or some fraud or deception; and (3) imminent restraint such as to destroy free agency without present means of protection.

**21. Contracts ⇐95(1)**

Economic duress, which may invalidate a contract, may be claimed only when the party against whom it is claimed was responsible for claimant's financial distress.

**22. Contracts ⇐95(1)**

A claim of economic duress, as may invalidate a contract, must be based on the acts or conduct of the opposite party and not merely on the necessities of the purported victim or on a fear of what a third person might do.

**23. Contracts ⇐95(1)**

The mere fact that a person enters into a contract with reluctance or as a result of the pressures of business circumstances does not, of itself, constitute economic duress invalidating the contract.

---

Justin L. Williams, Corpus Christi, for Appellants.

Javier Gonzalez, Keith N. Uhles, Royston, Rayzor, Vickery & Williams, Brownsville, Jon D. Brooks, Rangel Law Firm, P.C., Corpus Christi, for Appellee.

Before Justices HINOJOSA, CASTILLO, and CHAVEZ.[1]

**OPINION**

Opinion by Justice HINOJOSA.

This case requires us to determine the validity of an indemnity agreement. In three issues, appellants, ABB Kraftwerke Aktiengesellschaft and ABB Alstom Power (Switzerland) Ltd., f/k/a ABB Power Generation, Ltd. ("ABB"), contend the trial court erred in granting the motions for summary judgment of appellee, Brownsville Barge & Crane, Inc. ("Brownsville Barge"). We affirm.

**A. BACKGROUND AND PROCEDURAL HISTORY**

This case arises from the shipment of a large turbine generator from Manheim, Germany to Monterrey, Mexico, through the Port of Brownsville. ABB manufactured and arranged for the shipment of the 325-metric-ton generator from Germany to the Port of Brownsville. ABB contracted with C.H. Robinson ("Robinson") to transport the generator from the Port of Brownsville to Monterrey.

Robinson contracted with Schaefer Stevedoring ("Schaefer") to provide stevedoring services at the Port of Brownsville. Schaefer was to offload the generator from a lash barge and load it onto a railway car alongside the dock. Schaefer entered into a "Lifting Services Agreement" with Brownsville Barge for its floating crane barge, the "Atlantic Giant," to make the lift. The Atlantic Giant was the only floating crane between Houston, Texas and Tampico, Mexico, capable of lifting this

---

1. Retired Justice Melchor Chavez, assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon 1998).

generator because of its size and configuration. In the months preceding the lift, Brownsville Barge was given partial payment for the use of the Atlantic Giant. All necessary arrangements and permits to move the generator into Mexico were also obtained.

Just before the lift, Brownsville Barge approached representatives of ABB and Robinson and asked them to sign an indemnity agreement, attached as an exhibit to the Lifting Services Agreement entered into between Brownsville Barge and Schaefer. Brownsville Barge informed the representatives that it would not provide the lifting equipment if ABB's representative did not sign the indemnity agreement. ABB signed the indemnity agreement; Robinson refused.

Oscar Zamora, Sr., was a longshoreman at the Port of Brownsville. Zamora was the gang foreman of the longshoremen hired by Schaefer to perform the lift. During the lift, while the generator was suspended by the crane, a jacking plate fell from the generator and fatally injured Zamora. Zamora's family filed suit against ABB, Robinson, and Brownsville Barge for wrongful death. The lawsuit eventually settled.

Brownsville Barge filed a cross-claim against ABB, asserting ABB owed it contractual indemnity for the legal fees it incurred in defending against the Zamora family's claims. Brownsville Barge filed a motion for partial summary judgment and a no evidence motion for summary judgment, and the trial court granted both motions. ABB also filed a motion for summary judgment, which the trial court denied. This appeal ensued.

### B. Issues Presented

In three issues, ABB contends the trial court erred in granting Brownsville Barge's motions for summary judgment because: (1) Brownsville Barge did not have a valid contract with ABB; (2) there was no valid consideration for the indemnity agreement; and (3) the indemnity agreement was an unenforceable adhesion contract. ABB does not complain of the trial court's denial of its motion for summary judgment.

### C. Standard of Review

We review the grant of a traditional summary judgment de novo. *Alejandro v. Bell*, 84 S.W.3d 383, 390 (Tex.App.-Corpus Christi 2002, no pet.). To sustain a summary judgment, we must determine that the pleadings and summary judgment evidence establish that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *McFadden v. Am. United Life Ins. Co.*, 658 S.W.2d 147, 148 (Tex.1983). We accept all evidence favorable to the nonmovant as true, indulge the nonmovant with every reasonable inference, and resolve any doubt in the nonmovant's favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549 (Tex.1985). Summary judgment is proper if the movant disproves at least one element of each of the plaintiff's claims or affirmatively establishes each element of an affirmative defense to each claim. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997).

By contrast, a no-evidence summary judgment presented under Texas Rule of Civil Procedure 166a(i) is equivalent to a pretrial directed verdict, and this Court applies the same legal sufficiency standard on review. *Zapata v. The Children's Clinic*, 997 S.W.2d 745, 747 (Tex.App.-Corpus Christi 1999, pet. denied). A no-evidence motion for summary judgment must be granted if: (1) the moving party asserts that there is no evidence of one or more specified elements of a claim or defense on which the adverse party would have the

ABB KRAFTWERKE v. BROWNSVILLE BARGE & CRANE Tex. 291
Cite as 115 S.W.3d 287 (Tex.App.—Corpus Christi 2003)

burden of proof at trial; and (2) the respondent produces no summary judgment evidence raising a genuine issue of material fact on those elements. *See* Tex.R. Civ. P. 166a(i). In reviewing a no-evidence summary judgment, we review the record in the light most favorable to the nonmovant to determine whether more than a scintilla of evidence was presented on the challenged elements of the nonmovant's claim. *See Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex.2002).

D. LACK OF ENFORCEABLE CONTRACT

[1] In its first issue, ABB complains that the trial court erred in granting summary judgment on Brownsville Barge's indemnity claim because Brownsville Barge did not have a valid contract with ABB.

The indemnity agreement was attached as an exhibit to the Lifting Services Agreement. ABB asserts the Lifting Services Agreement was only between Brownsville Barge and Schaefer. ABB argues that it was not a party to the Lifting Services Agreement.

[2-4] Whether ABB was a party to the Lifting Services Agreement becomes relevant to our analysis only if we find that the indemnity agreement cannot stand on its own as a contract between ABB and Brownsville Barge. A contract of indemnity is an original obligation between the contracting parties, independent of other agreements. *Joseph Thomas, Inc. v. Graham*, 842 S.W.2d 343, 346 (Tex.App.-Tyler 1992, no writ). Indemnity contracts are construed under normal rules of contract construction. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 284 (Tex.1998). The indemnity agreement at issue must meet the criteria of a binding contract to be an original obligation and stand on its own.

[5, 6] Under Texas law, the requirements of a binding contract are: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Labor Ready Cent. III, L.P. v. Gonzalez*, 64 S.W.3d 519, 522 (Tex.App.-Corpus Christi 2001, no pet.). Consideration is also a fundamental element of a valid contract. *Fed. Sign v. Tex. So. Univ.*, 951 S.W.2d 401, 408-09 (Tex.1997).

[7, 8] Because indemnity agreements involve an extraordinary shifting of risk, the supreme court has imposed certain fair-notice requirements. *See Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex.1993). These requirements incorporate the express negligence doctrine and mandate conspicuousness. *Id.* The express negligence doctrine requires that the intent of the party seeking indemnity from the consequences of that party's own future negligence must be expressed in unambiguous terms within the four corners of the contract. *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex.1987). The conspicuous requirement demands that significant terms must appear on the face of the agreement in such a way as to attract the attention of a reasonable person. *Dresser Indus.*, 853 S.W.2d at 508.

Brownsville Barge's representative approached Roland Schneider, ABB's authorized representative, with an indemnity agreement containing the following terms:

> ABB and or C.H. Robinson Company shall release, defend, indemnify and hold Brownsville Barge & Crane, Inc., its directors, officers, employees, agents and subcontractors (Contractor Group) harmless from and against all liability, claims and losses, damages, punitive

**292** Tex.   **115 SOUTH WESTERN REPORTER, 3d SERIES**

damages, costs, expenses, attorney's fees, demands, suits, and causes of action of every kind (the "claims"), arising on account of personal injury or death or damage to property in any way incident to or in connection with or arising out of the "Lifting Services Agreement" dated March 22, 1999 between Schaefer Stevedoring, Inc. and Brownsville Barge & Crane, Inc. regardless of the sole, joint or concurrent negligence, negligence per se, gross negligence, statutory fault, or strict liability of any member of the Contractor Group or the unseaworthiness of any vessel owned operated or chartered by any member of the Owner Group without limit and without regard to the cause or causes thereof that may have caused or contributed to the claim, to the extent such indemnity obligations are not prohibited by applicable law.

By its very terms, the agreement purports to indemnify Brownsville Barge for liabilities resulting from its own future negligence. The agreement provides that ABB would "indemnify and hold harmless Brownsville Barge & Crane, Inc .... from and against all liability ... arising on account of personal injury or death ... arising out of the 'Lifting Services Agreement' ... regardless of the sole, joint or concurrent negligence" of Brownsville Barge employees. Brownsville Barge's intent as to what risk it intended to shift to ABB is clear from the four corners of the document. See *Atlantic Richfield Co. v. Petroleum Personnel, Inc.*, 768 S.W.2d 724, 726 (Tex.1989) (holding that language which sufficiently defines the parties' intent meets the requirements of the express negligence rule).

At the presentment of the indemnity agreement, the record reflects that Brownsville Barge made clear its position that execution of the lift was dependent on ABB signing the agreement. Thereafter, Schneider, ABB's Deputy General Manager, duly executed the indemnity agreement. It is undisputed that Schneider had full authority to bind ABB and to negotiate or consent to the terms of the indemnity agreement. Following execution of the agreement, Schneider consulted with Sandro Lepori, his supervisor in Switzerland. Lepori agreed that Schneider had appropriately signed the agreement. Thus, ABB accepted the offer when it returned the signed indemnity agreement to Brownsville Barge.

[9, 10] ABB argues that Brownsville Barge did not sign the indemnity provision. However, the absence of a signature on a contract does not necessarily destroy its validity. *Simmons & Simmons Constr. Co., Inc. v. Rea*, 155 Tex. 353, 286 S.W.2d 415, 418 (1955); *Williams v. Brown & Root, Inc.*, 947 S.W.2d 673, 677 (Tex.App.-Texarkana 1997, no writ). As long as the parties give their consent to the terms of the contract, and there is no evidence of an intent to require both signatures as a condition precedent to it becoming effective as a contract, signatures are not a required factor in the making of a valid contract. *Rea*, 286 S.W.2d at 417–18.

There is no evidence in the record that Brownsville Barge did not consent to the terms of the indemnity agreement. The offer was presented with the clear understanding that Brownsville Barge would offer the services of the Atlantic Giant on the condition that ABB signed the indemnity agreement.

Thus, based on the foregoing objective evidence, we hold there was a proper offer, acceptance, consent to the terms of the agreement, and intent of the parties that the contract be mutual and binding. See *Sutton v. Estate of McCormick*, 47 S.W.3d 179, 182 (Tex.App.-Corpus Christi 2001, no pet.) (using an objective standard to examine whether there was a meeting of the

ABB KRAFTWERKE v. BROWNSVILLE BARGE & CRANE   Tex.   293
Cite as 115 S.W.3d 287 (Tex.App.—Corpus Christi 2003)

minds). Appellant's first issue is overruled.

### E. LACK OF CONSIDERATION

[11] In its second issue, ABB contends the trial court erred in granting Brownsville Barge's motion for summary judgment because there was no consideration to validate the indemnity agreement. ABB asserts that Brownsville Barge was already obligated to perform the lift under the terms of the Lifting Services Agreement signed between Brownsville Barge and Schaefer, and that the indemnity agreement is void for lack of new consideration.

[12–15] A contract must be based upon a valid consideration, in other words, mutuality of obligation. *Fed. Sign.*, 951 S.W.2d at 408. Consideration is defined as "either a benefit to the promisor or a loss or detriment to the promisee. Surrendering a legal right represents valid consideration." *Northern Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 607 (Tex.1998). A contract that lacks consideration lacks mutuality of obligation and is unenforceable. *Fed. Sign*, 951 S.W.2d at 409.

[16, 17] There is a presumption that a written contract is supported by consideration. *Cortez v. Nat'l Bank of Commerce*, 578 S.W.2d 476, 479 (Tex.Civ.App.-Corpus Christi 1979, writ ref'd n.r.e.). As the party asserting lack of consideration, ABB had the burden to prove that there was no consideration for the indemnity agreement. *See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex.1991); *Rodriguez v. Southwestern Drug Corp.*, 619 S.W.2d 469, 472 (Tex.Civ.App.-Houston [14th Dist.] 1981, no writ).

Brownsville Barge's summary judgment evidence established that Brownsville Barge told ABB's representative that Brownsville Barge would not provide the Atlantic Giant unless ABB signed the indemnity agreement. In exchange for its agreement to indemnify Brownsville Barge, ABB received the benefit of the use of Brownsville Barge's lifting equipment so that its generator could be timely transported to Monterrey. We conclude that the exchange of consideration that passed between the parties, consisting of a promise to indemnify in exchange for the lifting services, was valid consideration to support the indemnity agreement.

[18] ABB's contention that Brownsville Barge was already obligated to perform the lift under the Lifting Services Agreement misinterprets the terms of the Lifting Services Agreement which provided that "[a]t such time as [Schaefer] may request [Brownsville Barge] to perform lifting services and provided [Brownsville Barge] accepts to perform such services for [Schaefer], [Schaefer] shall issue to [Brownsville Barge] a work order setting forth the particulars of the lifting services to be performed.... All work ... for lifting services shall be governed by the terms and conditions of this Agreement...." The Lifting Services Agreement did not obligate Brownsville Barge to perform any services; rather, it stated the terms that would apply if ABB elected to use Brownsville Barge's services and Brownsville Barge agreed to provide such services.

We hold that ABB has failed to meet its burden to prove that there was no valid consideration for the written indemnity agreement. Accordingly, appellant's second issue is overruled.

### F. ECONOMIC DURESS

[19] In its third issue, ABB contends the trial court erred in granting Brownsville Barge's motion for summary judgment because the indemnity agreement was coerced by economic duress.

**294** Tex.    **115 SOUTH WESTERN REPORTER, 3d SERIES**

[20] The elements of economic duress are: (1) a threat to do something that a party has no legal right to do; (2) illegal exaction or some fraud or deception; and (3) imminent restraint such as to destroy free agency without present means of protection. *King v. Bishop*, 879 S.W.2d 222, 223 (Tex.App.-Houston [14th Dist.] 1994, no writ); *Simpson v. MBank Dallas, N.A.*, 724 S.W.2d 102, 109 (Tex.App.-Dallas 1987, writ ref'd n.r.e.).

ABB contends that Brownsville Barge "put a gun to ABB's head" and forced it to sign the indemnity agreement in the face of Brownsville Barge's refusal to otherwise provide the Atlantic Giant. Brownsville Barge's "threat" to the ABB representative may have been constraining to ABB, but it was not necessarily a threat to commit an act Brownsville Barge had no legal right to do. ABB and Brownsville Barge were not parties to any agreement at the time the offer was made. Therefore, there was no legal obligation for Brownsville Barge to break.

Additionally, the record does not indicate that ABB was forced to accept the indemnity agreement against its will. ABB could have refused to execute the indemnity agreement as Robinson chose to do. This action may have caused ABB to incur additional expenses in procuring the services of a crane comparable to the Atlantic Giant, yet this inconvenience does not amount to a destruction of free will. *See Simpson*, 724 S.W.2d at 109.

[21-23] Finally, Brownsville Barge is not the party responsible for ABB's financial distress. Economic duress may be claimed only when the party against whom it is claimed was responsible for claimant's financial distress. *Deer Creek Ltd. v. North Am. Mortgage Co.*, 792 S.W.2d 198, 203 (Tex.App.-Dallas 1990, no writ). A claim of economic duress must be based on the acts or conduct of the opposite party and not merely on the necessities of the purported victim, or on a fear of what a third person might do. *First Tex. Sav. Ass'n of Dallas v. Dicker Ctr., Inc.*, 631 S.W.2d 179, 186 (Tex.App.-Tyler 1982, no writ). The mere fact that a person enters into a contract with reluctance, or as a result of the pressures of business circumstances, does not, of itself, constitute economic duress invalidating the contract. *Id.*

The record evidence shows that ABB's compulsion to deliver the generator without further delay to the original purchasers in Mexico was due to its original agreement with the purchasers. According to the terms of the purchase agreement, a delay in delivery would commence the accrual of liquidated damages. Because this financial distress originated from a party other than Brownsville Barge, it fails to support a claim of economic duress. *See Simpson*, 724 S.W.2d at 109.

Brownsville Barge merely presented ABB with a business decision-sign the indemnification agreement or face the loss of Brownsville Barge's lifting equipment. Such a situation does not amount to economic duress.

We conclude that Brownsville Barge did not threaten to do any act that it had no legal right to do, ABB was not forced to sign the indemnity agreement against its free will, and any economic pressure arose from ABB's agreement with a third party. We hold that the trial court did not err in finding that essential elements of duress were absent as a matter of law. Appellant's third issue is overruled.

We affirm the trial court's order granting appellee's motions for summary judgment.

