1          UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF TEXAS
2              BROWNSVILLE DIVISION

3  ABB KRAFTWERKE                    )
   AKTIENGESELLSCHAFT,               )
4  and ABB ALSTOM POWER              )
   (SWITZERLAND), LTD.,              )
5  formerly known as ABB            )
   POWER GENERATION, LTD.,           )
6                                    )
7       Plaintiffs,                  )
                                     )
   VS.                               )  CIVIL ACTION NO. B-03-192
8                                    )
   C.H. ROBINSON COMPANY,            )
9                                    )
        Defendant.                   )
10

11

12  ***********************************************

13       ORAL AND VIDEOTAPED DEPOSITION OF

14                 TOM FERGUSON

15              FEBRUARY 25, 2005

16  ***********************************************

17

18        ORAL AND VIDEOTAPED DEPOSITION of TOM

19  FERGUSON, produced as a witness at the instance of

20  the Plaintiffs, and duly sworn, was taken in the

21  above-styled and numbered cause on the 25th day of

22  February, 2005, from 11:11 a.m. to 12:20 p.m., before

23  Lisa D. Huneycutt, CSR in and for the State of Texas,

24  reported by machine shorthand, at the offices of

25  McGINNIS, LOCHRIDGE & KILGORE, 3200 One Houston Center,

1              The second thing is, you need to speak out

2    loud.  You need to give a verbal response, either, yes,

3    no or whatever answer the question calls for.

4              And last, if you -- instead of shaking your

5    head -- because that will come out on the video; but

6    likewise, it's hard for the court reporter to then have

7    to interpret whether your shake is a yes or no or some

8    other answer.

9              If you don't understand any of my questions,

10   which is likely at some point in time, then just tell me

11   you don't understand it, and I'll try to rephrase it or

12   restate the question in a manner that we -- that you can

13   understand so that you won't be answering something

14   where you're guessing at what I'm asking, okay?

15        A.   Okay.

16        Q.   Who do you work for?

17        A.   I work for C.H. Robinson.

18        Q.   And what is your job?

19        A.   I am a sales manager for the company.

20        Q.   And where are you located?

21        A.   Our location -- the office that I work out of

22   is in Iowa City.  Our corporate office is located out

23   of Eden Prairie, Minnesota.

24        Q.   Okay.  Where is C.H. Robinson incorporated?

25        A.   In Delaware.

1      Q.    And its principal place of business, is that

2 in Eden Prairie, Minnesota?

3      A.    That is correct.

4      Q.    Were you involved at all in the contract

5 between C.H. Robinson and ABB, or the ABB entities,

6 that is made the basis of this lawsuit?

7      A.    No.

8      Q.    Is there anyone currently employed with C.H.

9 Robinson, to your knowledge, who was involved with that

10 contract?

11      A.    No.

12      Q.    What happened to the division -- or let me

13 back up.

14           Was there a separate division of C.H.

15 Robinson, or a group, some type of identifiable workers

16 or employees that were involved in this contract?

17      A.    Say that again, please.

18      Q.    Yes.  Was there a separate division -- I know

19 there wasn't a separate corporation that was involved.

20 It was C.H. Robinson, correct?

21      A.    Correct.

22      Q.    Now, was there a separate division within

23 C.H. Robinson that handled this contract?

24      A.    I wouldn't call it a separate division.  I

25 would say a branch.

1     Q.    Okay.  And how would you identify that branch?

2     A.    As doing the multimodal heavy haul.

3     Q.    And for people who have no idea what that is,

4  give us some kind of explanation for what that is.

5     A.    That is moving the equipment of great

6  magnitude, these transformers or generators, moving

7  those from Point A to Point B.

8     Q.    Okay.  How did that branch come into

9  existence?

10     A.    That was started, I believe back in 1995, by

11  Jim Hamilton, at that time the general manager of the

12  Keller office, the Keller, Texas office.

13         And he had his own company, which he then had

14  some connection with C.H. Robinson up in Minnesota, and

15  started that division in Keller, Texas.  I believe it

16  was in 1995.

17     Q.    Okay.  And when did that branch or division

18  cease to exist as such?

19     A.    Sometime in 1999.  I believe midsummer.

20     Q.    Do you know where Mr. Hamilton is at this

21  time?

22     A.    No, I do not.  I've heard that he was in

23  Florida, but I have not talked to him in a very long

24  time.

25     Q.    Okay.  The branch of C.H. Robinson that was

1    involved in the ABB contract that was -- I guess they

2    were managed by Mr. Hamilton?

3        A.    Yes.

4        Q.    They were -- were they, in your opinion,

5    competent in performing the contracts that they entered

6    into?

7        A.    Yes.

8        Q.    They were not inexperienced with regard to

9    movement of heavy equipment, such as the generators and

10   transformers involved in the ABB contract?

11       A.    They were very experienced.

12       Q.    They did not require directions as to how to

13   do every aspect of their job from the people they

14   contracted with, did they?

15            MS. CIOTTI:   I'm going to object to the

16   form of the question.

17       A.    They --

18       Q.    (BY MR. WILLIAMS)   Let me -- let me rephrase

19   that.   That's not a very good question.

20            With regard to the terms of the contracts they

21   entered into, such as the ABB contract, for managing the

22   movement of heavy equipment, in your opinion, were they

23   experts in that kind of movement?

24       A.    Can you be more specific on "they."

25       Q.    "They" being that division, whoever was --

1 whoever was asked to do a particular task under the

2 terms of the contract for Robinson.

3      A.   Yes.   The people involved were capable of

4 doing what we were hired to do, C.H. Robinson.

5      Q.   Okay.   They -- they -- let me start a

6 different way.

7           You have looked at the terms of this contract?

8      A.   Yes.

9      Q.   Are you aware of the fact that some of the

10 problems or some of the things that they were trying

11 to solve in the movement of the generators and the

12 transformers from the Port of Brownsville to the

13 location in Mexico involved rail clearances, for

14 instance?

15     A.   Yes.

16     Q.   You have equipment that comes into Brownsville

17 that has certain dimensions, and those dimensions don't

18 meet clearances, so you have to take some parts of the

19 equipment off in order to get to the -- to meet the rail

20 clearances.

21          Were you aware of that?

22     A.   Yes.

23     Q.   They would be experts in understanding how

24 to remove pieces of heavy equipment, would they not?

25     A.   Who would be experts?

1  thing I should ask you is, how was the equipment moved?

2  Was it moved by rail, by truck?  How?

3       A.   It depended on the size of the piece and

4  the -- and where it was going from and going to.

5       Q.   Okay.  How many of these moves for Siemens

6  Westinghouse, or Westinghouse, were you involved in?

7       A.   I don't recall.  Several.

8       Q.   Okay.  Do you remember where the location of

9  those projects were?

10      A.   Typically, they were out of Charlotte, North

11  Carolina -- Pineville, North Carolina, actually,

12  Pensacola, Florida and Hamilton, Ontario, to various

13  locations.

14      Q.   Okay.  Were the transformers and generators

15  typically sent by rail, or were they sent over the road

16  by truck?

17      A.   Again, that depended on the project and the

18  size of the piece that was being shipped.

19      Q.   Okay.  In either event, would you need to

20  know about clearances and the sizes --

21      A.   Yes.

22      Q.   -- of pieces of equipment?

23           And how would you obtain that information?

24      A.   We would obtain that information from the

25  customer.

1      Q.    And in what form would the customer provide
2  that to you, typically?

3      A.    Typically, it would be a drawing, or either by
4  phone or e-mail or fax.  But the best way would be by
5  drawing.

6      Q.    And that's an industry standard, so to speak?

7      A.    Yes.

8      Q.    Were you ever involved in the moves of the
9  equipment, for instance, from the -- where it was placed
10 on a railcar?

11     A.    No.

12     Q.    Okay.  Were you involved in any of the moves
13 where a piece of the equipment had to be removed in
14 order to meet clearances?

15     A.    Can you be a little more specific on -- as
16 far as "removed."

17     Q.    Yeah.  Let's say that -- well, let's use
18 something similar to what happened here, like a
19 generator that has jacking lugs on it, and when the
20 jacking lugs are in place, it doesn't meet the rail
21 clearance, so they have to be removed for the shipment
22 by rail.

23           Anything similar to that that you can --

24     A.    No.

25     Q.    What would you, in your industry, typically

1                 MS. CIOTTI:  Object to the form of the

2    question.

3                 Go ahead and answer if you can.

4         A.    Can you say that a little more clearly, as far

5    as -- be a little more specific.  What are you looking

6    for, as far as "relationship"?

7         Q.    (BY MR. WILLIAMS)  What -- what type of, if

8    you know -- and you may not -- you may not know.  And

9    if this is one of the questions you don't know, just

10   tell me you don't know.

11                What kind of relationship was created by the

12   contract and its terms between Robinson and ABB?

13        A.    I don't know.

14        Q.    Okay.  What were the -- what was the job that

15   Robinson was supposed to handle for ABB as a result of

16   the contract?

17        A.    As opposed to the contract (sic), we were to

18   handle the transportation aspect from the Port of

19   Brownsville to the final destination in Mexico.

20        Q.    You're aware that an accident happened at

21   the Port of Brownsville?

22        A.    Yes.

23        Q.    Do you know what went wrong to cause that

24   accident to occur?

25        A.    Reading the depositions, I know that a piece

1   question.

2              Again, Justin, I don't want to be

3   difficult, but I think we're getting outside the scope

4   of his deposition notice.

5              He can answer if he can.

6       A.    I don't -- I did not read anything about

7   that.

8       Q.    (BY MR. WILLIAMS)  Okay.  With regard to the

9   contract between ABB and Robinson, arranging for the

10  subcontractors for the lift was Robinson's job, wasn't

11  it?

12      A.    Say that again now.

13      Q.    The contract between ABB and Robinson -- I

14  think you told me that the -- that the job Robinson was

15  to perform was to arrange for the transportation of the

16  equipment from the Port of Brownsville to the job site

17  in Monterey, correct?

18      A.    Correct.

19      Q.    That would include arranging for the

20  subcontractors, then, to make sure that the -- that

21  the transportation occurred?

22      A.    Correct.

23      Q.    If a subcontractor says they're not going to

24  do their part of the work and you can't get the lift

25  done at that time, whose -- who would that fall onto?

1      A.   That would full under C.H. Robinson to bring

2  a new solution and a resolution to the problem, and

3  provide options to the customer at that point, which

4  was ABB, and let them know what options are available.

5      Q.   Okay.  Did you know what options would have

6  been available, other than the use of the Brownsville

7  Barge & Crane Atlantic Giant, to make this lift at that

8  time?

9      A.   No.

10      Q.   Do you know what it is that C.H. Robinson

11  claims, as far as ABB's claim that they were acting as

12  their agent under this contract?

13      A.   Say that one more time now.

14      Q.   Yeah.  Do you know what it is -- what is C.H.

15  Robinson's position with regard to ABB's claim that they

16  were acting as ABB's agent at the time of this accident

17  in Brownsville?

18      A.   We were an independent contractor.  ABB was

19  our customer.

20      Q.   Okay.  What is the factual basis of your

21  knowledge with regard to C.H. Robinson acting as an

22  independent contractor?

23      A.   Can you state that a little more clearly.

24  I'm not following you.

25      Q.   Okay.  Factually, why is it that you say

1  asked you earlier that I wanted to get some

2  clarification on -- and I may not be getting this

3  exactly right.

4         He asked you something about where you got

5  clearances and dimensions from of the -- the product

6  that was being moved, and you said from the customer.

7         When he asked you about dimensions, what was

8  your understanding of what he meant by that?

9      A.   The dimensions of the piece of freight that

10 was being shipped.

11     Q.   Okay.  And as far as clearances, tell me what

12 your understanding of that term is.

13     A.   That is what we obtain from the railroad.

14 We get the dimensions from the customer, provide that

15 information to the railroad, and they, in turn, say,

16 "Yes, it will clear," or, "No, it will not clear."

17     Q.   Okay.  So clearance information would come

18 from the railroad?

19     A.   That is correct.

20     Q.   Okay.  Did C.H. Robinson ever agree to act as

21 an agent for ABB?

22     A.   No.

23              MR. WILLIAMS:  Objection; form.

24     Q.   (BY MS. CIOTTI)  Do you know how C.H. Robinson

25 was paid for the services it provided under the contract

1  marked as Exhibit No. 3?

2       A.    It was paid on a per -- per basis of -- I

3  mean, it was a lump sum.  I mean, we -- it shows right

4  there on the contract that it's -- we were paid a fixed

5  amount.

6       Q.    With some provision for contingency costs --

7       A.    Absolutely.

8       Q.    -- correct?

9       A.    Correct.

10      Q.    Is that normal to do that in a -- in a

11 contract that you sign with one of your customers, to

12 have a provision for contingency costs?

13      A.    Yes.

14      Q.    Do you know who supplied the equipment that

15 C.H. Robinson needed to move the generator involved in

16 Mr. Zamora's accident from the barge to the railcar?

17      A.    Our subcontractors.

18      Q.    And when you say "our subcontractors," tell

19 me who you mean by that.

20      A.    Schaefer Stevedoring, Brownsville Barge &

21 Crane, the railroad.  They provided the necessary tools

22 to move the product.

23      Q.    Okay.  Is Brownsville Barge & Crane one of

24 C.H. Robinson's subcontractors?

25      A.    No, I don't believe so.  I believe they were

1    a subcontractor of Schaefer Stevedoring.

2        Q.    Okay.  And how about the railroad?  Is the

3    railroad one of C.H. Robinson's --

4        A.    No.

5        Q.    -- subcontractors?

6        A.    No, it's not.

7        Q.    Okay.  Is C.H. Robinson an independent

8    business from ABB?  And if you need me to clarify that

9    question --

10       A.    Yeah.  Why don't you do that, please.

11       Q.    Does C.H. Robinson operate independently of

12   ABB?

13       A.    Yes.

14       Q.    Okay.  Is ABB -- is that where C.H. Robinson

15   gets the majority of its business?

16       A.    No.

17       Q.    In 1999, did C.H. Robinson get the majority

18   of its business from ABB?

19       A.    No.

20       Q.    Do you know whether C.H. Robinson even got a

21   significant part of its business from ABB in 1999?

22       A.    No, it wasn't a significant part -- a

23   significant amount, I should say.

24       Q.    This was a big contract --

25       A.    It was a big contract for sure.  But, I mean,

1  it wasn't -- in the overall percentage, it wasn't a lot.

2      Q.   Okay.  As far as the work that C.H. Robinson

3  agreed to perform for ABB, did ABB control all the

4  details of that work?

5      A.   No.

6              MR. WILLIAMS:  Objection; form.

7      Q.   (BY MS. CIOTTI)  Did they have the right to

8  control all the details of that work?

9      A.   They were our customer, and we would obviously

10 listen to what they had objections to or input.  But

11 they hired us to move these pieces from Point A to

12 Point B.

13     Q.   The last thing I'd like for you to do is look

14 at what we've marked Exhibit No. 2, and see if you can

15 tell me what that is.

16     A.   (Witness complies.)

17          It looks like a letter to Sandro --

18     Q.   Lepori?

19     A.   -- Lepori for the -- it looks like an invoice

20 for approximately $52,840.

21     Q.   Okay.  Was that the last invoice on the

22 Monterey project?

23     A.   I believe so, yes.

24     Q.   And can you tell me from looking at that when

25 C.H. Robinson would have completed the work it did for

1   ABB under the contract, the contract that we've marked

2   Exhibit No. 3?

3       A.   Right.  On a -- on a contract of this size,

4   typically what happens is, the job will get finished,

5   and then we wait half a month, 15 to 30 days or so, to

6   make sure all the invoices that we have for contingency

7   costs or any other charges that may be forgot about and

8   they come in -- we want to make sure that we provide

9   basically one lump sum to the customer for the job that

10  we've done, instead of sending out multiple invoices.

11          So on this particular one, I would say that,

12  you know, it was done well before the 19th of July.

13      Q.   Okay.  And when you talk about invoices coming

14  to C.H. Robinson, who are those invoices coming from?

15      A.   From our subcontractors.

16          MS. CIOTTI:  Okay.  I believe that's all

17  I have.

18          MR. WILLIAMS:  Just a few more.

19              FURTHER EXAMINATION

20  BY MR. WILLIAMS:

21      Q.   Mr. Ferguson, you don't have any personal

22  knowledge, with regard to this project, of whether or

23  not ABB gave any directions to C.H. Robinson with

24  regard to how the work was to be done, do you?

25      A.   I don't have any personal knowledge, no.

1  THE STATE OF TEXAS)

2  COUNTY OF HARRIS  )

3        I, LISA D. HUNEYCUTT, Certified Shorthand

4  Reporter in and for the State of Texas, do hereby

5  certify that the matters set forth in the caption to

6  the foregoing deposition are true and correct; that the

7  witness appeared before me at the time and place set

8  forth; that said witness was first duly sworn to tell

9  the truth, and thereupon proceeded to testify in said

10  cause; that the questions of counsel and the answers

11  of said witness were taken down in shorthand by me and

12  thereafter reduced to typewriting under my direction;

13  and that the foregoing pages comprise a true, correct

14  and complete transcript of the testimony given and the

15  proceedings had during the taking of said deposition.

16        I further certify that I am neither counsel,

17  attorney or relative of either party, or otherwise

18  interested in the events of this suit.

19        GIVEN UNDER MY HAND AND SEAL OF OFFICE on

20  this the 28th of February, 2005.

21

22

23        Lisa D. Huneycutt
          Texas CSR No. 6529

24        Expiration Date: 12-31-2005
          1010 Lamar, Suite 1400
          Houston, Texas  77002

25        713-739-1400