Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
ABB KRAFTWERKE AKTIENGESELLSCHAFT, ET AL.*
        Plaintiff,                         *
                                           *
VS.                                        * CIVIL ACTION
                                           * NO. B:03-CV-192
                                           *
C.H. ROBINSON COMPANY                      *
        Defendants.                        *
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF TODD STREVER

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ANSWERS AND DEPOSITION OF TODD STREVER, produced as a witness at the instance of the Defendant, taken in the above-styled and -numbered cause on the 21st day of January, 2005, A.D., beginning at 2:54 p.m. before Jarneka Epps, a Certified Shorthand Reporter in and for the State of Texas, in the offices of C.H. Robinson, located at 5650 North Riverside Drive, Suite 210, Fort Worth, Texas, in accordance with the Federal Rules of Civil Procedure and the agreement hereinafter set forth.

Esquire Deposition Services   703 McKinney Avenue, Suite 320        Dallas, Texas 75202
Phone (214) 965-9200   (800) 852-9737         Fax (214) 965-9205

7b4d657b-7dbf-4268-921b-35e9366a1e49

1  A.  Right here in Fort Worth.

2  Q.  Okay.  Back in 1999 were you employed by C.H.
3  Robinson?

4  A.  Yes.

5  Q.  What was your title or your job with C.H.
6  Robinson back then?

7  A.  Let's see.  At the time I left the company I was
8  director of business development, if I remember
9  correctly.

10 Q.  Okay.

11 A.  Manager of business development.

12 Q.  And what were your job duties as manager of
13 business development?

14 A.  Identify, secure new business for the branch of
15 C.H. Robinson that I worked for.

16 Q.  You were involved in a shipment of power
17 generation equipment from the port of Brownsville to the
18 power project outside of Monterrey, Mexico that C.H.
19 Robinson was working on behalf of ABB, correct?

20 A.  Correct.

21 Q.  What was your job with regard to that project?

22 A.  That particular project, I acted as kind of a
23 project manager.

24 Q.  Okay.  In order to accomplish the movement of the
25 heavy generators and transformers that were involved in

Esquire Deposition Services   703 McKinney Avenue, Suite 320   Dallas, Texas 75202
Phone (214) 965-9200  (800) 852-9737           Fax (214) 965-9205

7b4d657b-7dbf-4268-921b-35e9366a1e49

1  regard to the shipment from the manufacturer facilities in
2  Mannheim, Germany until the time they arrived in the port
3  of Brownsville, correct?
4      A.    That's correct.
5      Q.    And you had a specific objective to accomplish on
6  behalf of ABB that you entered into the contract for,
7  correct?
8      A.    Correct.
9      Q.    You were authorized by ABB to -- about the terms
10 of the contract to manage the shipment of the goods from
11 Monterrey to -- I mean from Brownsville to Monterrey,
12 correct?
13     A.    Yes.
14     Q.    And while you were authorized to manage that, you
15 were subject to ABB giving you directions with regard to
16 specifics that they might want to have done with regard to
17 the movement of this equipment?
18         MS. CIOTTI:  Object to form.
19     A.    Yes.
20     Q.    (By Mr. Williams) The -- in fact of the matter
21 is, that during the time that y'all were gathering
22 information and deciding how to accomplish the various
23 parts that were required to move the equipment from the
24 port in Brownsville to Monterrey, you got directions from
25 ABB on various things with regard to move, such as using

Esquire Deposition Services   703 McKinney Avenue, Suite 320   Dallas, Texas 75202
Phone (214) 965-9200  (800) 852-9737    Fax (214) 965-9205

7b4d657b-7dbf-4268-921b-35e9366a1e49

Page 9

1  cable to tie down the various pieces of equipment as
2  opposed to using rods, correct?
3       A.   I don't have a specific memory of cable versus
4  rods but, yeah, there was a dialogue about logistical
5  concerns associated with that -- with the scope of work
6  that we were going to perform.
7       Q.   And with regard to that, you would get directions
8  from ABB, correct?
9            MS. CIOTTI:  Object to form.
10      A.   Yes.  I mean there was information that we needed
11 from ABB.
12           (Exhibit No. 1 marked.)
13      Q.   (By Mr. Williams)  Okay.  Just one second.
14           We have these stapled documents marked as
15 Exhibit 1.
16           MS. CIOTTI:  Do you have another copy,
17 Justin?
18           MR. WILLIAMS:  I don't.  You can take a look.
19           MS. CIOTTI:  Where did these come from?
20           MR. WILLIAMS:  I'm not sure.
21           MS. CIOTTI:  This I haven't seen before.
22           MR. WILLIAMS:  I asked my secretary to gather
23 the correspondence yesterday for the deposition and
24 obviously somebody's seen some of them before.  Somebody's
25 marked on them but I don't recall having seen them in this

Esquire Deposition Services   703 McKinney Avenue, Suite 320        Dallas, Texas 75202
Phone (214) 965-9200   (800) 852-9737        Fax (214) 965-9205

7b4d657b-7dbf-4268-921b-35e9366a1e49

1  way, correct?

2              MS. CIOTTI:  Object to form.

3       A.   Can you -- I'm sorry.  Can you ask that again?

4       Q.   (By Mr. Williams) Sure.

5            For instance, you would agree with me that using a rod versus a cable to tie down a generator on a rail car, that's one of the details of the job that y'all were helping to perform for ABB, correct?

9       A.   Yeah.  Tie down was one of pieces of the surface we were provided.

11      Q.   And ABB had the right to tell you, we want to use a rod versus a cable or a cable versus a rod, correct?

13      A.   They did, however, in the scheme or the scope of the work.  There's also other regulations and stipulations that we had to meet, including the railroad had to approve what the tie down schematic looked like.  It had to meet engineering approval before they would transport it, so there were more pieces to the puzzle than just that.

19      Q.   Subject to it, you know, you weren't going to violate any law and you had to make sure that the railroad would accept the equipment for transportation or you weren't going to be able to get it to Monterrey?

23      A.   Correct.

24      Q.   Subject to that, ABB had the right to tell you to use rods versus cables or cables versus rods, correct?

Esquire Deposition Services   703 McKinney Avenue, Suite 320        Dallas, Texas 75202
Phone (214) 965-9200  (800) 852-9737        Fax (214) 965-9205

7b4d657b-7dbf-4268-921b-35e9366a1e49

1   for the movement of the transformer, Roland Schneider was
2   there with you at that time, correct?
3      A.   Yes.
4      Q.   If for instance, Mr. Schneider had asked that you
5   obtain another crane or a forklift to secure the jacking
6   plate prior to the -- prior to it being unloaded onto the
7   rail car, would you have followed those instructions and
8   done that?
9      A.   I guess I'm confused. Obtained a different crane
10  or --
11     Q.   No, another crane.
12     A.   Okay.
13     Q.   If you had crane, the Atlantic Giant, that was
14  lifting the transformer from the lash board onto the rail
15  car, correct?
16     A.   Right, the generator, correct?
17     Q.   And if Mr. Schneider had asked you to obtain
18  another crane or to obtain a forklift to secure the
19  jacking plate prior to the time that the lug boats were
20  removed, would you have done that?
21     A.   I mean, yes we could have considered that,
22  absolutely.
23     Q.   I think we talked in your first deposition -- and
24  we talked about in looking back at the events that
25  happened with regard to Oscar Zemora (phonetic) that

Esquire Deposition Services   703 McKinney Avenue, Suite 320        Dallas, Texas 75202
Phone (214) 965-9200   (800) 852-9737        Fax (214) 965-9205

7b4d657b-7dbf-4268-921b-35e9366a1e49

1   movement of this type of heavy equipment?

2      A.   Is that specific contract common?

3      Q.   Yes.

4      A.   Portions of it are.

5      Q.   Okay. The contract obviously -- there are --
6   would you agree that there are a lot of different problems
7   that could arise that you may not foresee during movement
8   of equipment like this between Texas and the U.S. and
9   Mexico?

10     A.   Yes.

11     Q.   It would be impossible to for see every problem
12  that is going to occur or every cost that you're going to
13  incur as a result of those problems and write it all down
14  in some kind of document?

15     A.   Correct.

16     Q.   You have to be able to have authorization to do
17  things as they come up in order to get the project
18  accomplished, do you not?

19     A.   Yes.

20     Q.   And you had that authority on behalf of ABB to do
21  the things that were necessary to get this equipment from
22  the port of Brownsville to Monterrey?

23     A.   I believe so. That's what's addressed with
24  contingencies.

25     Q.   Okay. You were aware that Mr. Hamilton went to

Esquire Deposition Services   703 McKinney Avenue, Suite 320   Dallas, Texas 75202
Phone (214) 965-9200   (800) 852-9737   Fax (214) 965-9205

7b4d657b-7dbf-4268-921b-35e9366a1e49

1  Switzerland in order to sign this contract, correct?
2      A.  I know he made -- I think more than one trip to
3  Switzerland to secure this business.  I'm not specifically
4  aware where he was when he signed the contract.
5      Q.  Were you involved in -- Mr. Hamilton told us in
6  his deposition that he originally met with Mr. Lepori and
7  original negotiations for doing this work occurred in
8  Mexico, were you involved in any of those original
9  meetings?
10             MS. CIOTTI:  Object to form.
11     A.  No.
12     Q.  (By Mr. Williams) Were you involved in any of the
13 meetings in Switzerland with regard to the negotiations of
14 the contract?
15     A.  No.
16     Q.  Did your involvement with the contract occur
17 after Robinson had secured the contract from ABB?
18     A.  Yes.
19     Q.  So anything with regard to the negotiations of
20 the contract or things leading up to that is going to be
21 things that Mr. Hamilton -- from C.H. Robinson standpoint
22 Mr. Hamilton would be the person to ask?
23     A.  Yes.
24     Q.  As part of your management duties, is the person
25 for Robinson and Brownsville at the time of the movement

Esquire Deposition Services    703 McKinney Avenue, Suite 320    Dallas, Texas 75202
Phone (214) 965-9200   (800) 852-9737    Fax (214) 965-9205

7b4d657b-7dbf-4268-921b-35e9366a1e49

1    Q.   Did ABB tell you what kind of railroad car to
2    use?
3    A.   No.
4    Q.   Did they tell you how to coordinate inspections
5    with the Mexican Rail Association?
6    A.   No.
7    Q.   Did they tell you how to go about getting
8    clearance approval?
9    A.   No.
10   Q.   Mr. Roland Schneider was there in Brownsville on
11   the day that the accident occurred; is that correct?
12   A.   Yes.
13   Q.   Can you tell me what his role was that day, what
14   his purpose was in being there?
15   A.   He was -- he was an ABB representative that was
16   there to advise on information that we needed regarding
17   the pieces themselves.
18   Q.   Can you tell me more specifically what sort of
19   information he would have provided regarding the pieces
20   themselves?
21   A.   Well, if we had questions about maybe how to
22   secure the piece to a crane, just in general, just so that
23   it didn't effect the product in a negative way or maybe
24   how it should be secured not to effect the product itself
25   but still to meet the regulations, just technical type

Esquire Deposition Services    703 McKinney Avenue, Suite 320    Dallas, Texas 75202
Phone (214) 965-9200   (800) 852-9737    Fax (214) 965-9205

7b4d657b-7dbf-4268-921b-35e9366a1e49

1  details associated with the product itself in transport.
2  Almost to protect the piece so that the things we were
3  doing wouldn't damage it or alter it in any way.
4      Q.  Would Mr. Schneider -- if you can answer this
5  question, would Mr. Schneider have had more knowledge or
6  information about the product than anyone else who was on
7  site that day the accident happened?
8      A.  Yes, absolutely.
9      Q.  Would he had had the most knowledge of anybody
10 who was there that day about how the jacking plates were
11 secured to the generator?
12     A.  Yes.
13     Q.  Mr. Williams asked you earlier about costs that
14 were incurred on behalf of ABB, and I think we were
15 talking specifically at that time about contingency
16 costs.  Did C.H. Robinson pay contingency costs itself and
17 then bill ABB for those contingency costs or did ABB pay
18 the vendors directly for any contingency costs that were
19 incurred, if you know?
20     A.  Well, typically C.H. Robinson pays the
21 contingency cost.
22     Q.  How about payments to the subcontractors who were
23 used to transport the generator on the date that the
24 accident occurred, would C.H. Robinson have paid those
25 subcontractors directly or would those subcontracts billed

Esquire Deposition Services   703 McKinney Avenue, Suite 320        Dallas, Texas 75202
Phone (214) 965-9200  (800) 852-9737         Fax (214) 965-9205

7b4d657b-7dbf-4268-921b-35e9366a1e49

1   ABB and then ABB paid them directly?
2       A.   C.H. Robinson would have paid those costs.
3       Q.   Did C.H. Robinson perform work -- while you were
4   working at C.H. Robinson, did C.H. Robinson perform work
5   for businesses other than ABB?
6       A.   Yes.
7       Q.   Do you know whether ABB -- the work for ABB was a
8   substantial portion of C.H. Robinson's business at this
9   time in 1999?
10      A.   Our particular division or the company as a
11  whole?
12      Q.   The company as a whole.
13      A.   I would say probably not very significant.
14      Q.   Did ABB furnish C.H. Robinson with any tools or
15  supplies or materials that C.H. Robinson would have needed
16  to transport the equipment for ABB?
17      A.   Just what came with the piece -- the piece
18  itself, maybe some of the wood that was attached to it,
19  those types of things, just packaging, those sorts of
20  things.
21      Q.   Would the subcontractors that were hired by C.H.
22  Robinson have furnished things like the crane that was
23  used to move the generator?
24      A.   Yes.
25      Q.   How about the barge, where did that come from?

Esquire Deposition Services   703 McKinney Avenue, Suite 320           Dallas, Texas 75202
Phone (214) 965-9200   (800) 852-9737           Fax (214) 965-9205

7b4d657b-7dbf-4268-921b-35e9366a1e49

Page 35

1   deposition. It has another mark on here, Lepori Exhibit
2   No. 4; is that right?
3       A.   Yes.
4       Q.   In looking over this document in the scope of
5   work that it calls for and you may have to look not just
6   at the contract but in these attachments, it talks about
7   the movement of different equipment. What I'd like to
8   find out is if you know when C.H.R. completed its
9   performance of the contract?
10      A.   If I know when it was completed?
11      Q.   Yeah, if you can recall.
12      A.   I don't. I don't specifically know.
13           MS. CIOTTI: Pass the witness back to you.
14                    FURTHER EXAMINATION
15  BY MR. WILLIAMS:
16      Q.   Mr. Strever, one of the things that the generator
17  came with when it came with the last barge was it came
18  with wood framing. Specifically, there was a softer part
19  of the underbelly of the generator that you, Robinson and
20  your contractors had to use on the rail car to protect the
21  generator, correct?
22      A.   Yes.
23      Q.   Now, that was part of the equipment that you used
24  in your job that was furnished by ABB, correct?
25      A.   Yes. It came from the barge onto the rail car.

Esquire Deposition Services   703 McKinney Avenue, Suite 320       Dallas, Texas 75202
Phone (214) 965-9200 (800) 852-9737           Fax (214) 965-9205

7b4d657b-7dbf-4268-921b-35e9366a1e49

Page 36

1   Q.   Also, do you recall whether or not ABB supplied
2   you with spreader bars?  I know there was discussion that
3   Amfels had no spreader bars and there was an e-mail passed
4   back and forth about that.  Do you know whether the
5   spreader bars were supplied by ABB?
6   A.   I do not know specifically but I would that would
7   be unlikely.
8   Q.   If you look at Hamilton's -- in Exhibit 1,
9   Hamilton's 2/21/99 memo down at item 10, he writes to
10  Sandro, Roland and Robert, Amfels has no spreader bar,
11  Versabar providing quote 2/22 estimated to be around
12  12,500.  What is cost of ABB spreaders?  Do you see that?
13  A.   I do.
14  Q.   That was something that was inquired about by
15  Mr. Hamilton?
16  A.   Yes.
17  Q.   And you do not know whether or not they ended up
18  using ABB spreaders?
19  A.   I remember the issue but I don't know what the
20  resolution was.
21  Q.   If you had to go ahead and pay 12,500 for
22  additional spreader bars that were outside of the
23  contract, you would have been able to bill that to ABB,
24  would you not?
25  A.   Yes, with their approval.

Esquire Deposition Services   703 McKinney Avenue, Suite 320        Dallas, Texas 75202
Phone (214) 965-9200 (800) 852-9737        Fax (214) 965-9205

7b4d657b-7dbf-4268-921b-35e9366a1e49