*W: Mr Justin Williams*
*C: Mrs Karan Ciotti*
*L: Mr Sandro Lepori*

1 Stenographer: Do you solemnly swear to tell the truth, the whole truth and nothing but the truth?
2 Mr Lepori: I swear
3 Interpreter: I swear to translate the whole truth to the best of my abilities

4 W: Would you state your name for the records, please?
5 L: My name is Sandro Lepori
6 W: Where do you live Mr Lepori?
7 L: I live in Berikon, in Switzerland
8 W: Who do you work for?
9 L: I work for the company Alstom
10 W: Approximately how long have you worked for Alstom?
11 L: For three years
12 W: Who did you work for prior to working for Alstom?
13 L: I was working for ABB Alstom prior
14 W: And prior to that, who did you work for?
15 L: ABB
16 W: And how long have you worked for ABB?
17 L: Over 30 years
18 W: What is your current job at Alstom?
19 L: I'm general manager in logistics
20 W: What exactly did you do as the general manager of logistics?
21 I: Did or do?
22 W: What do you do?
23 L: I deal with all the logistics which has to do with the supplying of power plants and I carry out
24 logistics
25 W: Does it include being in charge of moving heavy equipment manufactured by ABB or Alstom
26 from where it's manufactured to where the customer wants it to be set up?
27 C: Objection. Reading.
28 W: Does ABB have anything to do with Alstom as far as ownership of the company at this time?
29 L: Nowadays not.
30 W: You've had the pleasure of giving your deposition on two occasions before. Correct?
31 L: That's correct
32 W: We had the opportunity to meet in your office last Friday
33 L: That's correct
34 W: And we were able to meet for a while yesterday
35 L: That's correct
36 W: So you were able to learn a little bit about what it is that we're going to be discussing here
37 today
38 L: That's correct
39 W: Prior to me talking about this case with you, were you familiar with legal terms such as
40 independent contractor?
41 C: Objecting the form of the question
42 L: vaguely
43 W : in the contracts that you enter into with operators or managers for the transportation of your
44 equipment, do you use the term independent contractor in these contracts?
45 L: no, we don't use it because we don't need that type of definition

1 W: tell me, when you enter into a contract...let me start over. Over the course of the years with
2 Alstom and ABB do you have any idea how many contracts such as the one that was originally
3 marked as Lepori-4 you have entered into or have your employees?
4 L: over 200, 250
5 W: when you enter into these contracts do you turn over control of whatever project it is to the
6 operators and managers you operate with?
7 C: Objecting the form of the question
8 L: yes
9 W: You were turning over the control of the project to them?
10 C: Objecting the form of the question
11 L: I would like to give some details. There must be some specification: we do contract the company
12 but we do interfere if necessary.
13 W: I'm not sure because of the differences in language, sometimes it's difficult to understand
14 exactly. When I say control, I'm saying if you contract with them and turn over control then you
15 turn over the right to interfere
16 C: Objecting the form of the question
17 L: would you rephrase the question please?
18 W: Do you...entering into contracts, would you give up the right to interfere with the contractor?
19 L: No, as I was saying before, the type of contract we enter into gives us the possibility to interfere.
20 W: the equipment that you're contracting to move, would you give us examples of what type of
21 equipment you move?
22 L: as far as equipment for power stations, there are two types of material, as far as logistics is
23 concerned: there's what we call general cargo on the one hand and on the other there are some
24 critical components that are heavier than 300 t, that's where it all becomes complex
25 W: what would be examples of the heavy critical components?
26 L: as far as a gas power station is concerned, the critical pieces of equipment are a gas turbine for
27 example, a generator and a transformer
28 W: is it the same for an electrical power station?
29 L: yes
30 W: with regard to the movement of the equipment of the Monterrey power station, do you
31 remember where and when you first met any representative of CH Robinson?
32 L: for new power stations our unit we usually go on location to control and as far as Monterrey is
33 concerned I believe I met one representative of CH Robinson
34 W: Do you remember who he was?
35 L: It was Jim Hamilton
36 W: I know it's been a long time but do you remember approximately when it was?
37 L: it must have been in '97 or '98
38 W: following that meeting in Monterrey did you have any other meeting with Mr Hamilton?
39 L: Yes
40 W: At the best of your memory, when and where?
41 L: after that, meetings took place in Baden, in our premises in Switzerland.
42 W: did you meet more than one time in Baden with Mr Hamilton?
43 L: yes
44 W: do you remember how many times?
45 L: two times
46 W: During these two times that you met did you negotiate the contract that is here in Lepori no.4?
47 C: Objecting the form of the question
48 L: yes
49 W: And can you tell us what you did in these two meetings?
50 L: first of all we wanted to define the route of critical pieces of equipment, then we wanted to
51 decide the type of transportation, the different means of transport to use, then we discussed the

14

1 W: and why is that?

2 L: because you cannot control the forces

3 W: is it safe to be removing equipment, in your opinion, while it's suspended? Equipment that is
4 heavy?

5 L: as I was saying before, you shouldn't do this

6 W: you'd be loosening pieces of equipment while it's suspended above a railcar...

7 L: that's correct

8 W: you should not or you should?

9 L: you should not touch anything

10 W: not touching includes not loosening bolts and screws?

11 L: no loosening

12 W: is this information the kind of things that companies involved in transportation like CH
13 Robinson should actually know?

14 L: yes, it's a fact


15 W: Mr Lepori, with regard to the Z lawsuit, are you aware of the position ABB or ABB Alstom
16 took in fault of the Z lawsuit?

17 L: can you rephrase your question?

18 W: are you aware from the testimonies or the depositions of ABB Alstom what their position was
19 with regard to the fault of ABB Alstom in the Zamora allegation?

20 L: ...

21 W: let me rephrase the question: do you recall discussions with testimonies on Roland saw the
22 loosening of the suspended on the railcar, that he should have stopped the operations?

23 C: Objecting the form of the question. Leading

24 L: I recall that Roland admitted that he should have stopped operations

25 W: had the authority Mr Schneider to stop operations during the lift of the generator from the barge
26 to the railcar?

27 L: yes

28 W: do you have an opinion as to whether or not with a proper plan to make the lift from the barge
29 to the railcar Mr Schneider would have needed to stop the operations at any time?

30 L: no, had the company in charge of this movement planned the movement correctly, there
31 wouldn't have been such a need

32 W: there were various aspects of the job underneath the scope that...Let me rephrase the question:
33 in order to discover the scope of work indicated in exhibit 1, tell us all the different things that
34 Robinson was going to do

35 C: Objecting the form of the question

36 L: I think I answered this question before but I'll answer again: CH Robinson had the task to
37 control, to choose subcontractors and supervise how the work, the transportation, was carried out
38 from Brownsville to the power station

39 W: was CH Robinson to be involved in obtaining the various permits for transportation of the
40 generators?

41 L: yes, one of the important fact was connected with obtaining permits both on road transport and
42 for railroad transportation

43 W: did you expect...you told us that you may need, involving these contracts, to interfere or to
44 change directions of how this work is done

45 L: that's correct

46 W: did you expect that you would have to direct every aspect of the work that would have been
47 done by Robinson?

48 L: no, I would have had to deal with everything then.

49 W: if you had to do everything, there would have been no reason to have Robinson

50 L: and we're not a company that deals with transport

1 l6

1 L: no.2... If I'm not mistaken, the second generator was conveyed on a ship without a crane and
2 then we used the ship with cranes in order o put it on the railroad car.
3 W: you brought another ship to lift it from the ship to the railcar?
4 L: yes
5 W: do you recall where that second ship with a crane came from?
6 L: from Mexico, the Tampico port I believe.
7 W: do you know who arranged for that ship?
8 L: we did
9 W: the generator that we're talking about in the Zamora lawsuit, how was it to be set on the railcar?
10 L: I don't remember exactly but it is marked in the drawings
11 W: was it some type of wood platform?
12 L: yes, we usually use wood between the car and the piece of equipment
13 W: why?
14 L: this is a technical detail and I'm not able to answer this question
15 W: who was it supplied by?
16 L: us
17 W: is it a part of the equipment used for the transfer?
18 C: Objecting the form of the question
19 L: no, it could be supplied by another company
20 W: there is discussions in the...if you look at Lepori7, page 3, it that an e-mail from Hamilton to
21 you?
22 L to me to Roland and to Robinson
23 W: does it discuss the supply of spreader bars?
24 L: yes
25 W: what does Hamilton ask with regard to the supply of spreader bars?
26 L: he confirms that the company Versabar is going to provide for the spreader for 12,500$ and the
27 company Amfells didn't have the spreader that we needed.
28 W: does it ask whether or not ABB could provide that?
29 L: no
30 W: look at paragraph 10 on the 3rd line
31 C: Objecting the form of the question. Documents speak for themselves
32 W: what does the document ask in paragraph 10, 3rd line?
33 L: it doesn't ask, it confirms
34 W: are we looking at the same place?
35 L: oh yes, it asks what the cost of an ABB spreader would be
36 W: do you know whether or not ABB provided or eventually paid for the spreader?
37 L: We paid for the spreader.

**********

38 C: Mr Lepori, can you give me a thorougher address of what you gave earlier?
39 L: Sandro lepori is my name, and my address is: Heidengasse, 2. Zip code: 8965 Berikon
40 C: is it your home address?
41 L: yes
42 C: tell me what your work address is
43 L: Alstom (Switzerland) Ltd, Department CHST, Zip code 5401 Baden Switzerland
44 C: what is your phone number at work?
45 L: +41 562055802
46 C: is 56 the civic code for Baden?
47 L: yes
48 C: you said earlier that you work for Alstom
49 L: yes

25

1 There's a drawing in Exhibit 6, 201.602, page 3, for the lashing securing of the generator, this is
2 dated March 5th.
3 C: this exhibit no.6 is from Roland Schneider to Jim Hamilton , correct?
4 L: yes
5 C: do the jacking lugs have anything to do with the lashing securing of the generator?
6 L: no
7 C: and I'm looking back at the page of the exhibit no.7, did you say it was dated Feb 23rd? This
8 appears to be an e-mail from Thomas Ferguson at CH Robinson to RS, correct?
9 L: yes
10 C: it appears that Mr. Ferguson is working for CH Robinson and he's asking ABB for more
11 information, is that correct?
12 L: yes
13 C: does the information that he's requesting have anything to do with the jacking lugs?
14 L: I believe it doesn't
15 C: are jacking lugs and jacking plates the same thing?
16 L: yes
17 C: I just wanted to be clear.

18 C: let me back track to some questions that I should have asked you earlier. Did you review
19 anything for your deposition today?
20 L: yes
21 C: what did you review?
22 L: Tod Striever's deposition last month, Mr Bary's deposition from ABB Lumus…
23 C: Anything else?
24 L: I read my deposition that I gave in 2001 at the Brownsville Barge and Crane Company
25 C: you mean the deposition in the Brownsville Barge and Crane Company lawsuit?
26 L: yes. I read again exhibits 1 through 8.
27 C: you read all those exhibits, all the documents we marked 1 to 8 today?
28 L: yes
29 C: did you review anything else in preparation for your deposition today?
30 L: very quickly RS's deposition but vaguely
31 C: at your knowledge, did Mr. Schneider give only one deposition?
32 L: yes
33 C: anything else that you prepared for your deposition?
34 L: no
35 C: do you remember in Mr. S's deposition that he had met several times with Tod Striever, Charles
36 Cherrington at Schaefer before that March 23rd lift?
37 L: yes
38 C: do you remember he testified that he spoke directly with Mr. Cherrington that was again with the
39 stevedoring company on the day of the lift?
40 L: you March 23?
41 C: yes
42 L: yes
43 C: do you remember Mr. Schneider testifying that he explained exactly the procedure to Mr.
44 Cherrington?
45 L: yes but Tod Striever was present. Because it was important to understand that he always spoke to
46 other people through CH Robinson
47 C: tell me what you mean when he spoke through CH Robinson
48 L: in these operations you need some sort of chain of command, that was ABB, CH Robinson and
49 CH Robinson's subcontractors. If you don't keep this chain, in the end there is confusion

1 C: but you testified earlier that ABB retained the right to interfere in CH Robinson's performance
2 of the contract, is that correct?
3 L: yes
4 C: Roland Schneider worked for ABB, at that time
5 L: yes
6 C: so he had the right to communicate information directly to Mr. Cherrington, out of this chain of
7 command?
8 L: he had the possibility but I need to precise that CH Robinson was always present. We always
9 went through CH Robinson
10 C: do you recall from reading over Mr. S's deposition that Mr. Schneider spoke directly to Mr.
11 Cherrington and gave him instructions?
12 L: yes but I'm sure in the presence of Tod Striever
13 C: how are you sure that Mr. Striever was always there when Mr. Schneider was communicating
14 information to Mr. Cherrington?
15 L: I'm stressing this point because if he interferes on one of CH Robinson's subcontractors, it is
16 important that the party, the interface, is informed, and it can only take place if CH Robinson is
17 there. If Cherrington ahd a question that was not fundamental, he might have spoken directly to Mr.
18 Cherrington. For example, if he wanted to know where the center of gravity was.
19 C: you call it a fundamental question?
20 L: no
21 C: the center of gravity is not a fundamental question?
22 L: it's always in the drawings. If Mr. Cherrington had asked where the center of gravity was,
23 Schneider might have answered when Mr. Striever was not present pointing to the drawing. But if
24 he had to explain the process of securing the piece on the railroad car everybody had to be present.
25 Apart from the fact that the center of gravity is always marked on the piece
26 C: I want to make sure I understand…were you there at the dock of Brownsville that day, March
27 23ʳᵈ 1999?
28 L: No
29 C: Mr. Schneider was there right?
30 L: yes
31 C: would he be a better source of information than yourself about what was said to who that day on
32 dock of Brown?
33 L: yes
34 C: had you read Mr. S's deposition before your preparing for you deposition today?
35 L: I read it 5 years ago
36 C: based on those 2 reviews of that depo and what you know about him having worked for you for
37 20 years, do you have any reason to doubt his honesty?
38 L: no
39 C: do you believe he was truthful when he gave this deposition?
40 L: he suffers from the consequences, he's still suffering from what happened that day. He wasn't
41 really excited about testifying again
42 C: when you say he's still suffering from the consequences of that day you speak about the
43 Zamora's death?
44 L: yes
45 C: tell me more specifically what you mean when you say that he suffers from the consequences
46 L: he was there when the accident happened, he was on the other side if the generator when the
47 piece fell on Mr. Zamora. He assisted in first person, he was there. There are many questions linked
48 to this accident and he feels somehow guilty just for being there. I think he admits that if he had
49 been more energic… had he stopped operations before the accident took place, maybe Mr. Z's
50 death could have been prevented.
51 C: I believe you used the word energic earlier?

1 L: we need these jacking lugs in order to leave the factory., during the journey of the generator we
2 used the system to move the gen. We did not remove the jacking lugs in Rotterdam, because of the
3 lack of time. And we decided we will do it in Br
4 C: were there other shipments of generators where you did not remove the jacking lugs in
5 Rotterdam?
6 L: maybe, I don't know. The problem is that the jacking lugs must reach the site
7 C: they must get there with the generator…
8 L: yes
9 C: you said earlier that it's a standard practice to move these generator without jacking lugs…
10 L: if we have clearance problems
11 C: and Br wasn't the first time you had problems with clearance right?
12 L: no, it wasn't
13 C: the company you're working for, they're manufacturing generators still, correct?
14 L: exactly the same
15 C: is it normal practice for your company to remove those jacking plates in Rotterdam?
16 L: It depends on the country, we need the lugs when we reach the ship to transfer it and then we
17 have to remove them on the railroad car, it actually depends on the situation
18 C: the second generator that was moved by CH Robinson for the Monterey power plant, were the
19 jacking lugs of that generator be removed in Rotterdam?
20 L: I would say yes but I'm not sure
21 C: Just to be clear, Rotterdam is a port city is that correct?
22 L: yes
23 C: where is it?
24 L: in Holland
25 C: Europe?
26 L: yes
27 C: and in the situation where the jacking plates are removed in Rotterdam, then they stay off the
28 generator until they are on whatever railroad you're going to, is that correct?
29 L: yes
30 C: and then, when they need to be put back on the generator?
31 L: in Apodaca, when moving from Railroad to trailer
32 C: I want to clarify it…I think I said that they were removed in Rotterdam and kept off until
33 whatever railroad you're going to. And the point is you don't need them on the railcar for railroad
34 transportation
35 L: no, we don't need the plates for transportation. But for loading and unloading.
36 C: loading and unloading…?
37 L: to switch from one conveyance to the other
38 C: not from barge to railcar?
39 L: no
40 C: Not from ship to railcar
41 L: no

42 C: what was meant to do Mr. Schneider in Brownsville?
43 L: he was meant to supply information to the company, if necessary
44 C: was he there to supervise the uploading of the generator form the barge to the railcar?
45 L: no, he wasn't there to supervise, he was there to give information if needed
46 C: would he have given information that was requested to him?
47 L: yes, and had there been big errors he would have stopped everything
48 C: so, you would only provide information requested, but if there would have been big errors he
49 would…
50 L: he would have intervened

1 C: do you think that loosening the nuts of the bolts into the jacking lugs would be a big error?
2 L: no because the bolts in the jacking plate were not considered an immediate danger
3 C: the bolts in the jacking plates were not considered an immediate danger?
4 L: the screws…
5 Would you rephrase…we're a bit confused
6 C: loosening the nuts on the bolts would have been a big error?
7 L: no
8 C: did you say earlier that the bolts in the jacking plates were not considered an immediate danger
9 or did you say the nuts were not considered an immediate danger?
10 L: loosening, not removing, just loosening is not a vital error for the safety of the piece
11 C: loosening the nuts is not a vital error for the safety of the piece
12 L: how about taking the nuts off, was it a vital error?
13 L: this wouldn't have been a vital error if the piece is not touched
14 C: when you speak of the piece you're talking about the generator as a whole?
15 L: the lifting lug
16 C: lifting lug or jacking lug?
17 L: jacking lug
18 C: how about if one of the connecting bolts, would it be a vital error?
19 L: which bolts?
20 C: one of the bolts of the connecting plate, one of the two bolts in the jacking lug
21 L: …to the base of the generator…can I explain?
22 There are two bolts going this way, and two screws going down this way and the bolt holding the
23 screw…

24 C: would removing one of the connecting bolts out of the jacking plate, taking all the way out,
25 would it be a vital error?
26 L: no
27 C: why not?
28 L: because the other one would still be there
29 C: do you know it is a fact that the one bolt in there, without the other in there, just one bolt would
30 hold the jacking plate?
31 L: yes it is a fact
32 C: so in your mind it is not a problem if one bolt is taken off completely of the jacking plate, I mean
33 one of the connecting bolts?
34 W: Objecting the form of the question
35 L: it wouldn't be a problem
36 C: ok, let me rephrase. I want to make it clear for the records. We have a jacking plate, there are
37 two bolts connecting the jacking plate to the generator…
38 L: this way, not this way. top down
39 C: ok, when you say top down, you mean the bolts going this way and the nuts come up underneath,
40 the generator above the jacking plates or the jacking plates above the generator?
41 L: side by side. As it is portrayed here.
42 C: ok, things seem to have gone over too much but it's important that people that didn't go through
43 all these documents and read all these documents understand this. So we have the jacking plates,
44 one connecting bolt completely, the other is there but the nut is taken off completely. In your
45 opinion is that a dangerous situation?
46 L: the piece won't move
47 C: what is your understanding of how the jacking plate came off and hurt Mr. Zamora? I know you
48 weren't there that day.
49 L: they removed the bolts and the piece had nothing to hold on to, the piece was lining on the
50 generator. When the pieces around 30 cm over the railroad car, with bolts removed, Mr. Zamora

1 walked towards this piece, this lug, and wanted to loosen the screw which we call Richtsschraube,
2 we don't know the English for that, which is only there so that the lug is in the correct position. He
3 removed it and while removing it the piece fell on him. Because it wasn't a screw, you cannot make
4 a hole in the generator.
5 C: it wasn't a connecting bolt
6 L: no, it wasn't
7 C: Tell me how you came to this understanding how the accident happened. Why do you believe
8 this is the way Mr Zamora was injured?
9 L: because we talked about this with RS after the accident and when preparing for the first
10 deposition
11 C: did RS tell you he believed that this is what had happened?
12 L: yes
13 C: did he tell you he saw that happen?
14 L: when this happened he was on the other side of the generator. He did not see that
15 C: are you contending that Mr. Striever, from CH Robinson, should have told Mr. Zamora not to do
16 that?
17 L: I don't know where Mr. Striever was so I cannot say that
18 C: do you know whether Mr. Striever was Mr. Zamora's supervisor?
19 L: no, Mr. Zamora's supervisor was Cherrington from Schaefer
20 C: did Mr. S on the day of the accident have the right to control how he operations were performed
21 that day?
22 L: yes
23 C: did he control how the unloading operation went that day?
24 L: he was there to supply information, he was there to check whether there were big mistakes,
25 obvious mistakes.
26 C: when you said earlier that they removed the bolts, who were you speaking about?
27 L: the longshoremen
28 C: and the longshoremen where the individuals who were working for Schaefer, is that correct?
29 L: that's correct
30 C: was removing the bolts a big and bad mistake?
31 L: it's a risky operation
32 C: is that something that should have been corrected by someone?
33 L: looking back I would say yes
34 C: who should have corrected it?
35 L: CH Robinson, I believe it was CH Robinson's task
36 C: CH Robinson should have corrected the mistakes of the longshoremen who worked for
37 Schaefer?
38 L: there's something that must be added: longshoremen are part of the Union and we cannot act
39 directly, intervene with them, they will not accept our word, you always have to deal with the one
40 that contracted them, for example, we cannot work on the piece itself in the port, it's not allowed.
41 C: when you say we, who are you talking about?
42 L: ABB
43 C: first of all, do you know Mr. Zamora was in the Union?
44 L: yes
45 C: do you know who contracted him?
46 L: CH Robinson contracted Schaefer
47 C: and Schaefer contracted with the longshoremen, correct?
48 L: yes
49 C: so it would be Schaefer to tell the longshoremen what to do
50 L: yes
51 C: so Schaefer should have corrected this risky mistake of taking the bolts out?

1 L: yes
2 C: did Mr. Roland Schneider return to Brownsville for the lift and transport of the second generator
3 that came to Brownsville?
4 L: no, we sent another person
5 C: why is that?
6 L: in order to respect both the Zamora family and Mr. Schneider
7 C: did Mr. Schneider ever tell you that the communication between himself and CH Robinson was
8 good?
9 L: I think he was happy with the communication before the generator got to Brownsville, and as I
10 was saying beforehand, after that, he thought that the representative of CH Robinson in Brownsville
11 wasn't really prepared
12 C: tell me if you've seen this document before
13 L: I'm not sure I've seen exactly this document but it is a typical document that our technical
14 department writes after having supervised a transport
15 C: what is the date in that document?
16 L: April 15th 1999
17 C: so this was after the date of the accident, correct?
18 L: that's correct
19 C: who's the author of the document?
20 L: RS
21 C: are you noted as one of the recipients of this document?
22 L: yes

23 C: exhibit 9, page 6, can you read me the first paragraph under Section 5?
24 L: the cooperation of the parties involved to execute the transportation of the abovementioned
25 material...
26 C: sorry, I forgot you were taking your deposition in Italian...
27 Do you know who Mr Ansfeld is?
28 L: the company Ansfeld is the company in charge of moving the cargo from the barge onto the
29 railroad car using the 700 t floating crane
30 C: they are not part of CH Robinson right?
31 L: no
32 C: do you see any criticism in here to CH Robinson?
33 L: no
34 C: and again, this report is one that ABB prepared, is it fair to say?
35 L: yes
36 C: is this the kind of report that ABB prepares whenever they move heavy equipment?
37 L: when we are present
38 C: when someone from ABB is present?
39 L: yes
40 C: and this report concerns in part to the transfer of the generator at the port of Brownsville on
41 March 23rd 1999, correct?
42 L: ...
43 C: if you look at page 5, fourth paragraph, it may help
44 L: yes, it includes also the transportation of the gen
45 C: I'd like for you to look again at the exhibit no.3, are those the final invoices of CH Robinson for
46 the work that CH Robinson performed under the contract that 's labeled as Exhibit no.1?
47 L: I would say yes but I'm not 100% sure
48 C: if you look at the first sentence of the letter that is the first page of exhibit no.3, do you see that?
49 Does it state that this is the final invoice?
50 L: it states that but I'm not sure

1 C: but ABB did not control the details of the lift of the generator?

2 L: not as far as the specific details are concerned. I did not need to know what kind of engine was

3 employed. To me it was more important to know what kind of crane was used and what outreach

4 the crane had

5 C: is it normal for ABB to send an engineer like Mr. Schneider to a lift?

6 L: for the first shipment always

7 C: did ABB send an engineer to the subsequent shipments of the generator?

8 L: after the accident took place we have always sent and engineer for the Monterrey plant

9 C: not only for the second generator but for all the pieces?

10 L: yes, for all the 6 pieces

11 C: what was the name of the engineer you sent?

12 L: one was Alfred Koller

13 C: does he still work with Alstom?

14 L: yes

15 C: does he work with you?

16 L: yes

17 C: do you know his phone number?

17 L: 205-3086, that's the number of the secretary in my department. Through the secretary, they will

19 put you through to Mr. Koller

20 C: Andreas Repholts, does he still work with you at Alstom

21 L: yes

22 C: how can I get in touch with him?

23 L: you can call the same phone number

24 C: did Andreas work in the same company you worked for, whatever it may be, since 1999?

25 L: yes

26 C: do you recall in the lawsuit brought by the Zamora family if there was criticism by the Zamora

27 family or others that there was no warning label on the generator?

28 L: yes

29 C: and the criticism was that there should have been a warning label explaining that the jacking

30 plates were connected to the generator by only two bolts, is that correct?

31 L: I don't think we needed to explain it this was...

32 C: I can make this easier, I think...was that criticism that there should have been a warning label on

33 the generator directed to ABB?

34 L: yes

35 C: you testified earlier with Mr. Williams that the typical contract gives you the right to interfere

36 L: yes

37 C: is that document that gives the ability to interfere in any of these documents that we looked at

38 today?

39 L: the type of contract that was signed is to be interpreted in this manner

40 C: interpreted? Does it mean that it's not stated in here? That it's understood?

41 L: it is understood

42 C: but not written

43 L: not specifically but it is understood

44 C: who was it to be understood by in this situation?

45 L: CH Robinson or any other company

46 C: who at CH Robinson?

47 L: JH, for sure

48 C: did you discuss this with him?

49 L: no but after signing this contract we supplied information to CH Robinson without changing the

50 price

51 C: do you think that supplying information to a transport company is interfering?

39

\*\*\*\*\*\*\*\*\*\*
1 C: did ABB tell CH Robinson what contractors to hire?
2 L: no
3 C: did CH Robinson have anything to do with regard to these 6 pieces before they arrived to Texas?
4 L: no
5 C: and they moved the pieces from Texas to Mexico, correct?
6 L: yes
7 C: through the sub-contractors they hired?
8 L: yes
9 C: did CH Robinson provide ABB with any other services under the contract outside Texas to
10 Mexico?
11 L: no
12 C: I'm talking about performance of the contract, not signing it.
13 L: no
14 C: who is the shipper?
15 L: ABB
16 C: who is the consignee
17 L: our customer
18 C: which is the power plant in Mexico, correct?
19 L: yes

20 W: let me hand you what is marked as exhibit no.10. Can you tell me what this is?
21 L: CH Robinson's instructions to Brownsville and Rio Grande International Railroad, Union Pacific
22 Railroad, in order to fill out the Rail Bill Of Lading
23 W: and from the Bill of Lading from Brownsville to Apodaca, on this portion of the trip, the
24 shipper is who?
25 L: CH Robinson
26 W: And there are both an intermediate consignee and a final consignee?
27 L: yes
28 W: the intermediate consignee is a broker service in Brownsville, correct?
29 L: yes
30 W: and who's the final consignee?
31 L: CH Robinson, Apodaca
32 W: the equipment, all these generators, transformers and turbines were any of them manufactured
33 by ABB Power or ABB Alstom Power?
34 L: the generators and the turbines by ABB Power Generation. The transformers by ABB Powertech
35 in South Africa
36 W: was this equipment actually purchased by someone else than ABB Power Generation Ltd?
37 L: no, it was manufactured within ABB
38 W: I'm not asking you if there was someone else different from ABB manufacturing them, were
39 they produced by ABB Kraft...?
40 L: the generators were manufactured by ABB Kraftwerke Aktiengesellschaft, Mannheim, Germany.
41 The gas turbines were manufactured in Richmond, Virginia, USA by ABB
42 W: and neither the company based in Richmond, Virginia, nor the company based in Mannheim,
43 had any contracts involving this matter with CH Robinson, correct?
44 L: no, we were the only ones

45 C: I wanted to look at exhibit no.1, the transportation bid qualification and looking at this line here:
46 charges related to excessive demurrage or detention as responsibility of shipper and/or consignee.
47 Who you understand to be the shipper?
48 L: ABB Power Generation