IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ABB KRAFTWERKE | § | |
| AKTIENGESELLSCHAFT, ET AL. | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | C.A. No. B-03-192 |
| | § | |
| C. H. ROBINSON COMPANY | § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER

BE IT REMEMBERED that on June 14, 2005, the Court considered Defendant's Motion for Summary Judgment, Plaintiff's Motion and Amended Motion for Rehearing on the Application of Swiss Law, and all other pending motions and the responses and replies thereto. The Court **GRANTS** Defendant's Motion for Summary Judgment [Dkt. No. 63]; and **DENIES** Plaintiff's Motion and Amended Motion for Rehearing on the Application of Swiss Law [Dkt. Nos. 62 & 74].

## I. Undisputed Factual and Procedural Background

Plaintiffs originally filed this lawsuit in the United States District Court for the Southern District of Texas, Galveston Division. Determining the case had no ties to the Galveston Division and substantial ties to the Brownsville Division, the Galveston Court *sua sponte* transferred the action to the Brownsville Division. As complete diversity of citizenship exists, this Court has federal diversity jurisdiction pursuant to 28 U.S.C. § 1332. This case arises out of a contract for the shipment of a turbine generator from Manheim, Germany through the Port of Brownsville, Texas, to Monterrey, Mexico. Plaintiff ABB Kraftwerke Aktiengesellscaft ("ABB") manufactured the generator and arranged for its shipment to the Port of Brownsville.

On February 16, 1999, ABB Power Generation Ltd. ("ABB")[1] contracted with Defendant Robinson to transport the generator and heavy components from the Port of Brownsville to Monterrey.  *See* Def's Motion for Summary Judgment, Ex. 1 (contract between ABB and Robinson, ¶ 3).  Robinson then contracted with Schaefer Stevedoring ("Schaefer") to provide stevedoring services at the Port of Brownsville, which included transferring the generator from a lash barge and loading it onto a railway car at the dock. *See* Pls' First Amended Cmplt. ¶ 10.[2]  Schaefer contracted with Brownsville Barge & Crane for the use of its "Atlantic Giant," a floating crane barge that was the only crane in the geographic area capable of lifting a generator of such large size.  *See* id, Ex. 13 (contract).

On or about March 23, 1999, the day of the lift of the generator, representatives from Robinson and ABB, Todd Strever and Roland Schneider respectively, were present at the Port when the accident occurred to answer questions concerning the lift and the generator.  *See id*., Ex. 2, pp. 20-21; Ex. 3, pp. 5-6 (Deposition testimony), Immediately prior to the lift, a representative of Brownsville Barge presented Robinson and ABB with an indemnity agreement covering any accident that might occur during the lift.  Brownsville Barge informed the parties that it would not use the Atlantic Giant to make the lift if the indemnity agreement was not signed.  Only ABB signed the indemnity agreement.  *See* Pls' First Amended Cmplt. ¶¶ 13, 14, 15, 16.  ABB has argued in its briefing that it felt pressure to ensure the lift went forward that day so that the generator would arrive in Monterrey on time.  This, ABB argues, caused it to sign the indemnity contract, despite Robinson's refusal to sign the agreement.

Unfortunately, during the lift of the generator, Oscar Zamora, Sr., a longshoreman at the Port working for Schaefer, was killed when a jacking plate fell from the generator while

---

[1]Although Robinson contracted only with ABB Power Generation, Ltd., and not with ABB Kraftwerke Aktiengesellscraft, for the purpose of this decision, the Court refers to the Plaintiffs collectively as "ABB."

[2]The contract between Robinson and Schaefer Stevedoring is not in evidence, but this contract is not in dispute in this case.

it was suspended by the crane over a railcar.  The jacking plate fell from the generator, resulting in Mr. Zamora's death.   Oscar Zamora's family filed suit in the 357th Judicial District Court of Cameron County, Texas, for wrongful death against ABB, Robinson, and Brownsville Barge.  *See Graciela Zamora, et al. v. ABB Kraftwerke Aktiengesellschaft, et al.*, cause no. 99-04-1644-E.  Robinson settled with Zamora's family for $1,000,000.00. *See* Def's Motion for Summary Judgment, Ex. 7 (Compromise, Settlement and Release Agreement).  The Zamora family voluntarily dismissed its claims against Brownsville Barge.  Brownsville Barge, however, filed a cross-claim against ABB in which it asserted "ABB owed it contractual indemnity for the legal fees it incurred in defending against the Zamora family's claims."  *ABB Kraftwerke Aktiengesellschaft v. Brownsville Barge & Crane, Inc.*, 115 S.W.3d 287, 290 (Tex. App. –Corpus Christi-Edinburg 2003, review denied).[3]  The Appellate Court affirmed the trial court's grant of summary judgment in favor of Brownsville Barge, holding the indemnity agreement clearly demonstrated Brownsville Barge's intent to shift its risk to ABB.  *Id.* at 292.  Furthermore, the court determined ABB "may have been constrain[ed]" in its decision to sign the indemnity contract in the face of Brownsville Barge's refusal to use the Atlantic Giant if the agreement was not signed, but there was no economic duress as "ABB could have refused to execute the indemnity agreement as Robinson chose to do."  *Id.* at 294.  The Court thus upheld the indemnity agreement between ABB and Brownsville Barge.

In June 2000, ABB and the Zamora family settled the substantive claims in the underlying state lawsuit.  *See* Def's Motion for Summary Judgment, Exs. 11 & 12 (Pls' Thirteenth and Fourteenth Am. Cmplts).  After they settled the substantive claims, the Zamora family amended its petition because the only remaining dispute in the case concerned ABB's payment of costs, which were included in the settlement agreement. *See id.*, Ex. 11.

---

[3]On November 30, 1999, ABB also filed a cross-claim against Robinson for contribution and indemnity.  In December, 1999, ABB agreed to non-suit these claims against Robinson in exchange for Robinson's agreement to participate in informal discovery, thereby assisting ABB in its defense of the Zamora lawsuit.  *See* Defendant's Motion for Summary Judgment, Ex. 10.

As the Court noted in its earlier order partially dismissing Plaintiffs' claims, although Plaintiffs identify only one cause of action in their Amended Complaint–breach of contract–it is clear ABB seeks indemnity from Robinson. Plaintiffs state, "C.H. Robinson breached its contract with ABB by failing to ensure that all contractual requirements were in place prior to the lift, resulting in ABB being forced to sign an indemnity agreement on the docks just prior to the lift." Pl's Cmplt. ¶ 30. "ABB seeks all monies paid on behalf of defending Brownsville Barge & Crane's Cross-claim, . . . and for all costs and expenses involved in the same as a result of C.H. Robinson's breach of contract." *Id.* ¶ 35. "ABB seeks all amounts paid in settlement and defense of the Zamora litigation as a result of C.H. Robinson's breach of contract." *Id.* ¶ 36. In addition to this indemnity claim, Plaintiffs maintain that Robinson also breached the contract because Robinson failed to perform the work in a "good and workmanlike manner," did not perform all services for which they contracted, failed to properly ensure that its sub-contractors were competent and familiar with the generator they were to lift from the lash barge to the railcar, failed "to exercise proper managerial skills and control over its sub-contractors, and failed to provide experienced personnel to supervise the lift." *Id.* ¶ 22-33.

## II. Plaintiffs' Motion for Rehearing on the Application of Swiss Law
### A. Parties' Arguments

Plaintiffs request that this Court reconsider its September 30, 2004, order on the conflict of law issue for two main reasons: (1) the Court wrongly applied the "most significant relationship" test by taking the Defendant's place of business into consideration, instead of considering only its principal place of business; and (2) facts unearthed during discovery warrant reconsideration. More specifically, Plaintiffs argue Robinson traveled to Switzerland twice to negotiate the contract, the most significant portion of the contract did not involve Texas, and the origination of the contract occurred in Mexico and not in Texas. *See* Pls' Motion and Amended Motions for Rehearing on the Application of Swiss Law [Dkt. Nos. 62 & 74]. Plaintiffs only request the Court to

4

reconsider its choice of law decision concerning the breach of contract claim.  Thus, the Court leaves undisturbed, without further analysis in this opinion, its decision to apply Texas law to Plaintiffs' indemnity claims.

Defendant argues in response that Plaintiffs have never produced substantive or adequate evidence that Swiss law conflicts with Texas law, nor have Plaintiffs alleged new facts or law justifying reconsideration of the Court's previous order.

### B.  Analysis of Choice of Law – Breach of Contract Claim

The Court will not reiterate the analysis stated in its September 30, 2004, order, nor will it restate the legal standards discussed at length in its earlier order.  Instead, the Court briefly addresses Plaintiffs' reconsideration arguments.

### 1.  Did the Court Wrongly Adopt a Factor Considered in the Significant Relationship Test?

It is undisputed that the contract between Robinson and ABB Power Generation, Ltd. does not contain a choice of law provision.  In the absence of a choice of law contract clause, the Texas Supreme Court has adopted the "most significant relationship" test from the *Restatement (Second) of Conflict of Laws* for contract disputes.  *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421, 431 (Tex. 1984) (revoking the *lex loci contractus* rule, which previously governed conflict of laws analysis in contract cases, and announced that "the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue.").  The Court looks to the quality of those contacts with the forum.  *Id.* at 421.  The contacts are evaluated within the general framework of principals laid out in section 6 of the *Restatement.  Id.* at 420-21 n.5.

Section 188 of the *Restatement* offers specific guidance for resolving which law applies to contract cases.  These factors include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation

and place of business of the parties.  *Restatement* § 188.  *See also DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678-79 (Tex. 1990), *cert. denied* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991) (adopting section 188 of the *Restatement*); *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 705 (5th Cir. 1999).  Additionally, the *Restatement* states the contacts are "to be evaluated according to their relative importance with respect to the particular issue."  *Restatement* § 188.

Plaintiffs take issue with the Court's analysis concerning the domicile, residence, nationality, place of incorporation and place of business of the parties.  It is undisputed that ABB Kraftwerke Aktiengesellschaft is organized under the laws of Germany.  Plaintiff ABB Alstrom Power is organized under the laws of Switzerland.  Defendant Robinson is incorporated in Delaware, and its domicile and principal place of business is in Minnesota.  At the time period relevant to this lawsuit, 1999, Robinson had nine offices in Texas, including its office in Keller, Texas.  *See* Def's Reply to Pls' Am. Response to Def's Motion for Summary Judgment, Ex. G, at pp. 5-7.

Plaintiffs now argue the Court should only have considered the parties' principal place of business and no other businesses in its choice of law analysis.  Simply put, the Court did not incorrectly consider the location of all of Robinson's offices, nor did the Court incorrectly apply the significant relationship test to its conflict of law analysis.

Even if the Court were required to consider only Robinson's principal place of business, and Plaintiff cites no case law dictating such an approach, the Court points out in its opinion that "Plaintiffs neglect[ed] to mention that the only document attached to their response, which [wa]s a Texas Franchise Tax Report, list[ed] Sugarland, Texas *as Robinson's principal place of business.*  Despite Plaintiffs' arguments otherwise, Robinson . . . presented evidence that it conducted business in Texas, and Plaintiffs' own submitted evidence negate[d] any argument that Robinson ha[d] no connection, or a tenuous connection, to Texas."  *Id.* at p. 10.  Of the named parties in this case, only one, ABB Alstrom, Ltd., has its principal place of business, domicile, or residency in Switzerland.  ABB Kraftwerke Aktiengesellschaft, the party with whom Robinson actually

contracted for the management of transportation of the generator in Texas and Mexico, is organized under the laws of Germany, and Robinson is incorporated in Delaware with its domicile and principal place of business in Minnesota.  In considering Robinson's places of business, including evidence of its principal place of business, the Court took all factors listed in section 188 of the Restatement into consideration, and did not consider only the location of the performance of the contract or the place of execution.  *See Restatement (Second) of Conflict of Laws* § 188(2)(e); *see also Duncan*, 665 S.W.2d at 431 (revoking the *lex loci contractus* rule, which previously governed conflict of laws analysis in contract cases, and announcing that "the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue.").   Additionally, the Court correctly looked to the quality of all the contacts with the forum.  *Id.* at 421.  Weighing these factors, the Court determined that Texas had a significant relationship to the contractual dispute, but it cautiously found that "both Texas and Switzerland constitut[ed] locales that should be considered" because the domicile, residence, nationality, place of incorporation, and place of business of the parties did not necessarily favor one locale over the other. *See* Sept. 30, 2004, Order, at p. 10 [Dkt. No. 45].

## 2.  Plaintiffs have not Adequately Demonstrated an Actual Conflict Between the Law of Switzerland and Texas Exists

Furthermore, the Court determined that because performance of the contract did not take place solely in one forum, and the parties disagreed as to how the Court should determine where performance of the contract took place, the Court discussed all the factors identified by the *Restatement* for analyzing the choice of law for a contract claim. Most importantly, in an effort to conduct a thorough review of the pending motions and arguments, the Court analyzed the contract under the substantial contacts test *and* assumed, without deciding the issue, that there was an actual conflict between Texas and Swiss law.  *See Schneider Nat'l Transport v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2003) (noting no choice-of-law analysis is necessary in the absence of an actual conflict of

laws); *Houston Casualty Co. v. Certain Underwriters at Lloyd's London*, 51 F. Supp. 2d 789, 799 (S.D. Tex. 1999).

Plaintiffs do not now on reconsideration, nor did they in their original motion for the application of Swiss law, adequately establish the threshold showing that an actual conflict of law exists between Texas and Swiss law.  Plaintiffs originally submitted the affidavit of David N. Huegin, a licensed Swiss attorney, in an attempt to demonstrate both that an actual conflict exists between the law in Texas and Switzerland and that Plaintiffs' contract claim would not be barred by the statue of limitations under Swiss law as it is under Texas law.  Although the Court granted Plaintiffs permission to file the affidavit, upon review of this affidavit, the Court gave it little weight.  The affidavit contained legal conclusions that were matters of law for this Court to decide.  Furthermore, the affiant did not provide full cites to the allegedly relevant Swiss law or copies of the relevant law with translations, and the affiant, legal counsel to ABB Switzerland Ltd., was not disinterested.  Thus, any assertions by Plaintiffs that Swiss law did not bar Plaintiffs' claims as untimely were legally conclusory and not reliable because Mr. Huegin had an interest in this case by virtue of his position as legal counsel to ABB.  *See* Fed. R. Civ. P. 44.1; *Haywin Textile Products, Inc. v. Int'l Finance Inv.*, 137 F. Supp. 2d 431, 435 (S.D.N.Y. 2001).

### 3.  Plaintiffs' Argument that Robinson Availed Itself of Swiss Law by Its Actions

Plaintiffs argue the Court should reconsider its earlier decision because Robinson traveled to Switzerland twice to negotiate the contract.  The Court has already adequately addressed the place of negotiating and contracting.  As previously noted, the parties agreed the contract was signed in Switzerland, and Plaintiffs indicated in their original motion that a representative of Robinson traveled to Switzerland for this purpose. In their first motion requesting the Court to apply Swiss law, Plaintiffs presented virtually no evidence addressing the negotiation of the contract. Instead, Plaintiffs referenced various documents relating to the management of the project, which they argued originated in Switzerland.  Conversely, Defendant presented two letter quotations.  These letter

8

quotations contained information about the transportation of the generator and the quotations constituted negotiations that preceded execution of the contract. Moreover, the quotations were incorporated by reference into the contract and originated from Robinson's office in Keller, Texas. The letter documents on Robinson's letterhead with its address in Keller, Texas were attached to Robinson's original response to Plaintiffs' motion for the application of Swiss law. *See* Def's Response, Ex. A1 [Dkt. No. 29]. Plaintiffs focused on the fact that ABB returned its acceptance of Robinson's proposal from Switzerland. But, as Robinson pointed out, the acceptance was faxed to Robinson's office in Texas. Based on the evidence and arguments presented, the Court determined the negotiations in this case predominantly took place through a series of correspondence originating in *both* Switzerland and Texas, as will commonly be the case in contract negotiations between companies operating in different countries. The fact that a representative traveled twice to Switzerland, instead of only once for the final negotiation and signing of the contract, does not cause the Court, when considering all the relevant Restatement factors, to reconsider its determination that Texas law should apply.

### 4.  Plaintiffs' Contention that the Most Significant Portion of the Contract Did Not Involve Texas

The Court previously noted that the parties, although not in disagreement per se, placed different emphasis on the location of the performance of the contract, and the importance of these locations. Indisputably, the subject matter of the contract was the management of transportation of heavy components, including the generator, in Texas and Mexico, but not in Switzerland. Plaintiffs agree that "without doubt" the place of performance included Texas. Now on reconsideration, Plaintiffs contend the most difficult part of the performance of the contract occurred in Mexico and involved the "skidding of the heavy equipment from railcars . . . and then the skidding of the equipment from the trailers to the pads at the site of the power plant." Pls' Amended Motion for Rehearing on the Application of Swiss Law, at p. 3.

The correspondence between the parties and the allegations in the complaint focus

more on the seemingly onerous task of transporting the generator from the lash barge to the railcar, via the Atlantic Giant, at the *Port of Brownsville in Texas*.  Plaintiffs cited Defendant's experience in making such lifts as a reason for entering into the contract with Robinson.  Additionally, the project entailed the securing of permits and rail passes, which would ultimately allow the railcar to cross from Texas into Mexico, and obtaining such permits for railroad and ground transportation from both the American and Mexican governments was also a crucial if not "the crucial" and most important part of the contract.  *See* Def's Response to Pls' Amended Motion, at p. 11 (Ex. G, at pp. 3, 21-22 (Deposition of Sandro Lepori)).  Although Plaintiffs present deposition testimony by Todd Strever, a non-technician, that the skidding process was more complicated than lifting the generator from the lash barge to the railcar, these actions do not constitute the entire performance of the contract, which included the securing of permits and passes, the leg work for which was conducted from Robinson's offices in Texas, to ensure successful transportation of the generator.  It is not clear to the Court that the unloading of the generator from the railcar in Mexico is more important than the lift from the barge to the railcar.  Without either service or task completed, Robinson would have certainly been in breach of its contract with ABB.  Plaintiffs have not presented the Court with new or additional evidence causing it to reconsider its determination that the performance of the contract was divided between Texas and Mexico, with the performance in Texas at least as important as the management of the transportation that occurred in Mexico.

## 5.  The Origination of the Contract Occurred in Mexico and Texas

Concisely, Plaintiffs argue the contract originated in Mexico because "the original meeting with C. H. Robinson occurred in Monterrey, Mexico."  Sandro Lepori testified in his deposition that he met one Robinson representative, James Hamilton, in Monterrey, Mexico in 1997 or 1998, between one and two years before the parties actually entered into the contract.  *See* Pls' Amended Motion for Application of Swiss Law, at p. 4 & Ex. A, p. 2.  Plaintiffs provide no evidence that the particular contract at issue in this case was discussed in Monterrey in 1997 or 1998, or that any negotiations actually took place at that

time.  Rather, Sandro Lepori simply testifies that he met a representative in Monterrey, Mexico.  James Hamilton testified in his deposition that he met Sandro Lepori while he was on a job for an unrelated company.  *See* Def's Response, at p. 14 & Ex. E, at pp. 15-16.  Although Lepori and Hamilton discussed general procedures and services Robinson could provide for ABB in the future, this testimony cannot fairly be characterized as indicating the contract now at issue originated, or was negotiated, in Mexico.

### 6.  Affidavit of David Huegin

Plaintiffs ask this Court to take judicial notice of the fact that Switzerland is a civil law country, and that David Huegin's affidavit has not been contradicted.  The Court declines to do either as these findings are unnecessary to the disposition of the motions pending before the Court.  The Court did not give great weight to David Huegin's affidavit, but despite Plaintiffs' failure to adequately demonstrate an actual conflict of law exists, the Court assumed one did and completed its choice of law analysis.  Thus, Plaintiffs' failure to sustain their burden of demonstrating an actual conflict exists did not affect the outcome of this case.  *See In re Avantel*, 343 F.3d 311, 322 (5th Cir. 2003).[4]

Although there are many instances in which both Texas and Switzerland are implicated in this choice of law analysis, the Court determines that based on the above factors, Texas law is favored over Swiss law.  The contract was executed in Switzerland, but no performance of the contract occurred in Switzerland; a large portion of the contract's performance occurred in Texas; negotiations occurred in both Texas and Switzerland; the

---

[4]In *In re Avantel*, a contract dispute, the movant requesting that Mexican law apply described a Mexican legal doctrine more protective than its counterpart in Texas.  The Court noted that "the entirety of [the movant's] proof that such a . . . doctrine exists in Mexico consisted only of a declaration by a Mexican attorney, . . . describing his interpretation of the [doctrine]. . . . Thus, the district court determined that the declaration provided no verifiable information from which to infer whether this doctrine is any more protective than" its counterpart under Texas law. 343 F.3d at 322.  Having failed to demonstrate an actual conflict existed between Mexican and Texas law, the district court applied Texas law, "citing the well-settled principle that 'when the parties have failed to conclusively establish foreign law, a court is entitled to look to its own forum's law.'" *Id.* (citing *Banco de Credito Indus., S.A. v. Tesoreria General*, 990 F.2d 827, 836 (5th Cir. 1993) (other citations omitted)).

subject matter of the contract involves the management of transportation of heavy components, including the generator, in Texas and Mexico, and the subject of the contract does not involve Switzerland; and the domicile, residence, and place of business of the parties includes Switzerland and Texas, but neither Robinson nor ABB Kraftwerke Aktiengesellschaft, the actual parties to the underlying contract, have their domicile, residence, or principal place of business in Switzerland. The Court concludes, as it did in its original order, that the relevant factors favor the application of Texas law.

### III.  Defendant's Motion for Summary Judgment

Defendant's Motion for Summary Judgment asserts a simple proposition: Plaintiffs' claim for indemnity cannot stand as a matter of law because it is undisputed that no indemnity contract exists and common law indemnity is not available to Plaintiffs. Plaintiffs argue Defendant was an agent of ABB, and as such, ABB should be able to shift its liability to Defendant.

### A.  Standard for Summary Judgment

Summary judgment shall be granted if the record, taken as a whole, "together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual controversies, if any exist, are resolved in favor of the nonmoving party. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). *See also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). The party making a summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery documents that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "[T]he burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*; *see also Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir.1999). Although the party moving for summary

12

judgment must "demonstrate the absence of a genuine issue of material fact," *Celotex Corp*., 477 U.S. at  323, the party "need not negate the elements of the nonmovant's case." *Little*, 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 323).

If the moving party meets this burden, the non-movant then must designate specific facts, beyond the pleadings, showing there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e).  *See also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986); *Little*, 37 F.3d at 1071 (citing *Celotex*, 477 U.S. at 325).  "Unsubstantiated assertions" or "mere allegations or denials" will not adequately cast doubt on material facts at issue.  *See id.* (citing *Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994); *see also* Fed. R. Civ. P. 56(e). Likewise, the nonmovant must present more than a mere "scintilla" of evidence.  *See Davis v. Chevron U.S.A., Inc*., 14 F.3d 1082, 1086 (5th Cir. 1994).  The evidence must be viewed in the light most favorable to the nonmovant.  *See Whelan v. Winchester Prod. Co*., 319 F.3d 225, 228 (5th Cir. 2003); *Walker v. Thompson*, 214 F.3d 615, 624 (5th Cir. 2000).  Summary judgment should be granted "when the nonmoving party fails to meet its burden to come forward with facts and law demonstrating a basis for recovery that would support a jury verdict."  *Little*, 37 F.3d at 1071.

## B.  Plaintiffs' Indemnity Claim

It is undisputed that ABB does not have a claim for contractual indemnity against Robinson because no such indemnity provision exists within or separate from the underlying contract to transport the generator from Germany to Mexico.  Plaintiffs claim they were liable to the Zamoras and Brownsville Barge in the underlying suit based on vicarious liability because at all times relevant to this suit, Robinson was acting as ABB's agent.  Because of this alleged agency relationship, Plaintiffs seek to recover indemnity from Robinson for all expenses incurred in their defense of the state claim brought by the Zamora family against ABB, including the amounts paid to settle the Zamora lawsuit, as well as all monies "that may be paid in any judgment obtained by Brownsville Barge."  Pls'

Amended Original Cmplt. ¶ 35.[5]  Furthermore, Plaintiffs explicitly seek damages in the form of a return of the amount "paid on behalf of defending Brownsville Barge & Crane's Cross-claim."  Pls' Original Cmplt. ¶ 34.

### 1.  Parties' Arguments

Defendant argues Plaintiffs have no basis under Texas law to support a claim for indemnity because ABB was sued for direct, not vicarious, liability, and there was no agency relationship between ABB and Robinson.  Plaintiffs respond to Defendant's arguments with the following statement:

> Robinson has cited the court to no case which holds an indemnity claim for the action or inaction of an agent is barred by the failure of the Plaintiff to sue the principle [sic] under theories of vicarious liability.  There is no such case.  The Zamora Plaintiffs naturally sued Robinson, a corporate Defendant with insurance coverage for their wrongful actions and made claims against ABB for the same reason.  All of the claims against ABB were the result of Robinson's failure to perform their contractual duties.  If a plan lift had been in place, if the sub were familiar with the equipment no accident occur [sic] and no potential liability against ABB.

Pl's Amended Response, at pp. 10-11.

> The basis of all the claims in the Zamora lawsuit was that Zamora removed a bolt from the generator allowing a jacking plate to fall and kill him because Robinson's subcontractors did not know the removed bolts were all that attached the jacking plate to the generator. . . There are limited cases on the subject but here there is no question that absent the breach of duty on behalf of Robinson acting as ABB's agent, ABB would have faced no liability.

*Id.* at pp. 11, 12.

### 2.  Legal Standard

---

[5]It is undisputed that ABB and Brownsville Barge entered into an indemnity agreement in which ABB agreed to indemnify Brownsville Barge for any loss it incurred during the lift of the generator at the Port of Brownsville.  Brownsville Barge sued ABB directly for contractual liability. ABB cannot now, as a matter of law, shift its direct contractual liability to Robinson.  *See generally* Def's Reply to Pls' Amended Response to Def's Summary Judgment, at p. 8 & Ex. F (*ABB Kraftwerke AG v. Brownsville Barge & Crane, Inc.*, 115 S.W.3d 287, 290 (Tex. App. –Corpus Christi 2003, pet. denied)).

Under Texas law, two categories of indemnity exist:[6] (1) common law indemnity, and (2) contractual indemnity.  Unlike contractual indemnity, common law indemnity in Texas is extremely circumscribed and only a "vestige" of its previous form remains.  *See Bonniwell v. Beech Aircraft*, 663 S.W.2d 816, 819 (Tex. 1984).  Thus, the general rule is that common law indemnity no longer exists in Texas.  *See, e.g., B & B Auto Supply Sand Pit & Trucking Co. v. Central Freight Lines, Inc.*, 603 S.W.2d 814, 816-17 (Tex. 1980); *Cypress Creek Utility Serv. Co. v. Muller*, 640 S.W.2d 860, 864 (Tex. 1982).  Typically, therefore, if a party desires indemnification for its negligence, it must contract for such protection.  *See Hardy v. Gulf Oil Corp. v. Bouygues Offshore U.S.A., Inc.*, 949 F.2d 826, 830 (5th Cir. 1992).

Only two exceptions apply to the abolishment of common law indemnity in Texas.  Common law indemnity survives in products liability actions to protect an innocent retailer.  *See Duncan*, 665 S.W.2d at 432.  Additionally, common law indemnity exists "in negligence actions to protect a defendant whose liability is purely vicarious in nature."  *Hardy*, 949 F.2d at 831 (citing *e.g., Bonniwell*, 663 S.W.2d at 819-20).

"Vicarious liability is liability placed upon one party for the conduct of another, based solely on the relationship between the two."  *Vecellio Ins. Agency, Inc. v. Vanguard Underwriters Ins. Co.*, 127 S.W.3d 134, 138 (Tex. App. –Houston [1st Dist.] 2003, no pet.) (citing *St. Anthony's Hosp. v. Whitfield*, 946 S.W.2d 174, 178 (Tex. App. –Amarillo 1997, writ denied)).  An employer or a principal is exposed to liability because of the employee's or agent's negligence, not because of negligence of its own.  *See id.* (citations omitted).  Thus, when one defendant's liability is based solely on this relationship, and not because of its own negligence, that defendant's liability is purely vicarious, and common law indemnity exists.  *See St. Anthony's Hosp.*, 946 S.W.2d at 178.  "For a right of indemnity

---

[6] Contribution "is recoverable when both tort-feasors are at fault because of their own independent acts, whereas indemnity is recoverable in situations where one tort-feasor is liable for the acts of another based purely on the relationship between the two."  *St. Anthony's Hosp. v. Whitfield*, 946 S.W.2d 174, 177 (Tex. App. –Amarillo 1997, writ denied).

based on vicarious liability to exist, the injured party must

have a cause of action against the indemnitor, that is, the one whose action caused the

indemnitee to be vicariously liable."  *Id.* (citing *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772

S.W.2d 442, 446 (Tex. 1989) (other citations omitted)).  "There is no indemnity against a

defendant who is not liable to the plaintiff."  *Id.* (citations omitted).

### 3.  Analysis

The petition in the Zamora lawsuit clearly brings a claim against ABB for its own

liability as "the manufacturer in the business of designing, manufacturing, and marketing

generators and compressors including, but not limited to, the one to which the jacking plate

in question was attached."  Def's Amended Motion for Summary Judgment, Ex. 11 (Pl's

Thirteenth Amended Cmplt, at p. 4).  Moreover, the Zamora plaintiffs directly allege that the

"products liability tort which produc[ed and] caused the injuries and damages complained

of includ[e] the conscious pain and suffering of the deceased Oscar Zamora, Sr. and the

injuries, damages and loss to his surviving family members . . . ."  *Id.*

Defendant presented the thirteenth and fourteenth amended complaints in the

Zamora lawsuit as evidence that ABB was sued for its direct liability and not sued under a

purely vicarious liability theory.  Plaintiffs in turn have presented no evidence they were

sued only for vicarious liability.[7]  Although ABB acknowledges that the allegations in the

underlying lawsuit were product liability claims based on a failure to warn theory, they

attribute all of their liability or potential liability to Robinson's alleged failure to have a lifting

plan in place and Robinson's alleged breach of the contract.  According to ABB, but for

Robinson's breach of the contract, the Zamora Plaintiffs would not have brought a failure to

warn claim against ABB.  Pls' Surreply to Def's Motion for Summary Judgment, at p. 3.

Thus, ABB asserts that "[a]s a result of Robinson's failure to perform under the contract,

ABB was sued, ABB became vicariously liable for Robinson's inactions, whether the

---

[7]The settlement agreement between ABB and the Zamoras is not in evidence, and thus
the Court cannot comment on the liabilities that were or were not assumed in this settlement.

Zamora Plaintiffs couched their complaint in that language or not." *Id.*

Defendant cites for support *Compton v. Texaco, Inc.*, for the proposition that ABB may only seek indemnity for liability that is purely vicarious and not direct. *See* 42 S.W.3d 354, 361 (Tex. App. –Houston [14th Dist.] 2001, pet. denied). Plaintiffs argue this case is inapposite because "the party seeking common law indemnity was held strictly liable under an environment statue that did not deal with fault." Pls' Amended Response to Def's Motion for Summary Judgment, at p. 11. As Defendant notes, Plaintiffs' argument involves a distinction without a difference. In *Compton*, the Texas Court of Appeals held that although Compton "styl[ed] himself as an 'innocent retailer'" because he believed he was "not a party 'with potential liability for something [he] did,'" he was not entitled to common law indemnity. *Compton*, 42 S.W.3d at 363. As an owner in the chain of title of contaminated land, Compton could be held strictly liable by statute for the contaminated property. *See id.* Compton settled claims for which he was potentially strictly liable, which does not entail a determination of actual fault. Nevertheless, Compton's settlement was for his constructive liability by virtue of his status as an owner of the contaminated land, and not for the fault of any other party. Stated differently, Compton's liability was not based on another's wrongful conduct imputed to him, but rather on his own liability based on the relevant environmental law. The Court of Appeals held,"[t]he liability for which Compton seeks indemnity is direct liability based on ownership of the [land]. It is not liability in which Compton or his assignors are held vicariously liable for the conduct of Texaco . . . . The Supreme Court has stated that non-contractual, common law indemnity is only available to a person held vicariously liable and to an innocent product retailer." *Id.* (citing *Bonniwell*, 663 S.W.2d at 819-20). The Court concluded that it could not create a new category of common law indemnity, and as a result, Compton's common law indemnity claim failed as a matter of law.

ABB's arguments misconstrue vicarious liability. Although ABB is partially correct that in order to qualify for common law indemnity, it must establish a principal/agent relationship, even the existence of this kind of relationship will not allow ABB to shift its

liability to Robinson if ABB is liable for its own wrongdoing. "The vicarious liability of an employer for torts committed by employees should not be confused with the liability an employer has for his own torts. An employer whose employee commits a tort may be liable in his own right . . . ." *Black's Law Dictionary* 934 (8th ed. 2004).

Moreover, ABB's indemnity argument relates more to common law contribution between joint tort-feasors than it does to indemnification. *See Beech Aircraft Corp. v. Jenkins*, 698 S.W.2d at 725; *see also St. Anthony's Hosp.*, 946 S.W.2d at 179 (discussing the distinction between indemnity and contribution). "[W]here both defendants [are] allegedly negligent[, they are] therefore liable for contribution rather than indemnity." *Id.* In Texas, contribution between joint tort-feasors is controlled by statue. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.015 (Vernon Supp. 1997); *Singleton v. N.Y. Underwriters Ins. Co.*, 739 F.2d 198, 200 (5th Cir. 1984). One main purpose of a comparative fault system, such as that established in Texas, is to apportion damages among defendants liable under differing tort theories. *See, e.g.,* Tex. Civ. Prac. & Rem. Code Ann. § 33.015 (Vernon Supp. 1997); *B & B Auto Supply*, 603 S.W.2d at 817 (abolishing common law indemnity and quoting Dean Keeton's commentary: "where defendants are liable on differing tort theories, present indemnity rules between negligent tort-feasors should be abrogated in favor of an apportionment of damages based on quantification of fault . . .").

Regardless of how ABB wishes to categorize the Zamora lawsuit, the complaint in the underlying case alleged that both ABB's own negligence as well as Robinson's negligence *caused* Zamora's injuries and death. Furthermore, the complaint demonstrates the Zamoras did not bring a claim against ABB based on ABB's relationship with Robinson, nor did the Zamoras base their suit against ABB on Robinson's wrongdoing by alleging that ABB's liability was purely vicarious.

ABB presents no *evidence*, and merely argues, that it is entirely without fault and that it was held liable, or potentially liable, *only* because of its vicarious relationship with Robinson. Instead, Plaintiffs present a defense theory relating to causation–that is, ABB's alleged failure to warn was not the proximate cause of Zamora's injuries; Robinson's

negligence was the legal cause,  Although ABB's defense theory is that Robinson's negligence exclusively caused the accident, Defendant presents evidence to the contrary. For example, Arteaga, an AMFELS employee who was a witness to the accident, testifies in his deposition that he "fe[lt] . . . this accident would not have happened if in the topside of the motor . . . they would have put a warning that these bolts were not fastened on the unit." *See* Defs' Reply to Pls' Amended Response, at p. 7 & nn.3, 5, Ex. C (Deposition of Alfredo Arteaga, Mar. 13, 2000, at pp. 9-10, 13); ; *see also id.*, Ex. B (Deposition of Roland Schneider, Apr. 7, 2000, at pp. 5, 24-26 (stating the accident might not have happened if Schneider, once he realized the nuts on the jacking plate had been loosened, had insisted the nuts be put back on, or if he realized the nuts had been taken off, he had insisted they not be removed).

Additionally, Defendant presents *unrefuted* evidence that ABB manufactured, designed, and marketed the generator and jacking plate attached to the generator at issue.  *See* Def's Reply to Pls' Amended Response, at p. 6 & n.2 & Ex. B (Deposition of Roland Schneider, April 7, 2000, at pp. 5, 29-30); Parties' Joint Pretrial Order, at p. 12, ¶ 6(4) (stating this as an uncontested fact).  Defendant also presents deposition testimony revealing that no decals, warnings, or instructions concerning the jacking plate were in place at the time of the Zamora accident.  *See id.* at p. 7 & n.3 & Ex. B (Deposition of Roland Schneider, Apr. 7, 2000, at p. 20, 29-33); *id.* at Ex. D (Deposition of Jose Cruz Garcia, Mar. 13, 2000, at pp. 11, 14, 21-22 (Garcia, an AMFELS employee witness to the accident testified there were no instructions, decals, or warnings, and only two bolts held the jacking plate in place)).  In light of this evidence, Plaintiffs have not demonstrated Robinson was *solely* at fault and that ABB's liability was *purely* based on Robinson's negligence.

In making its determination that Plaintiffs cannot sustain a common law indemnity claim, this Court considered all the evidence filed in this case, which most pertinently includes the petition filed in the Zamora lawsuit, to determine the nature of Zamora's allegations against ABB.  *See, e.g., St. Anthony's Hosp.*, 946 S.W.2d at 178 (discussing

it was clear from the record that no negligence was alleged against the hospital, and rather the *cause of action* was for vicarious liability).  It is not unusual for the Court to consider the complaints in a case such as this.  For example, in *Haring v. Bay Rock Corp*., the Court took several factors into consideration when determining whether the Plaintiff was entitled to common law indemnity.  773 S.W.2d 676, 679 (Tex. App.–San Antonio, 1989).  The Court stated,

> [Plaintiff's] argument that his liability in the suit . . . was *purely* vicarious is without support in the record.  First, there was no pleading of vicarious responsibility against [the Plaintiff] . . . . Second, the jury did find [Plaintiff] to be independently negligent, which finding formed the basis of the judgment against [the Plaintiff].  Third, the judgment could not have been based upon a vicarious liability theory . . . because there was no finding of negligence against [the Defendant], an essential element of such a theory.

*Id.* (citation omitted).

    In this case, the Court is faced with a record that includes the petition in the state lawsuit filed against ABB, which portrays direct fault theories, and is not based on vicarious liability theories.[8]  The settlement agreement between the Zamoras and Robinson, which Defendant presented as evidence, does not admit fault or liability, and explicitly states that "no payments made, nor releases or other consideration given shall be construed to be nor are they an admission of liability, all liability being expressly denied."  Def's Amended Motion for Summary Judgment, Ex. 7, ¶ 2.  Defendant thus produced both the amended petition in the Zamora lawsuit and its own settlement agreement, which admits no liability.  In light of this evidence, to avoid summary judgment, ABB must present countervailing evidence that its liability, or potential liability, in the Zamora lawsuit was purely vicarious.  In fact, were ABB's indemnity claim to go to a jury, the jury would first

---

    [8]To be clear, this Court is not suggesting that the Zamora petition alone precludes ABB from now seeking indemnity based on vicarious liability or would have precluded the Zamoras from seeking vicarious liability against ABB had the case gone to trial.  But, the absence of countervailing evidence leads the Court to the only viable conclusion–Plaintiffs cannot support a claim for common law indemnity against Defendant when their potential liability, had they not settled, was based on a direct theory of liability.

need to find that Robinson was solely liable for Zamora's injuries–an untenable claim because it is undisputed that Robinson only transported the generator, and the Zamoras brought a negligent design claim against ABB.  "[A] principal has no right to indemnity until after there has been a judicial determination that the agent is liable to the injured party."  *St. Anthony's Hosp.*, 946 S.W.2d at 178 (citing *Plas-Tex, Inc.* 772 S.W.2d at 446).  Thus, for ABB to receive indemnification from Robinson on a theory of vicarious liability, Robinson's alleged negligence must first be submitted to the jury.  *See Vecellio Ins. Agency, Inc. v. Vanguard Underwriters Ins. Co.*, 127 S.W.3d at 140 (holding the jury charge in common law indemnity claim should include first a predicate question establishing the agent or employee committed a tort and then a question establishing the principal or employer was vicariously liable for the other's tort under the theory of respondeat superior).

Finally, and as a side issue, the Court finds ABB's argument that its common law indemnity claim is based, at least in part, on Robinson's breach of the contract, problematic.  ABB alleges Robinson failed to perform its obligations under the contract, and failed to use reasonable care and diligence in performing its obligations, which caused Zamora's injuries and necessitated ABB's settlement with the Zamoras.  *See* Pl's Reply to Def's Response to Motion for Leave to File Surreply, at p. 4; Pl's Amended Response to Def's Motion for Summary Judgment, at p. 12.  The fact that Robinson allegedly breached its contract with ABB is not a proper basis for determining ABB's indemnity claim.  In *Transworld Drilling v. Lingston Shipbuilding*, 693 S.W.2d 19, 22 (Tex. App.–Beaumont 1985, no writ), the Court held that the owner of an offshore drilling rig did not breach a warranty of good workmanlike construction because this warranty referred to the quality of work and not an incidence of negligence where a crane serviceman was injured when a large piece of machinery was being lowered onto the rig.  Similarly, any alleged breach of the contract on Robinson's part cannot be transformed into an implied contract of indemnity for negligent injuries to third parties.  *See, e.g., Haring*, 773 S.W.2d at 679-80; *Exxon Corp. v. Roberts*, 724 S.W.2d 863 (Tex. App. –Texarkana 1986, writ ref'd n.r.e.) (rejecting Exxon's argument that it was entitled to indemnity because the

alleged indemnitee had breached its warranty to "'perform its work in a good and workmanlike manner.'").

In short, and based on the record before the Court, ABB paid to settle claims for its own potential direct liability. Moreover, ABB failed to demonstrate how the Zamora's theories of liability against ABB, under any circumstance, could demonstrate ABB was purely vicariously liable. ABB's independent culpability, or potential culpability, destroys ABB's indemnity claim. *See Jackson v. Freightliner Corp.*, 938 F.2d 40, 42-43 (5th Cir. 1991) (holding no indemnity where alleged indemnitor was not liable for all the damages paid by the alleged indemnitee). Indeed, to allow ABB to shift its own direct liability to Robinson, even if a principal/agent relationship existed, would enable ABB to be unjustly enriched when in fact Texas has abolished general common law indemnity to avoid such unjust fault shifting between joint tort-feasors. ABB could have easily avoided its liability by including an indemnity provision in its contract agreement with Robinson. ABB should not now be allowed to circumvent both the general bar against common law indemnity claims, or artificially impose an implied contractual indemnity on Robinson.[9] Regardless of any alleged breach of contract, ABB is not entitled to be indemnified for a settlement it entered into based on theories of its own fault. *See UMC, Inc. v. Coonrod Elec. Co., Inc.*, 667 S.W.2d 549, 559 (Tex. App.–Corpus Christi 1983, writ ref'd n.r.e.). ABB has presented no evidence to the Court supporting a contrary conclusion.[10]

## C.  Summary Judgment on Plaintiffs' Breach of Contract Claim

Plaintiff has conceded that only if the Court reconsiders its earlier decision in which it held Texas's statue of limitations bars Plaintiffs' breach of contract claim and applies

---

[9]In this case, ABB's indemnity claim, to the extent it is based on Robinson's alleged breaches of contract, enables ABB to circumvent the statute of limitation, which bars its breach of contract claim.

[10]Because the Court has determined that ABB presented no evidence to refute Robinson's evidence that ABB did not settle claims for vicarious liability, ABB's claim for common law indemnity must fail. For this reason, the Court need not discuss the putative principal/agent relationship between ABB and Robinson.

Swiss law to the present case can its breach of contract claim survive a motion for summary judgment. *See* Pls' Amended Response, at p. 13; *see also* Joint Pre-Trial Order, at p. 29, ¶ 8(a)(2-3) (conceding that if Texas law applies, ABB's claim for breach of contract is barred by the statute of limitations). As discussed, the Court will not reconsider its choice of law decision, and Plaintiffs' claim for breach of contract is barred by the statute of limitations. *See* September 30, 2004, Order [Dkt. No. 45].

## IV. Plaintiffs' Motion for Leave to Amend Plaintiffs' Second Amended Original Complaint

Plaintiffs seek leave to file a second amended complaint to add the Zurich Insurance Company as a real party in interest pursuant to the terms of a liability insurance policy, which allegedly covered the defense and indemnity payments in the Zamora lawsuit. *See* Plaintiffs' Motion, at p. 1 [Dkt. No. 81]. Defendant has no objection to Plaintiffs' identification of their insurance carrier as the real party in interest. *See* Def's Response to Plaintiffs' Motion, at p. 1 [Dkt. No. 90]. To the extent, therefore, that Plaintiffs seek to amend their original complaint to add the Zurich Insurance Company as the real party in interest, the Court **GRANTS** this motion.

Defendant, however, objects to Plaintiffs' "addition of new factual allegations that Plaintiffs have not previously disclosed, and to any attempt to allege a new cause of action for unjust enrichment." *Id.* at pp. 1-2. Plaintiffs have not filed a reply to Defendant's response.

Federal Rule of Civil Procedure 15(a) states, "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served. . . . Otherwise, a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Fifth Circuit, based on the Supreme Court's guidance, uses five factors to determine whether a district court should grant leave to amend the complaint: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by

previous amendments; (4) undue prejudice to the opposing party; and (5) futility of the amendment.  *See Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2002) (citations omitted).

The Court presumes Plaintiffs do not intend to bring a separate claim for unjust enrichment against Defendant, as Plaintiffs have included only one reference to Robinson's alleged unjust enrichment under the heading of damages and not as a separate cause of action.  *See* Pls' Second Amended Original Cmplt. ¶ 50.  Moreover, as Defendant points out, a new cause of action for unjust enrichment has a statute of limitations period of two years, and as such the claim would not be timely filed in this case.  *See Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 410 (5th Cir. 2004) (citing Tex. Civ. Prac. & Rem. Code § 16.003(a); *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 885 (Tex. 1998); *Wagner & Brown, Ltd. v. Horwood*, 59 S.W.3d 732, 737 (Tex. 2001)).  Because Plaintiffs' claim for unjust enrichment, if one is actually pled, would be barred by the statute of limitations, any amendment at this late date–approximately one week prior to the scheduled final pretrial conference and 10 weeks after the close of discovery– would be futile.  Thus, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Leave to Amend Plaintiffs' Second Amended Original Complaint [Dkt. No. 81].

If Plaintiffs intended to amend their complaint to add a separate unjust enrichment claim, the Court grants them leave to seek reconsideration of this portion of the order within 10 days.  If Plaintiffs choose to contest the Court's denial of their motion for leave to amend the complaint, they *must* provide the Court with detailed argument as to why the Court should exercise its discretion and allow them to amend at this late date, which should include argument as to why the claim is not time barred under the statute of limitations.

## V.  Defendant's Rule 17(a) Objection and Motion to Dismiss

Defendant based its motion to dismiss on Plaintiffs' failure to amend their complaint to identify the real party in interest.  *See* Def's Motion to Dismiss [Dkt. No. 64].  After

24

Defendant filed its Motion to Dismiss, it also filed a reply to Plaintiffs' response in which it indicated it is unopposed to allowing Plaintiffs until April 29, 2005, to identify the real part[ies] in interest to this suit.  *See* Def's Reply, at p. 1 [Dkt. No. 75].  Plaintiffs filed their amended complaint on April 29, 2005.  The Court, therefore, **DENIES AS MOOT** Defendant's Motion to Dismiss [Dkt. No. 64].

## VI.  Plaintiffs' Motion to Strike Defendant's Two Year Statute of Limitations Motion for Summary Judgment

Although Robinson pled the two-year statue of limitations as an affirmative defense, it did not raise the issue in its motion for summary judgment, and instead raised it in its "Response to Plaintiffs' Motion for Leave to File Surreply to Defendant's Reply to Plaintiffs' Amended Response to Motion for Summary Judgment" [Dkt. No. 92].  Robinson argued in its response that it only recently located case law holding that the limitations period for a claim of common law indemnity is two years.  *See* Def's Response, at p. 2 & n.1 [Dkt. No. 92].  Prior to filing this response, on May 11, 2005, Defendant filed a trial brief concerning the limitations on Plaintiffs' claim for common law indemnity.

The Court begins by noting that Plaintiffs' Trial Brief on Limitations Regarding Common Law Indemnity does not correctly cite any of the three cases it principally relies on for the proposition that common law indemnity claims are governed by a four year statue of limitations.  Plaintiffs argue it is well established that an indemnity claim is governed by the four year statute of limitations, but they misconstrue the cases they cite. *Littlefield v. Scott*, 244 S.W. 824, 826 (Tex. Civ. App. –Beaumont 1922, writ ref'd) held "plaintiff's cause of action accrued . . . based on the *written contract of indemnity*" within four years, and a four year statute of limitations would apply to a written indemnity contract, but plaintiff's cause of action "*was not* based on the implied obligation. . . [and the] implied obligation would be barred in two years."  *Powell v. Brantly Helicopter Corp.*, 396 F.Supp. 646, 652 (E.D.Tex. 1975) held that the subrogation claim was barred by the two year statute of limitations.  *Producing Properties, Inc. v. Sohio Petroleum Co.*, 428 S.W.2d

365, (Tex. Civ. App. –Dallas 1968) held a four year statute of limitations applied to a *written* indemnity provision. Finally, *Hondo Oil and Gas Co. v. Texas Crude Operator, Inc.*, 970 F.2d 1433, 1440 (5th Cir. 1992) held a four year statute of limitations applied to a breach of contract claim involving written operating agreements.

Defendant cites to *Advent Trust Co. v. Hyder*, 12 S.W.3d 534, 543 (Tex. App. –San Antonio 1999, pet. denied) for the proposition that a two year statute of limitations applies to common law indemnity claims, and that such a claim accrues when the underlying litigation is settled or a judgment is rendered.

The quickest of searches on Westlaw produced several cases indicating a two year statute of limitations applies to common law indemnity claims. The fruits of this search included the cases cited above. The Court, then, can only assume that Defendant's failure to argue the statute of limitations bar to Plaintiffs' indemnity claim in its original motion for summary judgment was an oversight. Regardless, the Court disposed of Plaintiffs' common law indemnity claim on the merits, and does not, therefore, make a finding on the statute of limitations bar to Plaintiffs' indemnity claim. A cursory review of the case law, however, seemingly indicates a two year statute of limitations would apply to Plaintiffs' claim.

## VII.  Conclusion

The Court **GRANTS** Plaintiffs' Enlargement of Time to File Exhibits to Motion to Reconsider Application of Swiss Law [Dkt. No. 61]; **DENIES** Plaintiffs' Motion for Rehearing on the Application of Swiss Law [Dkt. No. 62]; **GRANTS** Defendant's Amended Motion for Summary Judgment [Dkt. No 63]; **DENIES AS MOOT** Defendant's Rule 17(a) Objection and Motion to Dismiss [Dkt. No. 64]; **GRANTS** Plaintiff's Motion for Enlargement of Time to File Deposition Excerpts [Dkt. No. 68]; **GRANTS** Plaintiffs' Motion to File Amended Response to Defendant's Motion for Summary Judgment [Dkt. No. 70]; **GRANTS** Plaintiffs' Motion to File Amended Motion for Rehearing on the Application of Swiss Law [Dkt. No. 73]; **DENIES** Plaintiffs' Amended Motion for Rehearing on the Application of Swiss Law [Dkt. No. 74]; **GRANTS IN PART AND DENIES IN PART**

Plaintiffs' Motion for Leave to Amend Plaintiffs' Second Amended Original Complaint [Dkt. No. 81]; **GRANTS** Plaintiff's Motion for Leave to File Surreply to Defendant's Reply to Plaintiffs' Amended Response to Motion for Summary Judgment [Dkt. No. 83]; **DENIES AS MOOT** Defendant's Motion to Strike Plaintiffs' First Supplemental Rule 26(a) Initial Disclosures [Dkt. No. 93]; **DENIES AS MOOT** Plaintiffs' Motion for Limited Continuance [Dkt. No. 96]; and **DENIES AS MOOT** Plaintiffs' Motion to Strike Defendant's Two Year Statute of Limitations Motion For Summary Judgment [Dkt. No. 97].

DONE this 14th day of June 2005, at Brownsville, Texas.


Hilda G. Tagle
United States District Judge

27